**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**

--------------------------------------------------- x

PERNOD RICARD USA, LLC                           :

      Plaintiff,                                :

    v.                                            :    Civil Action No. 06-505-SLR

BACARDI U.S.A., INC.,                            :

      Defendant.                              :

--------------------------------------------------- x

**DECLARATION OF WILLIAM Z. NAKHLEH
IN SUPPORT OF PERNOD RICARD USA, LLC'S
OPPOSITION TO BACARDI U.S.A., INC.'S MOTION TO TRANSFER VENUE
TO THE SOUTHERN DISTRICT OF FLORIDA**

1.      I am a member of the bars of the Commonwealth of Virginia and the District of

Columbia. I am an associate of the law firm Ropes & Gray LLP located at 700 12th Street,

N.W., Washington, D.C. 20005.

2.      Attached as Exhibit 1 is a true and correct copy of a print out of a web page from

the site http://www.hoovers.com/bacardi-u.s.a.,-inc./--ID_40051--/free-co-factsheet.xhtml, as it

existed on October 2, 2006. The overview states that Bacardi U.S.A., Inc. is the U.S. import,

sales, and marketing arm of Bacardi Limited, one of the world's leading wine and spirits

producers.

3.      Attached as Exhibit 2 is a true and correct copy of an annual report of Bacardi

Limited of Hamilton, Bermuda, published on June 6, 2006.

4.      Attached as Exhibit 3 is a true and correct copy of an article that appeared in the August 8, 2006 edition of *The Wall Street Journal*.

5.      Attached as Exhibit 4 is a true and correct copy of an article that appeared on the MSN Money website on August 8, 2006.

6.      Attached as Exhibit 5 is a true and correct copy of an article that appeared on the FT.com website on August 9, 2006.

7.      Attached as Exhibit 6 is a true and correct copy of the Answer, Affirmative Defenses and Counterclaims To First Amended Complaint that was filed on October 17, 1997 in *Havana Club Holding, S.A. et al.* v. *Galleon, S.A., Bacardi-Martini, U.S.A., Inc. et al.*, 96 Civ-9655 (SAS) (S.D.N.Y. 1996).

8.      Attached as Exhibit 7 is a true and correct copy of the Complaint that was filed on March 29, 2004 in *Bacardi & Company Limited et al.* v. *Empresa Cubana Exportadora de Alimentos Y Productos Varios et al.*, Civ. 1:04-CV-00519 (EGS) (D.D.C. 2004).

9.      Attached as Exhibit 8 is a true and correct copy of this Court's decision in *Paige Innovations Inc.* v. *General Cable Industrial, Inc.*, C.A. No. 94-676-SLR, dated Dec. 6, 1994.

10.      Attached as Exhibit 9 is a true and correct copy of this Court's decision in *Allied Signal Inc.* v. *Hoechst Celanese Corp.*, C.A. No. 97-508-SLR, dated June 8, 1998.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed this _6th_ day of October, 2006.

_____
William Z. Nakhleh

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2006 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to William J. Wade.

I further certify that I caused copies of the foregoing document to be served on October 6, 2006 upon the following in the manner indicated:

**BY HAND**

William J. Wade
Anne Shea Gaza
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801

**BY FEDERAL EPXRESS**

Eugene D. Gulland
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC  20004

William R. Golden, Jr.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY  10178

   _/s/   Jack B. Blumenfeld (#1014)_
Jack B. Blumenfeld (#1014)
jblumenfeld@mnat.com

# Exhibit 1

Case 1:06-cv-00530-SLR    Document 1-2    Filed 00/00/2006



**Intelligence. Insight. Results. Learn More Or Subscribe Now:**
**(866) 464-3202**

# Bacardi U.S.A., Inc.

2100 Biscayne Blvd.                 Phone: 305-573-8511
Miami, FL 33137-5028 (Map)          Fax: 305-573-7507
http://www.bacardi.com

Hoover's coverage by Linnea Anderson

## Overview

Bacardi U.S.A. is truly a story of liquid assets -- in more than one way. The company is the US import, sales, and marketing arm of Bacardi Limited, one of the world's leading wine and spirits producers. Bacardi U.S.A. markets Bacardi rums (the #1 rum in the world) and Martini & Rossi wines and spirits, including vermouth. It also sells other liquid assets such as Dewar's Scotch whisky, Bombay gins, DiSaronno Amaretto, and Grey Goose vodka. Its Hatuey beer is popular among Cuban-Americans. The company changed its name from Bacardi-Martini U.S.A. to Bacardi U.S.A. in 1999.

### **Sample Overview**

## Key Numbers

Key financials for Bacardi U.S.A., Inc.

| Company Type | Subsidiary of Bacardi |
|---|---|
| Fiscal Year-End | March |

**TIP:** Want to stay abreast of the latest in IPO news? **Sign up for Hoover's IPO Update newsletter** and start receiving exclusive Hoover's content delivered straight to your inbox. Each newsletter is delivered weekly to help you stay ahead of the competition.

## Key People

Key people and executives for Bacardi U.S.A., Inc.

Case 1:06-cv-00505-SLR    Document 19-2    Filed 10/06/2006    Page 3 of 4

| President and CEO | John P. Esposito |
| --- | --- |
| | (Subscribers see complete biographies -- <u>view sample</u>) |
| EVP, Sales | William G. (Bill) Anderson |
| VP, Information Technology | Doug Watson |

**Sample more Key People**

**TIP:** Use **Build Executive List** to target decision makers by industry, geography, **sales**, net income, and number of employees.

## Significant Developments

View company events at Bacardi U.S.A., Inc. such as IPOs, bankruptcies, or executive changes

| Event | Details |
| --- | --- |
| Top Executive Change | Subscribers get full details -- <u>view a sample</u> |

**More Significant Developments**

## Top Competitors

Top competitors of Bacardi U.S.A., Inc.

<u>Allied Domecq</u>

<u>Diageo</u>

<u>Pernod Ricard</u>

**There are 11 competitors for Bacardi USA; see more.**

**TIP:** Analyze the **Competitive Landscape** to view a head-to-head comparison of a firm's **profitability**, operations, growth, and valuation versus that of its top three competitors.

## Industry Information

Primary and secondary industries for Bacardi U.S.A., Inc.

Beverages
**Bottling & Distribution** (primary)

**TIP:** See what companies are creating the biggest impact each week with Hoover's Hottest Companies newsletter. **Sign up now** and start receiving exclusive Hoover's content delivered straight to your inbox. Each newsletter is delivered weekly to help you stay ahead of the competition.


# Industry Watch

Industry analysis videos for the industries of Bacardi U.S.A., Inc.

D.A. Davidson Senior Research Analyst Tim Ramey (2:51)
08/03/06 10:55ET - Ramey comments on how increased temperatures could effect California's wine country.

**View more industry interviews**

Privacy Policy | Copyright © 2006, Hoover's, Inc., All Rights Reserved

# Exhibit 2



BACARDI LIMITED

3-31-06
AA/S

82-4992

RECEIVED

2006 JUN -6 P 1:54

CORPORATE FINANCE







**BACARDI LIMITED**

FACUNDO L. BACARDI
CHAIRMAN OF THE BOARD

RECEIVED
2006 JUN -6 P 1:06
OFFICE OF INTERNATIONAL
CORPORATE FINANCE

RECEIVED
JUN 0 1 2006
OFFICE OF THE SECRETARY

May 3, 2006

Dear Shareholder:

I am pleased to inform you that at a meeting held on May 3, 2006, the Board of Directors voted to set the annual dividend on Bacardi Limited common shares at $11.92. Accordingly, the Board declared the dividends payable for the remainder of the fiscal year as follows:

| Record Date | Payable Date | Rate |
|---|---|---|
| April 15, 2006 | May 15, 2006 | $2.98 |
| July 15, 2006 | August 15, 2006 | $2.98 |
| October 15, 2006 | November 15, 2006 | $2.98 |
| January 15, 2007 | February 15, 2007 | $2.98 |

This year's dividend represents a 65% increase from last year's annual dividend.

In years past we have normally declared an interim dividend for May. Beginning this year we have made it our policy to smooth out the quarterly dividend payments by making four equal payments in an amount equaling the declared annual dividend.

Yours sincerely,

Facundo L. Bacardi
Chairman of the Board

# MARK OF DISTINCTION

The lineage of Bacardi Limited can be traced to 1830, when our founder, Don Facundo Bacardí Massó, left his native Spain for the shores of the colonial port city of Santiago de Cuba. Upon his arrival there, 175 years ago, he worked hard to prove his credentials as a merchant. Then, in 1862, he established the original Bacardi company and simultaneously launched one of the world's great international premium brands, BACARDI.

Bacardi Limited, a global company operating in more than 100 countries, is represented by the Bat Device. The Bat Device, once a symbol of good health, fortune, and family unity, today stands for a vibrant and energetic company of more than 6,000 dedicated employees – employees who in their different capacities shape and mold the development of our premium and super premium brands: BACARDI rum, MARTINI vermouth, DEWAR'S Scotch whisky, BOMBAY SAPPHIRE gin, GREY GOOSE vodka and CAZADORES Blue Agave tequila.

The Company enhanced its reputation of quality and elegance through construction of the three magnificent buildings showcased in this report: the Edificio Bacardi de la Habana, La Galarza Distillery in Mexico and in Bermuda, the Company's headquarters. The Edificio Bacardi de la Habana is a masterpiece of art deco construction that was completed 75 years ago and has been hailed as "...one of the most important examples of art deco ever constructed". The building, crowned with a giant bat on its highest finial, also contained an executive bar where the Company first engaged in experience marketing, through bartenders, to influence the taste of large numbers of American tourists.

La Galarza Distillery in Mexico, established 50 years ago, is the oldest operated BACARDI rum facility in existence. It was here where the yeast isolated by Don Facundo Bacardí Massó from the surrounding sugar cane fields in Santiago was first used outside Cuba to ferment molasses into alcohol. The alcohol was later distilled, filtered, aged and, through the skilled hands of the Master Blender and under the watchful eye of the Bat Device, blended into a masterpiece that can only be called BACARDI rum.

From artistry in architecture to craftsmanship in rum making, the Company has never remained idle in its pursuit of premium character. This year, to celebrate the Company's 40th anniversary in Bermuda, we have embarked on an ambitious effort to transform the Company's headquarters to reflect the elegance that once used to adorn the original building. Our Bermuda building has been upgraded, much like the Company's portfolio, in a modern, classical and premium way.

The Bat Device, like the BACARDI brand it first signified, is a mark of distinction, whose spirit and soul is now allied to a portfolio of international premium brands. The Device is a unifying force, through which all our companies, brands and individuals are united under a single banner of distinction.

BACARDI: "El Ron del Murcielago"

*The nymph holding a wine amphora is a relief by Maxfield Parrish (1870-1966) from the Edificio Bacardi de la Habana in Cuba.*



"Our Company is proud of the work that went into achieving our record operating performance for 2006. Our record sales and net earnings are the result of what we believe is the leading operating model in the spirits industry."



# REPORT OF THE CHAIRMAN OF THE BOARD AND THE PRESIDENT AND CHIEF EXECUTIVE OFFICER

*Dear Shareholder:*

We are pleased to report that Bacardi Limited had another successful year. Our Company is proud of the work that went into achieving our record operating performance for 2006. Our record sales and net earnings are the result of what we believe is the leading operating model in the spirits industry. Our strategy of focusing on our premium portfolio of brands has resulted in Earnings from Operations increasing by 31% to $873 million. This result combined with prudent financial management has resulted in a Net Earnings increase of 50% to a record $658 million. We are pleased to inform you that the Board of Directors increased the annual dividend rate payable on Bacardi Limited common shares from $7.24 to $11.92 per share, an increase of 65%. This results in a two-year annualized growth of 35%.



**DIVIDENDS PER SHARE**
CAGR 35%

| | 2005 | 2006 | 2007 |
|---|---|---|---|
| | $6.56 | $7.24 | $11.92 |

Although the dynamics of the spirits industry and the marketplace are more challenging than ever, we are adapting to meet these challenges. Through leadership, teamwork, commitment, and a significant emphasis on a performance-based culture, we are extending our core business, expanding into new markets, and capitalizing on new

opportunities to achieve our overarching goal of sustainable long-term shareholder value creation. Currently we are working to improve revenue growth, particularly in the mature markets of Europe, and are investing for the future in the emerging markets of Russia, India, China and Brazil.

Sales volumes of our core brands were strong compared to last year. The BACARDI rum volume increase was led by BACARDI Carta Blanca, which had a strong performance in the key markets of the United States and Mexico. BACARDI Flavored rum volume reached 2.2 million cases as the expansion into new markets continues. GREY GOOSE vodka comfortably surpassed its budgeted volume and original expectations and was successfully introduced in eighty markets around the world. GREY GOOSE vodka achieved the distinction of being the fastest brand in the United States spirits market to reach over 2 million cases since its original launch date. DEWAR'S Scotch whisky total volume was down 2% and in line with the broader decrease in the whisky category. While the decline is most notable in the mature markets of the United States and Spain, the brand grew strongly in two of its leading markets, Venezuela and the Dominican Republic, and DEWAR'S 12 Year Old continues to achieve strong growth. BOMBAY SAPPHIRE gin grew by 5%, a terrific result following the devastating fire at the bottling plant in October that temporarily disrupted supply in the latter part of the year. MARTINI vermouth volume was down 2%, despite continued strong performance in Russia and central Europe. During the latter part of the year we developed a new global advertising and promotion campaign for the MARTINI brand, including the MARTINI Formula One racing sponsorship, to rejuvenate the

## SUMMARY OF FINANCIAL PERFORMANCE
*(Expressed in Thousands of U.S. Dollars)*

| | Fiscal Year 2006 | Fiscal Year 2005 | Fiscal Year 2004 |
|---|---|---|---|
| Sales less excise taxes | 3,600,364 | 3,551,430 | 3,189,982 |
| Gross Profit | 2,360,999 | 2,166,343 | 1,868,116 |
| Selling, General and Administrative Expenses | 1,487,937 | 1,498,754 | 1,302,930 |
| Earnings from Operations | 873,062 | 667,589 | 565,186 |
| Other Expenses | 214,732 | 229,244 | 213,920 |
| Net Earnings | 658,330 | 438,345 | 351,266 |

**SALES VOLUME OF CORE BRANDS BY YEAR**
*(Thousands of 9 litre cases)*



| | |
|---|---|
| Fiscal 2006 | 41,914 |
| Fiscal 2005 | 40,542 |
| Fiscal 2004 | 38,172 |

15,000   25,000   35,000   45,000

brand. CAZADORES tequila achieved an overall increase of 7% in volume and took full advantage of a cost reduction in tequila's key ingredient, agave, to enhance profitability. As stated in our strategic vision for the Company, our focus is on our core premium brands. Since the Ready-to-Drink sector is no longer a strategic priority, it is being managed to maximize profits thus resulting in reduced earnings volatility in the overall portfolio.

Setting and achieving challenging financial and operating goals, however, is not the only way we measure our success. Within the organization, we implemented a number of changes to our operating structure and approach in the areas of Human Resources, Operations, Marketing and Travel Retail, in order to better meet our business and strategic goals. Our objective is to build a global Human Resources function, which will enable us to expand and further develop our global talent. In the area of Global Operations, we have combined all the manufacturing and supply chain activities into one unit, optimizing our procurement strategy, setting clearer quality standards, and improving the asset utilization of our distilleries and bottling plants around the world. We have also made an important change in the global Marketing function by centralizing the production of major campaigns and marketing programs, thereby enabling us to present a global image of our core brands. This year we formed a stand-alone business for Global Travel Retail in recognition of its role as the premier shop-window for the development of our premium and super-premium brands.

In the area of corporate governance, we are working towards improving the reporting of financial information, the implementation of a global code of conduct, and the expansion of corporate oversight in all areas of the business. While we are pleased with the quality and depth of our Board, we continuously review matters of Board composition

and structure so that we can align our Board's experience and individual perspective to meet the challenges of our industry. With the untimely passing of one of our long-serving directors, Sergio Danguillecourt, and the retirement of our former CEO and Chairman, Ruben Rodriguez, we are putting forth two candidates for the Board with extensive and diverse international experience in the consumer products field with internationally recognized publicly held companies.

One area that is particularly reflective of our image is Social Responsibility. Our commitment to responsible advertising, marketing and use of our products continues to be a fundamental part of our business. The Company is positioned to assume a leading role in this area within the alcoholic beverage industry.

Looking ahead, we expect to build on the strong momentum in our results. Further augmenting our performance in the coming years is our commitment to seize any interesting opportunities that may arise within the spirits industry as well as our expectation that our investments in innovation will have a significant impact on our business. Despite some short-term challenges, we are confident that the strategic changes we have made will further accelerate the growth of long-term value creation.

Finally, we would like to give special recognition to our worldwide employees. Despite the number of organizational changes and the challenges that we face in our industry, the personal commitment and dedication of our employees enabled us to execute our plan and deliver our record results. We thank them, along with our shareholders, for their continued support.

**Facundo L. Bacardi**
*Chairman of the Board*

**Andreas Gembler**
*President and Chief Executive Officer*







The foyer area of the *Edificio Bacardí de la Habana* in Cuba built in 1930. On the back wall is a plaque dedicated by Enrique Schueg Chassin in 1930 to his brother-in-law Emilio Bacardí Moreau.

# EDIFICIO BACARDI DE LA HABANA



The Edificio Bacardi de la Habana first opened its doors in 1930, at a cost of more than U.S. $1.4 million. Last year, we celebrated the 75th anniversary of the building's completion. Constructed under the direction of the fourth Chairman of the Company, Enrique Schueg, the Edificio Bacardi has been hailed as the very best example of art deco ever built.

*The front view of the Edificio Bacardi de la Habana in Cuba.*

Its design was the result of a closed competition between the most important Cuban architects of the time; the project was awarded to architects Esteban Rodríguez Castells, Rafael Fernández Ruenes, and José Ménendez. While the original project featured façades with Renaissance details, what happened next underlines both the desire for modernity and the importance of international influences.

After the contest, the architects traveled to Paris, where they were astounded by the new architecture they found there. After returning to Havana, they completely changed the ornamentation of the building, while retaining its original scale. Using terra cotta ornamentation on the façade and creating an opulent splendor for the interior, which has its own exhibition hall and mezzanine bar decorated with gilded palm trees, they crowned the edifice with a giant bat on its highest finial. At the Company bar, celebrities such as Errol Flynn, Bob Hope, Bing Crosby, Dorothy Lamour, Bill Bendix, champion boxer Kid Chocolate and members of Spain's Royal Family, as well as large numbers of tourists, enjoyed legendary cocktails such as the BACARDI Daiquirí, BACARDI COCKTAIL, BACARDI Mojito and BACARDI & COKE®, "The Original Cuba Libre".

While the Company no longer operates in the building, the expertise of preparing cocktails has been exported throughout the world. It is this knowledge, combined with the premium brands of Bacardi Limited, that enables bartenders to become the Company's foremost ambassadors.



Nude relief by American artist Maxfield Parrish (1870-1966) adorns the façade of the *Edificio Bacardi de la Habana*.





From the lobby area of the *Edificio Bacardi de la Habana*, the mezzanine level containing the famous Bacardi bar can be seen. At the bar tourists in large numbers enjoyed BACARDI rum.

Built in 1696, the chapel at *La Galarza Distillery* has been witness to the site's history for more than 300 years.

# LA GALARZA DISTILLERY



Front view of the executive house at *La Galarza Distillery*. As in rural parts of England, Belgium and France bats were placed above doorways to ward off misfortune.

The preparation of cocktails begins with the manufacture of BACARDI rum. La Galarza Distillery is the oldest Bacardi distillery in operation. It is located in the small town of Izúcar de Matamoros in Mexico's sugar producing Artecingo Valley, below the serene and mighty peak of the Popocatepetl volcano. Erected half a century ago, La Galarza was the first wholly-owned Bacardi facility constructed outside of Cuba and represents the culmination of the international Company vision of Emilio Bacardi and Enrique Schueg, and the production skills of Facundo Bacardí Massó.

our visitors are in the 21st century, and a few steps further on they are surrounded by a row of graceful colonial arches. Later, they might stand in the semi-tropical paradise where flocks of white geese float on an old millstream, and dusk welcomes bats from their day's slumber. Complete with a bat cave below a waterwheel that has turned for centuries,



Vaulted ceiling at the executive house at *La Galarza Distillery*. Below these arches and ceilings is a theatre as well as the executive boardroom.



Side view of the executive house at *La Galarza Distillery*.

Built on the site of a colonial hacienda dating from the 17th century, for the price of one million pesos, by architect Félix Candela, La Galarza Distillery derives its name from an old colonial family named Galarza, who once owned a sugar mill and hacienda on the site.

For half a century, La Galarza Distillery has been one of the showplaces of industrial Mexico. Photographs give little idea of the true flavor of La Galarza. At one moment

La Galarza is a place where the smell of molasses fills the air and envelops your senses amid several of the original buildings that date back to 1693.

As a producer that ages its products for up to 12 years, then blends these products using methods more than a century and a half old, the Bacardi company understands and appreciates age in a way other companies might not. After aging the product, the different rums are blended to create the many expressions of BACARDI – served neat, on the rocks, or mixed by bartenders with other ingredients to create a range of popular cocktails. The Bacardi Master Blender best understands the unique smoothness and unparalleled mixability of BACARDI rum.



# BRAND REVIEW

*Since its early beginnings and starting with the Mojito, BACARDI rum has been mixed to create legendary cocktails in the form of the BACARDI Daiquiri, BACARDI Cuba Libre and BACARDI Piña Colada. Today, the Company boasts an impressive portfolio of premium and super premium brands in the form of MARTINI vermouth, DEWAR'S Scotch whisky, BOMBAY SAPPHIRE gin, GREY GOOSE vodka and CAZADORES Blue Agave tequila that are mixed by bartenders the world over into cocktails that bring enjoyment to legal drinking age consumers.*



## BACARDI Rum

BACARDI rum put in a solid performance for Fiscal 2006 with positive growth in both volume and direct brand contribution.

Brand growth was achieved by: shifting the marketing mix towards stronger experiential marketing, implementing more innovative on-premise events, and strengthening the brand's premium position through increased pricing and quality.

## Performance Drivers

The United States delivered a volume growth rate for BACARDI rum that outpaced that of total distilled spirits, and was achieved despite price increases ahead of inflation by 3.6% .

The United States is a highly attractive market with dramatically improving demographics and positive consumer attitudes towards innovation. A return to economic growth has also assisted premium brands in the distilled spirits industry. And the rum category is one of the fastest growing segments, second only to the vodka category.

BACARDI Carta Blanca continued to capitalize on the success of its marketing initiatives and specifically the opportunity provided by expanded access to broadcast TV media in the United States. Our advertising campaign has provided significant sales volume uplift at levels not seen in many years.

Expanded access to broadcast TV media also provides exposure for our "Drink Responsibly" TV campaign, an initiative that has been a part of the marketing strategy in the United States for a number of years. We continue to place a high priority on promoting responsible and above legal age consumption in all marketing, advertising and

promotional activities, and this is particularly important with the approximately 80 million-strong "Echo Boom" generation reaching the legal drinking age from 1997 to 2015. Approximately 18% of the total TV media spend for BACARDI rum is placed on dedicated responsibility commercials in the United States. Print executions and all point of sale materials also include a "Drink Responsibly", "Must be 21" or "Designate a Driver" message.

We leveraged the growth of the flavored rum segment in the United States, which now accounts for over one-third of the total rum volume. The strategic intent is to grow trademark volume by promoting non-traditional rum usage. BACARDI BIG APPLE is now the Number Two flavor behind BACARDI LIMÓN.

In Mexico, results were also positive as we maintained strategic focus on reaffirming the Number One position of BACARDI Carta Blanca. The third phase of the successful "Movimiento" campaign was launched during the year, providing an excellent communication platform across all marketing efforts. Repositioning initiatives for BACARDI Añejo, communicatiing its naturalness and sociability, drove excellent volume results. BACARDI Solera has begun to respond to marketing programs initiated last year as reflected in performance ahead of last year after several years of decline. Importantly, the brand enjoys the highest image in the category and for almost 20 years it has been positioned as a "Celebration" brand. Recent initiatives focus on expanding celebration moments to increase consumption occasions.

BACARDI rum continued to grow in many other markets. In Canada, BACARDI Gold has shown retail volume growth in a category that is trending toward gold rums. BACARDI





rum performed strongly in the extremely price-driven German market despite a significant price increase just prior to the start of the fiscal year. A further increase in the white spirits market in Belgium has offered opportunities for BACARDI Carta Blanca, while our share in the dark rum segment is rapidly increasing due to the excellent performance of BACARDI Reserva. Market share of BACARDI rum in the Netherlands continues to grow and has reached an all time high, with improved performance of BACARDI Carta Blanca and growth in the flavored rums segment due to the successful launches of BACARDI CÔCO and BACARDI RAZZ.

BACARDI Carta Blanca growth momentum continued in India supported by a promotional plan centered on BACARDI & Cola. Concentrated investment and prioritized focus on brand building in Eastern and Central Europe have been very successful in Hungary, Poland, the Baltics, and especially in Russia, where BACARDI rum sales have grown significantly in the past year. In Spain, the boom of international dark rums and the development of white rum private labels in the off-premise market continued to impact white rum consumption and specifically challenged sales of BACARDI Carta Blanca. However, BACARDI LIMÓN continues to grow, expanding distribution into new areas strengthening the image of the BACARDI trademark.

BACARDI rum continues to develop exciting alternate ways to deliver the unique BACARDI image and taste experiences to consumers directly, shifting strategic focus from traditional promotions events to leveraged experiential events. Around the world, experiential marketing campaigns played a greater role in brand communication and in building affinity with our consumers.

### Initiatives for Future Growth

During Fiscal 2006, major projects were initiated in support of BACARDI Carta Blanca to further enhance the brand's consumer appeal and premium brand image, and to communicate a globally consistent message of "free-spiritedness." For the first time ever, a global agency for BACARDI Carta Blanca has been appointed.

A global promotional platform called BACARDI B-LIVE was initiated, bringing together the various music-related events under one umbrella. Through BACARDI B-LIVE we can provide consistent messaging with higher levels of efficiency and we will be in a better position to take advantage of global programs such as international sponsorships.

These initiatives will drive a new series of programs, from new packaging design and point of sale materials to new advertising, new media, and new approaches to the BACARDI experience that will position the brand for further growth in the future.

### MARTINI Vermouth

In Fiscal 2006, we continued to make further progress in the long-term brand health and image rejuvenation of MARTINI, and ended the year on a high note of expectation with new directional initiatives to instigate a full brand reinvention.

### Performance Drivers

Fiscal 2006 has been a challenging but exciting year for MARTINI vermouth. While MARTINI holds an unquestionable category leadership position, the brand continues to face the challenges of a mature category and changing apéritif consumption, and intense competition from private labels and low-priced brands. In this context, MARTINI vermouth has been reshaping its marketing mix to ensure a successful long-term growth strategy.

Finding ways to further develop the brand and the category away from traditional apéritif moments and ways of consumption has been a priority especially in Western Europe, where MARTINI vermouth derives a high proportion of sales and where brand performance has been particularly pressured. In Spain, the new Mini MARTINI format exceeded expectations, supported by the "Mini MARTINI" TV campaign,





and the test launch of the new MARTINI cooling system shows significant additional consumption potential. Both initiatives build new usage occasions and revitalize the product experience. France has been successful in redeveloping the brand in the on-premise with a strong merchandising plan called 'Aperitissimo', aimed at rediscovery of the brand and its taste, style, and 'gioia di vivere', supported by a team of dedicated salesmen. MARTINI vermouth experienced a turnaround of performance in the Netherlands, supported by the successful "Coccatiel" advertising and "MARTINI Mansion" interactive internet platform, and in Germany, thanks to the uniquely successful George Clooney campaign. The "Slam" execution of the George Clooney campaign was awarded the "Edgar Award", the most important consumer award in Germany for advertising. Marketing activities in Italy were focused on quality across the entire mix with an innovative program of experiential marketing.

Sales volume growth continued in Eastern Europe, especially in Russia where the brand has gained a very positive momentum driven by strong, broad scale advertising and promotional campaigns accompanied by tasting programs. MARTINI vermouth has an excellent brand image with a need to retain dynamism and relevance for its now sizeable share of mid-market consumers.

An exciting sponsorship was announced in the last quarter of the fiscal year, receiving extensive press coverage in January and February. The MARTINI brand has returned as a sponsor of Formula One racing in 2006, signing a multi-year deal as an official partner of SCUDERIA FERRARI, one of the most successful teams in the history of the FIA Formula One World Championship. The Formula One sponsorship marks a revival of the brand's more than 40-year association with motor sports, following a hiatus in recent years. This sponsorship provides an opportunity for high profile advertising and an opportunity to communicate a message of responsible drinking, urging consumers not to drink and



drive. All activities, collateral, and point of sales material associated with this sponsorship will actively communicate and promote the core message "Please Be Responsible: Don't Drink and Drive."

## Major Initiatives

During the past year, the MARTINI brand image has been further enhanced through new advertising and through new product and product experiences.

Campaigns and promotions have an exciting new tone. The new global advertising campaign "Mondo MARTINI" was launched, aimed at creating a more dynamic and less austere brand image. A unique MARTINI sponsored TV program called MARTINI World Circuit has been created to be broadcast in many countries worldwide. Starting in March 2006, the program will leverage the Formula One sponsorship, regaining visibility among consumers. MARTINI vermouth extended its cooperation with brand partners DOLCE & GABBANA® to create a new in-store on-premise environment and merchandising opportunities.

Product innovation contributed to building new usage opportunities and attracting new consumers. The Mini MARTINI format has been well received both for at-home consumption as well as at fashionable on-premise locations. The test launch of the unique MARTINI cooling machine dispensing system has had positive results in enhancing product experience in the on-premise market.

## DEWAR'S Scotch Whisky

The strategy for the DEWAR'S Scotch whisky brand portfolio has been to expand into more premium labels under the "House of DEWAR'S" banner, while continuing to drive for market share growth on DEWAR'S WHITE LABEL.

## Performance Drivers

In a very challenging market globally for Standard Scotch whisky, we leveraged our strong brand position in core





# BOMBAY SAPPHIRE

markets. Through a strong pricing program at the retail level, we protected our market share in the United States, while offsetting the challenges in the Standard Scotch segment by accomplishing growth in the Deluxe segment with DEWAR'S 12 Year Old. In Spain, we maintained premium price position and market share in a category that saw volumes under significant pressure. We benefited from a recovery in Latin America to sustain volume and value.

In Venezuela, Premium Standard Scotch was the fastest growing segment. DEWAR'S WHITE LABEL managed to substantially strengthen brand image while maintaining premium pricing and growing market share. In the Dominican Republic, DEWAR'S WHITE LABEL continued to be the undisputed leader in its market segment and is showing strong signs of volume recovery. In Greece, DEWAR'S WHITE LABEL successfully defended its market share in the Standard Scotch category as a result of ongoing rejuvenation programs.

DEWAR'S 12 Year Old continued to expand successfully in a wide variety of markets. Numerous "DEWAR'S Masterclass" educational presentations were undertaken in Scotland, the United States, the Middle East and Latin America to promote the development of a consistent global franchise. We are poised to take full advantage of the growth trend in the Premium Scotch category to accelerate DEWAR'S 12 Year Old globally, and especially in Asia, as a key part of the strategy to globalize the "House of DEWAR'S".

## Major Initiatives

New packaging for DEWAR'S WHITE LABEL and for DEWAR'S 12 Year Old was launched in the last few months to further enhance the premium quality of the brand. Advertising for DEWAR'S WHITE LABEL saw the development of new executions in Spain and Greece to revitalize the brand. In Greece, a new TV and print campaign was launched as part of rejuvenation program that included intense on-premise activities and experiential marketing initiatives connected to music and cinema. Marketing activity has been focused on building share in traditionally weak regional areas.

The highly popular "Premios Caracter WHITE LABEL" awards promotion was run again in Spain, and exceeded the successful results of last year. In the United States, the dedicated promotional team called "Company 12" continued to lead the sampling and visibility of DEWAR'S 12 Year Old across a wide range of events.

Both DEWAR'S WHITE LABEL and DEWAR'S 12 Year Old received a number of prestigious quality awards from leading industry institutions. The brands were both awarded the Gold Medal from Monde Selection, the oldest and most representative organization in the field of Quality Selections worldwide. At the San Francisco World Spirits Competition and at the International Wine and Spirits Competition, the brands were both awarded Silver Medals.

## BOMBAY Gin

BOMBAY SAPPHIRE gin continued to enjoy healthy consumer growth, increasing volume and market share year-on-year.

## Performance Drivers

BOMBAY SAPPHIRE is widely accepted by consumers and the trade as the premium gin standard, supported by a globally consistent focus on product quality and brand education.

The United States remains the primary driver of volume and direct contribution for BOMBAY SAPPHIRE. New promotional efforts have been introduced to expand usage beyond martini cocktail consumption. BOMBAY SAPPHIRE continued to sponsor high profile activities throughout the United States at exclusive store openings, museum exhibits, movie premiers, and lounge events. On-premise distribution drives were scheduled to match competitor levels. In Spain, both BOMBAY gin and BOMBAY SAPPHIRE enjoyed consistent volume growth and distribution gains.



# GREY GOOSE
## World's Best Tasting Vodka

**Major Initiatives**

Expansion this year of the Global Brand Ambassador program has ensured that the understanding of the brand's intrinsic values has been increased via conducted brand training sessions, press coverage on TV, radio and print, book signings, tastings and other events.

The brand's thematic link to design has been carried throughout the marketing mix and nowhere more so than in the Travel Retail sector. Global Travel Retail provides a platform to increase the premium image and awareness of BOMBAY SAPPHIRE and to seed local developing and emerging markets. Our Travel Retail programs have been very successful and have been awarded the three most prestigious travel retail marketing awards. Frontier Awards honored the brand with "Best Marketing Campaign of the Year" and "Best Partnership Initiative of the Year" for its partnership with VIRGIN AIRLINES®. VIRGIN AIRLINES® featured BOMBAY SAPPHIRE in all of their first class lounges and included mixologists onboard select plane routes. Duty Free News International awarded the brand "Best Spirits Marketing Campaign."

BOMBAY SAPPHIRE has the advantage of a globally consistent look and feel with premium luxury materials and experiences at all consumer touch points. From the new "Jewel Range" global point of sales designer collection and the global advertising campaign "BOMBAY SAPPHIRE Inspired" to all events communicating the brand's association with design, consumers experience the high quality credentials of BOMBAY SAPPHIRE.

Future opportunities are opening up within developing and emerging markets that continue to grow aggressively at a double-digit rate.

## GREY GOOSE Vodka

This marks the first full fiscal year that Bacardi Limited includes GREY GOOSE vodka in its portfolio of premium brands, and strong volume and direct contribution growth have placed the brand well ahead of acquisition expectations.

## Performance Drivers

The International vodka category has grown significantly over the last five years, and is now the leading spirits category in terms of growth in the Americas, Europe, and Asia, led by the premium and super-premium variants. Growth is attributed to the strong economic performance of the United States and to recent changes in consumer lifestyle and demographics. This has resulted in a consumer trend toward clear spirits with a mixability appeal and the resurgence of the cocktail culture. With GREY GOOSE vodka in our portfolio of premium brands, we are well positioned to capitalize on these positive global trends.

In the United States, GREY GOOSE enjoys strong consumer demand fueled by consistent communication of the "World's Best Tasting Vodka" platform in brand message, position, and image. The new "Cocktails" print campaign and the new "Bartender" TV campaign, both including dedicated "Drink Responsibly" messaging, firmly establish a GREY GOOSE tone of voice which is confident, assertive and in keeping with its brand leader status. The new advertising has been leveraged such that all aspects of the marketing mix are elevated in quality, including sales promotion materials and event execution. This year, GREY GOOSE sponsored Retief Goosen, the two-time US Open Golf Champion, nicknamed "The Goose." On the promotions side, through participation in innovative quality marketing programs spanning high-end charity events, such as the Entertainment Industry Foundation, and sporting events, such the NISSAN Open PGA Tour golf event, ISAF Team Racing World Championship international yacht race, and the BREEDERS CUP World Thoroughbred championships, GREY GOOSE continued to enhance its super-premium image and to sustain growth momentum.

The brand's success and acceptance outside of the United States continues to be equally as impressive, now





# TEQUILA CAZADORES® REPOSADO

being available in more than 80 countries, when at the time of acquisition it was available in 20 countries. Volume from markets outside of the United States has doubled since acquisition. Most markets outside of the United States have exceeded target volume for the year.

GREY GOOSE continued its impressive growth in Canada, taking leadership in the Canadian super-premium vodka segment. Brand performance has been driven by an on-premise strategy of targeting the top martini cocktail bars, nightclubs, and white tablecloth restaurants across Canada, and participating in special events that reinforce "Synonymous with the Best" brand positioning. Against a backdrop of "Consumed by the Best People, in the Best Places", GREY GOOSE sponsored key special events across Canada, including the Sub-Zero Ice Bar in Montreal, and the ESTÉE LAUDER/Elizabeth Hurley Charity Event in Toronto.

Significant distribution and volume gains were made for GREY GOOSE in Mexico and Puerto Rico following last year's launch, positioning the brand as category leader. The brand continues to enjoy favorable image and appeal in Japan. In the United Kingdom, GREY GOOSE achieved increased distribution in top-end outlets and presence in a number of carefully selected high-profile events linked with charity, art, and fashion.

Growth in international markets has been steady as new markets are added to the distribution network. Across Continental Europe, GREY GOOSE has been selectively introduced in prestigious locations, generating a very positive response, especially in France, Germany and Austria. The geographic expansion of GREY GOOSE presents a long-term volume and value growth opportunity that is a top priority. The Travel Retail market is a key component of global growth, providing a luxury environment to build brand image and awareness in important markets worldwide. Given the importance of Travel Retail to super-premium brands, we continue to provide significant consumer investment to build upon the growth in this area.

In order to sustain long-term growth and development

in core markets and developing or emerging markets, it is critical that GREY GOOSE remains consistent and focused in all aspects of the communication of brand image and product credentials. A number of initiatives were undertaken this year to ensure consistency of brand messaging. Education and training materials have been developed and used in the Global Brand Ambassador program and a 'Maitre de Chai' tastings program to fully explain and explore the brand's intrinsic value. The first-ever Global Brand Conference for GREY GOOSE was held in Cognac with more than 40 markets attending. The refurbishment project of the GREY GOOSE Press Center at our production facility in Cognac has begun. The GREY GOOSE Press Center, to be opened next year, will be integral to hosting and training the press and the trade.

GREY GOOSE vodka is the fastest ever spirit to reach 2 million cases in the United States, the world's largest vodka market - an amazing achievement for a super-premium brand. This augurs well for the brand's future global expansion.

## CAZADORES Tequila

Tequila remains an exciting and dynamic category, and one in which CAZADORES tequila continues to do well, with strong volume and direct contribution growth.

### Performance Drivers

While the category is concentrated in the Americas, there remains a good opportunity for the category globally and we continue to work on the optimum way to explore all avenues of growth.

In the United States, we are concentrating on building the brand in its core markets and unlocking the general market franchise. New packaging has been developed which will help us do this. Additionally, the "Las Chicas CAZADORES" experiential marketing program, an authentic, interactive, and educational program unique in the industry,

is aimed at fueling the brand's cross-over efforts.

In Mexico the brand remains healthy. One of our key initiatives is to expand the portfolio of high quality brands, and this year CAZADORES Añejo was launched for the Mexican and U.S. markets. Much of our brand investment was focused on experiential marketing, TV and outdoor campaigns and consumer promotions evolving the CAZADORES image to a more urban one and bringing more value to consumers to reinforce the quality image.

We are also implementing a convergence program with U.S. and Mexican marketing materials to ensure that we build consistency across the well-connected markets that will benefit us in the medium term both in the Americas and internationally.

All told, the brand is healthy and well placed for the future.

## MARTINI Sparkling Wines

The MARTINI sparkling wines range achieved volume growth. Asti MARTINI is the key brand in the range, and continues to lead the Asti category. Growth of Asti MARTINI was driven by the stellar performance of the brand in Russia, the United States, Austria and Canada.

In the United States, Asti MARTINI remained the Number One imported sparkling wine and continued to outperform key competitors in terms of growth. The focus is to extend its Number One imported brand position via marketing initiatives that drive new usage occasions, outside of the traditional celebration and holiday season. The brand dominates the Asti segment with over 60% market share.

The remarkable performance in Russia was driven by the strength of the MARTINI brand and by focused sales activity. There remains considerable potential in this market as consumer interest in imported sparkling wines continues to grow. MARTINI Prosecco was introduced in Canada, offering an outstanding mildly sparkling wine. Initial shipments were very encouraging and the brand is poised for strong growth in the upcoming year.

## ERISTOFF Vodka

Consumer and category trends are favorable for ERISTOFF vodka, and this is reflected in continued strong volume and value performance of the brand. The challenge now is to build a distinctive brand personality for ERISTOFF that will ensure we can move pricing forward to that of the leading international brands.

In the growing and crowded vodka category in France, ERISTOFF vodka is maintaining its strong leadership position. The brand image is evolving from "good value for money proposition" into a distinctive and competitive brand. In Spain, ERISTOFF vodka is enjoying volume growth driven mainly by the successful national launch of ERISTOFF Black variant, supported by a limited outdoor and radio campaign.

In more mature markets, we are also leveraging our portfolio to develop our flavored vodka business. Simultaneously we have been launching the brand into new high potential markets. Where we have done this, in China for example, we have been extremely successful. A number of new market launches are planned for the upcoming fiscal year.

## WILLIAM LAWSON'S Scotch Whisky

WILLIAM LAWSON'S Scotch whisky achieved increased sales volume, driven by strong performance in key Western European markets and expansion activity in new markets.

The brand experienced resurgence in its key market of France with record sales. In Spain, value promotions have been developed in order to defend the increasingly tough Standard Scotch business on the French/Spanish border. In Belgium, WILLIAM LAWSON'S Scotch whisky is growing as well in volume and value, benefiting from improving on-trade distribution and activity in a stable market.

The brand continues to seek opportunities to grow outside of the core markets. In the new Venezuela market, volume growth was significant. The brand provides important critical mass to our business as it is among the top 10 Scotch brands and is the most premium brand in the value Scotch segment.

# SOCIAL RESPONSIBILITY

Bacardi Limited is deeply committed to the responsible marketing, advertising and use of our products. We are steadfastly opposed to the use of our products by under-age consumers or any other irresponsible users. Around the world, Bacardi Limited and its subsidiaries support, and are in fact an integral part of, trade and social organizations that combat the problems of alcohol abuse, particularly under-age drinking and drunk driving. Much of our focus in these

of improving the self-regulatory process, whenever possible.

As founding members of the Distilled Spirits Council of the United States (DISCUS), Bacardi U.S.A. has made significant improvements in the *Code of Responsible Practices for Beverage Alcohol Advertising and Marketing* within the last few years. We have made the Code Review process more transparent, through the issuance of Semi-Annual Reports, increased the demographic reach for media advertising to a minimum 70% of the audience above the legal drinking age, instituted new guidelines regarding demographic data and advertising placements, and further strengthened how we advertise in magazines and on branded apparel, to maintain our objective of directing our advertising to those above the legal drinking age.



In Europe, we are represented on the Board of the European Spirits Organization (CEPS), and are members of the Scotch Whisky

organizations has been on effective self-regulatory codes, education, retailer programs and drunk driving/traffic safety initiatives.

## Self-Regulation and Responsibility Codes

As good corporate citizens, we believe that well-constructed self-regulatory codes can be more effective and credible than government regulation and legislation. Self-regulatory codes allow for speedy resolution of issues without compromising legitimate advertising and promotional needs. Our participation in such organizations commits us to adhere to industry codes on the responsible marketing and promoting of our products; to place moderation statements on our consumer advertising; and in many markets to place statements on our products to remind consumers to enjoy our brands responsibly. Of course, we are strong supporters

Association, as well as the Gin and Vodka Association. We support the guidelines issued by these organizations that cover advertising, promotions, public relations, and sampling programs, and give specific guidelines on avoiding appealing to underage consumers. In the United Kingdom, we support the industry-launched *Social Responsibility Standards for the Production and Sale of Alcoholic Drinks*.

## Social Organizations

In order to develop effective social responsibility initiatives, Bacardi Limited's subsidiaries participate in a number of Social Aspect Organizations throughout the world. In Europe, a new organization called the *European Forum for Responsible Drinking* has recently been formed and is dedicated to promoting responsible drinking throughout the European Union. In the United Kingdom, we have



the Chairmanship of the *The Portman Group*, and the *Drinkaware Trust* and in France, *Enterprise and Prevention*. In Spain, we are active in *Fundación Alcohol y Sociedad*. In Denmark, *VSOD* was formed to present a positive program on social aspects of drinking. In Mexico, *Fundación de Investigaciones Sociales A.C. (FISAC)* has programs dedicated to fighting underage drinking and drunk driving. In the United States, we have *The Century Council*, co-founded by Bacardi U.S.A. in 1991, and dedicated to fighting underage drinking and drunk driving. In Thailand, we are members of *REACT*, a social aspect organization dedicated to promoting responsible consumption of our products.

## Education

In the United States, The Century Council has developed two new programs in the past year. *Ask, Listen, Learn: Kids and Alcohol Don't Mix* was developed in partnership with Nickelodeon and is a new creative, multimedia program for middle school students. Designed by a team of specialist educators and psychologists, the interactive program helps parents have effective conversations about alcohol with their children, using accessible resources that include discussion booklets, public service announcements, and an interactive website.



*Ask, Listen, Learn* continues The Council's long-standing commitment to American youth following *Ready or Not®: Talking With Kids About Alcohol* in its English, Spanish and Native American versions.

Since underage drinking by girls has not reduced as much as it has by boys, the Council designed *Girl Talk: Choices and Consequences of Underage Drinking* for mothers and their teenage daughters. Designed to address the communication gap, *Girl Talk* features a brochure for mothers and a website, *www.girlsanddrinking.org*, designed to educate mothers about the important role they play in their daughter's decision to drink – or not to drink – alcohol. *Girl Talk* has been featured on NBC's "Today Show" and CNN's "This American Morning," as well as in countless newspapers across the country.

In Italy, we have undertaken an innovative collaboration with the Vatican, to promote messages of drinking in moderation through their literature, which has been made available to 1,300 schools. In the United Kingdom, our advertising and packaging refers users to the *Drinkaware* website, which provides guidelines on daily consumption and on how to enjoy and respect alcohol as part of consumer lifestyles.

In Mexico, we support the *TIPPS Program* of interactive workshops to promote an overall culture of responsibility and moderation with respect to alcohol consumption. Our subsidiary in Mexico has also developed a web page to provide information and reference to the latest news regarding alcohol-related issues.

## Retailer Programs

In the United States, the Council recently created the *65% Campaign* to encourage parents to play a more active role in keeping alcohol out of the hands of teens. This campaign is based on recent findings that 65% of youth obtain the alcohol they drink from their family and friends. Since The Council's inception, more than ten million posters, decals, buttons and employee information brochures have been distributed free of charge to retailers and



wholesalers nationwide. Bacardi also teamed up with the Council to produce a helpful Tip Card that was distributed at last year's Orange Bowl Football Classic.

In the United Kingdom, retailers launched the Challenge 21 program to reduce the availability of alcohol for purchase by underage drinkers. Bacardi worked with local police and the City Council Licensing Unit to launch the *Best Bar None Awards* in Southampton, an accreditation program for pubs, clubs and bars. We also sponsored a late-night free bus service across the Christmas period in Southampton as part of a city centre transport initiative.

## Drunk Driving/Traffic Safety

In Europe, we have created a social responsibility campaign to run alongside the MARTINI sponsorship of the SCUDERIA FERRARI Team, which has been launched for the 2006 racing season. Using the central message, "Please Be Responsible: Don't Drink and Drive," a marketing campaign is available for *Grand Prix* race days as part of our approach urging spectators to live for today and tomorrow. We will develop further partnership activity over the course of the three-year agreement.

Through our French subsidiary, we have participated in programs through Enterprise and Prevention to reduce the incidence of alcohol-related road accidents among young people, and to eliminate sales of beverage alcohol to minors.

In Germany, we have invested in a Driver's Corner as part of our on-premise promotional activity, which provides free soft drinks for designated drivers at Bacardi events.

The Century Council has played a leadership role in the identification of the hardcore drunk-driver problem and has developed effective means to combat it. In 1997, The Council launched The National Hardcore Drunk Driving Project, a single, comprehensive resource to assist in the development of programs that advocate swift identification, certain punishment and effective treatment to reduce hardcore drunk driving. In June 2004, the Council produced Hardcore Drunk Driving Judicial Guide: A Resource Outlining Judicial Challenges, Effective Strategies and Model Programs. The Guide is a resource for judges and judicial educators to help them address the complexities in their courts of reducing drunk driving, in turn protecting the public from these dangerous offenders.

There are many other examples of our support to combat the problems associated with misuse of our products, and to show how our products should be enjoyed responsibly. These initiatives are of the keenest interest to us.





# A TRIBUTE

*This year has seen the retirement of two important individuals who have contributed to the success of the Company. We extend to Ruben Rodriguez and Barbara Johnson and their families every success for the future.*



**RUBEN RODRIGUEZ:** On June 22, 2006, Ruben Rodriguez who is currently a member of the Board of Directors of Bacardi Limited, will retire from the Board. Mr. Rodriguez was appointed Chairman of the Board of Bacardi Limited in June 2000 and served in this capacity until 2005. He was appointed President and Chief Executive Officer of Bacardi Limited in March 2000 and served in this capacity, after a brief hiatus in 2003 and 2004, until the following year.

During his tenure, Mr. Rodriguez oversaw two major acquisitions for the Company. He spearheaded the acquisition for CAZADORES tequila in 2003 and as Chairman oversaw the acquisition of GREY GOOSE vodka in 2004. Before becoming Chairman and Chief Executive Officer, Mr. Rodriguez had been Chief Financial Officer of Bacardi Limited since 1993 and Director of Audit and Finance from 1989 to 1993.

Prior to joining Bacardi Limited, Mr. Rodriguez was Area Controller for Chesebrough-Pond's, Inc. in Latin American, Europe and the Far East. Additionally he was Controller for Bristol-Myers Co. for Australia, Mexico, Brazil and New Zealand. He received his Bachelor of Science degree from the University of Houston and is a Certified Public Accountant and Certified Internal Auditor.

**BARBARA JOHNSON:** On July 1, 1965, Barbara Johnson embarked on a long career that would take her to her 'retirement' on October 1, 1998. But the Board of Directors was not ready for her to retire completely and convinced her to remain on as Secretary to the Board of Directors. Originally hired as an Executive Secretary, Barbara moved up the ranks of the Company to the position she held before retiring as Vice President and Secretary to the Board of Directors. Barbara Johnson's name has become synonymous with Bacardi, known by all those who have worked and visited the office of Bacardi in Bermuda. Barbara Johnson will also retire on June 22, 2006.



FINANCIAL SECTION



# Management's Discussion and Analysis of
# Financial Condition and Results of Operations

## Business

Bacardi Limited (the "Company"), a privately held company headquartered in Bermuda, produces, markets and distributes a variety of internationally recognized spirits. Our brand portfolio includes over 200 brands and labels of rum, vodka, whisky, gin, vermouth and tequila products among others, most of which are sold on a global basis.

Our main Core Brands include BACARDI rum, MARTINI vermouth, DEWAR'S Scotch whisky, BOMBAY gin, GREY GOOSE vodka and CAZADORES tequila. The Company operates in over sixty markets with the principal markets being the United States, Spain, France, the United Kingdom, Mexico, Germany, Italy and Russia. The Company has prioritized its expansion in the emerging markets of India, China and Brazil.

### SUMMARY OF FINANCIAL PERFORMANCE

*(Expressed in Thousands of U.S. Dollars)*

|  | Fiscal Year 2006 $ | Fiscal Year 2005 $ | Fiscal Year 2004 $ |
|---|---|---|---|
| Sales less excise taxes | 3,600,364 | 3,551,430 | 3,189,982 |
| Gross profit | 2,360,999 | 2,166,343 | 1,868,116 |
| Selling, General and Administrative Expenses | 1,487,937 | 1,498,754 | 1,302,930 |
| Earnings from Operations | 873,062 | 667,589 | 565,186 |
| Other Expenses | 214,732 | 229,244 | 213,920 |
| Net Earnings | 658,330 | 438,345 | 351,266 |
| Cash Flow from Operations | 741,157 | 599,372 | 450,743 |
| Gross Margin | 52% | 48% | 45% |
| Earnings from Operations Margin | 19% | 15% | 14% |
| Effective Tax Rate | 10% | 12% | 19% |
| Total Debt to Total Capital | 45% | 54% | 35% |

# Management's Discussion and Analysis of
# Financial Condition and Results of Operations (Continued)

The following is a review of Bacardi Limited's results of operations and financial condition for the fiscal years ended March 31, 2006 and 2005.

## Sales

Bacardi Limited achieved record sales reaching $4.55 billion in fiscal 2006. The focus on our Core Brand portfolio led the growth with continuing global expansion of many of our premium brands. GREY GOOSE vodka continues to outpace original expectations as the Company marked its first full year of sales. During the year, certain agency brand distribution agreements were terminated having a negative impact on sales of $126 million. Fluctuations in foreign exchange rates negatively impacted sales by $32 million in the current year.

BACARDI rum sales, after excise taxes and excluding flavored rums, grew 4% over the prior year as the growth trend continues in the United States and Mexico. MARTINI vermouth sales after excise taxes were 2% below last year reflecting continuing challenges faced in its principal markets in Europe. DEWAR'S Scotch whisky sales after excise taxes resulted in a 4% decrease driven by overall volume decreases in the United States and Spain, although sales for the premium whisky range increased by 13%. BOMBAY gin finished fiscal year 2006 up 6% as the brand continues its stellar market performance overcoming a production shortfall due to a fire at its production facility in the current year. GREY GOOSE vodka, in its first full year as part of the Company, continues to produce double digit growth in its primary market of the United States and has been positively received in new global markets.

BACARDI Flavored rum sales less excise taxes grew by 12% due to new flavor introductions as well as continuing growth in the United States. The impact of the declining ready-to-drink markets continues to diminish as the business is managed to optimize profitability.

## Gross Profit

Gross profit for fiscal 2006 reached $2.4 billion, an increase of $195 million from the previous year. The increase in gross profit outpaced the increase in sales due to a more favorable sales mix shifting towards higher margin products as displayed by the increase in gross profit margin to 52% from 48%. A marked decrease in cost of sales of $146 million, mainly resulting from a shift in the product mix as well as certain production efficiencies, also contributed to the improved margins.

## Selling, General and Administrative Expenses

Selling, General and Administrative expenses slightly decreased in the current year. Advertising and promotion, which is a main component of this expense, increased by $27 million reflecting reinvestment in new initiatives in support of Core Brands and a reduced focus on ready-to-drink. Selling expenses increased versus the prior year by $24 million due to expanded sales force activity. Administrative expenses included increases in personnel costs from remuneration, headcount and severance costs. The above increases were offset by reductions in other expenses.

## Earnings from Operations

Record earnings from operations of $873 million were achieved in fiscal 2006. The positive factors driving this increase are the favorable sales mix impact of the volume increases in the Core Brands as well as the Company's efforts to contain its cost structure.

# Management's Discussion and Analysis of
# Financial Condition and Results of Operations (Continued)

### Other Expenses and Income Taxes

Included in other expenses are net interest expense and various other items. Interest expense for fiscal 2006 increased marginally as compared to fiscal 2005 due to the full year impact of the GREY GOOSE acquisition debt and increasing interest rates on variable interest debt offsetting the positive impact resulting from debt pay downs. Other non-operating expenses decreased to $3 million in the current year from $35 million in the prior year primarily due to the prior year including make whole payments of $37 million on debt refinancing. The provision for income taxes increased by $18 million due to higher pre-tax earnings offset by a reduction in the effective tax rate from 12% to 10%.

### Net Income

Fiscal 2006 reported record net income of $658 million, a 50% increase from fiscal 2005.

### Liquidity

The strong cash flows generated by operations continue to allow the Company to meet operating needs, prepay debt and distribute earnings. Operations generated cash flows of $741 million, an increase of $142 million from the previous year. This resulted from increased net earnings and a continuing favorable working capital position. Cash used in investing activities is significantly lower than the prior year as the prior year includes the acquisition of GREY GOOSE vodka. The current year includes net acquisitions of property, plant and equipment at a usual level. Cash used in financing activities mainly represents net debt repayments as well as increased dividends. In the prior year cash provided by financing activities included the debt incurred in connection with the GREY GOOSE acquisition.

### Long Term Debt

The Company has long-term obligations related to contracts, leases and borrowing facilities that resulted during the course of normal business operations and brand acquisitions. The Company's largest borrowing facility is subject to certain financial covenants. Currently, the most restrictive financial covenant requires that the Company not have debt in excess of a defined multiple of EBITDA. The strength of the Company's cash flows have allowed the continued repayment of these facilities which results in the Company maintaining debt well below the maximum allowed under these facilities. At March 31, 2006 the Company believes that it has complied with all terms of these facilities.

### Foreign Currencies

The Company's portfolio of brands generates sales throughout the world in a variety of currencies. Where possible the Company minimizes its risk from changes in foreign currency exchange rates through matching of foreign currency revenues and expenses. The Company utilizes foreign currency forward and option contracts to further reduce the remaining foreign currency exposure risk. To the extent that this foreign currency exposure remains, results from operations will be negatively impacted by a strengthening U.S. Dollar and conversely, positively impacted by a weakening U.S. Dollar.

### Critical Accounting Policies

The consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America. U.S. generally accepted accounting principles are acceptable for the Company under Bermuda law. The preparation of consolidated financial statements in accordance with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. The most critical accounting policies that require estimates and assumptions and could have a material effect on the results of operation or financial condition relate to intangible assets, employee benefit plans, income taxes and contingencies.

# Management's Discussion and Analysis of
# Financial Condition and Results of Operations (Continued)

## Intangible Assets

The intangible assets recorded in the consolidated financial statements were mainly obtained through acquisitions and represent trademarks and all related rights. Upon acquisition, the assets and liabilities acquired, including the brands, are recorded at fair value with any remaining amounts recorded as goodwill. Brands and other intangible assets with indefinite useful lives are tested for impairment annually or more frequently if events or circumstances indicate that the asset might be impaired. The amount of impairment, if any, is based upon estimates of fair value and written off against earnings for the period. Fair value estimates are primarily determined through the use of the royalty savings and excess earnings approaches and require subjectivity. As of March 31, 2006, all of the Company's brands are determined to have indefinite useful lives.

## Employee Benefit Plans

The Company has a number of different pension and other retirement plans. The cost of benefits earned by the employees by defined benefit plans is actuarially determined using the projected benefit method based upon certain assumptions that include market discount rates and management's best estimate of salary escalation, service lives of employees and employee turnover, as well as expected plan investment performance. The assumptions are reviewed on an annual basis.

## Income Taxes

Income tax expense is based on income generated and the statutory tax rates of the various tax jurisdictions in which the Company operates. Judgment is required in determining income tax expense as well as evaluating tax positions. Income taxes are recorded using the asset and liability method which requires that current taxes be recognized for the estimated current taxes payable and deferred taxes be recognized for the temporary difference between the tax and accounting bases of assets and liabilities and for the future benefit of the realizable value of losses. Deferred tax liabilities are recorded for certain foreign subsidiaries' undistributed earnings except to the extent that the retained earnings are expected to be indefinitely reinvested as determined by management. Tax reserves are established when it is probable that additional taxes will be paid, are adjusted in light of changing facts and circumstances, and a number of years may elapse before a final resolution is reached. It is the Company's policy to establish adequate reserves for all known probable tax exposures so that the ultimate resolution would not be expected to have a material effect on the Company's financial position or results of operations.

## Contingencies

The Company and its subsidiaries are party to various legal claims, actions and complaints which due to their nature involve inherent uncertainties. Management assesses the probability of future loss and records a liability for probable losses.

# Management's Report to the Shareholders of Bacardi Limited

The management of Bacardi Limited is responsible for the preparation, integrity and fair presentation of the consolidated financial statements and other information contained in this Annual Report. The financial statements were prepared in accordance with accounting principles generally accepted in the United States of America and, where appropriate, include amounts based on management's judgment and best estimates. Other financial information presented in this Annual Report is consistent with the data contained in the accompanying financial statements.

It is the Company's policy to establish and maintain a system of internal accounting and administrative controls, to provide reasonable assurance that the financial information is accurate and reliable and that Company assets are adequately accounted for and safeguarded. The system includes a defined organizational structure and appropriate division of responsibilities; established policies and procedures that are communicated throughout the Company; careful selection, training and development of employees; and an internal audit program. Policies and procedures prescribe that all employees are to maintain high standards of proper business practice. The Company strives to maintain an effective system of internal control, reliable financial reporting systems and dependable safeguards against unauthorized acquisition, use or disposition of assets.

The Board of Directors oversees the Company's systems of internal accounting and administrative controls through its Audit Committee, which is comprised of directors independent of management. The Audit Committee meets regularly with representatives of the Company's external auditors, internal auditors, and management, to satisfy themselves that Bacardi Limited's internal control policies are being followed. In addition, the Audit Committee meets regularly with the external and internal auditors to provide a forum for open discussion of any issues.

The consolidated financial statements have been reviewed by the Audit Committee and, together with the other required information in this Annual Report, have been approved by the Board of Directors. In addition, the consolidated financial statements have been audited by PricewaterhouseCoopers, who were given unrestricted access to all financial records and related data and whose report is included in this Annual Report.

Andreas Gembler
*President and Chief Executive Officer*

Ralph Morera
*Senior Vice President Finance and Chief Financial Officer*

Hamilton, Bermuda
May 11, 2006

# EXHIBIT 2 (PART 2)

# Report of Independent Auditors

To the Shareholders of Bacardi Limited:

In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of earnings, shareholders' equity and cash flows present fairly, in all material respects, the financial position of Bacardi Limited and its subsidiaries at March 31, 2006 and 2005, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

*PricewaterhouseCoopers*

May 11, 2006
Hamilton, Bermuda

# Consolidated Statements of Earnings

For the Years Ended March 31, 2006 and 2005
*(Expressed in Thousands of U.S. Dollars)*

|                                              | 2006<br>$ | 2005<br>$ |
|----------------------------------------------|----------:|----------:|
| SALES                                        | 4,553,225 | 4,543,216 |
| EXCISE TAXES                                 |   952,861 |   991,786 |
|                                              | 3,600,364 | 3,551,430 |
| COST OF SALES                                | 1,239,365 | 1,385,087 |
| GROSS PROFIT                                 | 2,360,999 | 2,166,343 |
| SELLING, GENERAL AND ADMINISTRATIVE EXPENSES | 1,487,937 | 1,498,754 |
| EARNINGS FROM OPERATIONS                      |   873,062 |   667,589 |
| OTHER (INCOME) EXPENSES                       |           |           |
|    Interest income            |    (4,101)|    (2,351)|
|    Interest expense           |   140,726 |   139,180 |
|    Miscellaneous expense - net|     2,836 |    35,352 |
|                                              |   139,461 |   172,181 |
| EARNINGS BEFORE INCOME TAXES                 |   733,601 |   495,408 |
| PROVISION FOR INCOME TAXES                   |    75,271 |    57,063 |
| NET INCOME                                   |   658,330 |   438,345 |

*The accompanying notes are an integral part of these consolidated financial statements.*

# Consolidated Balance Sheets

As of March 31, 2006 and 2005
*(Expressed in Thousands of U.S. Dollars, except share and per share amounts)*

| | March 31, 2006 $ | March 31, 2005 $ |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS** | | |
| Cash and equivalents | 20,706 | 17,019 |
| Accounts receivable, less allowance for doubtful accounts of | | |
| $27,992 in 2006 and $29,269 in 2005 | 723,645 | 728,239 |
| Inventories | 718,967 | 778,534 |
| Other current assets | 119,040 | 127,260 |
| | 1,582,358 | 1,651,052 |
| LONG-TERM INVESTMENTS, ADVANCES AND OTHER ASSETS | 232,524 | 209,008 |
| PROPERTY, PLANT AND EQUIPMENT, NET | 527,685 | 528,964 |
| INTANGIBLE ASSETS | 5,273,962 | 5,315,683 |
| | 7,616,529 | 7,704,707 |
| **LIABILITIES** | | |
| **CURRENT LIABILITIES** | | |
| Short-term borrowings | 243,887 | 296,860 |
| Accounts payable | 219,650 | 251,448 |
| Accrued liabilities | 502,441 | 562,907 |
| Taxes payable | 142,229 | 146,195 |
| Current portion of long-term debt | 249,316 | 147,583 |
| | 1,357,523 | 1,404,993 |
| LONG-TERM DEBT | 2,335,736 | 2,926,029 |
| OTHER LIABILITIES | 502,424 | 472,340 |
| SERIES 3 PREFERRED SHARES | 144,207 | 154,265 |
| | 4,339,890 | 4,957,627 |
| **BMRH Founders' Common Shares** | 92,467 | 92,467 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **SHAREHOLDERS' EQUITY** | | |
| COMMON SHARES, $1.40 par value; 24,000,000 shares authorized, | 32,909 | 32,909 |
| 23,506,653 issued and outstanding | | |
| SHARE PREMIUM | 957,267 | 957,267 |
| RETAINED EARNINGS | 2,327,342 | 1,800,653 |
| ACCUMULATED OTHER COMPREHENSIVE LOSS | (133,346) | (136,216) |
| | 3,184,172 | 2,654,613 |
| | 7,616,529 | 7,704,707 |

Signed on behalf of the Board

Facundo L. Bacardi, *Chairman of the Board*          Raymond P. Silcock, *Chairman of the Audit Committee*

*The accompanying notes are an integral part of these consolidated financial statements.*

# Consolidated Statements of Shareholders' Equity

For the Years Ended March 31, 2006 and 2005
*(Expressed in Thousands of U.S. Dollars)*

| | Common Shares $ | Share Premium $ | Retained Earnings $ | Accumulated Other Comprehensive Loss $ | Total Shareholders' Equity $ |
|---|---|---|---|---|---|
| BALANCE AT MARCH 31, 2004 | 32,909 | 957,267 | 1,516,510 | (151,864) | 2,354,822 |
| Comprehensive income: | | | | | |
| Net income | - | - | 438,345 | - | 438,345 |
| Foreign currency translation adjustments | - | - | - | 6,306 | 6,306 |
| Minimum pension liability adjustments, net of tax of $29 | - | - | - | (560) | (560) |
| Net change in gain on derivative instruments | - | - | - | 17,461 | 17,461 |
| Other | - | - | - | (7,559) | (7,559) |
| Total comprehensive income | | | | | 453,993 |
| | | | | | |
| Dividends declared (Note 19) | - | - | (154,202) | - | (154,202) |
| | | | | | |
| BALANCE AT MARCH 31, 2005 | 32,909 | 957,267 | 1,800,653 | (136,216) | 2,654,613 |
| Comprehensive income: | | | | | |
| Net income | - | - | 658,330 | - | 658,330 |
| Foreign currency translation adjustments | - | - | - | 4,418 | 4,418 |
| Minimum pension liability adjustments, net of tax of $3,543 | - | - | - | (5,476) | (5,476) |
| Net change in gain on derivative instruments | - | - | - | 4,694 | 4,694 |
| Other | - | - | - | (766) | (766) |
| Total comprehensive income | | | | | 661,200 |
| | | | | | |
| Dividends declared (Note 19) | - | - | (131,641) | - | (131,641) |
| BALANCE AT MARCH 31, 2006 | 32,909 | 957,267 | 2,327,342 | (133,346) | 3,184,172 |

*The accompanying notes are an integral part of these consolidated financial statements.*

# Consolidated Statements of Cash Flows

For the Years Ended March 31, 2006 and 2005
*(Expressed in Thousands of U.S. Dollars)*

|  | 2006 $ | 2005 $ |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES |  |  |
| Cash provided from operations (Note 3) | 741,157 | 599,372 |
| | | |
| CASH FLOWS USED IN INVESTING ACTIVITIES |  |  |
| Acquisition of GREY GOOSE brand | (10,428) | (2,282,636) |
| Purchase of property, plant and equipment | (62,473) | (38,632) |
| Proceeds on disposition of property, plant and equipment | 11,359 | 2,025 |
| Change in other assets | (18,055) | 8,911 |
| Change in long-term investments and advances | 4,632 | 20,527 |
| Cash used in investing activities | (74,965) | (2,289,805) |
| | | |
| CASH FLOWS (USED IN) PROVIDED BY FINANCING ACTIVITIES |  |  |
| Dividends paid | (170,188) | (154,202) |
| Short/long-term debt: |  |  |
| Borrowings | 468,572 | 4,614,523 |
| Repayments | (958,796) | (2,749,414) |
| Payment of financing costs | (2,056) | (34,234) |
| Cash (used in) provided by financing activities | (662,468) | 1,676,673 |
| | | |
| CHANGE IN CASH AND EQUIVALENTS | 3,724 | (13,760) |
| CHANGE IN CASH AND EQUIVALENTS DUE TO UNREALIZED FOREIGN EXCHANGE | (37) | 1,221 |
| CASH AND EQUIVALENTS – BEGINNING OF YEAR | 17,019 | 29,558 |
| CASH AND EQUIVALENTS – END OF YEAR | 20,706 | 17,019 |
| | | |
| SUPPLEMENTAL CASH FLOW DISCLOSURES |  |  |
| Cash paid during the year for: |  |  |
| Interest | 135,154 | 125,679 |
| Income Taxes | 82,896 | 74,252 |

*The accompanying notes are an integral part of these consolidated financial statements.*

# Notes to Consolidated Financial Statements
For the Years Ended March 31, 2006 and 2005

## 1. BACKGROUND AND SIGNIFICANT ACCOUNTING POLICIES

Bacardi Limited (the "Company"), based in Bermuda, produces, markets and distributes premium spirits, apéritifs and ready-to-drink alcoholic beverages globally. The significant accounting policies of the Company are as follows:

### (a) Basis of Preparation of Financial Statements

The consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America and are presented in United States dollars. U.S. generally accepted accounting principles are acceptable for the Company under Bermuda law. The preparation of consolidated financial statements in accordance with U.S. generally accepted accounting principles ("GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the periods reported. Actual results could differ from those estimates.

### (b) Principles of Consolidation

The consolidated financial statements include the accounts of the Company and all wholly-owned and majority owned subsidiaries. All significant intercompany accounts and transactions have been eliminated.

### (c) Foreign Currency Translation

i) Translation of financial statements

The assets and liabilities of subsidiary companies denominated in foreign currencies are translated at the exchange rates in effect at the balance sheet dates. Revenues and expenses are translated using average exchange rates for the period. The resulting gains and losses are deferred as a separate component of the accumulated other comprehensive loss caption of shareholders' equity and are included in net income only when there is a complete or substantially complete liquidation of an investment.

ii) Translation of foreign currency transactions and balances

Transactions in foreign currencies are translated at the rates of exchange prevailing at the dates of those transactions. Monetary assets and liabilities in foreign currencies are translated at the rates of exchange prevailing at the balance sheet date. Gains and losses on translation are included in net income.

### (d) Cash and Equivalents

Cash and equivalents include cash and short-term deposits with an original maturity of less than three months.

### (e) Accounts receivable

Accounts receivable are recorded at the invoiced amount, net of allowances for doubtful accounts, and do not bear interest. The allowance for doubtful accounts represents the best estimate of the amount of probable credit losses.

### (f) Inventories

Inventories are valued at the lower of cost or market. Cost is determined using either the average cost or first-in, first-out method. In accordance with generally recognized industry practice, inventories of distilled spirits aging in bonded warehouses have been included in current assets, although the remaining aging period may be in excess of one year.

### (g) Investments

The equity method of accounting is used for investments where the Company has the ability to exercise significant influence but not control. Other investments are accounted for at cost or fair value depending on the nature of the investment.

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

1. **BACKGROUND AND SIGNIFICANT ACCOUNTING POLICIES** *(Continued)*

   **(h)  Intangible Assets**

   Brands and other intangible assets which are determined to have indefinite useful lives and goodwill are not amortized. Brands and other intangible assets determined to have definite lives are amortized over their estimated useful lives. Goodwill represents the excess of the purchase price over the fair value of net tangible and identifiable intangible assets acquired in a business combination, and is tested for impairment annually or more frequently if events or circumstances indicate goodwill may be impaired.

   Brands and other intangible assets with indefinite useful lives are tested for impairment annually or more frequently if events or circumstances indicate that the asset might be impaired. The amount of impairment, if any, is based upon estimates of fair value and written off against earnings for the period. Fair value estimates are primarily determined through the use of the royalty savings and excess earnings approaches.

   **(i)  Revenue Recognition**

   Revenues are recognized upon passage of title and risk of loss, which either occurs when the product is delivered to the point of shipment or to the customer. Revenue is stated net of discounts, sales returns and allowances, and certain sales incentives and other similar items. Sales for the years ended March 31, 2006 and 2005 are presented net of $1,071.2 million and $1,108.2 million, respectively, for these items.

   **(j)  Cost of Sales**

   Cost of sales includes the costs of receiving, producing, inspecting, warehousing, insuring and transporting goods sold during the period.

   **(k)  Shipping and Handling Costs**

   Costs incurred for shipping and handling to customers are classified in selling, general and administrative expenses in the accompanying consolidated statements of earnings, and were $116.8 million and $120.7 million for the years ended March 31, 2006 and 2005, respectively.

   **(l)  Advertising and Promotion Costs**

   Advertising and promotion costs are classified in selling, general and administrative expenses in the accompanying consolidated statements of earnings, and are expensed as incurred. Advertising and promotion costs were $690.5 million and $663.1 million for the years ended March 31, 2006 and 2005, respectively.

   **(m)  Long Lived Assets**

   Property, plant and equipment is carried at cost less accumulated depreciation. Depreciation is calculated on a straight-line basis over the estimated useful lives of the assets as follows, except for land which is not depreciated:

   | | |
   |---|---|
   | Buildings | 9 to 50 years |
   | Machinery and equipment | 3 to 25 years |
   | Furniture and fixtures | 3 to 14 years |

   Leasehold improvements are amortized on a straight-line basis over the lesser of the lease term or the expected useful life of the leasehold improvement.

   Betterments and renewals, which improve and extend the life of an asset, are capitalized. Maintenance and repair costs are expensed as incurred. Upon disposition or retirement of long lived assets, a gain or loss is recognized for the difference between the net sales value and the book value of the assets. Long lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. An impairment loss would be recognized when estimated future cash flows expected to result from the use of the asset and from its eventual disposition are less than its carrying amount.

# Notes to Consolidated Financial Statements (Continued)

For the Years Ended March 31, 2006 and 2005

1. **BACKGROUND AND SIGNIFICANT ACCOUNTING POLICIES** *(Continued)*

   (n) **Employee Benefit Plans**

   The Company has a number of different pension and other retirement plans, which are designed and managed according to the rules of the various countries in which it operates. The defined benefit pension plans and the non-pension postretirement benefit plans are accounted for in accordance with the provisions of Statement of Financial Accounting Standards ("SFAS") No. 87, "Employers' Accounting for Pensions" and SFAS No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions", respectively.

   The cost of benefits earned by the employees covered by defined benefit plans is actuarially determined using the projected benefit method based upon certain assumptions that typically include market based discount rates and management's best estimate of salary escalation, service lives of employees and employee turnover, as well as expected plan investment performance. Because of these assumptions, the valuation of the pension plan obligations is subject to change. The Company bears the risk of experience gains and losses against these assumptions. The value of the pension plan assets and obligations will fluctuate as a result of actuarial gains and losses comprising changes in assumptions or experience gains and losses. Plan amendments are typically amortized over the expected average remaining service life of the employees. The excess of the net actuarial gain or loss over 10% of the greater of the benefit obligation and the fair value of plan assets is amortized over the expected average remaining service life of the employees. For the non-pension postretirement benefit plans, the excess of the net actuarial gain or loss over 10% of the benefit obligation is amortized over the expected average remaining service life of the employees. The costs of pension benefits for defined contribution plans are charged to operations as contributions become due.

   (o) **Derivative Instruments**

   The Company enters into various forward, swap and option contracts to manage interest rate exposure and limit exposure to fluctuations in foreign currency exchange rates.

   At the inception of the hedge relationship, a derivative instrument that hedges the exposure to changes in the fair value of a recognized asset or liability, or a firm commitment is designated as a fair value hedge. A derivative instrument that hedges a forecasted transaction or the variability of cash flows related to a recognized asset or liability is designated as a cash flow hedge.

   Changes in the fair value of derivatives that are designated as fair value hedges are recorded in the statements of earnings to offset changes in the fair value of the underlying hedged assets, liabilities or firm commitments. The Company currently has no derivatives designated as fair value hedges. Changes in fair value of derivatives that are designated as cash flow hedges are recorded as a component of accumulated other comprehensive loss until the underlying hedged transactions are recognized in earnings. On an ongoing basis, derivatives used in hedging transactions are assessed to determine if they are "highly effective" in offsetting changes in fair value or cash flow of hedged items. If it is determined that a derivative is not highly effective as a hedge, changes in fair value of the derivatives are recognized in earnings immediately.

   Derivative instruments which do not qualify for hedge accounting are recorded at fair value in the balance sheet with changes in fair value recognized in earnings immediately.

   (p) **Incentive Plans**

   The Company, through a wholly owned subsidiary, has a stock-based compensation plan, which is described in Note 13. Awards issued under the plan are accounted for as stock appreciation rights and the amount by which the fair market value, as determined, exceeds the exercise price ("intrinsic value") is recorded as an increase or decrease to earnings over the vesting period.

   The Company also has, as described in Note 13, an earnings appreciation rights plan. Compensation expense is recognized in net earnings over the vesting period to the extent that the current unit value exceeds the grant price.

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

1.    **BACKGROUND AND SIGNIFICANT ACCOUNTING POLICIES** (Continued)

**(q)   Income Taxes**

Income taxes are recorded using the asset and liability method of accounting. Under this method, current income taxes are recognized for the estimated income taxes payable for the current year. Deferred tax assets and liabilities are recognized for temporary differences between the tax and accounting bases of assets and liabilities. Deferred tax assets are also recognized for the benefit of losses available to be carried forward to future years for tax purposes to the extent that they are likely to be realized. When necessary, a valuation allowance is recognized to reduce net deferred tax assets to amounts that management believes are more likely than not to be realized.

Deferred income tax liabilities have been provided on certain foreign subsidiaries' undistributed earnings except to the extent that the retained earnings are considered to be indefinitely reinvested. The amount of unrecognized deferred income tax liability is not material.

The Company and its subsidiaries operate in areas of the world where earnings are both subject to and exempt from taxation. As a result, there are inevitably tax assessments and issues relating to taxation which may arise in one or more jurisdictions. It is the Company's policy to establish adequate reserves so that the ultimate resolution of any outstanding tax assessments would not be expected to have a material effect on the Company's financial position or results of operations.

**(r)   Reclassifications**

Certain amounts from the prior year have been reclassified to conform to the current year presentation.

**(s)   Recent Accounting Pronouncements**

(i)   Accounting Changes and Error Corrections

In May 2005, the Financial Accounting Standards Board ("FASB") issued SFAS No. 154, "Accounting Changes and Error Corrections, a replacement of Accounting Principles Board ("APB") Opinion No. 20 and FASB Statement No. 3." SFAS No. 154 requires retrospective application to prior periods' financial statements of a voluntary change in accounting principle unless it is impracticable. APB No. 20, "Accounting Changes," previously required that most voluntary changes in accounting principle be recognized by including in net income of the period of the change, the cumulative effect of changing to the new accounting principle. SFAS No. 154 is effective for the Company on April 1, 2006 and is not expected to have a material impact on the consolidated financial statements.

(ii)   Inventory Costs

In November 2004, the FASB issued SFAS No. 151, "Inventory Costs, an amendment of Accounting Research Bulletin No. 43, Chapter 4." SFAS 151 requires that abnormal amounts of idle facility expense, freight, handling costs and wasted materials (spoilage) be recorded as current period charges and that the allocation of fixed production overheads to inventory be based on the normal capacity of the production facilities. SFAS 151 is effective for the Company on April 1, 2006, and is not expected to have a material impact on the consolidated financial statements.

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

2.  **ACQUISITION OF BRAND**

On August 5, 2004, the Company acquired the GREY GOOSE brand, a premium vodka brand, all related brand rights, other related assets and certain liabilities for approximately $2.3 billion. The assets and liabilities acquired were recorded at fair value as determined on the acquisition date as follows:

| (Thousands of U.S. dollars) | $ |
|---|---|
| Inventories | 39,478 |
| Promotional inventory | 2,359 |
| Prepaid media | 3,401 |
| Property, plant and equipment | 11,202 |
| Intangible assets | 2,235,520 |
| Production liability | (9,324) |
| Total purchase price | 2,282,636 |

The intangible assets represent the GREY GOOSE trademark and all related rights, which have determined to have indefinite lives. The results of operations of the GREY GOOSE brand have been included in the consolidated financial statements from the date of acquisition.

As part of the purchase of GREY GOOSE, the Company is obligated to pay up to $300 million of contingent consideration if certain sales volume targets are achieved on a yearly basis through 2014. For the years ended March 31, 2006 and 2005, the Company incurred contingent pay-outs of approximately $17.5 million and $10.4 million, respectively. Payments of this contingent consideration are recorded as an increase to the relevant assets based on their respective fair values.

3.  **STATEMENTS OF CASH FLOWS**

Cash provided from operations is comprised as follows:

| | for the year ended March 31, | |
|---|---|---|
| | 2006 | 2005 |
| (Thousands of U.S. Dollars) | $ | $ |
| Net income | 658,330 | 438,345 |
| Items not affecting cash | | |
|     Deferred income taxes | (7,174) | 4,917 |
|     Equity earnings net of dividends | (8,488) | (4,934) |
|     (Gain)/loss on sale of assets | (3,355) | 103 |
|     Depreciation and amortization | 71,951 | 83,198 |
|     Incentive compensation plans expense | 55,232 | 69,413 |
| Net change in other items related to operations | | |
|     Accounts receivable | (3,911) | (2,595) |
|     Inventories | 51,226 | 41,649 |
|     Accounts payable | (11,213) | 36,098 |
|     Accrued liabilities | 46,786 | 9,171 |
|     Taxes payable | (50) | (18,806) |
|     Pension liabilities | 3,943 | 27,751 |
|     Other current assets | 2,418 | 1,811 |
|     Other liabilities | (51,945) | (85,938) |
| Proceeds from issuance of Long-Term Incentive Plan shares | 27,619 | 1,370 |
| Redemptions of Long-Term Incentive Plan shares | (90,212) | (2,181) |
| Cash provided from operations | 741,157 | 599,372 |

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

**4. INVENTORIES**

Inventories comprise:

|  | at March 31, | |
|---|---|---|
| *(Thousands of U.S. Dollars)* | 2006 $ | 2005 $ |
| Raw materials and supplies | 96,718 | 89,763 |
| Work-in-progress | 69,894 | 78,638 |
| Aging product | 283,405 | 295,120 |
| Finished goods | 268,950 | 315,013 |
|  | 718,967 | 778,534 |

**5. LONG-TERM INVESTMENTS, ADVANCES AND OTHER ASSETS**

Long-term investments, advances and other assets comprise:

|  | at March 31, | |
|---|---|---|
| *(Thousands of U.S. Dollars)* | 2006 $ | 2005 $ |
| Investments at equity | 24,865 | 29,198 |
| Investments at cost | 35,217 | 35,322 |
| Advances | 13,272 | 11,680 |
| Deferred tax assets | 53,870 | 35,367 |
| Prepaid and intangible pension assets | 38,814 | 39,904 |
| Derivative instruments | 24,050 | 19,278 |
| Other assets | 42,436 | 38,259 |
|  | 232,524 | 209,008 |

**6. PROPERTY, PLANT AND EQUIPMENT**

Property, plant and equipment comprises:

|  | at March 31, | | | |
|---|---|---|---|---|
| *(Thousands of U.S. Dollars)* | Cost $ | Accumulated Depreciation & Amortization $ | 2006 Net $ | 2005 Net $ |
| Land | 57,631 | - | 57,631 | 56,866 |
| Buildings | 420,381 | 243,696 | 176,685 | 186,016 |
| Machinery, equipment, furniture and fixtures | 672,388 | 464,334 | 208,054 | 208,152 |
| Leasehold improvements and other | 147,343 | 62,028 | 85,315 | 77,930 |
|  | 1,297,743 | 770,058 | 527,685 | 528,964 |

Depreciation and amortization expense on property, plant and equipment for the years ended March 31, 2006 and 2005 amount to $65.1 million and $69.6 million, respectively. Total accumulated depreciation and amortization at March 31, 2005 amounted to $764.5 million.

# Notes to Consolidated Financial Statements (Continued)

For the Years Ended March 31, 2006 and 2005

### 7.  INTANGIBLE ASSETS

Intangible assets comprise:

|  | at March 31, | |
|---|---|---|
|  | 2006 | 2005 |
| *(Thousands of U.S. Dollars)* | $ | $ |
| Brands: | | |
| GREY GOOSE | 2,263,742 | 2,245,456 |
| DEWAR'S | 1,297,495 | 1,297,495 |
| Martini & Rossi group | 952,040 | 1,006,870 |
| BOMBAY | 360,646 | 360,646 |
| CAZADORES | 127,260 | 127,207 |
| Other | 34,620 | 34,620 |
|  | 5,035,803 | 5,072,294 |
| Other intangible assets – net | 22,765 | 27,995 |
| Goodwill | 215,394 | 215,394 |
|  | 5,273,962 | 5,315,683 |

The brands above resulted from the purchases of each respective brand group and are determined to have indefinite lives. Other intangible assets are comprised of deferred finance charges, which are amortized over the life of the underlying debt.

### 8.  LONG-TERM DEBT

Long-term debt comprises:

|  | at March 31, | |
|---|---|---|
|  | 2006 | 2005 |
| *(Thousands of U.S. Dollars)* | $ | $ |
| Syndicated Credit Facility (a) | 2,131,681 | 2,609,452 |
| Private Placement Notes (b) | 350,000 | 350,000 |
| Other (c) | 103,371 | 114,160 |
|  | 2,585,052 | 3,073,612 |
| Less: Current portion | 249,316 | 147,583 |
|  | 2,335,736 | 2,926,029 |

(a)  On July 27, 2004, the Company entered into a term and revolving credit facilities agreement with a group of financial institutions for the purpose of refinancing existing debt, the acquisition of the GREY GOOSE brand and for general corporate purposes. These facilities bear interest, paid quarterly, at the relevant LIBOR rate plus a margin, which ranges from 0.20% to 0.60%, as determined by the Company's leverage ratio on a quarterly basis and allow for prepayments. These facilities are comprised of the following:

    (i)  Facility A1 – a €648.1 million ($785.4 million and $840.2 million at March 31, 2006 and 2005, respectively) term loan maturing on July 27, 2009. On January 14, 2005, Facility A1 was converted from a USD based currency facility to a Euro based currency facility. The average interest rates on outstanding balances were 3.05% and 2.64% at March 31, 2006 and 2005, respectively.

    (ii)  Facility A2 – an amortizing term loan of $1,010 million and $1,450 million at March 31, 2006 and 2005, respectively. Semi-annual principal payments of $100 million are due beginning on March 31, 2006. The remaining principal and accrued interest is due at maturity on July 27, 2009. The average interest rates on outstanding balances were 5.21% and 3.56% at March 31, 2006 and 2005, respectively.

    (iii)  Facility B – a $1 billion multicurrency revolving credit facility with an outstanding balance of $140.6 million

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

8.  **LONG-TERM DEBT** *(Continued)*

and $123.3 million at March 31, 2006 and 2005, respectively. This facility matures on July 27, 2009. The Company had borrowings in both U.S. Dollars and Pounds Sterling. The average interest rates on these outstanding balances were 5.00% and 5.01% at March 31, 2006 and 2005, respectively.

(iv)  Facility C – a $195.7 million term loan maturing on July 27, 2007. The Company had borrowings in both U.S. Dollars and Pounds Sterling. The average interest rates on these outstanding balances were 5.27% and 3.73% at March 31, 2006 and 2005, respectively.

**(b)** The Private Placement Notes ("the Notes") consist of notes held by insurance companies as follows:

(i)  On March 25, 2004, the Company issued $350 million in Private Placement Notes that pay interest semi-annually. These notes are comprised of two series, Series A Notes amounting to $300 million and Series B Notes amounting to $50 million. The Series A Notes bear interest at 4.42% and mature on March 25, 2011. The Series B Notes bear interest at LIBOR plus 0.65% and mature on March 25, 2014. The average interest rate on the Series B Notes was 5.73% and 4.02% at March 31, 2006 and 2005, respectively. Proceeds from the Notes were utilized to pay existing debt.

(ii)  On October 23, 2003, a subsidiary of the Company issued $100 million in Private Placement Notes, which were repaid in full in December 2004. In connection with the prepayment of these Notes a make whole payment of $1.0 million was paid, and is included in miscellaneous expense – net in the accompanying consolidated statement of earnings for the year ended March 31, 2005.

(iii)  As part of the refinancing of the purchase of the Martini & Rossi group the Company issued Private Placement Notes, which had an outstanding balance of $155 million ("Series C") and $250 million ("Series D") as of March 31, 2004. The Series C and D Notes were repaid in full in September 2004. In connection with the prepayment of these Notes a make whole payment of $35.9 million was paid, which is included in miscellaneous expense – net in the accompanying consolidated statement of earnings for the year ended March 31, 2005.

**(c)** Certain of the Company's subsidiaries have also entered into additional financing arrangements in various currencies. The agreements bear interest at fixed and floating rates ranging from 2.58% to 9.4% at March 31, 2006.

Debt denominated in foreign currencies totals approximately $974.7 million and $1,023.3 million at March 31, 2006 and 2005, respectively.

Under the terms of the Company's debt agreements, the Company is required to maintain certain financial covenants related to the levels of interest coverage and net debt. In addition, the agreements place certain restrictions on sales of assets, investments, business amalgamations and pledging of assets by the Company and its subsidiaries. The Company believes it is in compliance with all covenants at March 31, 2006.

The following debt repayment schedule sets out the annual principal repayments as per agreements:

| *(Thousands of U.S. Dollars)* | $ |
|---|---|
| for the year ending March 31, 2007 | 249,316 |
| 2008 | 419,608 |
| 2009 | 204,870 |
| 2010 | 1,361,258 |
| 2011 | 300,000 |
| Thereafter | 50,000 |
| | 2,585,052 |

# Notes to Consolidated Financial Statements (Continued)

For the Years Ended March 31, 2006 and 2005

### 9.  OTHER LIABILITIES

Other liabilities comprise:

| (Thousands of U.S. Dollars) | at March 31, | |
|---|---|---|
| | 2006 $ | 2005 $ |
| Employee benefit liabilities | 209,666 | 205,621 |
| Deferred tax liabilities | 98,713 | 95,293 |
| Other liabilities | 194,045 | 171,426 |
| | 502,424 | 472,340 |

### 10.  EMPLOYEE BENEFIT PLANS

The Company has a number of different pension and termination indemnity plans, as well as other post-retirement benefit plans in the various countries in which it operates. The majority of benefit obligations and pension plan assets are measured as of December 31 each year.

#### Defined Benefit Pension Plans

The Company's defined benefit pension and termination indemnity benefits are based primarily on years of service and employees' earnings near retirement. Information about the funded and unfunded pension plans and termination indemnity plans maintained by certain of the Company's subsidiaries is as follows:

| (Thousands of U.S. Dollars) | Funded Pension Plans | | Unfunded Pension Plans | |
|---|---|---|---|---|
| | 2006 $ | 2005 $ | 2006 $ | 2005 $ |
| CHANGE IN PENSION BENEFIT OBLIGATION, FOR THE YEAR ENDED MARCH 31,: | | | | |
| Present value at beginning of year | 356,740 | 323,282 | 162,100 | 154,566 |
| Service cost | 12,344 | 11,350 | 2,339 | 2,930 |
| Interest cost | 19,592 | 18,925 | 7,251 | 7,695 |
| Employee contributions | 1,242 | 982 | - | - |
| Prior service costs | 432 | 365 | 274 | 2,768 |
| Benefits paid | (17,960) | (20,307) | (11,428) | (14,033) |
| Actuarial loss | 31,572 | 18,311 | 4,807 | 1,266 |
| Other | 5,145 | (1,016) | 1,501 | 2,358 |
| Foreign currency | (11,595) | 4,848 | (6,074) | 4,550 |
| Present value at end of year | 397,512 | 356,740 | 160,770 | 162,100 |
| | | | | |
| CHANGE IN PENSION PLAN ASSETS, FOR THE YEAR ENDED MARCH 31,: | | | | |
| Fair value at beginning of year | 300,865 | 260,512 | - | - |
| Actual return on plan assets | 36,597 | 24,047 | - | - |
| Company contributions | 22,889 | 31,757 | 11,428 | 14,033 |
| Employee contributions | 1,242 | 982 | - | - |
| Benefits paid | (17,960) | (20,307) | (11,428) | (14,033) |
| Other | 3,168 | (85) | - | - |
| Foreign currency | (10,346) | 3,959 | - | - |
| Fair value at end of year | 336,455 | 300,865 | - | - |

# Notes to Consolidated Financial Statements (Continued)

For the Years Ended March 31, 2006 and 2005

10. **EMPLOYEE BENEFIT PLANS** (Continued)

**Defined Benefit Pension Plans** (Continued)

| (Thousands of U.S. Dollars) | Funded Pension Plans | | Unfunded Pension Plans | |
|---|---|---|---|---|
| | 2006 $ | 2005 $ | 2006 $ | 2005 $ |
| FUNDED STATUS – OVERALL DEFICIT, AT MARCH 31,: | (61,057) | (55,875) | (160,770) | (162,100) |
| Company contributions after measurement date | 1,416 | 2,415 | 787 | 706 |
| Unrecognized transition (asset) obligation | (85) | (229) | 889 | 962 |
| Unrecognized prior service cost | 4,842 | 3,397 | 7,822 | 8,892 |
| Unrecognized net loss | 72,209 | 62,801 | 24,102 | 21,291 |
| Net amount recognized in the consolidated balance sheets | 17,325 | 12,509 | (127,170) | (130,249) |
| | | | | |
| AMOUNTS RECOGNIZED IN THE CONSOLIDATED BALANCE SHEETS CONSIST OF, AT MARCH 31,: | | | | |
| Prepaid pension assets | 33,997 | 34,161 | - | - |
| Accrued pension liabilities | (24,746) | (22,885) | (143,734) | (145,561) |
| Intangible assets | 1,522 | 639 | 3,295 | 5,104 |
| Accumulated other comprehensive loss | 6,552 | 594 | 13,269 | 10,208 |
| Net amount recognized in the consolidated balance sheets | 17,325 | 12,509 | (127,170) | (130,249) |
| | | | | |
| INFORMATION ON THE MINIMUM LIABILITY AND ACCUMULATED BENEFIT OBLIGATION, AT MARCH 31,: | | | | |
| Increase (decrease) in minimum liability included in other comprehensive loss | 5,958 | (984) | 3,061 | 1,515 |
| Accumulated benefit obligation | 320,978 | 288,040 | 142,734 | 143,263 |
| | | | | |
| INFORMATION FOR PENSION PLANS WITH AN ACCUMULATED BENEFIT OBLIGATION IN EXCESS OF PLAN ASSETS, AT MARCH 31,: | | | | |
| Projected benefit obligation | 192,145 | 82,296 | 160,770 | 162,100 |
| Accumulated benefit obligation | 153,799 | 69,299 | 142,734 | 143,263 |
| Fair value of plan assets | 133,600 | 53,941 | - | - |
| | | | | |
| COMPONENTS OF PENSION EXPENSE, FOR THE YEAR ENDED MARCH 31,: | | | | |
| Service cost | 12,344 | 11,350 | 2,339 | 2,930 |
| Interest cost | 19,592 | 18,925 | 7,251 | 7,695 |
| Expected return on plan assets | (20,050) | (17,227) | - | - |
| Amortization of transition (asset) obligation | (145) | (150) | 73 | 73 |
| Amortization of prior service cost | 165 | (175) | 1,351 | 1,695 |
| Amortization of net loss | 2,402 | 3,232 | 951 | 1,072 |
| Other | 1,438 | (335) | 1,093 | 2,380 |
| Pension Expense | 15,746 | 15,620 | 13,058 | 15,845 |

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

**10. EMPLOYEE BENEFIT PLANS** *(Continued)*

**Defined Benefit Pension Plans** *(Continued)*

| | Funded Pension Plans | | Unfunded Pension Plans | |
|---|---|---|---|---|
| *(Thousands of U.S. Dollars)* | 2006 | 2005 | 2006 | 2005 |
| WEIGHTED-AVERAGE ASSUMPTIONS AT THE BEGINNING OF THE YEAR USED TO DETERMINE PENSION EXPENSE | | | | |
| Discount rate | 5.6% | 5.9% | 5.3% | 5.6% |
| Rate of compensation increase | 4.0% | 3.9% | 3.4% | 3.4% |
| Expected long-term rate of return on plan assets | 6.7% | 6.6% | - | - |
| WEIGHTED-AVERAGE ASSUMPTIONS USED TO DETERMINE PRESENT VALUE OF PENSION BENEFIT OBLIGATIONS AT THE END OF THE YEAR | | | | |
| Discount rate | 5.2% | 5.6% | 5.0% | 5.3% |
| Rate of compensation increase | 4.0% | 4.0% | 3.2% | 3.4% |

To develop the expected long-term rate of return on assets assumption for each plan, the Company considered the historical returns and the future expectations for returns for each asset class, as well as the target asset allocations of the funds.

The weighted average asset allocation and target allocation by asset category of the pension plan assets are as follows, at March 31,:

| | Target | Actual Allocation | |
|---|---|---|---|
| Asset Category | Allocation | 2006 | 2005 |
| Equity securities | 60% | 59% | 60% |
| Debt securities | 36% | 36% | 34% |
| Other | 4% | 5% | 6% |
| Total | 100% | 100% | 100% |

The investments of the pension funds are diversified across a range of asset classes and are diversified within each asset class. The assets are generally actively managed with the goal of adding some incremental value through security selection and asset allocation.

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

### 10. EMPLOYEE BENEFIT PLANS (Continued)

**Non-Pension Retirement Benefit Plans**

Information about the unfunded non-pension retirement benefit plans, which consist mostly of post retirement healthcare benefit plans maintained by certain of the Company's subsidiaries, is as follows:

| (Thousands of U.S. Dollars) | 2006 $ | 2005 $ |
|---|---|---|
| CHANGE IN NON-PENSION BENEFIT OBLIGATION, FOR THE YEAR ENDED MARCH 31,: | | |
| Present value at beginning | 56,054 | 56,527 |
| Service cost | 1,790 | 1,680 |
| Interest cost | 3,342 | 3,127 |
| Prior service costs | - | 1,140 |
| Benefits paid | (2,369) | (1,811) |
| Actuarial loss (gain) | 4,936 | (4,704) |
| Foreign currency | 22 | 95 |
| Present value at end of year | 63,775 | 56,054 |
| | | |
| FUNDED STATUS – (DEFICIT), AT MARCH 31,: | (63,775) | (56,054) |
| Company contributions after measurement date | 534 | 580 |
| Unrecognized transition obligation | 8,249 | 9,006 |
| Unrecognized prior service cost | (573) | (561) |
| Unrecognized net loss | 14,379 | 9,854 |
| Accrued non-pension liabilities recognized in the consolidated balance sheets | (41,186) | (37,175) |
| | | |
| COMPONENTS OF NON-PENSION EXPENSE, FOR THE YEAR ENDED MARCH 31,: | | |
| Service cost | 1,790 | 1,680 |
| Interest cost | 3,342 | 3,127 |
| Amortization of transition obligation | 765 | 759 |
| Amortization of prior service cost | 12 | 14 |
| Amortization of net loss | 325 | 276 |
| Other | 87 | 1,963 |
| Non-pension expense | 6,321 | 7,819 |
| | | |
| WEIGHTED-AVERAGE ASSUMPTIONS USED TO DETERMINE NON-PENSION EXPENSE | | |
| Discount rate | 5.7% | 6.2% |
| Medical inflation rate (initial rate / ultimate rate) | 10.0%/5.0% | 12.0%/5.3% |
| | | |
| WEIGHTED-AVERAGE ASSUMPTIONS USED TO DETERMINE PRESENT VALUE OF NON-PENSION BENEFIT OBLIGATIONS AT END OF YEAR | | |
| Discount rate | 5.5% | 5.7% |
| Medical inflation rate (initial rate / ultimate rate) | 9.2%/4.9% | 10.0%/5.0% |

For fiscal year 2006, the effect of a one percentage point increase or decrease in the assumed medical inflation rate on the non-pension service and interest costs is a $1.2 million increase and a $0.9 million decrease, respectively, and on the benefit obligation, a $11.8 million increase and a $9.2 million decrease, respectively.

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

## 10. EMPLOYEE BENEFIT PLANS (Continued)

### Defined Contribution Plans

Certain of the Company's subsidiaries maintain funded defined contribution pension plans and insured pension plans for which the total expense recognized by the Company is $8.2 million and $6.7 million for the years ended March 31, 2006 and 2005, respectively.

### Cash Flows

In fiscal year 2007, the Company expects to contribute approximately $15.3 million to its funded pension plans, $9.6 million in benefit payments for unfunded pension plans, $2.4 million in benefit payments for other unfunded non-pension plans and $8.6 million to funded defined contribution plans.

Estimated future benefit payments under the defined benefit pension plans and the non-pension plans are as follows:

| (Thousands of U.S. Dollars) | Funded Pension Plans | Unfunded Pension Plans | Unfunded Non-Pension Plans |
|---|---|---|---|
| Year ending March 31, | $ | $ | $ |
| 2007 | 13,632 | 9,625 | 2,353 |
| 2008 | 13,367 | 9,715 | 2,501 |
| 2009 | 15,785 | 9,846 | 2,572 |
| 2010 | 14,421 | 9,990 | 2,689 |
| 2011 | 16,480 | 10,069 | 2,824 |
| 2012 – 2016 | 93,385 | 52,355 | 15,950 |

## 11. SERIES 3 PREFERRED SHARES

The Series 3 Preferred Shares represent preferred shares of a subsidiary which were issued in connection with the acquisition of the Martini & Rossi group. As provided for under the terms of the shares, during May 2003 the Company elected to call the shares for redemption. The holders of shares with a call value amounting to approximately 119 million Euro exercised their right to postpone the redemption until June 2008, and the remaining shares with a call value amounting to 6 million Euro ($6.9 million) were redeemed in June 2003. As a result of the postponement of a portion of the redemption, the dividend rate increased to 7% through the remainder of the term. Dividend expense for the Series 3 Preferred shares amounted to $10.1 million and $10.5 million for the years ended March 31, 2006 and 2005, respectively, and is included in interest expense in the accompanying consolidated statements of earnings. The Series 3 Preferred Shares are designated as a hedge of the Company's net investment in Euro based subsidiaries. As such, the foreign currency translation gains and losses are recorded in accumulated other comprehensive loss.

## 12. BMRH FOUNDERS' COMMON SHARES

On May 7, 1993, Bacardi-Martini & Rossi Holdings N.V. ("BMRH"), a subsidiary of the Company, issued common shares ("BMRH Founders' common shares") to former Martini & Rossi shareholders. The dividend rate is equal to that paid on the common shares of the Company. The shares are convertible, solely at the option of the Company into shares of common stock of the Company on a one-for-one basis. The provisions of these shares entitle the holders to cause BMRH to purchase all or any portion of their shares for a limited period following the occurrence of certain events. The shares are presented as minority interest in the accompanying consolidated balance sheets. Dividend expense for the BMRH Founders' common shares amounted to $4.2 million and $3.8 million for the years ended March 31, 2006 and 2005, respectively, and is included in miscellaneous expense - net in the accompanying consolidated statements of earnings. As of March 31, 2006 and 2005, 580,565 shares are outstanding.

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

## 13. INCENTIVE PLANS

### Long-Term Incentive Plan

The Company has a Long-Term Incentive Plan (the "Plan") to provide incentives for selected senior executives to achieve long-term business goals of the Company and its shareholders. Under the terms of the Plan, participants receive stock options in a wholly owned subsidiary, Bacardi Benefit Company Limited ("BBC"); and upon exercise of the option to purchase shares, the participant must hold the shares for a minimum of six months before the shares can be put back for redemption at the fair market value as determined by the pre-set formula. The stock options represent the right to acquire BBC shares, which mirror all of the rights of the Company's common shares except that they have no voting rights. Options are granted on April 1st, vest at the rate of 20% per year and expire on the tenth anniversary from the grant date. The fair value of the BBC shares is determined using a formula that takes into consideration the Company's net earnings, as determined under the terms of the Plan, and the price/earnings multiple for the Company's peer group, adjusted for the difference between the Company's three-year compounded annual growth rate for sales and net earnings versus the peer group's growth in sales and net earnings.

The following table summarizes the activity in options issued under the Plan:

|  | for the year ended March 31, | | | |
|  | 2006 | | 2005 | |
|  | # of options outstanding | Weighted average exercise price | # of options outstanding | Weighted average exercise price |
|---|---|---|---|---|
|  |  | $ |  | $ |
| Outstanding at beginning of year | 336,620 | 134.33 | 355,700 | 134.10 |
| Cancelled | (1,700) | 218.00 | (7,000) | 158.58 |
| Exercised and redeemed | (283,365) | 130.03 | (12,080) | 113.42 |
| Outstanding at end of year | 51,555 | 155.21 | 336,620 | 134.33 |
| Exercisable at April 1 | 51,555 | 155.21 | 322,700 | 130.70 |

The following table summarizes information about options outstanding at year end:

| Stock options expiring April 1 | # of options Outstanding | # of options Exercisable at April 1, 2006 | Exercise price |
|---|---|---|---|
|  |  |  | $ |
| 2007 | 4,900 | 4,900 | 96.50 |
| 2008 | 3,650 | 3,650 | 96.50 |
| 2009 | 4,520 | 4,520 | 110.00 |
| 2010 | 13,045 | 13,045 | 120.00 |
| 2010 | 4,000 | 4,000 | 110.00 |
| 2011 | 21,440 | 21,440 | 218.00 |
|  | 51,555 | 51,555 |  |

At March 31, 2006, the weighted average remaining contractual life of the options outstanding under the Plan is 3.9 years (2005 – 4.40 years).

During fiscal years 2006 and 2005, the Company recognized expense of $12.5 million and $54.4 million, respectively, including both the change in the earned intrinsic value of the outstanding awards and dividends. As of March 31, 2006 and 2005, a liability, representing the earned intrinsic value of these shares, amounting to $20.9 million and

# Notes to Consolidated Financial Statements (Continued)

For the Years Ended March 31, 2006 and 2005

**13. INCENTIVE PLANS** *(Continued)*

**Long-Term Incentive Plan** *(Continued)*

$72.6 million, respectively, is included in accrued liabilities in the accompanying consolidated balance sheets. If all units exercisable at April 1, 2006 were to be exercised and subsequently repurchased at the formula-calculated value of Bacardi Benefit Company Limited stock at April 1, 2006, the net cash outflow of the Company would be approximately $20.9 million.

**Earnings Appreciation Rights Plan**

Effective April 1, 2002, the Company implemented an Earnings Appreciation Rights Plan ("EARP") to compensate key employees with an interest in maximizing the growth of the Company. Awards under the plan are granted on April 1st of each fiscal year to key employees at a unit value based on a multiple of earnings ("grant price"). The awards vest 100% on the third anniversary of their issuance and expire on June 30th of the fifth calendar year following the year in which they were granted. Once vested, awards may be exercised during a 30-day period from June 1st to June 30th in each fiscal year. Upon exercise, award holders are entitled to receive the difference between the grant price and the current unit value of the awards.

The following table summarizes the EARP award activity:

| | for the year ended March 31, | | | |
| | 2006 | | 2005 | |
| | # of awards outstanding | Weighted average exercise price | # of awards outstanding | Weighted average exercise price |
| | | $ | | $ |
|---|---|---|---|---|
| Outstanding at beginning of year | 648,725 | 120.34 | 298,275 | 127.53 |
| Issued | 106,900 | 169.88 | 487,250 | 115.33 |
| Cancelled | (30,800) | 124.13 | (136,800) | 118.16 |
| Exercised and redeemed | (20,325) | 143.33 | - | - |
| Outstanding at end of year | 704,500 | 127.03 | 648,725 | 120.34 |
| | | | | |
| Exercisable at April 1 | 219,275 | 127.23 | 90,525 | 143.33 |

The following table summarizes information about awards outstanding at year end:

| Awards expiring April 1 | # of awards outstanding | # of awards exercisable at April 1, 2006 | Exercise price |
|---|---|---|---|
| | | | $ |
| 2007 | 68,775 | 68,775 | 143.33 |
| 2008 | 150,500 | 150,500 | 119.87 |
| 2009 | 381,925 | - | 115.33 |
| 2010 | 103,300 | - | 169.88 |
| | 704,500 | 219,275 | |

At March 31, 2006, the weighted average remaining contractual life of the EARP awards outstanding is 2.74 years (2005 – 3.48 years).

During the years ended March 31, 2006 and 2005, the Company recognized expense of $42.7 million and $15.1 million, respectively, representing the change in the earned intrinsic value of the outstanding awards which is included in the accompanying consolidated statements of earnings. At March 31, 2006 and 2005, a liability of $57.1 million and $15.1 million, respectively, is recorded for this plan, which represents the earned portion of the intrinsic value of these awards. Of the March 31, 2006 liability, $27.1 million is included in accrued liabilities and $33.3 million

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

**13. INCENTIVE PLANS** (Continued)

**Earnings Appreciation Rights Plan** (Continued)

is included in other liabilities, and the March 31, 2005 liability is included in other liabilities in the accompanying consolidated balance sheets. If all units exercisable at April 1, 2006 were to be exercised at the April 1, 2006 unit value, the cash outflow of the Company would be approximately $27.1 million.

**14. FAIR VALUE OF FINANCIAL INSTRUMENTS**

The carrying amounts and fair values of the Company's financial instruments are as follows:

| (Thousands of U.S. Dollars) | at March 31, 2006 | | at March 31, 2005 | |
| --- | --- | --- | --- | --- |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | $ | $ | $ | $ |
| Cash and equivalents | 20,706 | 20,706 | 17,019 | 17,019 |
| Accounts receivable | 723,645 | 723,645 | 728,239 | 728,239 |
| Short-term borrowings | (243,887) | (243,887) | (296,860) | (296,860) |
| Accounts payable | (219,650) | (219,650) | (251,448) | (251,448) |
| Accrued liabilities | (502,441) | (502,441) | (562,907) | (562,907) |
| Taxes payable | (142,229) | (142,229) | (146,195) | (146,195) |
| Long-term debt | (2,585,052) | (2,585,052) | (3,073,612) | (3,073,612) |
| Series 3 Preferred Shares | (144,207) | (161,661) | (154,265) | (176,327) |
| Foreign currency contracts and options | (2,492) | (2,492) | (402) | (402) |
| Currency swap | - | - | (8,571) | (8,571) |
| Interest rate swap agreements | 23,845 | 23,845 | 19,088 | 19,088 |

The reported fair values are based on a variety of factors and assumptions. Accordingly, the fair values may not represent actual values of the financial instruments that could have been realized as of March 31, 2006 or 2005 or that will be realized in the future and do not include expenses that could be incurred in an actual sale or settlement. The following methods were used to estimate the fair values of our financial instruments, none of which are held for trading or speculative purposes:

*Cash and Equivalents, Accounts Receivable, Short-term borrowings, Accounts Payable, Accrued Liabilities and Taxes Payable*
> The carrying amounts of cash and equivalents, accounts receivable, short-term borrowings, accounts payable, accrued liabilities and taxes payable approximate their fair values due to the short maturity of these instruments.

*Long-Term Debt and Series 3 Preferred Shares*
> The fair values of long-term debt and Series 3 Preferred Shares were estimated using discounted cash flow analyses based on market rates available to the Company for similar debt with the same remaining maturities.

*Foreign Currency Contracts and Options*
> The fair values of the foreign currency forward contracts and options were estimated using current market prices for similar instruments.

*Currency Swap*
> The fair value of the currency swap was estimated using forward foreign exchange rates as compared to the rates of the swap.

*Interest Rate Swap Agreements*
> The fair value of the interest rate swap agreements was estimated based on counterparty quotations for the instruments.

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

## 15. DERIVATIVE INSTRUMENTS

### Foreign Currency Contracts

The Company holds foreign currency forward contracts and currency options, which mature at various dates within the following fifteen months, to purchase and sell foreign currencies with a notional amount of $162.3 million and $274.4 million, respectively, at March 31, 2006 (2005 - $234.8 million and $208.5 million, respectively). These instruments do not qualify for hedge accounting treatment and consequently the changes in fair values are immediately recognized in earnings. The net loss recognized on foreign currency contracts for the years ended March 31, 2006 and 2005, is $3.6 million and $6.6 million, respectively, and is included in miscellaneous expense - net in the accompanying consolidated statements of earnings.

### Interest Rate Swaps

The Company has interest rate swap agreements designated as cash flow hedges which exchange floating rates on portions of its Syndicated Credit Facility. Current outstanding notional amounts of these contracts are $850 million and €330 million with an average fixed interest rate of 2.96% at March 31, 2006. At March 31, 2005, the notional amounts were $1.25 billion and €330 million with an average fixed interest rate of 2.93%. For fiscal years 2006 and 2005, there has been no ineffectiveness related to these cash flow hedges and all fair value adjustments have been included in accumulated other comprehensive loss.

## 16. ACCUMULATED OTHER COMPREHENSIVE LOSS

Accumulated other comprehensive loss is comprised of the following:

| | at March 31, | |
|---|---|---|
| (Thousands of U.S. Dollars) | 2006 | 2005 |
| | $ | $ |
| Foreign currency translation | (142,785) | (147,203) |
| Minimum pension liability, net of taxes of $6,570 and $3,027, respectively | (13,251) | (7,775) |
| Unrealized gain on cash flow hedges | 23,845 | 19,151 |
| Other | (1,155) | (389) |
| Accumulated Other Comprehensive Loss | (133,346) | (136,216) |

## 17. CREDIT RISK

Financial instruments which potentially subject the Company to concentrations of credit risk or counter-party risk principally consist of cash and equivalents, trade receivables, pension plan assets, currency and interest rate swaps, currency options and foreign currency contracts. The Company's credit risk or counter-party risk on foreign currency contracts, currency options and currency and interest rate swaps is the replacement cost at the then estimated fair value of the instruments. The Company places its cash and equivalents, pension plan assets, currency and interest rate swaps, currency options and foreign currency contracts with high credit quality financial institutions and, by policy, limits the amount of credit exposure to any one financial institution. Credit limits, ongoing credit evaluation and account monitoring procedures are utilized to minimize credit risk of trade receivables.

## 18. AUTHORIZED SHARE CAPITAL

During May 2003, an amendment to the bye-laws of the Company was approved authorizing the creation, but not the issuance, of two classes of common shares of the Company. Each existing common share of the Company would be designated as a Class A share upon the initial issuance of the Class B shares. The number of Class B shares available for issuance would be limited to a maximum of 30% of the Company's total share capital after the proposed share capital increase has been implemented. Initially, the holders of the Class A shares, voting as a class, would be entitled to elect thirteen members of the Board of Directors and the holders of the Class B shares, voting as a class, would be entitled to elect three members of the Board of Directors.

## Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

**18. AUTHORIZED SHARE CAPITAL** *(Continued)*

On all other matters, the holders of Class A shares would be entitled to ten votes for each share and the holders of Class B shares would be entitled to one vote for each share held. Class A and Class B shares would entitle the holders to an equal right to dividends. During February 2004, the shareholders approved granting the Board of Directors the authority with a two-thirds affirmative vote to issue the shares, but none have been authorized and issued as of March 31, 2006.

**19. DIVIDENDS**

The Company's bye-laws require the Company to pay aggregate annual cash dividends on its common shares (including for this purpose the Bacardi Corporation, a subsidiary of the Company, preferred shares) equal to a percentage of the Company's total consolidated net earnings for the preceding fiscal year adjusted for certain items as stated in the bye-laws. The BMRH Founders' common shares provide for a per-share annual dividend rate equal to that paid on the Company's common shares. The Bacardi Corporation Preferred Shares and BMRH Founders' common shares dividends are considered minority interest and are included in other miscellaneous expense – net in the accompanying consolidated statements of earnings.

Dividends are accrued when declared. The first quarter dividend for Fiscal 2007 and 2006 was declared in May 2006 and March 2005, respectively. Accordingly, the amount included in accrued liabilities at March 31, 2006 and 2005 was $0 and $38.6 million, respectively. The dividend for Fiscal 2007, declared in May 2006, amounts to $11.92 per share payable each quarter at a rate of $2.98 per share.

**20. INCOME TAXES**

The Company and its subsidiaries operate in areas of the world where earnings are both subject to and exempt from taxation. The operations of the subsidiaries are subject to income taxes at the applicable local rates in the countries where the subsidiaries operate. The provisions for income taxes have been determined on the basis of the taxable income of each individual company or jurisdiction.

Major components of the provision for income taxes are as follows:

| | for the year ended March 31, | |
| --- | --- | --- |
| *(Thousands of U.S. Dollars)* | 2006 | 2005 |
| | $ | $ |
| Current | 82,445 | 52,146 |
| Deferred | (7,174) | 4,917 |
| Total income tax expense | 75,271 | 57,063 |

The provisions for (benefits from) income taxes computed by applying the local statutory rates to income before taxes, as reconciled to the actual provisions (benefits), are as follows:

| | for the year ended March 31, | |
| --- | --- | --- |
| *(Thousands of U.S. Dollars)* | 2006 | 2005 |
| | $ | $ |
| Consolidated income taxes at statutory rates | 54,389 | 66,663 |
| Other taxes | 15,268 | 9,468 |
| Changes in tax rates | 11,415 | (3,084) |
| Tax effect of non-deductible or non-taxable items | 5,219 | 997 |
| Tax credits on dividend from subsidiary | (5,100) | (3,361) |
| Net change in liabilities for tax settlements | (1,542) | (19,248) |
| Other, net | (4,378) | 5,628 |
| Consolidated income tax expense | 75,271 | 57,063 |

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

**20. INCOME TAXES** *(Continued)*

The components of the net deferred income tax assets and liabilities are as follows:

| | at March 31, | |
|---|---|---|
| *(Thousands of U.S. Dollars)* | 2006 | 2005 |
| | $ | $ |
| **Deferred tax assets:** | | |
| Property, plant and equipment | 5,354 | 7,187 |
| Net operating/capital loss carryforwards | 41,482 | 11,708 |
| Employee benefits | 45,760 | 39,094 |
| Other liabilities | 14,499 | 14,198 |
| Inventories | 2,554 | 8,568 |
| Other | 2,146 | 738 |
| Valuation allowance | (36,941) | (25,563) |
| Total deferred tax assets | 74,854 | 55,930 |
| | | |
| **Deferred tax liabilities:** | | |
| Property, plant and equipment | (25,579) | (25,051) |
| Trademarks and other intangible assets | (27,820) | (28,644) |
| Undistributed foreign earnings | (19,371) | (17,105) |
| Long-term investments | (11,210) | (11,210) |
| Inventories | (25,287) | (17,005) |
| Employee benefits | (4,726) | (6,108) |
| Other current assets | (1,390) | (2,377) |
| Other | (315) | (6,357) |
| Total deferred tax liabilities | (115,698) | (113,857) |
| | | |
| Net deferred tax liability | (40,844) | (57,927) |

The deferred income tax assets and liabilities recognized in the consolidated balance sheets consist of:

| | at March 31, | |
|---|---|---|
| *(Thousands of U.S. Dollars)* | 2006 | 2005 |
| | $ | $ |
| Current deferred tax assets - net | 6,279 | 6,747 |
| Long-term deferred tax assets - net | 53,870 | 35,367 |
| Current deferred tax liabilities | (2,280) | (4,748) |
| Long-term deferred tax liabilities | (98,713) | (95,293) |
| Net deferred tax liability | (40,844) | (57,927) |

As of March 31, 2006, the Company had $144.4 million of net operating and capital loss carryforwards available from its subsidiaries to offset future taxable income. Loss carryforwards of $75.2 million must be utilized in the next twenty years, and the remainder can be utilized over an indefinite period. The valuation allowance is for net operating losses and temporary differences in jurisdictions for which the realization of the deferred tax asset does not meet the more likely than not criteria.

# Notes to Consolidated Financial Statements (Continued)
For the Years Ended March 31, 2006 and 2005

### 21. GUARANTEES AND ENDORSEMENTS

In the ordinary course of business, the Company has provided guarantees on certain liabilities of its joint ventures. As of March 31, 2006, the maximum amount of the guarantees amounted to approximately $20 million that would be payable by the Company in the event of default by the joint venture companies. As of March 31, 2006, the Company has no obligation recorded under these guarantees because no financial loss is expected.

In addition, certain subsidiaries of the Company have entered into purchase commitment agreements with third parties in the aggregate amount of approximately $183 million at March 31, 2006. The majority of these commitments are settled within twelve months.

### 22. CONTINGENCIES

Commencing in November 2003, a series of virtually identical class action lawsuits have been filed in the United States against the Company, certain of its subsidiaries, and many other spirits, beer and wine manufacturers and importers, alleging primarily that the named companies improperly target underage consumers through deceptive and unfair marketing and advertising practices. To date, nine such class actions have been filed by the same national plaintiff's counsel seeking to recover, on behalf of parents or guardians of underage children, disgorgement of profits made by the named defendants from alleged underage sales, restitution of funds used by such underage consumers on alcohol purchases, and certain other remedies. The Company, which is participating in a joint defence effort with other industry members, believes the lawsuits to be entirely without merit and is vigorously defending them. To date, four of the lawsuits have been dismissed on the merits by courts in four separate jurisdictions (and one additional case was voluntarily dismissed by the plaintiff). Plaintiffs have appealed some of these rulings and it is anticipated that appeals from all the dismissals will follow. Such appeals are currently pending. Recently, plaintiffs have agreed to voluntarily dismiss, without prejudice, all non U.S. Bacardi companies (and certain other affiliates), including the Company, subject to certain conditions that may permit plaintiffs to reinstate the lawsuits against such companies in the future. As a result, for the time being, only the Company's U.S. distributor remains a defendant in these lawsuits. The ultimate outcome of or potential losses arising from these cases cannot be determined at this time given the pendency of the appeals filed (or to be filed) by plaintiffs as well as the fact that in certain of the cases, the courts have yet to rule on defendants' pending motions to dismiss.

On August 24, 2005, one of the Company's subsidiaries received an Administrative Order from the U.S. Environmental Protection Agency ("EPA") containing findings of violations of permit discharge limits and permit special conditions at its production facilities in Puerto Rico, providing for interim discharge limits, and ordering compliance with certain provisions of the Clean Water Act. Since the issuance of this Order, the Company's subsidiary has met with the EPA, and the local Puerto Rican environmental board, and made several submissions, including two Plans of Action which intend to address EPA's concerns. On March 22, 2006, the EPA issued a second Order extending the interim discharge limits until September 30, 2006 and incorporating as requirements two demonstration studies proposed by the Company's subsidiary in one of its Plans of Action. The Company is cooperating with the EPA and the Puerto Rican authorities to resolve this matter. At this time, the Company cannot determine the ultimate outcome or potential loss, if any, arising from the EPA Order.

The Company and its subsidiaries are party to various legal claims, actions and complaints. While the Company currently believes that the ultimate outcome of these proceedings will not have a material adverse effect on the Company's results of operations, financial position or cash flows, litigation is subject to inherent uncertainties. It is not possible to predict with certainty whether or not the Company and its subsidiaries will ultimately be successful in any of these legal matters, or, if not, what the impact may be. Legal costs are expensed as incurred.

# BOARD OF DIRECTORS



Victor R. Arellano, Jr.



Facundo L. Bacardi*



Jaime Bergel



Francisco Carrera-Justiz



Adolfo L. Danguillecourt**



Paul M. de Hechavarría



Ignacio de la Rocha



Guillermo J. Fernandez-Quincoces



Andreas Gembler



Barry E. Kabalkin**



Jay H. McDowell



Guy Peyrelongue



Ruben Rodriguez



Eduardo M. Sardiña



Raymond P. Silcock

*Chairman of the Board    **Deputy Chairman of the Board

# OFFICERS AND COMMITTEES

### Sergio Danguillecourt Maduro[†]



This year we mourn the tragic loss of Bacardi Limited Director, Sergio Danguillecourt, 42, and his wife, Jacqueline Kriz Danguillecourt, 28. Mr. Danguillecourt, a member of the Board since 1992 and a member of the Audit committee since 1998, and his wife passed away on December 19th, 2005, in a commercial airline accident in Miami, Florida.

Sergio began his career at Bacardi in sales for Bacardi España S.A. in 1982 and eventually became marketing executive at Bacardi U.S.A., Inc. before leaving the Company in 1996 to concentrate on outside business interests. For the past ten years Mr. Danguillecourt served on the Board of Trustees for his alma mater, Manhattanville College, and established the college's first endowed chair in economics.

Sergio will be remembered for his hard work in helping to grow the Company from a single brand to a broad portfolio of premium spirits. On a personal level, Sergio will also be remembered for the love he had for his two sons and for being a good friend to so many.

The prayers of the Bacardi family, its Board of Directors and its employees are with his children and the Danguillecourt and Kriz families.

## Officers

**Facundo L. Bacardi**
*Chairman of the Board*

**Adolfo L. Danguillecourt**
*Deputy Chairman of the Board*

**Barry E. Kabalkin**
*Deputy Chairman of the Board*

**Andreas Gembler**
*President & Chief Executive Officer*

**Ralph Morera**
*Senior Vice President Finance & Chief Financial Officer*

**Eduardo B. Sanchez**
*Senior Vice President & General Counsel*

**Timothy C. Sullivan**
*Senior Vice President - Human Resources*

**Stella J. David**
*Senior Vice President & Chief Marketing Officer*

**Jon Grey**
*Vice President - Global Operations*

**Atul Vora**
*Vice President - Business Development*

**Gaston Tano**
*Controller*

**Pierre Minchin**
*Treasurer*

**Michael Maguire**
*Assistant Vice President*

**Barbara E. Johnson**
*Secretary*

**Gail A. Butterworth**
*Assistant Secretary & Director of Shareholder Relations*

## Audit Committee

The Audit Committee's primary functions are to advise and assist the Board of Directors with respect to the selection of the Independent Auditors of the Company, the conduct of the audit of the Company's accounts, financial reporting matters and internal controls over financial matters. The Committee is also responsible for reviewing the Company's consolidated financial statements, the reports of the Independent Auditors and other financial information.

Jaime Bergel
Sergio Danguillecourt[†]
Guillermo J. Fernandez-Quincoces
Jay H. McDowell
**Guy Peyrelongue**
Raymond P. Silcock - *Chairman*

## Nominating & Governance Committee

The Nominating & Governance Committee assists the Board of Directors in identifying, recruiting and providing candidates who would become nominees for future election to the Board of Directors by the shareholders. The Committee is also responsible for assessing the performance of the Board of Directors and its individual members. Additionally, the Committee is tasked with oversight of the Company's corporate governance.

Victor R. Arellano, Jr.
Facundo L. Bacardi
Francisco Carrera-Justiz
Adolfo L. Danguillecourt - *Chairman*
Ignacio de la Rocha

## Compensation Committee

The Compensation Committee assists the Board of Directors in fulfilling its responsibilities in determining the compensation of the Company's senior executives and Board members. The Committee has the overall responsibility for approving and evaluating the compensation plans (including perquisites and retirement benefits), policies and programs of the Company with respect to officers, senior executives and Directors.

Adolfo L. Danguillecourt
Paul M. de Hechavarria
Guillermo J. Fernandez-Quincoces - *Chairman*
Jay H. McDowell
Guy Peyrelongue



# BERMUDA OFFICE



In 1965, Company Chairman José "Pepín" Bosch led the transfer of the headquarters of Bacardi International Limited from the Bahamas to Bermuda. Seven years later, he inaugurated the magnificent Bacardi Building on Pitts Bay Road, amid great fanfare. This building, originally designed by German Architect Ludwig Mies van der Rohe, was the crowning jewel of Mr. Bosch's many achievements.

Then, in 2000, with demand for office space growing, a new floor was added underneath the original single-level structure, while internal changes altered the character of the the general office space. Five years later, to celebrate the 40th anniversary of the presence of Bacardi in Bermuda, the Company embarked on an ambitious plan to restore the building to echo its former glory.

Original furnishings in use around the building were

**Bacardi Limited's headquarters by architect Ricardo Equilior based on designs by Ludwig Mies van der Rohe has been remodeled four times since inauguration in 1972.**

grouped, restored and placed back in their original offices. New carpeting with patterns representing the four corners of the earth once again adorns the main floor. Modern lighting in the form of chandaliers adds to the contemporary space. The gold frame around the beloved Félix Ramos mural was replaced with a simple yet elegant wood trim, which enhances the presence of this treasured work of art.

As a hallmark of the Company's lineage of distinction, artwork from the entire Bacardi group has been brought to the building to communicate the Company's core value of quality. The most important works that made the move were the portraits of our founders that once hung in Puerto Rico. These were comissioned in the early 1940s by Mr. Bosch from Cuban artist Esteban Valderrama and now overlook the central space below the night sky of Santiago de Cuba.



Emilio Bacardi Moreau



Facundo M. Bacardi Moreau



Enrique Schueg Chassin







# Distinction

## Why a "Ball & Bar"?





Registered for the first time in 1929, the MARTINI Ball and Bar logo is one of the most famous and recognizable trademarks in the world, synonymous with "Gioia di Vivere". MARTINI is the result of the passion and vision of three men and their families who created a vermouth with an unmistakable taste and turned a local product into an international phenomenon.

At the beginning of the 1920's, with the beginning of advertising and sponsorship activities, Luigi Rossi's four sons, innovative and visionary like their father, decided to reinforce the identity of their company by creating a logo which would be easy to recognize around the world and be the guarantee of the quality and uniqueness of its products.

The archives of the company do not reveal the exact origin of the shape of the logo, but numerous stories surrounding its creation have been told. For some people, it is an abstract representation, the ball signifying a glass of MARTINI Rosso, the original vermouth created by the company, and the bar being the bottle pouring into the glass. According to others, the ball symbolizes the world which represents the universality of the brand and the bar comes from an element of the label where the brand name MARTINI was printed in red book type capitals. However, the company has never forgotten its Italian heritage and paid tribute to its birthplace by using for its logo blue and red, the colours of the standards and

shields of the city of Turin (blue) and the House of Savoy (red) which was one of the first royal courts, by decree of King Vittorio Emanuele II, to allow MARTINI to display its coat of arms on its label in 1868.

The interpretations of the logo are diverse, but the fact is that the simplicity of the shapes and colours used has made it recognizable by everyone and ensured that it has remained relevant through the years. Sometimes imitated but never equalled, the MARTINI Ball and Bar logo is today, more than ever, the icon of the unique style, taste and life-embracing attitude that has defined the MARTINI brand since its creation.

**VERMOUTH**

**EXÍJALO SIEMPRE BIEN HELADO**





S. M. IL RE VITTORIO EMANUELE II.





# Why a "Bat"?



After the Santiago de Cuba earthquake of 1852, Don Facundo Bacardi Massó and his family sought refuge in his hometown of Sitges, Catalonia. It was there where his wife, Doña Amalia, discovered the tale of King James I of Aragon, also known as The Conqueror.

Legend has it that in 1238 the King set off to liberate Valencia from its Moorish occupiers. The evening before the battle, a bat was spotted hanging from the highest point in his tent. The next day, after winning the battle, he believed the bat had been a sign of watchfulness and family unity among the Kingdoms of Aragon, Catalonia and Valencia. To commemorate this good omen, King James I of Aragon affixed a bat to Valencia's coat of arms.

Don Facundo later returned to Santiago, where he began experimenting with the distillation of rum in his own home. Fruit bats were often spotted roosting in a nearby banana tree. Attracted by the sweet-smelling molasses used in rum production, they were known to regularly enter the kitchen and sample his concoctions. Doña Amalia knew from the local lore that Cuba's Taino Indians believed bats to be the possessors of all cultural good.

In 1862, after more than a decade of experimentation with rum production, Don Facundo purchased a small tin-roofed distillery where Doña Amalia was the first to

notice a colony of fruit bats hanging from the rafters. Remembering the story of King James I, the bats in her kitchen and the local Taino lore she suggested the use of a bat as the factory's trademark. She believed bats represented good health, fortune and family unity. Soon after the adoption of the Bat Device, Don Facundo's rum became known as "el Ron del Murciélago."

Then, as fate would have it, in 1888, BACARDI was awarded a bat-crowned gold medal featuring Lo Rat Penat at the International Exposition in Barcelona. During this same exposition, Her Majesty The Regent Maria Cristina bestowed upon BACARDI the title "Purveyors to the Royal Spanish Household" and BACARDI became known as "El Rey de los Rones y el Ron de los Reyes."

The Bat Device is today the recipient of more than 70 awards from international expositions and spirits contests. Most recently, BACARDI 1873 Solera was awarded Platinum Best in Show among all dark spirits from the Swiss registered World Beverage Competition. From its first award in 1876 to its current awards this year, BACARDI rum is the world's most awarded premium rum brand in the world.














Medals Awarded to BACARDI



# Why a "Goose"?



The origins of the Goose Device - and the name GREY GOOSE - lie in the Cognac region of western France, the natural home of the world's best tasting vodka. For centuries the world's most respected experts in spirits distillation have practiced their craft in the region, which is renowned for its luxury foods, wines and spirits. It's these craftsmen whose expertise and vision led to the creation of a spirit so exceptional that it has redefined vodka.

Under the watchful eye of an expert, the GREY GOOSE maître de chai (cellar master), the spirit is closely monitored so as to ensure that every drop of its production exceeds expectations. Only the finest ingredients are used, such as the golden fine French wheat and the naturally filtered artesian spring water that when fermented and distilled create the superior nature of GREY GOOSE vodka.

Reflecting how the world's best tasting vodka and Cognac are intrinsically linked, GREY GOOSE is named after the geese that have made Cognac their home and are celebrated in the region. The Geese are a familiar sight in the centre of Cognac where a flock regularly drink from the fountain in front of the Hotel de Ville and each year, geese are put in the spotlight with the Foère aux Pirons (festival of the geese), a local tradition which commemorates the region's world-renowned epicurean heritage.

In its first year of production, GREY GOOSE was hailed as "The World's Best Tasting Vodka" by the Chicago Testing Institute and was also awarded a Platinum medal at the World Spirits Championship in San Francisco, California.

# Why a "Deer"?




The Deer is a symbol of the Jalisco Highlands, known as Los Altos, where the most succulent agave grows. Rich in sugar content, only agave grown in Los Altos region is used for the production of CAZADORES. The result is finer and smoother-tasting tequila.

It all started when Don José María Bañuelos, a small agave farmer from the Jalisco town of Arandas, became dissatisfied with the spirits being made by local producers from his crop. José María experimented for several years with different ways of cooking, fermenting and distilling his agave to create tequila that captured the taste of the Mexican highlands.

Late at night, José María would gaze from his window onto his fields from his small adobe brick farmhouse. He would admire the majestic leaves of his blue agaves and marvel at the highland deer frolicking through his fields. He marvelled at their shadows as they ran timidly through his well-tended agave fields. He was so deeply impressed by their agility and pride that he allowed local farmers to hunt wild birds on his fields but never the proud deer.

When his grandson Don Felix Bañuelos started commercial production in 1922, he named his grandfather's tequila CAZADORES, Spanish for "hunters" after the maverick, pioneering spirit of his grandfather in pursuing his dream. And he chose the proud highland Deer as the independent symbol for the brand, because it not only symbolized his pride in his achievement but also represented the high quality found only in the agave from the Highland region.



TEQUILA



CAZADORES

REPOSADO

# Why a "Drum Major"?







# Why the "Queen" & a "Sapphire"?



# BACARDI LIMITED PORTFOLIO

## Rum and Flavored Rum

BACARDI Carta Blanca
BACARDI Gold / Oro
BACARDI Black / Select
BACARDI 151°

BACARDI LIMÓN
BACARDI O
BACARDI RAZZ / BERRY
BACARDI VANÍLA
BACARDI CÓCO
BACARDI BIG APPLE / APPLE
BACARDI GRAND MELÓN

BACARDI Reserva
BACARDI Añejo
BACARDI 1873
BACARDI 1873 Solera
BACARDI 8
BACARDI Reserva Limitada

CASTILLO Silver
CASTILLO Gold
CASTILLO Añejo
CASTILLO Spiced

PALMAS
ESTELAR

## Italian Vermouth

MARTINI Bianco
MARTINI Rosso
MARTINI Dry
MARTINI Rosé
MARTINI D'Oro

## French Vermouth

NOILLY PRAT Blanc
NOILLY PRAT Rouge
NOILLY PRAT Ambre

## Vodka

GREY GOOSE
GREY GOOSE L'Orange
GREY GOOSE La Vanille
GREY GOOSE Le Citron

ERISTOFF
ERISTOFF Red
ERISTOFF Black

RUSSIAN PRINCE
NATASHA

## Blended Scotch Whisky

DEWAR'S WHITE LABEL
DEWAR'S 12 Year Old
DEWAR'S Signature
DEWAR'S 18 Year Old

WILLIAM LAWSON'S Finest Blended
WILLIAM LAWSON'S SCOTTISH GOLD

## Single Malt Scotch Whisky

ABERFELDY 12 Year Old
ABERFELDY 21 Year Old

GLEN DEVERON 10 Year Old

ROYAL BRACKLA
CRAIGALLACHIE
AULTMORE

## Gin

BOMBAY
BOMBAY SAPPHIRE

BOSFORD

## Tequila

CAZADORES Reposado
CAZADORES Blanco
CAZADORES Añejo

CORZO Reposado
CORZO Blanco
CORZO Añejo

CUATRO VIENTOS
CAMINO REAL

## Cognac

OTARD XO
OTARD VSOP
OTARD Napoléon
OTARD XO Gold
OTARD 55
OTARD 1795 Extra

GASTON DE LA GRANGE

## Brandy

VIEJO VERGEL

## Liqueur

BÉNÉDICTINE
B&B

GET 27/31
CHINA MARTINI
NASSAU ROYALE

## Sparkling Wine

MARTINI Asti
MARTINI Riesling
MARTINI Prosecco
MARTINI Brut

GRANDI AUGURI
MAGICI ISTANTI

Bacardi Limited's Brand Portfolio consists of over 200 brands and labels. Just a small selection is represented here.

The following are trademarks or registered trademarks of Bacardi & Company Limited or of other subsidiaries of Bacardi Limited: BACARDI, the Bat Device, BACARDI LIMÓN, BACARDI O, BACARDI RAZZ, BACARDI BERRY, BACARDI VANÍLA, BACARDI CÓCO, BACARDI BIG APPLE, BACARDI APPLE, BACARDI GRAND MELÓN, MARTINI, the Ball and Bar logo, MARTINI & ROSSI, BOMBAY, BOMBAY SAPPHIRE, DEWAR'S, the Highlander Device, WHITE LABEL, GREY GOOSE, the Flying Goose Device, ERISTOFF, RUSSIAN PRINCE, NATASHA, CAZADORES, CORZO, CUATRO VIENTOS, CAMINO REAL, WILLIAM LAWSON'S, SCOTTISH GOLD, GLEN DEVERON, ABERFELDY, ROYAL BRACKLA, CRAIGALLACHIE, AULTMORE, BOSFORD, OTARD, GASTON DE LA GRANGE, VIEJO VERGEL, BÉNÉDICTINE, B&B, GET 27, GET 31, CHINA MARTINI, NASSAU ROYALE, CASTILLO, GRANDI AUGURI, MAGICI ISTANTI.
"DRINK RESPONSIBLY!"





BACARDI LIMITED

P.O. BOX HM 720, Hamilton HM CX, Bermuda. Telephone: 441-295-4345 Fax: 441-292-055
www.bacardi.com www.martini.com www.dewars.com www.bombaysapphire.com
www.greygoosevodka.com www.cazadores.com

# Exhibit 3

# Bacardi Is to Bring Havana Club Rum Back to the U.S.

By Vanessa O'Connell

Bacardi Ltd., in a move aimed at blocking Cuba from eventually bringing its rum brand to the U.S. market, is expected to announce today that it is relaunching Havana Club brand rum in the U.S.

Bacardi's action comes just days after the U.S. Patent and Trademark office on Aug. 3 notified Cuba, which has controlled the brand since 1959, that its Havana Club trademark "registration will be cancelled/expired." A few days earlier, the U.S. Treasury's Office of Foreign Assets Control had denied a Cuban government agency the license needed for U.S. trademark renewal.

These decisions made it difficult for the Cuban government to claim any rights to the trademark in the U.S., giving Bacardi the chance to act.

The battle between Bacardi and Cuba over Havana Club has its roots in Fidel Castro's takeover of Cuba in 1959. The newly installed Castro regime seized control of Cuba's rum industry, including both the Havana Club and Bacardi businesses. Bacardi's owners left Cuba and rebuilt their business using their Puerto Rico plant, but Havana Club's original owners didn't have any alternative factory to continue making the rum—allowing the Castro regime to retain control.

Until 1993, Cuba made Havana Club rum primarily for domestic consumption and the Soviet bloc, but that year Cuba struck a deal with French liquor concern Pernod-Ricard SA to sell the rum in 80 countries. Since then the rum has become popular around the world—except in the U.S. where the trade embargo blocked sale of Cuban-owned products.

While Cuba hasn't been able to sell Havana Club in the U.S., it obtained the U.S. trademark in 1974 when the brand's original owners inadvertently let the U.S. trademark lapse. With the help of the powerful anti-Castro lobby, however, Bacardi in 1999 persuaded lawmakers to change trademark law to prevent the U.S. from renewing trademarks for brands whose ownership was confiscated by the Castro regime.

For its part, Bacardi says it owns the rights to the Havana Club brand based on its attempt to launch Havana Club on a very small scale in the U.S. years ago, as well as a deal it says it made with descendants of the brand's original owners. It also has a pending application to register the Havana Club mark in its own name, according to Bacardi USA spokeswoman Pat Neal. She said the closely held company has been planning to relaunch Havana Club for at least three years.

# Exhibit 4

News - MSN Money

MSN Home   Hotmail   My MSN   **Sign In**

Search Web

**msn** Money

Search MSN Money:            Go    CNBC   Help

| Home | News | Banking | Investing | Planning | Taxes | My Money |   Portfolio   RSS   Loans   Insurance

**News Home**   This Week's Commentary   Commentary Index

August 08, 2006 06:42 PM ET

## Havana Club Rum Resurfaces in U.S.

MIAMI (AP) - A rum first made in Cuba is finally for sale again in the U.S. after being kept from Americans' pina coladas and mojitos for years by the trade embargo and a long legal battle.

**AP** Associated Press

All Associated Press News

Bacardi USA Inc. began shipping cases of Havana Club on Tuesday. It is based on a recipe created by a family-owned Cuban company in 1935 that was largely unused after Fidel Castro rose to power in 1959 and seized the family's plant and its trademark.

**Recent investing news**

Heinz sees 1st-quarter sales up more than 7 pct

At Forbes: Options Indictments

At Forbes: Falconbridge Plays Ball With Xstrata

At Forbes: 3Com's China Play 'Not Diminished' By CEO Change

At Forbes: Disney, Cisco Lift Market

The Cuban government has continued to produce rum under the Havana Club label since 1960 and it has been available widely elsewhere in the world since 1993, when the nation partnered with the French company Pernod Ricard SA. Bacardi says the Cuban-produced rum did not follow the original recipe, which was kept secret by the creator's family. It was not available in the U.S. anyway because of the trade embargo.

"It means a lot to me, so I think it means a lot to many people," said 70-year-old Ramon Arechabala, whose great-grandfather first concocted Havana Club rum. "It's a hell of a rum."

Arechabala said a Cuban revolutionary held a gun to his head to force him from the Jose Arechabala SA plant. His family fled to the U.S.

"They had always hoped to relaunch their brand," said Patricia Neal, a Bacardi spokeswoman. "They did not have the financial wherewithal even though they had the rum-making expertise."

Bacardi bought the recipe and the Havana Club name from the Arechabala family in 1994, and the rum was offered in the U.S. for three years. It was eventually pulled from shelves, though, after a legal battle began over who had the right to distribute a product under the Havana Club label in the U.S.

Cuba obtained the U.S. trademark in 1974, but the U.S. Patent and Trademark Office ruled against government-owned Cubaexport last week, saying it was canceling the registration. Cubaexport has six months to appeal the decision; should it do so, the trademark will remain on the books during the appeals process.

If an appeal were unsuccessful, Cubaexport could still take its case to federal court. A message left Tuesday with a Paris-based spokeswoman for Pernod Ricard seeking comment on the matter was not immediately returned.

Havana Club rum takes up to three years to age, but Bacardi had been preparing for a relaunch, so it will be on store shelves and in bartenders' hands later this week in Florida, the country's biggest rum market. The company says it has a limited supply of the rum but plans to offer it more widely in the U.S. It gave no further specifics.

"We're thrilled to bring Havana Club back," said John Gomez, a vice president at Miami-based Bacardi. "We decided that when we looked at that recipe that it really was the perfect rum to be introduced at this time."

Bacardi's version of Havana Club, which is made in Puerto Rico, starts with black-strap molasses that goes through a fermentation process the company says is three times slower than traditional methods. It is distilled five times and aged in oak barrels.

Its relaunch comes as worldwide attention has been focused on Cuba with word that President Fidel Castro underwent surgery last week and temporarily handed over power to his brother. Both Bacardi and the patent office said their decisions were unrelated.

"This decision is all part of a process," said Brigid Quinn, a U.S. Patent and Trademark Office spokeswoman. "It's definitely not related to current events."

———

Associated Press writer Hope Yen contributed to this report from Washington.

© 2006 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

MSN Privacy   Legal   Advertise                                     Feedback   Help

© 2006 Microsoft | *Microsoft*

# Exhibit 5

FT.com / World - Bacardi seeks global rights to Havana Club                                Page 1 of 1

---

 **.COM**   **WORLD**

FINANCIAL TIMES                                                                          Close

## Bacardi seeks global rights to Havana Club

Print

By Jenny Wiggins in London
Published: August 9 2006 07:49 | Last updated: August 9 2006 10:29

Bacardi plans to fight for the rights to the Havana Club rum brand in global markets after a US trademark ruling helped it re-launch the brand in the US following a long dispute with the Cuban government and Pernod Ricard.

The US patent and trademark office last week ruled that the Cuban government, which sells rum under the Havana Club brand name in partnership with Pernod Ricard in dozens of countries, could not claim any rights to the brand in the US because its registration of the brand had expired.

Bacardi claims that the ruling by the US trademark office means that it now owns the Havana Club brand, and that this will help it challenge the rights to the brand in globalmarkets.

"We will look at other [brand rights] challenges on a market by market basis," Bacardi said. The company owns the brand inKyrgyzstan, Croatia and Tajikistan; has rights pending in India, Nicaragua, the Bahamas and the US; and is challenging rights to the brand in Canada and Spain.

The ruling comes after 10 years of acrimony between the Cuban government and Bacardi. The Havana Club brand was created by a Cuban family, the Arechabalas, in 1935, and was sold in the US until the 1950s.

The family left the country during the Cuban Revolution under Fidel Castro in the 1960s, and sold the brand to Bacardi in the mid-1990s. Meanwhile, the Cuban government registered the Havana Club trademark in the US in 1976, and in 1993 formed a joint venture with Pernod Ricard to sell the brand internationally. It was not sold in the US due to the country's trade embargo with Cuba.

Bacardi, whose Bacardi rum vies with Diageo's Smirnoff vodka as the top-selling spirit in the US, started selling rum under the Havana Club name in the US in 1995, and was sued by Cuba and Pernod Ricard.

Bacardi stopped sales while it dealt with the litigation, which went to the Supreme Court.

The court ruled that the Cuban-French joint venture had no rights to the brand in the US.

Bacardi then entered a second set of lawsuits relating to the registration of the brand. It is still trying to register the Havana Club trademark in its own name.

Rum is one of the fastest growing spirits markets in the US, with annual sales volumes growing at between 5 and 7 per cent.

Copyright The Financial Times Limited 2006

"FT" and "Financial Times" are trademarks of the Financial Times. Privacy policy | Terms
© Copyright The Financial Times Ltd 2006.

# Exhibit 6

A 389

56

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------x
                                 :
HAVANA CLUB HOLDING, S.A. and    :
HAVANA CLUB INTERNATIONAL, S.A., :
                                 :    No. 96-Civ.-9655 (SAS)
                Plaintiffs,      :
                                 :    ANSWER, AFFIRMATIVE
       - against -               :    DEFENSES AND
                                 :    COUNTERCLAIMS TO FIRST
GALLEON, S.A., BACARDI-MARTINI U.S.A., :  AMENDED COMPLAINT
INC., GALLO WINE DISTRIBUTORS, INC., :
G.W.D. HOLDINGS, INC. and PREMIER :   JURY TRIAL DEMANDED
WINE AND SPIRITS,                :
                                 :
                Defendants.      :
                                 :
---------------------------------x

Defendants BACARDI-MARTINI U.S.A., Inc. ("BACARDI-MARTINI") and

Galleon, S.A. (now after its merger into its parent, Bacardi & Company Limited, the

surviving entity of the merger, known as Bacardi & Co. Ltd.) ("Bacardi"), for their Answer

to the First Amended Complaint and their Affirmative Defenses and Counterclaims herein,

through their undersigned counsel, Kelley Drye & Warren, LLP, allege as follows:

        1.      Admit, in respect of paragraphs 1 and 2 of the First Amended

Complaint, that plaintiffs have instituted the present action under the Lanham Act, 15 U.S.C.

§ 1051 et seq and 28 U.S.C. § 1331, but deny any violations of the Lanham Act or any

other law or treaty of the United States, and except as so admitted, deny each and every

other allegation contained therein.

10/17/97

2.  Admit, in respect of paragraph 3 of the First Amended Complaint, that venue is alleged under 28 U.S.C. § 1391, and that Bacardi is an alien, but deny that these defendants are residents of this district within the meaning of 28 U.S.C. § 1391 and further deny each and every other allegation contained therein.

3.  Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 4 and 5 of the First Amended Complaint and, therefore, deny same.

4.  Admit, in respect of paragraph 6 of the First Amended Complaint, that the party sued as Galleon, S.A. was formerly a separate Bahamian company, but aver that Galleon, S.A. was merged into its parent, Bacardi, a company organized and existing under the laws of Liechtenstein, with its headquarters at Millar Road, Nassau, Commonwealth of the Bahamas, which is the sole surviving entity of said merger and succeeded to all the assets of Galleon, S.A., including its rights in the HAVANA CLUB trademark for "rum," and assumed all its liabilities.

5.  Admit, in respect of paragraph 7 of the First Amended Complaint, that defendant BACARDI-MARTINI is a Delaware corporation and deny each and every other allegation contained therein.

6.  Deny the allegations contained in paragraphs 8 and 9 of the First Amended Complaint, except admit that the defendants Bacardi and BACARDI-MARTINI are under common ownership and control and admit that "Exclusive Imports" is a d/b/a of BACARDI-MARTINI.

7.    Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 10 and 11 of the First Amended Complaint and, therefore, deny same.

8.    Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 12, 13, 14 and 15 of the First Amended Complaint and, therefore, deny same.

9.    Deny each and every allegation contained in paragraphs 16 and 17 of the First Amended Complaint, except admit that the Cuban Asset Control Regulations prohibit the importation of rum and other goods from Cuba.

10.    Deny each and every allegation contained in paragraphs 18, 19, 20, 21, 22, 23, 24, 25, 26 and 27 of the First Amended Complaint, except admit that rum produced in the Bahamas under the authority of Bacardi's predecessor-in-interest, Galleon, S.A., was imported into the United States, distributed and sold exclusively by defendant BACARDI-MARTINI under the mark HAVANA CLUB in interstate commerce in the United States through various wholesalers, including Gallo Wine Distributors, Inc., in New York and elsewhere, which distributors sold said HAVANA CLUB rum to retailers which, in turn, sold it to consumers and that said HAVANA CLUB rum was listed and offered for sale in Beverage Media, Metro New York, and other publications and that copies of photographs of these products are attached as Exhibit A to the First Amended Complaint, and aver that the labeling and trade dress are as appears on the products themselves.

11.    Admit, in respect of paragraph 28, that Cuba is an island and aver that both Cuba and the islands that comprise the Commonwealth of the Bahamas are in the

Caribbean region, and except as so admitted and averred, deny each and every other allegation contained therein.

12.    Admit, in respect of paragraphs 29 and 30 of the First Amended Complaint, that the labeling and trade dress for the HAVANA CLUB rum made under authority of Bacardi's predecessor-in-interest, Galleon, S.A., is as it appears on the product itself, and except as so admitted, deny each and every other allegation contained therein.

13.    Admit, in respect of paragraph 31 of the First Amended Complaint, that bottles of liquor are generally displayed on retail shelves with the bottle turned to the front and except as so admitted, deny each and every other allegation contained therein.

14.    Deny each and every allegation contained in paragraph 32 of the First Amended Complaint.

15.    Admit, in respect of paragraph 33 of the First Amended Complaint, that Havana is the capital of Cuba and that it is a city located in Cuba, and except as so admitted, deny each and every allegation contained therein.

16.    Deny each and every allegation contained in paragraphs 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47 and 48 of the First Amended Complaint.

17.    Answering each and every allegation contained in paragraph 49 of the First Amended Complaint, repeat and reallege each and every response to paragraphs 1-31, 33, 39-48 of the First Amended Complaint as though fully set forth herein.

18.    Deny, in respect of paragraphs 50, 51 and 52, each and every allegation contained therein and specifically aver that defendants and their predecessors-in-interest did use the trademark HAVANA CLUB for rum and the labeling therefor in interstate commerce in the United States prior to January 1, 1996.

19.    Answering each and every allegation contained in paragraph 53 of the First Amended Complaint, repeat and reallege each and every response to paragraphs 1-31, and 40-44 of the First Amended Complaint, as though fully set forth herein.

20.    Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67 and 68 of the First Amended Complaint, and, therefore, deny same, except to specifically deny that the HAVANA CLUB mark was legally adopted and used in Cuba by these plaintiffs prior to the defendants' use of the HAVANA CLUB trademark for rum in the United States, and deny that defendants adoption of their mark was in bad faith or that defendants' use will lead to error or confusion.

## AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant-counterclaimants Bacardi and BACARDI-MARTINI, as and for their Affirmative Defenses and Counterclaims (collectively, the "Counterclaims"), allege upon personal knowledge as to their own acts and, upon information and belief as to the acts of others, as follows:

AS AND FOR A FIRST
AFFIRMATIVE DEFENSE AND COUNTERCLAIM

I.

False and Fraudulent Renewal of the
Purported HAVANA CLUB and Design Registration
In Violation of § 38 of the Lanham Act.

1.    Bacardi is a company organized and existing under the laws of

Liechtenstein, with a place of business at Millar Road, Nassau, Bahamas.

2.    BACARDI-MARTINI is a Delaware corporation with its principal place

of business in Miami, Florida.

3.    Plaintiff-counterclaim-defendant Havana Club Holding, S.A. ("Havana

Holding") a corporation organized under the laws of Luxembourg, was established in

November 1993 and has its offices in Paris, France.  Havana Holding never has done

business in the United States and does not own and never has owned any of the federal or

state permits required to engage in the distilled spirits business in the United States.

4.    Plaintiff-counterclaim defendant Havana Club International, S.A.

("HCI") is a Cuban company which never has done any business in the United States.  HCI

does not hold and never has held any of the federal or state permits required to engage in the

distilled spirits business in the United States.

5.    Neither Havana Holding nor HCI ever obtained a label approved from

the U.S. Bureau of Alcohol, Tobacco and Firearms (ATF) for any distilled spirits product,

including, but not limited to HAVANA CLUB rum.

6.    BACARDI-MARTINI is engaged, among other things, in the business

of importing, distributing, and selling distilled spirits, including BACARDI, CASTILLO, and

HAVANA CLUB rums, in interstate commerce throughout the United States. The rums sold by BACARDI-MARTINI in the United States were produced in Cuba until the unlawful expropriation of the Bacardi facilities and distillery there by the Castro regime and are now produced principally in Puerto Rico and The Bahamas.

7.     Bacardi and its predecessors-in-interest, including Galleon S.A. and Jose Arechabala S.A. ("Arechabala"), have been engaged in the spirits business since before the turn of the century and Bacardi owns the mark HAVANA CLUB for rum in the United States and App. Ser. No. 74/572,667 to register the mark HAVANA CLUB for "rum and rum specialty drinks" in International Class 33 in the U.S. Patent and Trademark Office (the "PTO").

8.     The Bacardi rum business is presently owned by the descendants of Don Facundo Bacardi, who over a century ago in Cuba originated a recipe and process for the distillation and manufacture of rum that has been sold ever since under the BACARDI name and mark. Compania Ron Bacardi, S.A., a Cuban joint-stock company formerly headquartered in Santiago de Cuba, formerly produced BACARDI rum in Cuba.

9.     As a result of the extensive advertising, promotion and sale of BACARDI rum, American consumers have long recognized BACARDI rum as being of the highest quality. Indeed, BACARDI rum is today the best-selling brand of spirits in the world.

10.     On October 14, 1960, the Cuban properties of the defendant-counterclaimants' predecessors Compania Ron Bacardi, S.A. and Arechabala were unlawfully expropriated by the Castro regime.

11.    Defendant-counterclaimants have a bona fide intent to produce rum in the future in a democratic Cuba. When the President of the United States, pursuant to the Cuban Democracy Act of 1992, 22 U.S.C.A. Section 6007(b), certifies that a democratic government has been re-established in Cuba and the U.S. trade embargo with Cuba is lifted, then defendant-counterclaimants intend once again to produce rum in Cuba, the land where Bacardi's rum business began.

12.    At present, however, it is not possible to make rum in Cuba and import and sell that rum in the United States. As American consumers are well aware due to the long-standing embargo of items manufactured in Cuba, rum produced there cannot at present be lawfully sold in or imported into the United States.

13.    BACARDI-MARTINI has been importing and will continue to import and distribute rum in the United States made under authority granted by Bacardi and its predecessor-in-interest. That rum is being sold under the trademark HAVANA CLUB and is carefully made in the style developed by Cuban rum masters prior to Castro's unlawful confiscation of the distilleries of Ron Bacardi S.A., Arechabala, and other Cuban rum producers.

14.    The Cuban Asset Control Regulations ("CACR"), implemented in 1963 under Section 5(b) of the Trading With The Enemy Act of 1917, as amended, 50 U.S.C. App. 1-44, prohibit transfers of property, including trademarks, in which a Cuban entity has an interest except when authorized by the Office of Foreign Assets Control ("OFAC") acting on behalf of the Secretary of the Treasury.

15. In 1976, the trademark HAVANA CLUB for "rum" was registered in the United States Patent and Trademark Office ("related U.S. Registration") by Empresa Exportadora de Alimentos y Productos Varios ("Cubaexport"), a Cuban state enterprise.

16. On October 29, 1993, Cubaexport entered into an agreement purportedly transferring the U.S. rights to the HAVANA CLUB trademark and the related U.S. Registration to Havana Rum & Liquors, S.A. On or about November 22, 1993, Havana Rum & Liquors, S.A. entered into an agreement purportedly transferring the aforesaid mark and the related U.S. Registration to Havana Club Holding, S.A.

17. Those provisions of the original transfer agreement relating to transfers of the U.S. rights to the HAVANA CLUB mark and the related U.S. Registration were rendered null and void by the CACR, § 515.201(b)(1), and the attempted assignment of said HAVANA CLUB mark and the related U.S. Registration were invalid and of no force and effect and void ab initio.

18. As a result, the status quo ante as of the October 29, 1993 date of said abortive original transfer agreement was never changed, and Cubaexport retained whatever rights it had in said mark and the related U.S. Registration as of said date, notwithstanding the invalid transfers.

19. Neither Havana Holding nor HCI ever sold any rum under the HAVANA CLUB mark in the United States.

20. Plaintiffs Havana Holding and HCI have never obtained rights to the trademark HAVANA CLUB for "rum" in the United States.

21. Any rights that Havana Club Holding, S.A. may have had, may have or claims to have had in the Registration of the HAVANA CLUB trademark (U.S. Reg. No.

1,031,651) from forever until the present have been cancelled by order of the Court stayed subject to an appeal.

22.    If Cubaexport ever had any rights in the HAVANA CLUB mark in the United States and the related U.S. Registration 1,031,651, which is denied, those rights, if any, still subsisted in Cubaexport after the purported assignment to Havana Holding and never were transferred from Cubaexport, and its purported assignment of said mark and related U.S. registration was a naked and unlawful assignment which was of no force and effect. Nonetheless, Havana Holding purported to renew said registration on or about January 12, 1996. The purported attempts by Cubaexport and plaintiff-counterclaim-defendants to transfer said mark and registration were, in addition to being invalid assignments-in-gross, null and void ab initio pursuant to 31 CFR § 515.203(a) and cannot serve as the basis for recognizing any rights to said mark in Havana Holding.

23.    Cubaexport and plaintiff-counterclaim-defendants Havana Holding and HCI were at all relevant times aware of the fact that the purported transfers of the HAVANA CLUB and Design mark in the United States and said registration thereof were prohibited by the CACR and willfully violated those regulations and knowingly caused their counsel to file a false and fraudulent application with OFAC to try to have said trademark retroactively approved. Indeed, said fraudulent and false application was only made after a petition to cancel the purported U.S. registration of said mark was filed in the PTO. Furthermore, Havana Holding knowingly falsely represented that it owned said mark and registration in connection with the renewal declaration filed on or about January 12, 1996.

24.    Cubaexport, plaintiff-counterclaimants-defendants' alleged predecessor-in-title obtained U.S. Registration No. 1,031,651 of the mark HAVANA CLUB and Design

for rum by false means, including making false or fraudulent representations to the PTO, that it owned said mark in the United States.

25.    Havana Rum & Liquors, SA, also an alleged predecessor, obtained title to U.S. Reg. No. 1,031,651 of the mark HAVANA CLUB and Design for rum by false means, including making false or fraudulent representations, both orally or in writing, to the PTO and OFAC, which statements were designed to conceal its unlawful activities as alleged above.

26.    Plaintiff-counterclaim-defendant Havana Holding knowingly obtained record title to U.S. Registration No. 1,031,651 of the mark HAVANA CLUB and Design by false means, including making false or fraudulent representations, to the PTO as alleged above in connection with the purported renewal of said mark in the name of Havana Holding and to OFAC in an effort to conceal its unlawful activities as alleged above.

27.    As a result of plaintiff-counterclaim-defendants' aforesaid acts, defendant-counterclaimants have sustained, and are continuing to sustain, damages to their business in the United States under the HAVANA CLUB mark for rum, including lost sales here of said product and have been forced to incur attorneys fees on their own behalf and on behalf of independent distributors who have been threatened and sued by plaintiff-counterclaim-defendants ostensibly relying on their fraudulently or falsely obtained rights in U.S. Reg. No. 1,031,651 for their purported HAVANA CLUB and Design mark, all in violation of Section 38 of the Lanham Act 15 U.S.C. § 1120.

28.    Notwithstanding plaintiff-counterclaim-defendants knowledge of their violations of the CACR, Havana Holding and HCI are still falsely asserting rights in the HAVANA CLUB mark in the United States.

WHEREFORE, defendant-counterclaimants pray for the relief requested hereinafter.

## AS AND FOR A SECOND
## AFFIRMATIVE DEFENSE AND COUNTERCLAIMS

### II.

### Abandonment

29.    Paragraphs 1 through 28 of the Counterclaims are incorporated herein by reference.

30.    If plaintiff-counterclaim-defendants ever obtained any common law rights in the mark HAVANA CLUB for rum, which is denied, plaintiffs nevertheless presently have no rights whatsoever to the mark HAVANA CLUB for "rum" in the United States because their aforesaid actions after the abortive assignments have caused it to lose any significance as a source of origin.  As between Havana Holding and HCI, on the one hand, and Cubaexport on the other, Cubaexport owns the reputation or goodwill, if any, that exists in the United States as a result of the purported advertising and sale of Castro regime HAVANA CLUB rum.  Any attempt by plaintiff-counterclaim-defendants to claim right to that reputation and goodwill, if any, constitutes abandonment of any rights therein.

WHEREFORE, defendant-counterclaimants pray for the relief requested hereinafter.

A **401**

## AS AND FOR A THIRD
## AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### III.

### Misrepresentation of Goods

31.     Paragraphs 1 through 30 of the Counterclaims are incorporated herein by reference.

32.     The aforesaid actions of plaintiff-counterclaim-defendants, including their use of the labeling statement incorporated as a component of the Design portion of the aforesaid mark that falsely indicates that Havana Holding or its predecessor was "founded in 1878", is part of a deliberate scheme by plaintiff-counterclaim-defendants to pass off their ersatz HAVANA CLUB rum as being somehow approved by the producer of, or as being the same quality as, the only Cuban origin HAVANA CLUB rum ever sold legally in the United States which was produced by defendants' predecessor-in-interest, Arechabala, which truthfully traced its origins to 1878.

33.     Furthermore, plaintiff-counterclaim-defendants' other aforesaid acts and omissions are intended to confuse anyone purchasing their ersatz product, including visitors to Cuba, into wrongly believing that they are somehow the legitimate successor to the original producer of the HAVANA CLUB rum sold in the United States, Arechabala. Indeed, the use of the statement "founded in 1878" as part of the Design portion of the mark can have no other purpose.

34.     Through the aforesaid acts, plaintiff-counterclaim-defendants have used the purported HAVANA CLUB and Design mark as a vehicle for fraud and said mark is

being used in violation of 15 U.S.C. § 1064(3) to misrepresent the source of their ersatz HAVANA CLUB rum.

WHEREFORE, defendant-counterclaimants pray for the relief requested hereinafter.

## AS AND FOR A FOURTH
## AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### IV.

### Unclean Hands

35.    Paragraphs 1 through 34 of the Counterclaims are incorporated herein by reference.

36.    Plaintiff-counterclaim-defendants have willfully violated civil and criminal statutes of the United States in their efforts to claim ownership of the HAVANA CLUB mark for rum in the United States.

37.    Plaintiff-counterclaim-defendants have sold under the mark HAVANA CLUB a rum product in Panama and elsewhere that contained rum made outside of Cuba, including rum specifically produced in Panama.

38.    Accordingly, Havana Holding and HCI are barred by the doctrine of unclean hands from being awarded any equitable relief herein, on the ground that the mark HAVANA CLUB has geographic significance.

A   403

WHEREFORE, defendant-counterclaimants pray for the relief requested hereinafter.

## AS AND FOR A FIFTH
## AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### V.

### Declaratory Judgment

39.    Paragraphs 1 through 38 are incorporated herein by reference.

40.    This is a counterclaim for a declaratory judgment brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the Lanham Act, 15 U.S.C.§ 1051, et. seq. which arises from an actual controversy between defendant-counterclaimants and plaintiff-counterclaim-defendants as to whether defendant-counterclaimants are entitled to use of the term HAVANA CLUB as a trademark for rum in the United States.  Plaintiff-counterclaim-defendants have asserted that this use by defendant-counterclaimants infringes on their purported rights in the mark HAVANA CLUB and Design as a result of a purported registration obtained under Section 44 of the Lanham Act, which issued  on January 27, 1974 and/or violates Section 43(a) of the Lanham Act.

41.    Neither plaintiff-counterclaim-defendants Havana Holding nor HCI has ever used the mark HAVANA CLUB and Design in interstate commerce in the United States and plaintiffs have no rights whatsoever in the HAVANA CLUB mark for rum in the United States.  Furthermore, plaintiff-counterclaim-defendants could not lawfully sell HAVANA CLUB rum in the United States if the embargo were lifted tomorrow.

42.    Long before January, 1986, the HAVANA CLUB name and mark was used on rum produced by or under the authority of Bacardi's predecessors-in-interest,

including Galleon, S.A. and Arechabala, that was distributed, offered for sale, and sold in interstate commerce in the United States.

43.    Pursuant to the Lanham Act, 15 U.S.C. § 1052(a), as amended, trademarks of spirits which may have geographic significance but which were in use prior to January 1, 1996 are exempt from any statutory proscription against the use of trademarks that might otherwise be considered geographically misdescriptive. In the Statement of Administrative Authority, Cong. Rec. Vol. 140 (1994), U.S.C.C.A.N., 103d Cong. 2nd Sess. 1994, Congress, in connection with TRIPs, explicitly stated, with respect to wine and spirits brands, that "[a]ny trademark containing a geographic indication that is currently registered or in use, or that is registered or in use [before January 1, 1996] may be maintained" (emphasis added). This policy was incorporated in the amendment to 15 U.S.C. § 1052(a), which "grandfathers" defendants' said usage of the mark HAVANA CLUB.

44.    Consequently, even assuming, arguendo, that the mark "Havana Club" may have geographic significance, which defendant-counterclaimants deny, defendant-counterclaimants are entitled to maintain use of that term as a trademark for rum in the United States.

45.    By reason of the foregoing, this Court should declare that defendant-counterclaimant Bacardi has the prior, superior, and exclusive right to use of the designation HAVANA CLUB as a trademark for rum in the United States and that plaintiff-counterclaim-defendant Havana Holding has acquired no valid rights in or to use of the words HAVANA CLUB as a trademark for rum in the United States and cannot stop Bacardi from use of said mark as aforesaid.

46.    Defendant-counterclaimants have been and are being damaged by Havana Holding's assertion of trademark rights in the term HAVANA CLUB and an actual controversy exists as to the existence of said rights as is demonstrated by the institution of the present suit.

WHEREFORE, defendant-counterclaimants respectfully pray for the relief requested hereinafter.

### AS AND FOR A SIXTH
### AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### VI.

### Failure to State Claim

47.    Paragraphs 1 through 46 are incorporated herein by reference.

48.    The First Amended Complaint fails to state any claims against defendant-counterclaimants upon which relief can be granted and plaintiffs have failed to demonstrate standing to assert said claims.

WHEREFORE, defendant-counterclaimants respectfully pray:

A.    That the First Amended Complaint herein be dismissed with prejudice; and that defendant-counterclaimants be awarded their reasonable attorneys' fees and their costs and disbursements incurred herein.

B.    That with respect to the Affirmative Defenses and Counterclaims asserted herein, the Court adjudge and decree as follows:

1.    That this Court declares that defendant-counterclaimant Bacardi has the exclusive right to use the trademark HAVANA CLUB for rum in the United States and that Havana Holding and HCI have acquired no rights in said trademark in the United

States and are permanently enjoined from using said mark in the United States and from

interfering in any manner with Bacardi's lawful use of said mark;

      2.    That defendant-counterclaimants recover their monetary damages

suffered as a result of the aforesaid violations of 15 U.S.C. § 1120 as well as their costs and

attorneys fees incurred in prosecuting said claim; and

      3.    That defendant-counterclaimants have such other and further

relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

    Defendant-counterclaimants hereby demand trial by jury on all issues so triable

as of right.

Dated:    New York, New York
          October 17, 1997


                      Respectfully submitted,

                      KELLEY DRYE & WARREN, LLP

                      By: _____
                          William R. Golden, Jr. (WG9406)
                          Margaret Ferguson (MF4036)
                          Jennifer Bernheim (JB9897)
                    Attorneys for Defendants-counterclaimants
                  Bacardi & Company Limited and
                  BACARDI-MARTINI U.S.A., Inc.
                  101 Park Avenue
                  New York, New York 10178
                  (212) 808-7800

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

BACARDI & COMPANY LIMITED,
1000 Bacardi Road
New Providence, Bahamas

and

BACARDI U.S.A., INC.,
2100 Biscayne Boulevard
Miami, Florida 33137

                                    Plaintiffs,


        v.


EMPRESA CUBANA EXPORTADORA DE
ALIMENTOS Y PRODUCTOS VARIOS d/b/a
CUBAEXPORT
Calle 24, n 55, edif. MINCEX, 8vo, piso.
Havana, Cuba

and

HAVANA CLUB HOLDING, S.A. d/b/a
HCH, S.A.
5 Rue Eugène Ruppert L2453
Luxembourg

                                    Defendants.

---

Civil Action No. _____


## COMPLAINT

Plaintiffs, by their attorneys, Kelley Drye & Warren LLP and Covington & Burling,

allege upon personal knowledge as to their own acts and information and belief as to all other

acts, as follows:

## NATURE OF THE ACTION

1.      Plaintiffs in this case sought cancellation of U.S. Registration No. 1,031,651 of the trademark HAVANA CLUB & DESIGN for rum in Cancellation Proceeding No. 92024108, styled "*Galleon S.A. et al. v. Havana Club Holding, S.A., et al.*" (the "HC Cancellation Proceeding"), before the Trademark Trial and Appeal Board ("TTAB") of the U.S. Patent and Trademark Office ("PTO"). On January 29, 2004, the TTAB issued a decision (the "TTAB Decision") dismissing Plaintiffs' Supplemental and Amended Petition to Cancel the aforesaid U.S. Registration. This is an action seeking: (a) review of the TTAB Decision and rectification of the PTO records by striking or canceling U.S. Registration No. 1,031,651 of the trademark HAVANA CLUB & DESIGN for rum (henceforth sometimes referred to as the "Extant U.S. HAVANA CLUB Registration"); (b) a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 resolving actual controversies between the parties concerning the use and ownership of the HAVANA CLUB & DESIGN trademark in the United States and the rights arising out of the Extant U.S. HAVANA CLUB Registration; and (c) an injunction prohibiting Defendants from using or registering any mark incorporating the words HAVANA CLUB and from interfering with Plaintiffs' use and registration of the HAVANA CLUB mark.

## SUMMARY

2.      This dispute arises from the Cuban government's confiscation of the HAVANA CLUB trademark in Cuba and its subsequent attempts to extend the effects of that confiscation to the HAVANA CLUB trademark in the United States. The HAVANA CLUB trademark for rum was originally created, registered and used in Cuba, the United States and elsewhere by José Arechabala S.A. ("JASA"), a Cuban company owned by the Arechabala family.

3.    In 1960, the Cuban revolutionary government forcibly seized and then purported to expropriate JASA's assets, including the HAVANA CLUB trademark, without compensation. JASA was thus deprived of all means of conducting business and its directors, officers and shareholders were driven into exile or imprisoned. After the purported confiscation of JASA's assets, the Cuban government purported to assign the worldwide rights to the HAVANA CLUB mark to defendant Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport"), a state-owned foreign trade enterprise. Cubaexport waited until JASA's registrations of the HAVANA CLUB trademark had expired in 1973 and then it obtained U.S. Registration No. 1,031,651 HAVANA CLUB & DESIGN for rum, in a manner that concealed from the PTO that the original Cuban trademark had been confiscated. The Extant U.S. HAVANA CLUB Registration includes the Spanish legend *"Fundada en 1878,"* a phrase copied from JASA's HAVANA CLUB mark, which refers to the year in which the Arechabala family business was founded.

4.    In 1993, the Cuban government caused Cubaexport to purport to transfer the HAVANA CLUB mark and the Extant U.S. HAVANA CLUB Registration to Havana Rum & Liquors S.A. ("HRL"), another company controlled by the Cuban government, and from HRL to defendant Havana Club Holdings, S.A. ("HCH"). In a subsequent U.S. lawsuit filed by HCH against Galleon S.A. (a predecessor of Bacardi & Company Ltd. ("BACO")) and affiliates, the court nullified that transfer. *See Havana Club Holding, S.A. et al. v. Galleon, S.A. et al.*, 62 F. Supp. 2d 1085 (S.D.N.Y.), *aff'd*, 203 F.3d 116 (2d Cir. 2000), *cert. denied*, 531 U.S. 918 (2000). Neither Cubaexport nor any of its purported successors in interest has ever used the HAVANA CLUB trademark in the United States. In 1997, BACO became successor in interest to JASA's rights in and to the HAVANA CLUB trademark worldwide.

    5.    In the HC Cancellation Proceedings initiated by BACO to cancel the Extant U.S. HAVANA CLUB Registration, the TTAB refused to strike that Registration from the PTO's records despite Cubaexport's failure to file a timely renewal application, and dismissed BACO's petition to cancel that Registration for failure to state a claim. The TTAB declined to rule whether Cubaexport's registration should be cancelled because it rested on an uncompensated expropriation of JASA's assets. The TTAB further stated that Bacardi had not adequately shown that Cubaexport made material false representations in obtaining, maintaining, and renewing the Extant U.S. HAVANA CLUB Registration.

    6.    In this action, Plaintiffs seek:

    (a)    Reversal of the TTAB's decision and rectification of the records of the PTO by (i) striking the Extant U.S. HAVANA CLUB Registration from the Principal Register of the PTO on the ground that Cubaexport failed to file the mandatory renewal application and declaration prior to the end of the statutory period or (ii) alternatively, canceling that Registration on the grounds, among others, that the Extant U.S. HAVANA CLUB Registration was fraudulently obtained, maintained, and renewed; that the registered mark was abandoned; and that the registered mark misrepresents the source of goods;

    (b)    A declaration that BACO owns the common law rights in the HAVANA CLUB mark for rum and that Defendants have no common law or other rights in any mark incorporating or consisting of the words HAVANA CLUB;

    (c)    A declaration that Plaintiffs' use of the HAVANA CLUB mark does not infringe on any mark owned by the Defendants or otherwise violate any enforceable rights of the Defendants, because longstanding U.S. public policy and Section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, Public Law No. 105-277, 112

Stat. 2681 (Oct. 21, 1998) ("Section 211"), preclude recognition and enforcement of purported

rights in a trademark or registration that are founded on the Cuban government's expropriation of

assets; and

> (d)    An injunction prohibiting Defendants from using or registering in the PTO

or in any State of the United States any mark incorporating or consisting of the words HAVANA

CLUB and from interfering with Plaintiffs' use and registration of the HAVANA CLUB mark.

## PARTIES AND RELATED ENTITIES

### Plaintiffs and Related Entities

7.    Plaintiff Bacardi & Company Limited ("BACO") is a Liechtenstein company

having its principal place of business at 1000 Bacardi Road, New Providence, Commonwealth of

the Bahamas.  BACO is the successor to Compañía Ron Bacardí S.A., a Cuban *sociedad*

*anónima* (joint-stock company) which was headquartered in Santiago de Cuba, Republic of

Cuba, until its assets in Cuba were confiscated by the Cuban government in October 1960.

8.    BACO, through its affiliates, licensees, and distributors, produces and markets

distilled spirits worldwide.  BACO owns the internationally renowned name and mark

BACARDI, together with the registrations of that name and mark and the related business and

goodwill, on a worldwide basis.  BACO was a party to the HC Cancellation Proceeding.

9.    José Arechabala S.A. ("JASA") is a *sociedad anónima* organized and existing

under the laws of the Republic of Cuba.  JASA's headquarters and principal place of business

were in Cárdenas, Cuba, until its assets in Cuba were confiscated by the Cuban government in

1960.  JASA's current principal place of business is in Vaduz, Principality of Liechtenstein.

JASA is the creator and the original owner of the HAVANA CLUB trademark in Cuba, the

United States, and other countries, and the trademark registrations associated therewith.  JASA is

owned substantially by members of the Arechabala family. JASA is currently in the process of

voluntary corporate liquidation, by decision of its shareholders, who have formed a substantially

mirror-image company, Jose Arechabala International Ltd., to carry on the family's business.

10.    José Arechabala International Ltd. ("JAI") is a joint-stock company organized and

existing under the laws of the Principality of Liechtenstein, having its principal place of business

in Vaduz, Liechtenstein. JAI is owned substantially by the same persons who are shareholders

of JASA.

11.    In April 1997, JASA conveyed to JAI all right, title, and interest in and to the

HAVANA CLUB trademark worldwide and certain associated assets and goodwill, including the

secret family formula for the HAVANA CLUB rum (the "HAVANA CLUB Assets"). At the

same time persons comprising substantially all of the shareholders and holders of undivided

equity interests in JASA conveyed to JAI any and all right, title and interest that each of them

might hold in and to the HAVANA CLUB Assets. JAI in turn sold to BACO all right, title, and

interest in and to the HAVANA CLUB Assets worldwide. BACO is accordingly the successor

in interest to the original owners of the HAVANA CLUB trademark and the other HAVANA

CLUB Assets worldwide.

12.    Galleon S.A. ("Galleon"), a wholly owned subsidiary of BACO, was a *sociedad

anónima* organized and existing under the laws of the Commonwealth of the Bahamas, with its

principal place of business in Nassau, Commonwealth of the Bahamas. Galleon was also a party

to the HC Cancellation Proceeding. In 1997, Galleon merged into BACO and BACO, as the sole

surviving entity, succeeded to all the assets of Galleon and assumed all of Galleon's liabilities.

BACO was substituted into the federal court action styled *Havana Club Holding, S.A. et al. v.*

*Galleon, S.A. et al.*, 96 Civ. 9644 (SAS), as the successor to Galleon in respect of the claims and counterclaims asserted therein.

13.    Plaintiff Bacardi U.S.A., Inc. ("Bacardi U.S.A.") (formerly named Bacardi-Martini U.S.A., Inc.) is a Delaware corporation having its principal place of business at 2100 Biscayne Boulevard, Miami, Florida 33137.  Bacardi U.S.A. owns all the requisite federal and state permits to import rum and other distilled spirits into the United States and to sell such distilled spirit products to licensed wholesalers throughout the United States wherever the sale of distilled spirits is permitted by law.  Bacardi U.S.A. is BACO's exclusive distributor in the continental United States of BACARDI, CASTILLO, and HAVANA CLUB rums.  Bacardi U.S.A. was a party to the HC Cancellation Proceeding.  Bacardi U.S.A., BACO, and Galleon will henceforth be collectively referred to as "Bacardi."

14.    Bacardi U.S.A., under the authority of BACO's predecessor, Galleon, began use of the HAVANA CLUB trademark for rum in interstate commerce in the United States in 1995, including advertising, distribution, and sales of HAVANA CLUB rum.  Bacardi U.S.A. engaged in such use after reaching an interim understanding with JASA's representatives.

15.    BACO owns registrations of the mark HAVANA CLUB for rum in forty-four states, including New York, New Jersey, Texas, Pennsylvania, Michigan, Maryland, and Virginia.  BACO is also the owner of Application Serial No. 74/572,667 pending in the PTO for registration of the word mark HAVANA CLUB for rum.  This application was filed on September 12, 1994 as an intent-to-use application, and later was amended to allege use, with a first use date as early as 1934.

**Defendants and Related Entities**

16.    Defendant Cubaexport is a Cuban state-owned foreign trade enterprise which was established in 1965 by the Cuban Ministry of Foreign Commerce for the purpose of exporting

food and other products. Cubaexport is a "foreign state" within the meaning of 28 U.S.C. § 1603

and a "designated Cuban national" as defined in 31 C.F.R. § 515.305. Cubaexport's offices are

at Calle 24, n 55, edif. MINCEX, 8vo. piso, Havana, Cuba. Cubaexport was joined as a party to

the HC Cancellation Proceeding.

17.    Pernod Ricard S.A. ("Pernod") is a *société anonyme* (joint stock company)

organized and existing under the laws of France, with offices at 142 Boulevard Hausmann, Paris,

France. Pernod is one of the largest companies engaged in the business of manufacturing,

distribution and sale of spirits worldwide.

18.    Havana Rum & Liquors, S.A. ("HRL") is a *sociedad anónima* organized and

existing under the laws of the Republic of Cuba, with offices at 305A Miramar, Havana, Cuba.

HRL is wholly owned by Cuban nationals and is effectively controlled by the Cuban

government. HRL is a "foreign state" within the meaning of 28 U.S.C. § 1603 and a "designated

Cuban national" as defined in 31 C.F.R. § 515.305.

19.    Defendant Havana Club Holding, S.A. ("HCH") is a *société anonyme* organized

and existing under the laws of Luxembourg, with offices at 5, Rue Eugene Ruppert L2453,

Luxembourg. HCH is owned equally by Pernod and HRL and each has equal representation on

HCH's Board of Directors. HCH purports to hold title to trademark registrations for HAVANA

CLUB rum in countries other than Cuba. HCH was a party to the HC Cancellation Proceeding.

HCH is a "designated Cuban national" as defined in 31 C.F.R. § 515.305.

20.    Havana Club International, S.A. ("HCI") is a mixed company organized and

existing under the laws of the Republic of Cuba, controlled equally by HRL and Pernod, with its

headquarters and principal place of business in Havana, Cuba. HCI exports HAVANA CLUB

rum from Cuba under an exclusive license by HCH. HCI is a "designated Cuban national" as

defined in 31 C.F.R. § 515.305.

JURISDICTION

21.    The Court has subject matter jurisdiction under 15 U.S.C. §§ 1071(b), 1119, and

1121; 28 U.S.C. §§ 1330, 1331, 1338(a), 1605(a)(1)-(4), 2201, 2202, and principles of

supplemental and pendent jurisdiction. Venue is proper in this district under 15 U.S.C. §

1071(b) and 28 U.S.C. § 1391.

FACTS ENTITLING PLAINTIFFS TO RELIEF

**A.    JASA Creates and Uses the HAVANA CLUB Trademark**

22.    The Arechabala family business was founded by José Arechabala Aldama in

1878. The business included rum distilling and other enterprises. JASA, which was

incorporated in or around 1924, carried out the family's rum business.

23.    JASA created, registered, and first used the trademark HAVANA CLUB for rum

in Cuba, the United States and other countries. On or about March 19, 1934, JASA obtained

Cuban Registration No. 53,614 of the mark HAVANA CLUB for "alcohol, rum, etc." In August

1935, JASA was issued Cuban Registrations Nos. 54,890 and 54,890-A for HAVANA CLUB

Design marks.

24.    JASA produced HAVANA CLUB rum primarily for export, principally to the

United States. JASA began to use the trademark HAVANA CLUB for rum sold in commerce in

the United States at least as early as 1934. On May 14, 1935, JASA registered the words

HAVANA CLUB on the Principal Register of the PTO as a trademark for "Ethyl alcohol, rum,

etc." under U.S. Registration No. 324,385. On June 16, 1936, JASA registered a label design

including the words HAVANA CLUB on the Principal Register of the PTO as a trademark for

-9-

"Rum, etc." under U.S. Registration No. 335,919. The design portion of that registered mark included the words *"Fundada en 1878"* (founded in 1878), a reference to the year in which the Arechabala family business was first established in Cuba. On August 11, 1953, JASA obtained U.S. Registration Nos. 578,679 and 578,680 on the Supplemental Register of the PTO for label design trademarks incorporating the words HAVANA CLUB.

25.    From 1934 to the end of 1959, JASA continued to export HAVANA CLUB rum for distribution and sale in the United States. HAVANA CLUB rum sold by JASA in the United States was produced at various times both in Cuba and Puerto Rico. Before 1959, however, JASA had discontinued its production of rum in Puerto Rico and all HAVANA CLUB rum was produced in Cuba.

26.    The words "Havana Club" were also used by JASA as a trading style or trade name to identify that part of JASA's business dealing with the production, export, distribution, and sale of HAVANA CLUB rum to the United States and elsewhere.

**B.    The Cuban Revolutionary Government Confiscates JASA's Assets in Cuba, Including the HAVANA CLUB Mark**

27.    On January 1, 1960, troops of the Castro revolutionary government forcibly entered JASA's headquarters in Cárdenas, Cuba, taking control of the whole industrial complex, including the rum distillery, other industrial facilities, equipment, offices and business records. The members of the family who ran the rum distillery and other family businesses were expelled and not allowed to remove any papers or other property from their offices. The Deputy General Counsel and Secretary of the company was arrested and imprisoned for ten years. All other executives and shareholders were eventually forced to leave Cuba. The Cuban government designated an administrator to run the business to the exclusion of JASA and its owners.

28.    Under Law No. 890, dated October 13, 1960, the Cuban government purported formally to expropriate the physical assets, property, accounts, business records, and trademarks of a large number of Cuban businesses, including JASA and Compañía Ron Bacardí, S.A.  This expropriation purported to affect all of JASA's tangible and intangible assets in Cuba, which comprised substantially all of the assets owned by the company, and also the trademark rights and related registrations owned by JASA in other countries, including the HAVANA CLUB trademark rights and related registrations in the United States.

29.    Law No. 890 specified that subsequent legislation would provide compensation for owners of property expropriated by Law No. 890.  No such legislation has ever been enacted and neither JASA nor any of its shareholders has received any compensation for any assets of JASA that were seized by the Cuban government in 1960.  The expropriation of those assets was, therefore, a confiscation.  The value of the assets of JASA confiscated by the Cuban government exceeded 25 million dollars at the time of the confiscation.

30.    On November 1, 1966, the Cuban government purported to transfer to Cubaexport the trade names and registered trademarks that had been confiscated from JASA, including the HAVANA CLUB mark and related registrations.  As a Cuban government enterprise, Cubaexport knew that all these names and marks transferred into its name had been expropriated from JASA under Law No. 890 without payment of any compensation.  Soon thereafter, Cubaexport began selling HAVANA CLUB rum made in the distillery that had been confiscated from JASA.

31.    The Cuban government transferred the physical assets seized from JASA that had been associated with the production of HAVANA CLUB to another Cuban state enterprise, Empresa de Bebidas y Licores.  In 1993, those assets were further transferred to Corporación

-11-

Cuba Ron, S.A. ("Cuba Ron"), still another enterprise owned or controlled by the Cuban government.

32.    The Cuban government deprived JASA of its assets, took away its rum and other businesses, seized its funds and corporate records (including records of JASA's trademark registrations abroad and its trademark agents), and imprisoned or intimidated JASA's senior executives and shareholders and eventually drove them into exile in various countries. As a result, JASA was unable to continue its business in or outside Cuba or to renew or maintain its trademark registrations in the United States. Despite this adversity, JASA and its shareholders maintained their determination to protect their rights and to resume production and sale of HAVANA CLUB rum when it became possible, either through political change in Cuba leading to restitution of their confiscated assets or, later, through an arrangement with a suitable partner contributing financial and managerial resources to that venture.

**C.    The Cuban Asset Control Regulations**

33.    In 1963, the United States imposed a total embargo of trade between the United States and Cuba under the Trading with the Enemy Act, 50 U.S.C. App. § 1 *et. seq.* The embargo has been implemented by the Cuban Asset Control Regulations ("CACR"), 31 C.F.R. Part 515, which are administered by the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury. In 1996, Congress enacted the Cuban Liberty and Democracy Solidarity Act (the "Libertad Act"), which, among other things, codified the Cuban embargo. 28 U.S.C. § 6032(h).

34.    The CACR prohibit, *inter alia*, the importation, distribution or sale in the United States of rum produced in Cuba. 31 C.F.R. Part 515. This prohibition has been in effect since the inception of the CACR.

35.    Section 515.201(b)(1) of the CACR prohibits (except as specifically authorized by OFAC) all transfers by any person subject to the jurisdiction of the United States of property (or evidences of ownership of property) in which Cuba or any Cuban national (including a designated Cuban national such as Cubaexport) has had, at any time since July 8, 1963, any interest of any nature whatsoever, direct or indirect.  Section 505.201(b)(2) of the CACR prohibits (except as specifically authorized by OFAC) all transfers outside the United States involving any such property or property interests subject to the jurisdiction of the United States. Accordingly, rights in U.S. trademarks or trademark registrations in which Cuban nationals have an interest cannot be transferred under the CACR without an OFAC license.

36.    Section 515.201(c) of the CACR further prohibits "any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" of Section 505.201(b). Section 515.203(a) of the CACR provides that any transfer that violates the CACR is null and void and that such transfers "shall not be the basis for the assertion or recognition of any interest in or right, remedy, power or privilege with respect to such property."

**D.    U.S. Public Policy Does Not Recognize Cuba's Confiscatory Acts in Respect of Property in the United States**

37.    As described below, Defendants have claimed certain rights based on actions by the Cuban government purporting to confiscate JASA's property, including the HAVANA CLUB trademark for rum.  Actions by a foreign government that expropriate assets without adequate compensation are repugnant to United States public policy.  Accordingly, the United States will not recognize or give effect to any such confiscatory act that purports to affect property situated in the United States (the "Non-Recognition Doctrine").

38.    On October 21, 1998, Congress passed Section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, Public Law No. 105-277, 112 Stat. 2681 (Oct.

21, 1998) ("Section 211"), codifying, in part, the Non-Recognition Doctrine. Section 211(b) provides that:

> "No U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successor-in-interest under sections 44(b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126(b) or (e)) for a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented."

39. The term "designated national" is defined to mean "Cuba and any national thereof including any person who is a specially designated national." *See* Section 211(d)(1) and 31 C.F.R. § 515.305. The term "specially designated national" is defined in the CACR to include, among others, any entity that is owned or controlled by the Cuban government. *See* 31 C.F.R. § 515.306(a)(3). The term "confiscated" is defined in Section 211 to mean "expropriated by the Cuban government on or after January 1, 1959, without payment of adequate and effective compensation." *See* Section 211(d)(2) and 31 C.F.R. § 515.336.

**E.    Cubaexport's Registration of the Confiscated HAVANA CLUB Mark**

40. After Law No. 890 was issued, the Cuban government or its successors claimed title to property owned by Cuban companies located outside Cuba, including rights to the BACARDI trademark. In a series of cases decided over several years and involving Cuban companies in exile, courts in the United States and elsewhere refused to recognize such claims, including claims to the BACARDI trademark, based on the principles underlying the Non-Recognition Doctrine.

41. Having failed to obtain worldwide title to the BACARDI trademark, BACARDI being the most popular rum that had been produced in Cuba, the Cuban government then turned to HAVANA CLUB, the mark designating the second most popular Cuban rum. As a result of

the earlier court decisions, Cubaexport and the Cuban government knew that their claims to the HAVANA CLUB mark in the United States or any other U.S. mark that Cuba had purportedly confiscated under Law No. 890 would not be recognized in the United States. Cubaexport then engaged in a multifaceted effort (a) to conceal from the PTO that Cubaexport's claim to the HAVANA CLUB name and trademark derived from the Cuban government's confiscation of JASA's assets and (b) to mislead the U.S. public into believing that Cubaexport's HAVANA CLUB rum, which Cubaexport intended eventually to sell in the United States, was the same as JASA's HAVANA CLUB rum, which had been sold in the United States for more than two decades.

42.    On June 12, 1974, shortly after JASA's HAVANA CLUB Registrations expired, Cubaexport applied to the PTO, under Section 44 of the Lanham Act, 15 U.S.C. § 1126, to register a trademark consisting of a label design displaying the words HAVANA CLUB. The application was based on a newly issued Cuban Registration No. 110,353, dated February 12, 1974. Although Cubaexport still held Cuban HAVANA CLUB registrations that had been confiscated from JASA, Cubaexport obtained in its own name the new Cuban Registration No. 110,353 and used this new registration as the basis of its U.S. trademark application, in order to conceal from the PTO that Cubaexport's claim of title to the HAVANA CLUB mark was based on the confiscation of JASA's assets.

43.    In filing this application to register the HAVANA CLUB & DESIGN mark, Cubaexport consented to jurisdiction in the United States and appointed Rabinowitz, Boudin, Standard, Krinsky, & Lieberman, PC as its domestic (U.S.) representative for service of process in proceedings affecting the mark.

44.    The HAVANA CLUB & DESIGN mark that Cubaexport sought to register in the

United States prominently displays the Spanish legend *"Fundada en 1878."* Cubaexport

intentionally copied this legend from the label design that had been registered by JASA in U.S.

Registration No. 335,919 in 1936. Cubaexport was founded in 1965, not in 1878. Cubaexport

also knew that it would not be deemed to be JASA's successor under U.S. law. The statement

*"Fundada en 1878"* was intentionally used by Cubaexport to mislead the American public into

believing that Cubaexport's HAVANA CLUB rum had a family heritage dating back nearly a

century and came from, or was associated with, or approved by, JASA, the original producer of

the HAVANA CLUB rum that they had previously purchased and enjoyed in the United States.

Cubaexport also knew that the HAVANA CLUB mark that it was applying to register still

symbolized an invaluable reputation and goodwill as the result of the excellent quality and sales

success of JASA's HAVANA CLUB rum in the United States.

45.    When Cubaexport applied to register the HAVANA CLUB & DESIGN mark in

the United States, Cubaexport was well aware that JASA had discontinued making HAVANA

CLUB rum only because the Cuban government had forcibly seized and confiscated JASA's rum

distillery and other assets and because JASA's directors, officers, and shareholders had been

driven into exile or imprisoned.

46.    Neither Cubaexport nor the Cuban government ever possessed the secret

Arechabala family formula used by JASA to produce the HAVANA CLUB rum sold in the

United States and elsewhere. The Cuban government surreptitiously concocted a new formula to

produce its ersatz HAVANA CLUB rum, in a manner intended to deceive purchasers of

HAVANA CLUB rum into believing that they were buying the same product that JASA had

made. At all relevant times, Cubaexport knew that the formula used in the HAVANA CLUB

-16-

rum it sold was not the one that had been used by JASA. Therefore, Cubaexport's intended use

of the HAVANA CLUB mark was designed to deceive U.S. consumers regarding the true source

of the rum so marked.

47.    On January 27, 1976, the PTO issued U.S. Reg. No. 1,031,651 of the HAVANA

CLUB & DESIGN mark (the Extant U.S. HAVANA CLUB Registration) to Cubaexport.

48.    Neither JASA, JAI, their shareholders, nor BACO, as JASA's bona fide successor

in interest, has ever consented to the registration or use of the trademark and trade name

HAVANA CLUB by Cubaexport, HRL, or HCH.

49.    The rights to the HAVANA CLUB & DESIGN mark and the related federal

registration are intangible property rights with a situs in the United States. Rights in a trademark

in the United States may be acquired only by lawful use of that mark in interstate or foreign

commerce. Such usage confers common law trademark rights. The failure to register a mark

does not affect common law trademark rights. Nor does lapse of a registration, in the event that

one is obtained, affect common law trademark rights.

50.    Under Section 44 and Sections 1 and 45 of the Lanham Act, 15 U.S.C. § 1051 *et

seq.*, a foreign applicant must have a good faith intent to use the mark applied for in commerce in

the United States. When a foreign national such as Cubaexport registers a mark under Section

44 of the Lanham Act, that registrant must use the registered mark in commerce in the United

States within a reasonable period after filing an application under Section 44 of the Lanham Act.

51.    Cubaexport has never sold rum in the United States under the HAVANA CLUB

& DESIGN mark. Cubaexport has claimed that its failure to use the trademark is excused by the

Cuban embargo under the excusable-non-use doctrine codified in Section 8(b)(2) of the Lanham

Act, 15 U.S.C. § 1058(b)(2). Because of its familiarity with the excusable-non-use doctrine,

Cubaexport knew that JASA's non-use of the HAVANA CLUB mark after 1960 has been excused by the Cuban government's seizure of JASA's property and destruction of JASA's organization and management structure.

52.    To maintain its trademark registration, Cubaexport was required to file between the fifth and sixth years after its HAVANA CLUB & DESIGN mark was registered, an affidavit averring ownership and continued use of the mark.  On or about January 12, 1982, such an affidavit was filed by Cubaexport in the PTO in respect of the Extant U.S. HAVANA CLUB Registration.  This declaration, ostensibly signed by Fausto Alfonso Man, averred that Cubaexport was the owner of said mark and registration and invoked the embargo and the excusable-non-use doctrine to satisfy the use requirement of Section 8.  For the same reasons set forth in paragraphs 44 to 46 above, Cubaexport knew in January 1982 that Cubaexport was not the lawful owner of the HAVANA CLUB & DESIGN mark in the United States, and continued to conceal and misrepresent the pertinent facts that would have undermined its claims.

**F.    The Joint Venture between the Cuban Government and Pernod**

53.    In the early 1990s, the Cuban government sought to obtain hard currency by enticing private foreign investments in Cuba.  One prospective partner was Pernod.  In November 1993, Pernod and the Cuban government entered into a joint-venture arrangement to exploit the HAVANA CLUB trademark worldwide.  Pernod knew, prior to concluding this joint-venture with the Cuban government, that the HAVANA CLUB mark, along with the related rum-producing assets, had been confiscated from JASA by the Cuban government.

54.    In anticipation of the transaction with Pernod, the Cuban government caused Cubaexport to transfer all its rights to the HAVANA CLUB trademark outside Cuba and associated assets to HRL, a company controlled by the Cuban government.  Luis Perdomo, a senior Cuban rum industry executive, was named President of HRL, and Vidal Manuel Prieto

Espina, who had previously served as managing director of Cubaexport, was made a managing director of HRL. Other officers were transferred from Cubaexport to HRL. Accordingly, on October 29, 1993, Cubaexport transferred to HRL its entire business connected with the HAVANA CLUB rum, including the goodwill associated with that business worldwide, and the right to export HAVANA CLUB rum to all the territories in the world. As part of this transfer of the HAVANA CLUB rum business, Cubaexport assigned to HRL its worldwide rights to the HAVANA CLUB trademark, including the rights to the Extant U.S. HAVANA CLUB Registration, together with the goodwill of the business symbolized by that mark. With this transfer of all its rum assets, Cubaexport left the rum business.

55.     The joint-venture arrangement was implemented in an agreement called *Convenio Asociativo* (Association Agreement) (the "Convenio") dated November 23, 1993, between Pernod and HRL. The object of the joint-venture was to advertise, distribute, and sell HAVANA CLUB rum worldwide. The parties agreed to create a Luxembourg entity, HCH, owned in equal parts by Pernod and HRL, which was to hold title to registrations of the HAVANA CLUB trademark. HCH was to be managed by a board of directors in which Pernod and HRL would be equally represented. Luis Perdomo was appointed Vice President of HCH and one of two Cuban directors on HCH's four-person board. HCI was established to handle the export of HAVANA CLUB rum from Cuba.

56.     At the closing of the transaction, Pernod paid to HRL a fixed sum (the amount of which has not been publicly disclosed, but which is believed to be many millions of dollars) and agreed to a continuing royalty arrangement. In exchange, HRL transferred to HCH all of HRL's rights in the HAVANA CLUB trademark for rum outside Cuba, together with the goodwill of the

business. HCI appointed Pernod as the exclusive distributor of HAVANA CLUB rums outside
Cuba.

57.    In aid of the joint venture arrangements, Cuba Ron, a state-owned company, was
organized in 1993 to distill rum in Cuba. Since 1993, Cuba Ron has supplied to HCI the rum
sold under the HAVANA CLUB mark. Cuba Control, S.A., another Cuban entity, has been
charged with overseeing and controlling the quality of that HAVANA CLUB rum.

58.    By written assignment dated January 10, 1994, Cubaexport purportedly confirmed
the prior transfer to HRL of the rights to the U.S. HAVANA CLUB trademark and the Extant
U.S. HAVANA CLUB Registration, along with the goodwill of that business. The assignment
was executed by Milda Picos River, who was identified as Manager of Cubaexport. This
purported assignment was recorded in the PTO at Reel 1104, Frame 047 on February 10, 1994.
Cubaexport neither applied for nor obtained approval from OFAC for this transfer at that time.
Accordingly, the transfer was in violation of the CACR and hence null and void.

59.    Cubaexport, HRL, HCH and Pernod understood and intended that the November
1993 transfer by HRL to HCH of the worldwide rights to the HAVANA CLUB trademark
included such rights in respect of the U.S. HAVANA CLUB trademark and the related federal
registration, together with the related goodwill of the business and the exclusive right to
distribute HAVANA CLUB rum in the United States.

60.    Cubaexport, HRL and HCH knew that the CACR prohibited all transfers of U.S.-
based intellectual property rights owned by Cuban nationals without the specific prior approval
of OFAC. Such approval could be obtained only through an application to OFAC for a specific
license in which the particulars of the transfer were fully and truthfully disclosed. Further, as
OFAC had never granted a license for a transfer and sale which resulted in a substantial

monetary payment to the Cuban government, Cubaexport, HRL, and HCH knew in late 1993 or early 1994 that OFAC would not approve an assignment of the U.S. rights to the HAVANA CLUB trademark and the related federal registration from HRL to HCH if full information were disclosed.

61.     In 1993, Pernod caused its Spanish counsel to contact members of the Arechabala family in Spain in an effort to buy their worldwide rights to the HAVANA CLUB trademark. The Arechabalas broke off the talks when it became apparent that Pernod was not prepared to pay a fair price for the mark. In the course of the discussions, Pernod was advised by the Arechabala family representatives that JASA's prior rights to the HAVANA CLUB mark would be enforced.

62.     The Cuban government, Cubaexport, HRL and Pernod knew, at the time the Convenio was being concluded, that JASA had discontinued use of the HAVANA CLUB mark only under compulsion and that, rather than abandoning that mark, the Arechabalas were attempting to resume production and sale of HAVANA CLUB rum. Accordingly, the relationship between the Cuban government, Cubaexport, HRL and HCH was structured in an attempt to hide that the transfers violated U.S. statutes and regulations and that the chain of title for the HAVANA CLUB mark traced back to JASA.

63.     To this end, Cubaexport, HRL and HCH took actions that were intended to conceal from OFAC the November 1993 transfer to HCH of the U.S. HAVANA CLUB & DESIGN trademark and related federal registration pursuant to the Convenio, a transfer which was in violation of the CACR. Their plan called for placing record title to the HAVANA CLUB mark in the United States in HCH's name without revealing the transfer under the Convenio to the PTO or OFAC. HCH was to apply for a new registration of the HAVANA CLUB trademark

in the United States under Section 44 of the Lanham Act, on the basis of a Luxembourg

registration that HCH had acquired under the Convenio.  Once HCH's new U.S. registration of

the HAVANA CLUB trademark was ready to issue, the Extant U.S. HAVANA CLUB

Registration would be renounced or allowed to expire.  Under this scheme, the Defendants would

not reveal to OFAC or the PTO the prior November 23, 1993 assignment of that mark to HCH,

or the consideration paid to HRL by Pernod.

      64.    In furtherance of this scheme, Cubaexport, HRL, and HCH originally chose not to

memorialize in a separate U.S. assignment document the purported transfer of the Extant U.S.

HAVANA CLUB Registration from HRL to HCH.  On May 15, 1995, HCH did apply for a new

U.S. registration of the HAVANA CLUB mark, under Section 44 of the Lanham Act, based on

its Luxembourg registration.  But the plan to keep the Convenio transfers secret went awry, as

described below, when a cancellation proceeding brought by José María Arechabala Rodrigo

against Cubaexport in the PTO in May 1994 eventually forced Cubaexport to disclose the prior

transfers to HRL and HCH.

**G.**    **Protests by the Arechabala Family**

      65.    After general information about the Pernod/Cuban joint venture to market

HAVANA CLUB rum appeared in the trade press, Ramón Arechabala, individually and on

behalf of the other shareholders of JASA, sent a letter to Pernod's Chairman, Patrick Ricard, in

December 1993.  The letter stated, *inter alia*, that the HAVANA CLUB mark belonged to the

Arechabala family and had been unlawfully seized without payment of compensation, that

Pernod's attempt to acquire rights in the trademark HAVANA CLUB rum without the consent of

JASA and its shareholders would be ineffective, and that JASA and its shareholders were

prepared to bring legal claims to vindicate their rights.  In addition, Juan Prado, a senior Bacardi

executive, wrote to Mr. Thierry Jacquillat, a senior Pernod executive, in December 1993, to warn

Pernod that the rightful owner of the HAVANA CLUB trademark was the Arechabala family.

**H.     The Collapse of the Scheme to Conceal the Transfer from OFAC**

66.     On May 3, 1994, José María Arechabala Rodrigo filed a cancellation petition

against Cubaexport in the PTO, seeking to cancel the Extant U.S. HAVANA CLUB Registration

on the ground of abandonment (the "Arechabala Cancellation Proceeding").

67.     As HCH had not yet obtained a new U.S. registration of the HAVANA CLUB

mark, the Arechabala Cancellation Proceeding forced HCH publicly to claim ownership of the

Extant U.S. HAVANA CLUB Registration as a result of the November 23, 1993 assignment.

HRL and HCH then executed a separate U.S. assignment deed on June 24, 1994, which

purported to confirm the prior November 23rd transfer from HRL to HCH of the U.S. rights to

the HAVANA CLUB & DESIGN mark and the related federal registration, along with the

goodwill of that business.  This purported assignment was then recorded in the PTO at Reel

1219, Frame 0428 on September 13, 1994.  This transfer was in violation of the CACR and

hence null and void.

68.     After having the assignment to HCH recorded in the PTO, HCH and HRL were

substituted for Cubaexport as respondents in the Arechabala Cancellation Proceeding.  HCH and

HRL then challenged Mr. Arechabala's standing to contest HCH's Extant U.S. HAVANA

CLUB Registration, arguing that HAVANA CLUB rum could not be made outside Cuba because

of the alleged geographic significance of the mark.  This contention was made notwithstanding

that, at the very same time, HRL (with the knowledge of HCH and Cubaexport) was having

HAVANA CLUB rum made in Panama with Panamanian rum.  In fact, one out of every five

bottles of the "seven-year" HAVANA CLUB rum produced for sale by HRL in 1994 and 1995

contained Panamanian rum.  Declarations were filed in the PTO cancellation proceeding making

the knowingly false statements that HCH's HAVANA CLUB rum was exclusively made in Cuba

of Cuban ingredients.

69.    The Arechabala Cancellation Proceeding was ultimately dismissed by the TTAB

on the ground that the non-use of the HAVANA CLUB mark by HRL and HCH did not

constitute abandonment because the Cuban embargo barred these entities from using the mark in

the United States.

**I.    Bacardi's Acquisition of the HAVANA CLUB Mark**

70.    Bacardi had been interested in acquiring JASA's rights to the HAVANA CLUB

mark since the 1970's and renewed that pursuit in 1993. Bacardi knew that the HAVANA

CLUB mark had been purportedly confiscated from JASA under the same Law No. 890 that

purported to confiscate the BACARDI name and mark, as well as the assets of Compañía Ron

Bacardí S.A.

71.    After an agreement-in-principle between Bacardi and the Arechabala family had

been reached in 1995, the Arechabalas undertook to reactivate JASA and to obtain the requisite

corporate and shareholder approvals for the transaction. As a consequence of this process, the

JASA shareholders decided to create JAI substantially as a mirror image of JASA, in order to

operate in the future through a more flexible and modern corporate structure established outside

Cuba. The JASA shareholders then initiated the process of liquidating the company.

72.    In April 1997, JASA, the JASA shareholders, JAI, and BACO reached final

agreements regarding the HAVANA CLUB trademark. First, JASA transferred to JAI all of its

right, title, and interest in and to the HAVANA CLUB trademark worldwide, the related

goodwill of the business, and certain other related assets such as JASA's secret formula for the

manufacture of HAVANA CLUB rum. Simultaneously, substantially all of JASA's shareholders

transferred to JAI any and all right, title, and interest that they might hold in the HAVANA

-24-

CLUB trademark worldwide, and the related assets transferred from JASA to JAI. Second, JAI

transferred to BACO all right, title, and interest in and to the HAVANA CLUB trademark

worldwide and such other related assets, that JAI had acquired from JASA.

73.    Under the 1997 agreements, BACO is the owner of all title, right, and interest in

and to the mark HAVANA CLUB in the United States, Cuba, and elsewhere that previously

were owned by JASA and their shareholders.

**J.    Bacardi's Sale of HAVANA CLUB Rum in the United States**

74.    In 1995, under the interim understanding with the Arechabalas, Bacardi U.S.A.

imported into the United States rum produced in the Bahamas under the authority of Galleon,

and sold that rum under the HAVANA CLUB trademark in interstate commerce in the United

States.

75.    On July 14, 1995, Bacardi U.S.A. obtained BATF approval for the original labels

used on HAVANA CLUB rum. The first sales by Bacardi of HAVANA CLUB rum in the

United States took place in 1995. Bacardi shipped HAVANA CLUB "Light" and HAVANA

CLUB "Gold" rum to distributors in New York, Illinois, California, and Florida. Those

distributors sold the HAVANA CLUB rum to retailers which, in turn, sold HAVANA CLUB

rum to consumers. During 1996, Bacardi expanded the sale of HAVANA CLUB rum to licensed

wholesalers in other selected markets across the United States.

**K.    The HAVANA CLUB Litigation**

76.    On September 12, 1994, Galleon filed an "intent-to-use" application to register

the word mark HAVANA CLUB for rum on the Principal Register of the PTO.

77.    In July 1995, Galleon and Bacardi U.S.A. initiated the HC Cancellation

Proceeding before the TTAB, seeking cancellation of the Extant U.S. HAVANA CLUB

Registration, record title to which was at that time in the name of HCH. Galleon contended,

*inter alia,* that the recorded assignments of the HAVANA CLUB & DESIGN mark and the

related federal registration, first from Cubaexport to HRL, and then from HRL to HCH, violated

the CACR and that such void transfers, under the language of the CACR, could not serve as "the

basis for the assertion or the recognition of any interest in, or right, remedy, power or privilege

with respect to such [Registration]." Cancellation was also sought on the ground that the Extant

U.S. HAVANA CLUB Registration was fraudulently obtained, maintained, and renewed, that

the registered mark was abandoned, and that the intended use of the registered mark

misrepresented the source of the goods.

78.     On October 5, 1995, Cubaexport, HRL and HCH belatedly applied for a

retroactive OFAC license that would authorize the two successive assignments of the HAVANA

CLUB trademark. The application filed with OFAC contained the knowing misstatements that

(a) the "aforesaid assignments were part of the reorganization of the Cuban rum and liquors

industry" and (b) "each of the assignors and assignees are nationals of Cuba." The application

thus concealed the fact that the HAVANA CLUB mark had been sold to a Luxembourg

company, HCH, which was 50% owned by Pernod, a French and that neither of these companies

was part of the Cuban rum "industry."

79.     On November 13, 1995, OFAC granted License No. C-18147 retroactively for the

assignments of the HAVANA CLUB & DESIGN mark and the related federal registration, but

that license was explicitly subject to the conditions that "this license is granted upon the

statements and representations made in your application" and "if this license was issued as a

result of a willful misrepresentation on the part of the applicant or his duly authorized agent, it

may . . . be declared void from the date of its issuance."

80.     The Extant U.S. HAVANA CLUB Registration had to be renewed by early 1996

by its owner or that registration would automatically expire.  On January 18, 1996, HCH filed an

application for renewal with a declaration signed by Luis Perdomo, Vice Chairman (the

"Renewal Declaration").  The Renewal Declaration did not correct any of the misstatements and

omissions that had been made in the previous submissions to the PTO, and the declaration

asserted HCH's ownership of the Extant U.S. HAVANA CLUB Registration, explicitly

referencing the PTO records showing the assignments to HCH.  On January 27, 1996, the PTO

issued a Certificate of Renewal for the Extant U.S. HAVANA CLUB Registration in the name of

HCH pursuant to Section 9 of the Lanham Act .

81.     In December 1996, HCH and HCI brought an action in the U.S. District Court for

the Southern District of New York styled *Havana Club Holding, S.A. et al. v. Galleon S.A. et al.*,

96 Civ. 9655 (SAS), for infringement of the federally registered HAVANA CLUB & DESIGN

trademark, false designations of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),

and unfair competition.  Bacardi counterclaimed for cancellation of HCH's Extant U.S.

HAVANA CLUB Registration on several grounds, including abandonment, fraud, and violation

of the CACR.

82.     On March 17, 1997, the HC Cancellation Proceeding was stayed pending

disposition of the federal court action, which involved some of the same issues.

83.     On April 17, 1997, OFAC issued a Notice of Revocation of Cubaexport's License

No. C-18147 concerning the assignments of the HAVANA CLUB trademark and the related

federal registration, based on "facts and circumstances that have come to the attention of this

Office that were not included in the application of October 5, 1995."  OFAC, therefore, directed

that "License No. C-18147 issued to Cubaexport on November 13, 1995 is hereby revoked

retroactive to the date of issuance," which was November 13, 1995.

     84.    On August 8, 1997, the United States District Court for the Southern District of

New York dismissed HCH's federal trademark infringement claim against Bacardi on the ground

that HCH had never acquired any interest in the HAVANA CLUB & DESIGN registration that

could be infringed, because the purported transfers from Cubaexport were null and void under

the CACR. *Havana Club Holding, S.A. v. Galleon S.A.*, 974 F.Supp 302 (S.D.N.Y. 1997).

     85.    On October 20, 1997, the court entered a Partial Judgment (the "Judgment")

implementing the August 8th decision.  That Judgment ruled that ". . . [HCH] and [HCI] have no

rights to the registered trademark HAVANA CLUB for 'rum' in the United States." (Judgment

¶ 7).  The Judgment also held:

> "Neither [HRL], [HCH], nor its licensee, [HCI] ever obtained any rights to the
> HAVANA CLUB mark in the United States by transfer." (Judgment ¶ 6)

> "Any rights that [HCH] may have had, may have, or claims to have had in the
> Registration of the HAVANA CLUB trademark (U.S. Reg. No. 1,031,651) from
> forever until today are hereby canceled." (Judgment ¶ 8)

     86.    The District Court declined to decide whether Cubaexport had any rights in the

U.S. HAVANA CLUB & DESIGN Registration, because Cubaexport was not a party to the

action and had refused to join as a party.  The Court held:

> "Those provisions of the original transfer agreement relating to transfers of the
> U.S. Rights to the HAVANA CLUB mark and the related U.S. Registration were
> rendered null and void by the CACR, § 515.201(b)(1), and the attempted
> assignment of said HAVANA CLUB mark and the related U.S. Registration were
> invalid and of no force and effect and *void ab initio*."  (Judgment ¶ 4)

> "As a result, the status quo ante as of the October 29, 1993 date of said abortive
> original transfer agreement is restored, and Cubaexport retained whatever rights it
> had in said mark and the related U.S. Registration as of said date, notwithstanding
> the invalid transfers." (Judgment ¶ 5)

The court added:

"Nothing herein shall prevent Cubaexport, if it so chooses, from asserting or seeking to enforce rights in the trademark HAVANA CLUB rum in the United States and nothing herein shall prevent the defendants or others from contesting those rights or contending that said rights were lost as a result of acts or omissions by Cubaexport." (Judgment ¶ 10)

87.    After a bench trial, the District Court held, among other things, that Section 211 barred HCH from asserting rights in the "Havana Club" trade name, because that name was substantially similar to the HAVANA CLUB mark that was previously used by JASA in association with the business seized by Cuba without payment of compensation and because HCH had not obtained Bacardi's consent to that use as the successor to JASA.

88.    On February 4, 2000, the United States Court of Appeals for the Second Circuit unanimously upheld the trial court's decision. *See* 203 F.3d 116 (2d Cir. 2000). The Second Circuit's Mandate became final on February 25, 2000, and HCH's petition for a writ of *certiorari* was denied on October 2, 2000. Under Section 37 of the Lanham Act, 15 U.S.C. § 1119, certified copies of the decisions of the District Court, the Second Circuit, and the U.S. Supreme Court were filed with the PTO.

89.    Instead of implementing the Judgment pursuant to 15 U.S.C. § 1119, the PTO issued an Order to Show Cause on October 26, 2001, giving the parties 14 days to demonstrate why the Director of the PTO should not rectify the PTO's records to reflect the District Court's order invalidating the recorded assignments of the entire interest and goodwill in the U.S. HAVANA CLUB & DESIGN mark and the related federal registration from Cubaexport to HRL and from HRL to HRH. The Order to Show Cause omitted any reference to Paragraph 8 of the Judgment, which cancelled any right or claim that HCH may ever have had, may have, or claims to have had in the Extant U.S. HAVANA CLUB Registration, and also omitted reference to Paragraph 4, which ruled that Cubaexport's transfers were void *ab initio*.

-29-

90.     A Notice of Recordal of an Assignment Document was put in the PTO record, together with a related Order signed by Lynne Beresford directing the PTO's Assignment Division to record an assignment of the Extant U.S. HAVANA CLUB Registration to Cubaexport. The conveying party was identified as the U.S. District Court for the Southern District of New York and the conveyance was by court order dated October 20, 1997. This assignment document did not restore the *status quo ante* as of the date of the abortive transfer, which was November 23, 1993.

91.     On January 15, 2002, the PTO issued a notice pursuant to 15 U.S.C. § 1119 stating that, having considered the initial submissions and replies from each party, the PTO's registration records would be rectified to conform with the assignment records.

**L.     The Interim Agreement**

92.     In a contract dated March 19, 2002, and purported to be made retroactive to October 4, 2000, Cubaexport, HRL, HCH, HCI, Cuba Ron, and Pernod agreed to amend the Convenio and all related agreements so that the HAVANA CLUB & DESIGN mark, the assets associated with the U.S. HAVANA CLUB rum business and certain other related rights conditionally reverted back to Cubaexport (the "Interim Agreement"). The parties further agreed that if (a) they were able to obtain an OFAC license authorizing the transfer of the mark to HCH or HRL, or (b) the PTO determined that Cubaexport did not own the HAVANA CLUB & DESIGN mark, or (c) "[a]ny other event [ ] makes possible the realization of the initial intent of the parties" to transfer the mark to HCH as expressed in the Convenio, then the mark and related rights would again return to HCH. Several provisions of the Interim Agreement purport to transfer property rights that are subject to the CACR without OFAC approval and are thus void *ab initio*.

**M.    The TTAB Cancellation Proceeding**

93.    On March 15, 2002, BACO, as successor to Galleon, and Bacardi U.S.A. filed a

motion in the HC Cancellation Proceeding to resume the proceeding (which had been stayed

during the court action), to substitute parties, and for summary judgment.  On January 21, 2003,

the TTAB resumed proceedings, set a briefing schedule, and joined Cubaexport as a defendant

along with HCH.

94.    The basis for Bacardi's summary judgment motion was that the Extant U.S.

HAVANA CLUB Registration had expired pursuant to 15 U.S.C. § 1059 and Rule 2.183 of the

Trademark Rules of Practice, 37 C.F.R. §§ 2.181-2.184 (1995), because Cubaexport had failed to

file the mandatory renewal application and declaration.  A Renewal Declaration had been filed

by HCH, but the October 20, 1997, Judgment held that any rights that HCH may have had, may

have or claims to have had in the Extant U.S. HAVANA CLUB Registration "from forever until

today are canceled" (Judgment ¶ 8) and further held that the attempted assignments of that mark

and the related federal registration "were invalid and of no force and effect and void *ab initio*."

(Judgment ¶ 4).  As the Renewal Declaration had not been filed by the owner of the registration,

the registration had not been validly renewed and had to be stricken from the Principal Register

of the PTO.

95.    In a decision mailed on January 29, 2004 (the TTAB Decision), the TTAB denied

Bacardi's motion for summary judgment.  The TTAB Decision was in error, as will be

demonstrated in this proceeding.  Among other errors, the TTAB mistakenly concluded that,

because HCH's Renewal Declaration had presented a complete application that met the formal

requirements for renewal, Cubaexport itself could have filed a renewal application and

declaration that would satisfy those same requirements.  By 1996, however, Cubaexport had left

the rum business and could not truthfully aver that, but for the Cuban embargo, it was ready and

able to export HAVANA CLUB rum to the United States.

96.     The TTAB agreed with Bacardi that "[a] proper renewal application must be

executed and filed by the owner of a registration" (TTAB Decision p. 36) and stated, citing 15

U.S.C. § 1127, that the term "registrant" includes "both the original registrant [Cubaexport] and

a person who has acquired ownership through *proper transfer* of title." (TTAB Decision p. 36 n.

23) (emphasis added). Therefore, the TTAB concluded, "continuity of title from the registrant to

the present owner must be shown." (TTAB Decision p. 36).

97.     The TTAB stated that "well before the nine-month renewal period commenced

[on July 27, 1995] it appeared that Cubaexport was no longer the owner of the registration."

(TTAB Decision P. 37) This statement disregarded the Judgment, which had held that the

transfers were void and that the *status quo ante* as of November 23, 1993, was restored.

Cubaexport, not HCH, was then the putative owner of the Extant U.S. HAVANA CLUB

Registration as of November 23, 1993, and through April 27, 1996, the statutory deadline for

filing a valid renewal application and declaration.

98.     The TTAB also stated that "[a]ccording to HCH and Cubaexport, all of the parties

concerned considered HCH as the owner of the registration." (TTAB Decision p. 37). This

statement ignored that the United States was also a concerned party and that HCH and

Cubaexport had created their own predicament by violating the CACR. The Judgment held,

among other things, that HCH never "obtained any rights in the HAVANA CLUB mark in the

United States by transfer" (Judgment ¶ 6). Therefore, Cubaexport was the only party that the

TTAB could deem to be the putative "owner" of that registration consistent with the Judgment.

99.     The TTAB then observed that:

"[T]here is no opportunity now for Cubaexport to file a new, substitute or amended renewal application. The statutory renewal period has long passed, and neither we, nor the parties, may extend or reopen that period." (Judgment, p. 38)

But the TTAB went on to conclude, contrary to Section 211 and the Judgment, that HCH had complied with the PTO Renewal Rules when it filed its renewal application in its own name, that it had filed a proper renewal application, that the PTO had acted properly in accepting the renewal application and renewing the application in HCH's name, and that the resulting renewal application was valid.

100.    The TTAB never ruled on Section 211. The only rationale the TTAB offered for ignoring the nullification of the transfers ordered by the Judgment is that, to avoid confusion and administrative burden on the PTO, the TTAB "must focus on circumstances when the renewal applicant filed its application, not on the circumstances which existed years later." (TTAB Decision p. 38) This was legal error. The Judgment conclusively established that HCH never had any claim whatsoever to legal or equitable title to the Extant U.S. HAVANA CLUB Registration, so the TTAB was bound to treat HCH's renewal filing as a nullity.

101.    The TTAB Decision went on to consider whether any of the other claims in Bacardi's 1996 Supplemental and Amended Petition were ones on which the TTAB could grant relief. The TTAB dismissed Bacardi's claim of fraud in obtaining the registration on the ground that Bacardi did not allege that JASA had used the HAVANA CLUB mark in the United States in 1974 when Cubaexport filed its trademark application. Similarly, in dismissing Bacardi's claim of fraud in maintaining the registration, the TTAB found that Cubaexport could not have knowingly made a misrepresentation concerning ownership of the mark in its Section 8 affidavit, since no allegation of JASA's use of the mark in the United States in 1974 was made. In 1974, however, JASA was not able to use the mark in the United States because its assets had been

-33-

confiscated by the Cuban government and because, as a Cuban entity, it was barred by the Cuban embargo from selling rum in the United States.

102.    The TTAB further held that, since OFAC had not explained the reasons for revoking the transfer license, the allegation that Cubaexport and HCH had willfully violated the CACR and that HCH had knowingly filed a false Renewal Declaration failed to state a claim for fraudulent renewal.  This confused the rules for pleading fraud with proof of a fraud allegation. The TTAB declined to determine whether there was a fraudulent transfer of the mark under the CACR on the ground that the TTAB "has little or no experience in determining violation of statutes or regulations that do not directly concern registrations of trademarks." (TTAB Decision p. 51).

103.    The TTAB rejected the abandonment claims on the ground that the assignment-in-gross rule does not apply to this case because Cubaexport, HRL and HCH never had business assets in the United States that could be separated from the trademark.

104.    Finally, the TTAB refused to consider whether the HAVANA CLUB & DESIGN mark was being used to misrepresent the source of the goods because this "claim is premised on the assumption that Cubaexport is not the true and legitimate owner of the HAVANA CLUB mark, which can only be regarded as a political question based on the premise that the Cuban government is not legitimate." (TTAB Decision p. 55).  The TTAB added that it did not have the authority to answer this question.  The TTAB did not rule on the applicability of the Non-Recognition Doctrine or the other bases, including Section 211, for concluding that Cubaexport was not the true owner of the Extant U.S. HAVANA CLUB Registration.

## COUNT I

### APPEAL FROM THE TTAB DECISION

**A.    The U.S. HAVANA CLUB & DESIGN Registration Must be Stricken Because Cubaexport Omitted Filing the Mandatory Renewal Application and Declaration**

105.    Paragraphs 1 through 104 are incorporated herein by reference.

106.    The Judgment voided the recorded transfers and left Cubaexport with whatever rights it had in the HAVANA CLUB & DESIGN mark in the United States and the related federal registration as of November 23, 1993, the date of the void transfers.  The court did not reach the merits of Bacardi's claim for cancellation of the Extant U.S. HAVANA CLUB Registration because Cubaexport, which had a claim to title to that registration was not a party, and had refused to be joined voluntarily as a party, to the action before Judge Scheindlin. Therefore, the Judgment provided that "[n]othing herein shall prevent Cubaexport, if it so chooses, from asserting rights in the trademark HAVANA CLUB rum in the United States and nothing shall prevent [Bacardi] from contesting those rights or contending that said rights were lost as a result of acts or omissions by Cubaexport." (Judgment ¶¶4, 10).  As Cubaexport was a party to HC Cancellation Proceeding, the TTAB was obliged to decide the effect of Cubaexport's omission, as the record owner, to renew the Extant U.S. HAVANA CLUB Registration.

107.    The Extant U.S. HAVANA CLUB Registration nominally owned by Cubaexport was set to expire automatically at the end of its 20-year term (plus the statutory grace period) on April 27, 1996 under Section 9(a) of the Lanham Act, 15 U.S.C. § 1059(a), unless the mandatory renewal application and declaration was filed by its owner prior to that deadline.

108.    Cubaexport did not file a renewal application and declaration on or before April 27, 1996, or thereafter. As a result of this omission by Cubexport, the Extant U.S. HAVANA CLUB Registration expired automatically under the Lanham Act.

109.    On or about January 18, 1996, HCH filed a Renewal Declaration in its own name, claiming, under pain of perjury, that HCH owned the Extant U.S. HAVANA CLUB Registration based on the recorded assignments from Cubaexport to HRL and from HRL to HCH. The Judgment held, however, that those recorded assignments were null and void *ab initio* under 31 C.F.R. § 515.203(a), and also canceled any rights HCH may have had, may have or claims to have had in the Extant U.S. HAVANA CLUB Registration from forever until the October 27, 1997 date of the Judgment (¶8). Therefore, HCH could not satisfy the renewal requirement of continuity of title from Cubaexport and was not at that or any other time the owner of the Extant U.S. HAVANA CLUB Registration.

110.    Furthermore, the HAVANA CLUB trademark that is the subject of the aforesaid federal registration is, as the District Court held, similar to the HAVANA CLUB mark used with the assets of JASA seized by the Cuban government without compensation in 1960, so the TTAB was proscribed from recognizing or enforcing any interest of HCH in said registration.

111.    No renewal application and declaration was ever filed by the owner of the Extant U.S. HAVANA CLUB Registration prior to the statutory deadline for filing such renewal applications and declarations.

112.    Because the requirements of 15 U.S.C. § 1059 were not met, and the Extant U.S. HAVANA CLUB Registration expired, the records of the PTO must be rectified by striking and expunging said registration from the Principal Register of the PTO.

-36-

**B.     Fraud in Obtaining and Maintaining Registration by Cubaexport**

113.     Paragraphs 1 through 112 are incorporated herein by reference.

114.     The Cuban government, after having first failed to establish rights to sell its export rum under the BACARDI trademark, then turned in 1974 to the HAVANA CLUB mark, which had been used by JASA on the second most popular Cuban rum. Cuba had lost a series of U.S. court decisions in similar cases under the Non-Recognition Doctrine. Cubaexport, as an arm of the Cuban government, knew that its claims to the HAVANA CLUB mark in the United States or any other U.S. mark that Cuba had purportedly confiscated under Law No. 890 would be denied if the facts were fully disclosed to U.S. authorities and that it would not be deemed to be the successor to JASA under U.S. law.

115.     Nonetheless, on June 12, 1974, Cubaexport applied to the PTO, pursuant to Section 44 of the Lanham Act, 15 U.S.C. § 1126, to register a trademark consisting of a label design displaying the words HAVANA CLUB (the "HAVANA CLUB & DESIGN" mark). Although Cubaexport still held Cuban HAVANA CLUB registrations that had been confiscated from JASA, Cubaexport's June 12th application was based on a newly issued Cuban Registration No. 110,353, dated February 12, 1974. This course of action was adopted to conceal that Cubaexport's claim of title to the HAVANA CLUB mark was based on the previous confiscation of JASA's assets.

116.     The HAVANA CLUB & DESIGN mark that was the subject of Cubaexport's U.S. trademark application prominently displays the Spanish legend *Fundada en 1878,"* which Cubaexport intentionally copied from the label design that had been registered by JASA in the United States under Registration No. 335,919 in 1936. Cubaexport's intention in prominently displaying *"Fundada en 1878"* as part of the HAVANA CLUB & DESIGN mark was to mislead the American public into believing that Cubaexport's HAVANA CLUB rum had a family

heritage dating back nearly a century and came from, or was associated with, or approved by,

JASA, the original producer of the HAVANA CLUB rum that they had previously purchased

and enjoyed in the United States.  Cubaexport's decision to adopt the HAVANA CLUB mark for

export rum was further based on the determination by senior Cuban rum executives that, in 1974,

the HAVANA CLUB mark still had a valuable reputation and goodwill in the United States.

That goodwill had been created by the success of JASA's HAVANA CLUB rum and it rightfully

belonged to JASA in the United States.

117.    Moreover, when Cubaexport applied to register the HAVANA CLUB & DESIGN

mark with the PTO in 1974, Cubaexport knew that JASA had only discontinued making

HAVANA CLUB rum because JASA's rum distillery and other assets had been forcibly seized

and confiscated by the Cuban government and its officers, executives, and shareholders had been

driven into exile or imprisoned.

118.    Cubaexport never obtained the secret formula used by JASA to produce the

HAVANA CLUB rum sold in the United States and elsewhere.  So Cubaexport surreptitiously

concocted a new formula for its ersatz HAVANA CLUB rum, which materially changed the

character of the rum.  Nonetheless, the HAVANA CLUB & DESIGN mark which Cubaexport

had applied to register in the United States was designed by Cubaexport with the intent of

misleading prospective purchasers into believing that they were buying the same product that

JASA had made and sold in the United States.

119.    Accordingly, Cubaexport, made the following material false statements and

omissions in connection with its application to register the HAVANA CLUB & DESIGN mark

with knowledge of their falsity and with the intent of deceiving the PTO and keeping material

information from coming to their attention:

    a.    That Cubaexport was the owner in the United States of the HAVANA CLUB & DESIGN mark for rum.  This statement was knowingly false because Cubaexport knew:

        i.    that JASA's HAVANA CLUB mark still enjoyed a strong reputation in the United States;

        ii.    that JASA continued to have common law trademark rights in the HAVANA CLUB mark for rum in the United States, and

        iii.    that the interruption of JASA's use of the HAVANA CLUB mark was caused by the confiscation of JASA's assets by the Cuban government and JASA had no intention of abandoning its United States trademark rights.

    b.    That the label statement "Fundada en 1878" ("founded in 1878") referred to JASA's business, not to Cubaexport, which was founded in 1965, and that said label statement was intentionally designed to mislead consumers as to the provenance and the source of the rum sold under that mark; and

    c.    That Cubaexport's use in the United States of the HAVANA CLUB & DESIGN mark in connection with the sale of rum would deceive U.S. consumers as to the source of the rum so marked.

120.    On January 27, 1976, U.S. Reg. No. 1,031,651 of the HAVANA CLUB & DESIGN mark was issued to Cubaexport.

121.    Neither JASA, JAI, their shareholders, nor Bacardi, as JASA's bona fide successor in interest, has ever consented to the registration or the use of the trademark and trade name HAVANA CLUB by Cubaexport, HRL, or HCH.

122.    To maintain the Extant U.S. HAVANA CLUB Registration, Cubaexport was required to file an affidavit between the fifth and sixth year after the registration, averring ownership and continued use of the mark.  On or about January 12, 1982, such an affidavit was filed by Cubaexport in the PTO in connection with the Extant U.S. HAVANA CLUB Registration.  This declaration, ostensibly signed by Fausto Alfonso Man, averred that

Cubaexport was the owner of said mark and registration and invoked the embargo and the

excusable nonuse doctrine to satisfy the use requirement of Section 8.

123.    For the same reasons set forth in paragraphs 114 through 119 above, Cubaexport

also knew in January 1982 that Cubaexport was not the owner of the HAVANA CLUB &

DESIGN mark in the United States; that JASA was the owner in the United States of common

law trademark rights in the HAVANA CLUB mark for rum; that JASA's HAVANA CLUB

mark for rum still enjoyed a strong reputation; and that if Cubaexport were allowed to sell its

rum labeled with the HAVANA CLUB & DESIGN mark in the United States, American

consumers would be deceived as to its quality and source of origin.

124.    Wherefore, the U.S. HAVANA CLUB & DESIGN Registration has been

fraudulently obtained and maintained in violation of 15 U.S.C. § 1064(3) and should be

cancelled.

**C.    Fraud in Obtaining and Renewing Registration by HCH**

125.    Paragraphs 1 through 124 are incorporated herein by reference.

126.    Cubaexport, HRL, and HCH were, at all relevant times in 1993 and 1994, aware

of the fact that their purported transfers of the HAVANA CLUB & DESIGN mark and the

related federal registration in the United States were prohibited by the CACR absent a specific

license from OFAC.  Accordingly, in order to put and maintain the U.S. HAVANA CLUB &

DESIGN Registration in HCH's name by false means, Cubaexport, HRL, and HCH deliberately

caused their duly authorized representative to make statements on their behalf in an OFAC

License Application that they all knew contained material misleading omissions and material

affirmative false statements that were made with the intent of deceiving OFAC and putting the

federal registration in the name of HCH by false means.  These statements were as follows:

    a.      That the assignments were made as "part of the reorganization of the Cuban rums and liquors industry"; and

    b.      that "each of the assignors and assignees are nationals of Cuba."

127.    Furthermore, on or about January 18, 1996, defendant HCH knowingly filed a false Renewal Declaration averring that HCH owned the U.S. HAVANA CLUB & DESIGN mark and the related federal registration, when Cubaexport, HCH, and HRL all knew that the transfers had been the subject of false statements that had been made to OFAC and thus were void under the CACR because no valid OFAC license therefore had been obtained and that putative title to the Extant U.S. HAVANA CLUB Registration remained in Cubaexport.

128.    HCH also knew that Bacardi was using the HAVANA CLUB mark for rum in the United States on and before January 18, 1996 and HCH knew, for that reason as well, that HCH was not the true owner of the U.S. HAVANA CLUB & DESIGN mark and the related federal registration in the United States at that time.

129.    Wherefore, the U.S. HAVANA CLUB & DESIGN Registration was falsely and fraudulently put in HCH's name by Cubaexport and HCH and fraudulently renewed by HCH in violation of 15 U.S.C. § 1064(3) and should be cancelled.

**D.    Abandonment**

130.    Paragraphs 1 through 129 are incorporated herein by reference.

131.    On or about November 23, 1993, after assigning the rights to the U.S. HAVANA CLUB & DESIGN mark and the related registration to HRL and transferring its marketing employees to HCI, Cubaexport left the rum business. From 1993 to the present, a period of more than 3 years, Cubaexport has not advertised, licensed for sale, or sold HAVANA CLUB rum anywhere in the world.

132.    Cubaexport, since 1993, has held bare title to the Extant U.S. HAVANA CLUB Registration but at no time during that period has Cubaexport been ready or able to export HAVANA CLUB rum to the United States or anywhere else in the world.

133.    Cubaexport also abandoned the Extant U.S. HAVANA CLUB Registration and whatever claims it had to rights in the HAVANA CLUB & DESIGN mark in the United States by allowing the aforesaid federal registration to lapse.

134.    Wherefore, the HAVANA CLUB & DESIGN mark has been abandoned by Cubaexport within the meaning of Section 45 of the Lanham Act, 15 U.S.C. § 1127, and the Extant U.S. HAVANA CLUB Registration should be cancelled.

**E.    Misrepresentation of Goods**

135.    Paragraphs 1 through 134 are incorporated by reference.

136.    Defendant Cubaexport has allowed HCH and/or HCI (a) to prepare and cause advertisements for Defendants' ersatz HAVANA CLUB rum to appear in magazines and publications distributed through the channels of interstate commerce in the United States and (b) to pay promotional fees or to give other inducements to motion picture producers to cause their HAVANA CLUB rum and their purported HAVANA CLUB & DESIGN mark to be depicted in motion pictures distributed in interstate commerce in the United States, including the film "The Firm." These advertisements and the use and depiction of said mark in films are designed to induce American consumers into buying Defendants' ersatz HAVANA CLUB rum abroad and to build up a demand for said product in the United States.

137.    Cubaexport's use of the labeling statement incorporated in the HAVANA CLUB & DESIGN mark falsely indicating that the producer was "founded in 1878" is part of a deliberate scheme to pass off Defendants' ersatz HAVANA CLUB rum as being somehow

approved by JASA, or as being the same quality as the only HAVANA CLUB rum ever sold legally in the United States, which was produced by JASA.

138.    Furthermore, said advertising and promotional use of said HAVANA CLUB & DESIGN mark and Cubaexport's other aforesaid acts and omissions are intended to confuse the American public into wrongly believing that Cubaexport is somehow the legitimate successor to the original producer of the HAVANA CLUB rum sold in the United States, JASA. Indeed, the use of the statement "founded in 1878" as part of the HAVANA CLUB & DESIGN mark can have no other purpose.

139.    Through the aforesaid acts, Cubaexport has used the purported HAVANA CLUB & DESIGN mark as a vehicle for fraud and said mark is being used in violation of 15 U.S.C. § 1064(3) to misrepresent the source of Defendants' ersatz HAVANA CLUB rum.

140.    Wherefore, said mark was used by or with the permission of Cubaexport in violation of § 1064(3) and the registration thereof should be cancelled.

## COUNT II
### DECLARATION OF COMMON LAW RIGHTS IN THE HAVANA CLUB TRADEMARK

141.    Paragraphs 1 through 140 are incorporated herein by reference.

142.    BACO is the true owner of the common law rights in and to the HAVANA CLUB mark as the bona fide successor-in-interest to JASA, the original owner of those rights. JASA never abandoned its rights in and to the HAVANA CLUB mark; JASA was prevented from using the mark in the United States and elsewhere as a result of the Cuban government's confiscation of JASA's assets in 1960. At all times prior to BACO's acquisition of the mark, JASA intended to resume use of the mark when it had the means to do so.

-43-

143.    BACO also established common law rights in the HAVANA CLUB mark as a result of its own use of the mark in the United States. BACO used the mark in the United States in 1995 and 1996 and only discontinued use under an agreement with HCH and HRL. BACO is prepared, and intends, to resume use of the HAVANA CLUB mark in the United States. Similarly, BACO has not abandoned the common law rights to the HAVANA CLUB mark that it acquired from JASA.

144.    Defendants have no common law or other rights in any mark incorporating the words HAVANA CLUB. Defendants' alleged rights in any such a mark stem from Cuba's confiscation of JASA's assets. As a matter of public policy, the United States will not recognize a claim of right in a U.S. trademark that is based in whole or in part on such a confiscation.

145.    Further, Section 211 prohibits any United States court from recognizing, enforcing or otherwise validating Defendants' assertion of rights in a mark incorporating the words HAVANA CLUB because such a mark is the same as or substantially similar to the HAVANA CLUB mark that JASA used in connection with the assets that were confiscated by the Cuban government in 1960. Neither JASA nor Bacardi, as JASA's bona fide successor in interest, has consented to Defendants' use of a mark incorporating the words HAVANA CLUB. Accordingly, Defendants have no enforceable rights in any such mark.

146.    An actual controversy exists between the parties with respect to the foregoing claims of common law ownership and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below. Plaintiffs have no adequate remedy at law.

## COUNT III

### DECLARATION OF NON-VIOLATION OF FEDERAL TRADEMARK LAWS

147.    Paragraphs 1 through 146 are incorporated herein by reference.

148.    Plaintiffs' use of the HAVANA CLUB mark in connection with the sale, distribution, and advertising of HAVANA CLUB rum in the United States does not constitute trademark infringement or unfair competition in violation of Section 32 or Section 43(a) of the Lanham Act, 28 U.S.C. §§ 1114 or 1125(a).

149.    Plaintiffs' use of the HAVANA CLUB mark does not infringe under any federal law any mark purportedly owned by Defendants, or constitute unfair competition in violation of any right purportedly owned by Defendants under any federal law.

150.    Defendants have not been damaged, and will not in the future be damaged, by Plaintiffs' use of the HAVANA CLUB mark or by any alleged violation of federal law based on Plaintiffs' use of said marks.

151.    An actual controversy exists between the parties with respect to the foregoing claims of non-violation and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below.  Plaintiffs have no adequate remedy at law.

## COUNT IV

### DECLARATION OF NON-VIOLATION OF STATE LAW

152.    Paragraphs 1 through 151 are incorporated herein by reference.

153.    Plaintiffs' use of the HAVANA CLUB mark does not infringe under any state law any mark incorporating the words HAVANA CLUB purportedly owned by Defendants, or constitute unfair competition in violation of any right purportedly owned by Defendants under any state law based on a mark or trade name incorporating the words HAVANA CLUB.

154.   Defendants have not been damaged, and will not in the future be damaged, by Plaintiffs' use of the HAVANA CLUB mark or by any alleged violation of state law based on Plaintiffs' use of said marks.

155.   An actual controversy exists between the parties with respect to the foregoing claims of non-violation and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below.  Plaintiffs have no adequate remedy at law.

## COUNT V
### TREATY VIOLATIONS AND CONSTITUTIONAL GROUNDS

156.   Paragraphs 1 through 155 are incorporated herein by reference.

157.   Contrary to Section 44 of the Lanham Act, 15 U.S.C. § 1126, and international conventions, the HAVANA CLUB mark was not used in commerce in the United States within a reasonable period after Cubaexport's original application was filed.

158.   Indeed, the HAVANA CLUB mark has never been used by the original registrant, Cubaexport, in interstate or foreign commerce of the United States.

159.   Wherefore, the purported HAVANA CLUB mark has never been used in commerce which may lawfully be controlled by Congress, so the PTO has no power to maintain the U.S. HAVANA CLUB & DESIGN Registration on the Principal Register of the PTO and said registration should be cancelled.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs pray for relief as follows:

160.   Plaintiffs request that this Court enter judgment:

(a)   Adjudging and declaring that Reg. No. 1,031,651 of the HAVANA CLUB & DESIGN mark be cancelled and stricken from the Principal Register of the PTO;

(b)    Declaring that BACO owns the common law rights to the HAVANA

CLUB trademark in the United States, that BACO's use of the HAVANA CLUB trademark does

not infringe on any mark owned by Defendants or otherwise violate any enforceable rights of the

Defendants, and that Defendants have no rights in any mark incorporating the words HAVANA

CLUB;

(c)    Enjoining Defendants, their agents, servants, employees, parents,

subsidiaries, affiliates and all persons in active concert with Defendants, from using or

registering in the PTO or in any State of the United States any mark incorporating or consisting

of the words HAVANA CLUB and from interfering with Plaintiffs' use and registration of the

HAVANA CLUB mark;

(d)    Awarding Plaintiffs their costs and attorneys' fees pursuant to 15 U.S.C. §

1117 and applicable state law; and

(e)    Awarding Plaintiffs such further relief as the Court may deem just and

proper.

Respectfully submitted,

William R. Golden, Jr.                      Eugene D. Gulland (D.C. Bar No. 175422)
KELLEY DRYE & WARREN                        Oscar M. Garibaldi (D.C. Bar No. 251330)
101 Park Avenue                             Gregory M. Williams (D.C. Bar No. 467950)
New York, New York 10178                    COVINGTON & BURLING
(212) 808-7800                              1201 Pennsylvania Avenue, N.W.
                                            Washington, D.C.  20004-2401
                                            (202) 662-6000

Attorneys for the Plaintiffs Bacardi & Company Limited
and Bacardi-Martini U.S.A., Inc.

-47-

# Exhibit 8

5/14/95

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PAIGE INNOVATIONS INC.,          )
                                 )
            Plaintiff,           )
                                 )
       v.                        )
                                 )  Civil Action No. 94-676-SLR
GENERAL CABLE INDUSTRIES, INC.,  )
                                 )
            Defendant.           )

MEMORANDUM ORDER

On December 16, 1994, plaintiff Paige Innovations, Inc.
brought this action in the United States District Court for the
District of Delaware for damages and injunctive relief against
defendant General Cable Industries, Inc. for the wrongful
infringement of United States Design Patent No. 287,123 ("the
'123 patent").  The invention of this patent concerns an
extension cord product.  Plaintiff claims that the allegedly
infringing product has been sold in Delaware.  (D.I. 29 at 4)

Presently before the court is defendant's motion to
transfer the case from this District to the United States
District Court for the Eastern District of Kentucky pursuant to
28 U.S.C. § 1404.  (D.I. 10)  For the reasons discussed below,
the motion will be denied.

1

Congress intended through Section 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. <u>Stewart Organization, Inc. v. Ricoh Corp.</u>, 487 U.S. 22, 29 (1988). "The standard under which transfer applications are considered requires district courts to consider the convenience of parties and witnesses, the interest of justice, and whether the action could have been brought in the transferee court." <u>SportsMEDIA Technology Corp. v. Upchurch</u>, 839 F.Supp. 8, 9 (D.Del. 1993). The parties do not dispute that this action could have been brought in the Eastern District of Kentucky.

As a threshold matter, the parties disagree vigorously as to the proper weight to assign the plaintiff's choice of forum. As a general rule, "[b]ecause plaintiff['s] choice of forum is accorded substantial weight, the burden is on the defendants to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." <u>Bergman v. Brainin</u>, 512 F.Supp. 972, 973 (D.Del. 1981) (citing <u>Shutte v. Armco Steel Corp.</u>, 431 F.2d 22, 25 (3d Cir. 1970), <u>cert denied</u>, 401 U.S. 910 (1971)) (emphasis added). Plaintiff's choice of forum is "paramount." <u>E.g.</u>, <u>Wesley-Jessen Corp. v. Pilkington Visioncare</u>, 157 F.R.D. 215, 216 (D.Del 1993).

Defendant argues that such deference to plaintiff's choice of forum applies only when plaintiff has chosen its "home turf" as the forum for the lawsuit. In fact, "[t]he deference to

3

With respect to convenience of the parties and witnesses, defendant argues that this factor overwhelmingly favors transfer. Specifically, defendant contends that (1) at least five of its employees with personal knowledge of the subject matter of this suit reside in Kentucky; (2) one critical non-party witness resides "to the best of [defendant's] knowledge" in Kentucky; (3) defendant's business as well as the personal lives of its employees will be disrupted if its employee witnesses must travel to Delaware for trial; (4) Kentucky is defendant's home; (5) Kentucky is no less, and arguably more, convenient than Delaware for plaintiff and its witnesses. Plaintiff counters that it intends to call at least one witness resident in Ontario, as well as expert witnesses who will "most likely" reside in the Washington, D.C. area. (D.I. 29 at 15) According to plaintiff, it will be more convenient and less expensive for these witnesses to travel to its chosen forum than to Kentucky.

Even if the Eastern District of Kentucky were the more convenient trial forum for both the parties and the non-party witnesses, this would not be sufficient to compel a transfer. This court in Wesley-Jessen analyzed an analogous situation in which a defendant made a similar showing, and concluded that transfer was inappropriate for three reasons. First, the court noted that, being a company engaged in business throughout the United States, the claim that litigation away from the most convenient forum is burdensome is somewhat suspect. 157 F.R.D.

5

three months before the plaintiff's chosen forum.  This case has been set for trial to begin on March 4, 1996.  The court is not persuaded, based on the 1993 statistics, that the Eastern District of Kentucky would set this case for trial at any earlier date.  The efficient use of judicial resources does not require the transfer of this case.

Addressing compulsory process, defendant has also argued that one third party witness, a former employee of defendant, is not within the subpoena power of this court, but is "to the best of [defendant's] knowledge within the subpoena power of the Eastern District of Kentucky."  The court addressed an analogous contention in Critikon, 821 F.Supp. at 967.  Here, as in that case, defendant

> has not represented to the [c]ourt that [the
> third party witness] would be unwilling to
> testify at trial voluntarily.  Because [the
> witness] is a former employee of [defendant],
> ... the [c]ourt must assume that he would be
> willing to testify absent a subpoena.

Thus, even if defendant were to prove that the third party witness resided in Kentucky, this factor would not weigh strongly in its favor.[3]

Concerning the cost to the parties, defendant argues that the net cost of litigating in Delaware would "substantially" exceed that of litigating in Kentucky.  While it

_____

3.  Defendant also argues that the court should transfer this action because "[i]t appears that" many of its current employees are not "subject to subpoena by this Court."  (D.I. 11 at 17)  These current employees, of course, are under defendant's control, and thus their susceptibility to subpoena is not at issue.

Island, Washington, D.C. and California, and that, in any event, all necessary documents will be photocopied and readily available at trial wherever it should occur. (D.I. 29 at 16-17)

> As this court held in Critikon:
>
> The location of documents, in the context of access to proof, in a document-intensive case such as this can be misleading. No matter where the trial is held, [defendant's] ... counsel and [plaintiff's] ... counsel will be required to travel to [various places] to select and produce the requested discovery. Regardless of where trial is held, the documents will be copied and mailed to the offices of counsel and subsequently transported to trial.

821 F.Supp. at 966-67. For this reason, the court finds that defendant has not established that this factor compels the transfer of this action.

Based on the record as it presently stands, defendant has failed to demonstrate that the interests of justice dictate transferring this action.

## CONCLUSION

Therefore, at Wilmington, this 1ᵗʰ day of May, 1995, IT IS ORDERED that defendant's motion to transfer this action (D.I. 10) is denied.

_____
United States District Judge

9

# Exhibit 9

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ALLIEDSIGNAL INC.,                    )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )  Civil Action No. 97-508-SLR
                                      )
HOECHST CELANESE                      )
CORPORATION,                          )
                                      )
          Defendant.                  )

MEMORANDUM ORDER

     At Wilmington this 8th day of June, 1998, having

reviewed defendant's motion to transfer and the papers filed in

connection thereto;

     IT IS ORDERED that said motion (D.I. 7) is denied, for

the reasons that follow:

     1.  Title 28, section 1404(a) provides:

          For the convenience of parties and witnesses,
          in the interests of justice, a district court
          may transfer any civil action to any other
          district or division where it might have been
          brought.

     2.  As a general rule, "[b]ecause plaintiff['s] choice

of forum is accorded substantial weight, the burden is on [a]

defendant[] to establish that the balance of convenience of the

parties and witnesses strongly favors the defendant[]." Bergman

v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981), citing Schutte

v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970) (emphasis

added).

     3.  This court has recognized of late that the

"convenience" factor in a transfer of venue analysis is a

somewhat antiquated notion in a day and age where transportation,

communication, and information retrieval systems allow for almost

immediate access to locations, parties and witnesses, and

evidence.  See, e.g., Wesley-Jessen Corp. v. Pilkington

Visioncare, 157 F.R.D. 215, 218 (D. Del. 1993).

     4.  Nevertheless, there are circumstances where issues

of convenience deserve consideration, e.g., where a party's

activities are local or regional (versus national or

international) in scope; where a party's resources (human and

otherwise) are insufficient to adequately litigate in an

inconvenient forum; or where another court has or had related

litigation.  These latter considerations are relevant as well to

analyzing the "interests of justice" factor in the § 1404(a)

context.

     5.  Defendant in this case argues that a transfer to

the Western District of North Carolina is warranted on the

grounds that these parties were engaged in litigation over

similar technology in that court, Hoechst Celanese Corp. v.
Allied-Signal Inc., Civil Action No. 3:92CV66-MU, a case which
was settled by the parties in December 1993.  Defendant contends
that, because "[t]he North Carolina court was actively involved
in the pre-trial proceedings," it would save judicial resources
to transfer this case to North Carolina.  (D.I. 8 at 5)

     6.  Plaintiff responds that

> [t]he prior North Carolina case involved
> different patents and different accused
> products and was settled before trial nearly
> four years ago, with little substantive
> judicial involvement in the pretrial
> proceedings.

(D.I. 11 at 1)

     7.  Having checked with the North Carolina court, this
court finds plaintiff's characterization a more accurate one.
The court concludes that defendant has presented no persuasive
reasons for a transfer in this case.

                        _____
                       United States District Judge