IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

---------------------------------------------------- x

PERNOD RICARD USA, LLC,                  :

         Plaintiff,                          :

                                   Civil Action No. 06-505-SLR
        v.                                  :

BACARDI U.S.A., INC.,                      :

         Defendant.                          :

---------------------------------------------------- x

**DECLARATION OF WILLIAM Z. NAKHLEH
IN SUPPORT OF PERNOD RICARD USA, LLC'S OPPOSITION
TO BACARDI U.S.A., INC.'S MOTION TO DISMISS COUNT II**

1.      I am a member of the bars of the Commonwealth of Virginia and the District of

Columbia. I am an associate of the law firm Ropes & Gray LLP located at 700 12th Street,

N.W., Washington, D.C. 20005.

2.      On August 3, 2006, the Post Registration Division of the U.S. Patent and

Trademark Office ruled that Registration No. 1,031,651 of the HAVANA CLUB trademark

owned by Cubaexport would expire unless its decision not to renew the registration was reversed

on appeal. Attached hereto as Exhibit 1 is a true and correct copy of the decision.

3.      Cubaexport appealed that ruling by filing a petition to the Director/Commissioner

for Trademarks on October 4, 2006.

4.    Attached as Exhibit 2 is a true and correct copy of the July 18, 2006 decision of the Commissioner for Trademarks denying Bacardi's petition in connection with Cubaexport's renewal of its registration.

5.    Attached as Exhibit 3 is a true and correct copy of the Answer, Affirmative Defenses and Counterclaims To First Amended Complaint that was filed on October 17, 1997 in *Havana Club Holding, S.A. et al. v. Galleon, S.A., Bacardi-Martini, U.S.A., Inc. et al.*, 96 Civ-9655 (SAS) (S.D.N.Y. 1996).

6.    Attached as Exhibit 4 is a true and correct copy of the Complaint that was filed on March 29, 2004 in *Bacardi & Company Limited et al. v. Empresa Cubana Exportadora de Alimentos Y Productos Varios et al.*, Civ. 1:04-CV-00519 (EGS) (D.D.C. 2004).

7.    Attached as Exhibit 5 is a true and correct copy of Bacardi's Partially-Consented Motion To Stay Pending Final Resolution of Patent and Trademark Office Post Registration Office Action.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed this 20th day of October, 2006.

William Z. Nakhleh

2

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on October 20, 2006, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to William J. Wade.

I also certify that copies were caused to be served on October 20, 2006 upon the following in the manner indicated:

### BY HAND

William J. Wade, Esquire
Anne Shea Gaza, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

### BY FEDERAL EXPRESS

Eugene D. Gulland, Esquire
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004

William R. Golden, Jr., Esquire
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

/s/ Rodger D. Smith II
Rodger D. Smith II (#3778)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Wilmington, DE 19801
(302) 658-9200
rsmith@mnat.com

# EXHIBIT 1

## UNITED STATES PATENT AND TRADEMARK OFFICE

REGISTRATION NO:    1,031,651

August 3, 2006

REGISTRANT: EMPRESA CUBANA EXPORTADORA DE ALIMENTOS ETC.

**\*1031651\***

CORRESPONDENT ADDRESS:
    HERBERT SCHWARTZ
    ROPES & GRAY LLP
    1251 AVENUE OF THE AMERICAS
    NEW YORK, NY 10020

RETURN ADDRESS:
Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451

MARK:    HAVANA CLUB

CORRESPONDENT'S REFERENCE/DOCKET NO:  N/A

CORRESPONDENT EMAIL ADDRESS:

Please provide in all correspondence:

1. Registration date, registration number, mark and registrant's name.
2. Date of this Office Action.
3. Examiner's name and Post Registation Division.
4. Your telephone number and e-mail address.

## POST REGISTRATION OFFICE ACTION

Registration Number  1,031,651

The Sections 8 & 9 Combined filing submitted on December 14, 2005, cannot be accepted for the reasons set forth below.

The Office has received your letter of August 1, 2006, indicating  that the specific license necessary to authorize the required fee for filing the combined document has been denied.  Because the specific license is necessary for authorizing payment of the required fee, and that license has been denied, the required fee for filing the Sections 8 & 9 Combined filing has not been submitted; accordingly, the registration will be cancelled/expired.

It is noted that your letter contains arguments in support of renewing the subject registration.  You may file a petition to the Director requesting review of this decision.  The petition must be filed within six months from the mailing date of this letter and must be accompanied by a fee of $100.  37 C.F.R. §§2.6, 2.146(a)(2) and 2.176.

Sharon Granata

/Sharon Granata/

Trademark Specialist

Post Registration Division

PH: (571) 272-9167

FAX (571) 273-9167

sharon.granata@uspto.govov

**How to respond to this Office Action:**

To respond formally via regular mail, your response should be sent to the mailing Return Address listed above and include the registration number, the words 'Post Registration' and the examiner's name on the upper right corner of each page of your response.

To check the status of your application at any time, visit the Office's Trademark Applications and Registrations Retrieval (TARR) system at **http://tarr.uspto.gov/**

**FOR INQUIRIES OR QUESTIONS ABOUT THIS OFFICE ACTION, PLEASE CONTACT THE ASSIGNED EXAMINER.**

# EXHIBIT 2



Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451
www.uspto.gov

Re: Trademark Registration of      :
   Empresa Cubana Exportadora de    :
   Alimentos y Productos Varios  d/b/a  :
   Cubaexport                       :
Registration No. 1,031,651       :     On Petition
Registered: January 27, 1976     :
Mark: HAVANA CLUB and Design  :
Petition Filed: January 25, 2006   :

Bacardi & Company Limited and Bacardi USA, Inc. (collectively, petitioner) have petitioned the Director of the United States Patent and Trademark Office (Director) to deny renewal of the subject registration. The Director has authority to review the request under 37 C.F.R. §2.146. The petition is denied.

## FACTS

The above-mentioned registration issued on January 27, 1976. On December 14, 2005, Empresa Cubana Exportadora de Alimentos y Productos Varios d/b/a Cubaexport (registrant) filed a combined Section 8 declaration of excusable nonuse and Section 9 renewal application (combined filing) pursuant to 15 U.S.C. §§1058 and 1059. This petition was filed on January 25, 2006.[1]

## ANALYSIS

Petitioner seeks to introduce documents and information for the Director's consideration in regard to the combined filing submitted by the registrant. The review of a combined filing is an *ex parte* matter. Neither the Trademark Act nor the Trademark Rules of Practice provide for a third party to intervene in an *ex parte* matter. Therefore, petitions filed by third parties to review actions taken in *ex parte* matters are generally denied. *Trademark Manual of Examining Procedure* (TMEP) §1705.01.

Here, petitioner seeks to involve itself in the Director's review of a combined filing in connection with a registration of which petitioner is not the owner. The Director will not consider the information or documents submitted with this petition because petitioner is a third party in this *ex parte* matter.

## DECISION

The petition is denied.

---

[1] On July 19, 1994, petitioner instituted cancellation proceedings regarding the subject registration before the Trademark Trial and Appeal Board (TTAB). While the proceedings were under way, the subject registration was granted a first renewal, on June 18, 1996, for a term of ten years. In a decision issued January 29, 2004, the TTAB dismissed the petition to cancel. On March 29, 2004, petitioner commenced a civil action in the United States District Court for the District of Columbia (District Court) seeking review of the TTAB decision. The District Court has not yet issued a decision in this matter.

Sharon R. Marsh
Deputy Commissioner
 for Trademark Examination Policy

SRM:CPC

Date:

Attorney for Petitioner:

William R. Golden, Jr.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

Attorney for Registrant:

Vincent N. Palladino
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020-1104

-2-

# EXHIBIT 3

A   389

56

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

HAVANA CLUB HOLDING, S.A. and
HAVANA CLUB INTERNATIONAL, S.A.,

                Plaintiffs,

      - against -

GALLEON, S.A., BACARDI-MARTINI U.S.A.,
INC., GALLO WINE DISTRIBUTORS, INC.,
G.W.D. HOLDINGS, INC. and PREMIER
WINE AND SPIRITS,

                Defendants.

------------------------------------x

No. 96-Civ.-9655 (SAS)

ANSWER, AFFIRMATIVE
DEFENSES AND
COUNTERCLAIMS TO FIRST
AMENDED COMPLAINT

JURY TRIAL DEMANDED

      Defendants BACARDI-MARTINI U.S.A., Inc. ("BACARDI-MARTINI") and Galleon, S.A. (now after its merger into its parent, Bacardi & Company Limited, the surviving entity of the merger, known as Bacardi & Co. Ltd.) ("Bacardi"), for their Answer to the First Amended Complaint and their Affirmative Defenses and Counterclaims herein, through their undersigned counsel, Kelley Drye & Warren, LLP, allege as follows:

      1.    Admit, in respect of paragraphs 1 and 2 of the First Amended Complaint, that plaintiffs have instituted the present action under the Lanham Act, 15 U.S.C. § 1051 et seq and 28 U.S.C. § 1331, but deny any violations of the Lanham Act or any other law or treaty of the United States, and except as so admitted, deny each and every other allegation contained therein.

JJ NY27/FBROM/84125.21

## A  390

2.     Admit, in respect of paragraph 3 of the First Amended Complaint, that venue is alleged under 28 U.S.C. § 1391, and that Bacardi is an alien, but deny that these defendants are residents of this district within the meaning of 28 U.S.C. § 1391 and further deny each and every other allegation contained therein.

3.     Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 4 and 5 of the First Amended Complaint and, therefore, deny same.

4.     Admit, in respect of paragraph 6 of the First Amended Complaint, that the party sued as Galleon, S.A. was formerly a separate Bahamian company, but aver that Galleon, S.A. was merged into its parent, Bacardi, a company organized and existing under the laws of Liechtenstein, with its headquarters at Millar Road, Nassau, Commonwealth of the Bahamas, which is the sole surviving entity of said merger and succeeded to all the assets of Galleon, S.A., including its rights in the HAVANA CLUB trademark for "rum," and assumed all its liabilities.

5.     Admit, in respect of paragraph 7 of the First Amended Complaint, that defendant BACARDI-MARTINI is a Delaware corporation and deny each and every other allegation contained therein.

6.     Deny the allegations contained in paragraphs 8 and 9 of the First Amended Complaint, except admit that the defendants Bacardi and BACARDI-MARTINI are under common ownership and control and admit that "Exclusive Imports" is a d/b/a of BACARDI-MARTINI.

##NY2/IFPRGM/14125.21                    -2-

# A 391

7.  Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 10 and 11 of the First Amended Complaint and, therefore, deny same.

8.  Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 12, 13, 14 and 15 of the First Amended Complaint and, therefore, deny same.

9.  Deny each and every allegation contained in paragraphs 16 and 17 of the First Amended Complaint, except admit that the Cuban Asset Control Regulations prohibit the importation of rum and other goods from Cuba.

10.  Deny each and every allegation contained in paragraphs 18, 19, 20, 21, 22, 23, 24, 25, 26 and 27 of the First Amended Complaint, except admit that rum produced in the Bahamas under the authority of Bacardi's predecessor-in-interest, Galleon, S.A., was imported into the United States, distributed and sold exclusively by defendant BACARDI-MARTINI under the mark HAVANA CLUB in interstate commerce in the United States through various wholesalers, including Gallo Wine Distributors, Inc., in New York and elsewhere, which distributors sold said HAVANA CLUB rum to retailers which, in turn, sold it to consumers and that said HAVANA CLUB rum was listed and offered for sale in Beverage Media, Metro New York, and other publications and that copies of photographs of these products are attached as Exhibit A to the First Amended Complaint, and aver that the labeling and trade dress are as appears on the products themselves.

11.  Admit, in respect of paragraph 28, that Cuba is an island and aver that both Cuba and the islands that comprise the Commonwealth of the Bahamas are in the

## A  392

Caribbean region, and except as so admitted and averred, deny each and every other allegation contained therein.

12.    Admit, in respect of paragraphs 29 and 30 of the First Amended Complaint, that the labeling and trade dress for the HAVANA CLUB rum made under authority of Bacardi's predecessor-in-interest, Galleon, S.A., is as it appears on the product itself, and except as so admitted, deny each and every other allegation contained therein.

13.    Admit, in respect of paragraph 31 of the First Amended Complaint, that bottles of liquor are generally displayed on retail shelves with the bottle turned to the front and except as so admitted, deny each and every other allegation contained therein.

14.    Deny each and every allegation contained in paragraph 32 of the First Amended Complaint.

15.    Admit, in respect of paragraph 33 of the First Amended Complaint, that Havana is the capital of Cuba and that it is a city located in Cuba, and except as so admitted, deny each and every allegation contained therein.

16.    Deny each and every allegation contained in paragraphs 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47 and 48 of the First Amended Complaint.

17.    Answering each and every allegation contained in paragraph 49 of the First Amended Complaint, repeat and reallege each and every response to paragraphs 1-31, 33, 39-48 of the First Amended Complaint as though fully set forth herein.

18.    Deny, in respect of paragraphs 50, 51 and 52, each and every allegation contained therein and specifically aver that defendants and their predecessors-in-interest did use the trademark HAVANA CLUB for rum and the labeling therefor in interstate commerce in the United States prior to January 1, 1996.

# A   393

19.     Answering each and every allegation contained in paragraph 53 of the First Amended Complaint, repeat and reallege each and every response to paragraphs 1-31, and 40-44 of the First Amended Complaint, as though fully set forth herein.

20.     Aver that these defendants lack knowledge or information sufficient to form a belief as to the truth of each and every allegation contained in paragraphs 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67 and 68 of the First Amended Complaint, and, therefore, deny same, except to specifically deny that the HAVANA CLUB mark was legally adopted and used in Cuba by these plaintiffs prior to the defendants' use of the HAVANA CLUB trademark for rum in the United States, and deny that defendants adoption of their mark was in bad faith or that defendants' use will lead to error or confusion.

## AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant-counterclaimants Bacardi and BACARDI-MARTINI, as and for their Affirmative Defenses and Counterclaims (collectively, the "Counterclaims"), allege upon personal knowledge as to their own acts and, upon information and belief as to the acts of others, as follows:

A   394

## AS AND FOR A FIRST
## AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### I.

### False and Fraudulent Renewal of the
### Purported HAVANA CLUB and Design Registration
### In Violation of § 38 of the Lanham Act.

1.      Bacardi is a company organized and existing under the laws of

Liechtenstein, with a place of business at Millar Road, Nassau, Bahamas.

2.      BACARDI-MARTINI is a Delaware corporation with its principal place

of business in Miami, Florida.

3.      Plaintiff-counterclaim-defendant Havana Club Holding, S.A. ("Havana

Holding") a corporation organized under the laws of Luxembourg, was established in

November 1993 and has its offices in Paris, France.  Havana Holding never has done

business in the United States and does not own and never has owned any of the federal or

state permits required to engage in the distilled spirits business in the United States.

4.      Plaintiff-counterclaim defendant Havana Club International, S.A.

("HCI") is a Cuban company which never has done any business in the United States.  HCI

does not hold and never has held any of the federal or state permits required to engage in the

distilled spirits business in the United States.

5.      Neither Havana Holding nor HCI ever obtained a label approved from

the U.S. Bureau of Alcohol, Tobacco and Firearms (ATF) for any distilled spirits product,

including, but not limited to HAVANA CLUB rum.

6.      BACARDI-MARTINI is engaged, among other things, in the business

of importing, distributing, and selling distilled spirits, including BACARDI, CASTILLO, and

A   395

HAVANA CLUB rums, in interstate commerce throughout the United States. The rums sold by BACARDI-MARTINI in the United States were produced in Cuba until the unlawful expropriation of the Bacardi facilities and distillery there by the Castro regime and are now produced principally in Puerto Rico and The Bahamas.

7.    Bacardi and its predecessors-in-interest, including Galleon S.A. and Jose Arechabala S.A. ("Arechabala"), have been engaged in the spirits business since before the turn of the century and Bacardi owns the mark HAVANA CLUB for rum in the United States and App. Ser. No. 74/572,667 to register the mark HAVANA CLUB for "rum and rum specialty drinks" in International Class 33 in the U.S. Patent and Trademark Office (the "PTO").

8.    The Bacardi rum business is presently owned by the descendants of Don Facundo Bacardi, who over a century ago in Cuba originated a recipe and process for the distillation and manufacture of rum that has been sold ever since under the BACARDI name and mark. Compania Ron Bacardi, S.A., a Cuban joint-stock company formerly headquartered in Santiago de Cuba, formerly produced BACARDI rum in Cuba.

9.    As a result of the extensive advertising, promotion and sale of BACARDI rum, American consumers have long recognized BACARDI rum as being of the highest quality. Indeed, BACARDI rum is today the best-selling brand of spirits in the world.

10.    On October 14, 1960, the Cuban properties of the defendant-counterclaimants' predecessors Compania Ron Bacardi, S.A. and Arechabala were unlawfully expropriated by the Castro regime.

# A  396

11.    Defendant-counterclaimants have a bona fide intent to produce rum in the future in a democratic Cuba. When the President of the United States, pursuant to the Cuban Democracy Act of 1992, 22 U.S.C.A. Section 6007(b), certifies that a democratic government has been re-established in Cuba and the U.S. trade embargo with Cuba is lifted, then defendant-counterclaimants intend once again to produce rum in Cuba, the land where Bacardi's rum business began.

12.    At present, however, it is not possible to make rum in Cuba and import and sell that rum in the United States. As American consumers are well aware due to the long-standing embargo of items manufactured in Cuba, rum produced there cannot at present be lawfully sold in or imported into the United States.

13.    BACARDI-MARTINI has been importing and will continue to import and distribute rum in the United States made under authority granted by Bacardi and its predecessor-in-interest. That rum is being sold under the trademark HAVANA CLUB and is carefully made in the style developed by Cuban rum masters prior to Castro's unlawful confiscation of the distilleries of Ron Bacardi S.A., Arechabala, and other Cuban rum producers.

14.    The Cuban Asset Control Regulations ("CACR"), implemented in 1963 under Section 5(b) of the Trading With The Enemy Act of 1917, as amended, 50 U.S.C. App. 1-44, prohibit transfers of property, including trademarks, in which a Cuban entity has an interest except when authorized by the Office of Foreign Assets Control ("OFAC") acting on behalf of the Secretary of the Treasury.

## A  397

15.    In 1976, the trademark HAVANA CLUB for "rum" was registered in the United States Patent and Trademark Office ("related U.S. Registration") by Empresa Exportadora de Alimentos y Productos Varios ("Cubaexport"), a Cuban state enterprise.

16.    On October 29, 1993, Cubaexport entered into an agreement purportedly transferring the U.S. rights to the HAVANA CLUB trademark and the related U.S. Registration to Havana Rum & Liquors, S.A. On or about November 22, 1993, Havana Rum & Liquors, S.A. entered into an agreement purportedly transferring the aforesaid mark and the related U.S. Registration to Havana Club Holding, S.A.

17.    Those provisions of the original transfer agreement relating to transfers of the U.S. rights to the HAVANA CLUB mark and the related U.S. Registration were rendered null and void by the CACR, § 515.201(b)(I), and the attempted assignment of said HAVANA CLUB mark and the related U.S. Registration were invalid and of no force and effect and void ab initio.

18.    As a result, the status quo ante as of the October 29, 1993 date of said abortive original transfer agreement was never changed, and Cubaexport retained whatever rights it had in said mark and the related U.S. Registration as of said date, notwithstanding the invalid transfers.

19.    Neither Havana Holding nor HCI ever sold any rum under the HAVANA CLUB mark in the United States.

20.    Plaintiffs Havana Holding and HCI have never obtained rights to the trademark HAVANA CLUB for "rum" in the United States.

21.    Any rights that Havana Club Holding, S.A. may have had, may have or claims to have had in the Registration of the HAVANA CLUB trademark (U.S. Reg. No.

A 398

1,031,651) from forever until the present have been cancelled by order of the Court stayed subject to an appeal.

22.    If Cubaexport ever had any rights in the HAVANA CLUB mark in the United States and the related U.S. Registration 1,031,651, which is denied, those rights, if any, still subsisted in Cubaexport after the purported assignment to Havana Holding and never were transferred from Cubaexport, and its purported assignment of said mark and related U.S. registration was a naked and unlawful assignment which was of no force and effect. Nonetheless, Havana Holding purported to renew said registration on or about January 12, 1996. The purported attempts by Cubaexport and plaintiff-counterclaim-defendants to transfer said mark and registration were, in addition to being invalid assignments-in-gross, null and void ab initio pursuant to 31 CFR § 515.203(a) and cannot serve as the basis for recognizing any rights to said mark in Havana Holding.

23.    Cubaexport and plaintiff-counterclaim-defendants Havana Holding and HCI were at all relevant times aware of the fact that the purported transfers of the HAVANA CLUB and Design mark in the United States and said registration thereof were prohibited by the CACR and willfully violated those regulations and knowingly caused their counsel to file a false and fraudulent application with OFAC to try to have said trademark retroactively approved. Indeed, said fraudulent and false application was only made after a petition to cancel the purported U.S. registration of said mark was filed in the PTO. Furthermore, Havana Holding knowingly falsely represented that it owned said mark and registration in connection with the renewal declaration filed on or about January 12, 1996.

24.    Cubaexport, plaintiff-counterclaimants-defendants' alleged predecessor-in-title obtained U.S. Registration No. 1,031,651 of the mark HAVANA CLUB and Design

# A 399

for rum by false means, including making false or fraudulent representations to the PTO, that it owned said mark in the United States.

25.    Havana Rum & Liquors, SA, also an alleged predecessor, obtained title to U.S. Reg. No. 1,031,651 of the mark HAVANA CLUB and Design for rum by false means, including making false or fraudulent representations, both orally or in writing, to the PTO and OFAC, which statements were designed to conceal its unlawful activities as alleged above.

26.    Plaintiff-counterclaim-defendant Havana Holding knowingly obtained record title to U.S. Registration No. 1,031,651 of the mark HAVANA CLUB and Design by false means, including making false or fraudulent representations, to the PTO as alleged above in connection with the purported renewal of said mark in the name of Havana Holding and to OFAC in an effort to conceal its unlawful activities as alleged above.

27.    As a result of plaintiff-counterclaim-defendants' aforesaid acts, defendant-counterclaimants have sustained, and are continuing to sustain, damages to their business in the United States under the HAVANA CLUB mark for rum, including lost sales here of said product and have been forced to incur attorneys fees on their own behalf and on behalf of independent distributors who have been threatened and sued by plaintiff-counterclaim-defendants ostensibly relying on their fraudulently or falsely obtained rights in U.S. Reg. No. 1,031,651 for their purported HAVANA CLUB and Design mark, all in violation of Section 38 of the Lanham Act 15 U.S.C. § 1120.

28.    Notwithstanding plaintiff-counterclaim-defendants knowledge of their violations of the CACR, Havana Holding and HCI are still falsely asserting rights in the HAVANA CLUB mark in the United States.

A   400

WHEREFORE, defendant-counterclaimants pray for the relief requested

hereinafter.

## AS AND FOR A SECOND
## AFFIRMATIVE DEFENSE AND COUNTERCLAIMS

### II.

### <u>Abandonment</u>

29.    Paragraphs 1 through 28 of the Counterclaims are incorporated herein

by reference.

30.    If plaintiff-counterclaim-defendants ever obtained any common law

rights in the mark HAVANA CLUB for rum, which is denied, plaintiffs nevertheless

presently have no rights whatsoever to the mark HAVANA CLUB for "rum" in the United

States because their aforesaid actions after the abortive assignments have caused it to lose any

significance as a source of origin.  As between Havana Holding and HCI, on the one hand,

and Cubaexport on the other, Cubaexport owns the reputation or goodwill, if any, that exists

in the United States as a result of the purported advertising and sale of Castro regime

HAVANA CLUB rum.  Any attempt by plaintiff-counterclaim-defendants to claim right to

that reputation and goodwill, if any, constitutes abandonment of any rights therein.

WHEREFORE, defendant-counterclaimants pray for the relief requested

hereinafter.

A   401

AS AND FOR A THIRD
AFFIRMATIVE DEFENSE AND COUNTERCLAIM

III.

Misrepresentation of Goods

31.    Paragraphs 1 through 30 of the Counterclaims are incorporated herein by reference.

32.    The aforesaid actions of plaintiff-counterclaim-defendants, including their use of the labeling statement incorporated as a component of the Design portion of the aforesaid mark that falsely indicates that Havana Holding or its predecessor was "founded in 1878", is part of a deliberate scheme by plaintiff-counterclaim-defendants to pass off their ersatz HAVANA CLUB rum as being somehow approved by the producer of, or as being the same quality as, the only Cuban origin HAVANA CLUB rum ever sold legally in the United States which was produced by defendants' predecessor-in-interest, Arechabala, which truthfully traced its origins to 1878.

33.    Furthermore, plaintiff-counterclaim-defendants' other aforesaid acts and omissions are intended to confuse anyone purchasing their ersatz product, including visitors to Cuba, into wrongly believing that they are somehow the legitimate successor to the original producer of the HAVANA CLUB rum sold in the United States, Arechabala. Indeed, the use of the statement "founded in 1878" as part of the Design portion of the mark can have no other purpose.

34.    Through the aforesaid acts, plaintiff-counterclaim-defendants have used the purported HAVANA CLUB and Design mark as a vehicle for fraud and said mark is

# A  402

being used in violation of 15 U.S.C. § 1064(3) to misrepresent the source of their ersatz HAVANA CLUB rum.

    WHEREFORE, defendant-counterclaimants pray for the relief requested hereinafter.

## AS AND FOR A FOURTH
## AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### IV.

### Unclean Hands

    35.    Paragraphs 1 through 34 of the Counterclaims are incorporated herein by reference.

    36.    Plaintiff-counterclaim-defendants have willfully violated civil and criminal statutes of the United States in their efforts to claim ownership of the HAVANA CLUB mark for rum in the United States.

    37.    Plaintiff-counterclaim-defendants have sold under the mark HAVANA CLUB a rum product in Panama and elsewhere that contained rum made outside of Cuba, including rum specifically produced in Panama.

    38.    Accordingly, Havana Holding and HCI are barred by the doctrine of unclean hands from being awarded any equitable relief herein, on the ground that the mark HAVANA CLUB has geographic significance.

# A   403

WHEREFORE, defendant-counterclaimants pray for the relief requested hereinafter.

## AS AND FOR A FIFTH
## AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### V.

### Declaratory Judgment

39.     Paragraphs 1 through 38 are incorporated herein by reference.

40.     This is a counterclaim for a declaratory judgment brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the Lanham Act, 15 U.S.C. § 1051, et. seq, which arises from an actual controversy between defendant-counterclaimants and plaintiff-counterclaim-defendants as to whether defendant-counterclaimants are entitled to use of the term HAVANA CLUB as a trademark for rum in the United States.  Plaintiff-counterclaim-defendants have asserted that this use by defendant-counterclaimants infringes on their purported rights in the mark HAVANA CLUB and Design as a result of a purported registration obtained under Section 44 of the Lanham Act, which issued on January 27, 1974 and/or violates Section 43(a) of the Lanham Act.

41.     Neither plaintiff-counterclaim-defendants Havana Holding nor HCI has ever used the mark HAVANA CLUB and Design in interstate commerce in the United States and plaintiffs have no rights whatsoever in the HAVANA CLUB mark for rum in the United States.  Furthermore, plaintiff-counterclaim-defendants could not lawfully sell HAVANA CLUB rum in the United States if the embargo were lifted tomorrow.

42.     Long before January, 1986, the HAVANA CLUB name and mark was used on rum produced by or under the authority of Bacardi's predecessors-in-interest,

A   404

including Galleon, S.A. and Arechabala, that was distributed, offered for sale, and sold in interstate commerce in the United States.

43.   Pursuant to the Lanham Act, 15 U.S.C. § 1052(a), as amended, trademarks of spirits which may have geographic significance but which were in use prior to January 1, 1996 are exempt from any statutory proscription against the use of trademarks that might otherwise be considered geographically misdescriptive.  In the Statement of Administrative Authority, Cong. Rec. Vol. 140 (1994), U.S.C.C.A.N., 103d Cong. 2nd Sess. 1994, Congress, in connection with TRIPs, explicitly stated, with respect to wine and spirits brands, that "[a]ny trademark containing a geographic indication that is currently registered or in use, or that is registered or in use [before January 1, 1996] may be maintained" (emphasis added).  This policy was incorporated in the amendment to 15 U.S.C. § 1052(a), which "grandfathers" defendants' said usage of the mark HAVANA CLUB.

44.   Consequently, even assuming, arguendo, that the mark "Havana Club" may have geographic significance, which defendant-counterclaimants deny, defendant-counterclaimants are entitled to maintain use of that term as a trademark for rum in the United States.

45.   By reason of the foregoing, this Court should declare that defendant-counterclaimant Bacardi has the prior, superior, and exclusive right to use of the designation HAVANA CLUB as a trademark for rum in the United States and that plaintiff-counterclaim-defendant Havana Holding has acquired no valid rights in or to use of the words HAVANA CLUB as a trademark for rum in the United States and cannot stop Bacardi from use of said mark as aforesaid.

A    405

46.    Defendant-counterclaimants have been and are being damaged by Havana Holding's assertion of trademark rights in the term HAVANA CLUB and an actual controversy exists as to the existence of said rights as is demonstrated by the institution of the present suit.

WHEREFORE, defendant-counterclaimants respectfully pray for the relief requested hereinafter.

### AS AND FOR A SIXTH
### AFFIRMATIVE DEFENSE AND COUNTERCLAIM

### VI.

#### Failure to State Claim

47.    Paragraphs 1 through 46 are incorporated herein by reference.

48.    The First Amended Complaint fails to state any claims against defendant-counterclaimants upon which relief can be granted and plaintiffs have failed to demonstrate standing to assert said claims.

WHEREFORE, defendant-counterclaimants respectfully pray:

A.    That the First Amended Complaint herein be dismissed with prejudice; and that defendant-counterclaimants be awarded their reasonable attorneys' fees and their costs and disbursements incurred herein.

B.    That with respect to the Affirmative Defenses and Counterclaims asserted herein, the Court adjudge and decree as follows:

1.    That this Court declares that defendant-counterclaimant Bacardi has the exclusive right to use the trademark HAVANA CLUB for rum in the United States and that Havana Holding and HCI have acquired no rights in said trademark in the United

A  406

States and are permanently enjoined from using said mark in the United States and from interfering in any manner with Bacardi's lawful use of said mark;

       2.    That defendant-counterclaimants recover their monetary damages suffered as a result of the aforesaid violations of 15 U.S.C. § 1120 as well as their costs and attorneys fees incurred in prosecuting said claim; and

       3.    That defendant-counterclaimants have such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

    Defendant-counterclaimants hereby demand trial by jury on all issues so triable as of right.

Dated:    New York, New York
          October 17, 1997

                            Respectfully submitted,

                            KELLEY DRYE & WARREN, LLP

                            By: _Margaret Ferguson_

                            William R. Golden, Jr. (WG9406)
                            Margaret Ferguson (MF4036)
                            Jennifer Bernheim (JB9897)
Attorneys for Defendants-counterclaimants
Bacardi & Company Limited and
BACARDI-MARTINI U.S.A., Inc.
101 Park Avenue
New York, New York 10178
(212) 808-7800

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BACARDI & COMPANY LIMITED,<br>1000 Bacardi Road<br>New Providence, Bahamas<br><br>and<br><br>BACARDI U.S.A., INC.,<br>2100 Biscayne Boulevard<br>Miami, Florida 33137<br><br>                    Plaintiffs,<br><br>        v.<br><br>EMPRESA CUBANA EXPORTADORA DE<br>ALIMENTOS Y PRODUCTOS VARIOS d/b/a<br>CUBAEXPORT<br>Calle 24, n 55, edif. MINCEX, 8vo, piso.<br>Havana, Cuba<br><br>and<br><br>HAVANA CLUB HOLDING, S.A. d/b/a<br>HCH, S.A.<br>5 Rue Eugène Ruppert L2453<br>Luxembourg<br><br>                    Defendants. | Civil Action No. _____ |

## COMPLAINT

Plaintiffs, by their attorneys, Kelley Drye & Warren LLP and Covington & Burling,

allege upon personal knowledge as to their own acts and information and belief as to all other

acts, as follows:

## NATURE OF THE ACTION

1.     Plaintiffs in this case sought cancellation of U.S. Registration No. 1,031,651 of the trademark HAVANA CLUB & DESIGN for rum in Cancellation Proceeding No. 92024108, styled "*Galleon S.A. et al. v. Havana Club Holding, S.A., et al.*" (the "HC Cancellation Proceeding"), before the Trademark Trial and Appeal Board ("TTAB") of the U.S. Patent and Trademark Office ("PTO"). On January 29, 2004, the TTAB issued a decision (the "TTAB Decision") dismissing Plaintiffs' Supplemental and Amended Petition to Cancel the aforesaid U.S. Registration. This is an action seeking: (a) review of the TTAB Decision and rectification of the PTO records by striking or canceling U.S. Registration No. 1,031,651 of the trademark HAVANA CLUB & DESIGN for rum (henceforth sometimes referred to as the "Extant U.S. HAVANA CLUB Registration"); (b) a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 resolving actual controversies between the parties concerning the use and ownership of the HAVANA CLUB & DESIGN trademark in the United States and the rights arising out of the Extant U.S. HAVANA CLUB Registration; and (c) an injunction prohibiting Defendants from using or registering any mark incorporating the words HAVANA CLUB and from interfering with Plaintiffs' use and registration of the HAVANA CLUB mark.

## SUMMARY

2.     This dispute arises from the Cuban government's confiscation of the HAVANA CLUB trademark in Cuba and its subsequent attempts to extend the effects of that confiscation to the HAVANA CLUB trademark in the United States. The HAVANA CLUB trademark for rum was originally created, registered and used in Cuba, the United States and elsewhere by José Arechabala S.A. ("JASA"), a Cuban company owned by the Arechabala family.

3.    In 1960, the Cuban revolutionary government forcibly seized and then purported to expropriate JASA's assets, including the HAVANA CLUB trademark, without compensation. JASA was thus deprived of all means of conducting business and its directors, officers and shareholders were driven into exile or imprisoned. After the purported confiscation of JASA's assets, the Cuban government purported to assign the worldwide rights to the HAVANA CLUB mark to defendant Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport"), a state-owned foreign trade enterprise. Cubaexport waited until JASA's registrations of the HAVANA CLUB trademark had expired in 1973 and then it obtained U.S. Registration No. 1,031,651 HAVANA CLUB & DESIGN for rum, in a manner that concealed from the PTO that the original Cuban trademark had been confiscated. The Extant U.S. HAVANA CLUB Registration includes the Spanish legend *"Fundada en 1878,"* a phrase copied from JASA's HAVANA CLUB mark, which refers to the year in which the Arechabala family business was founded.

4.    In 1993, the Cuban government caused Cubaexport to purport to transfer the HAVANA CLUB mark and the Extant U.S. HAVANA CLUB Registration to Havana Rum & Liquors S.A. ("HRL"), another company controlled by the Cuban government, and from HRL to defendant Havana Club Holdings, S.A. ("HCH"). In a subsequent U.S. lawsuit filed by HCH against Galleon S.A. (a predecessor of Bacardi & Company Ltd. ("BACO")) and affiliates, the court nullified that transfer. *See Havana Club Holding, S.A. et al. v. Galleon, S.A. et al.,* 62 F. Supp. 2d 1085 (S.D.N.Y.), *aff'd,* 203 F.3d 116 (2d Cir. 2000), *cert. denied,* 531 U.S. 918 (2000). Neither Cubaexport nor any of its purported successors in interest has ever used the HAVANA CLUB trademark in the United States. In 1997, BACO became successor in interest to JASA's rights in and to the HAVANA CLUB trademark worldwide.

     5.      In the HC Cancellation Proceedings initiated by BACO to cancel the Extant U.S.

HAVANA CLUB Registration, the TTAB refused to strike that Registration from the PTO's

records despite Cubaexport's failure to file a timely renewal application, and dismissed BACO's

petition to cancel that Registration for failure to state a claim. The TTAB declined to rule

whether Cubaexport's registration should be cancelled because it rested on an uncompensated

expropriation of JASA's assets. The TTAB further stated that Bacardi had not adequately shown

that Cubaexport made material false representations in obtaining, maintaining, and renewing the

Extant U.S. HAVANA CLUB Registration.

     6.      In this action, Plaintiffs seek:

        (a)     Reversal of the TTAB's decision and rectification of the records of the

PTO by (i) striking the Extant U.S. HAVANA CLUB Registration from the Principal Register of

the PTO on the ground that Cubaexport failed to file the mandatory renewal application and

declaration prior to the end of the statutory period or (ii) alternatively, canceling that Registration

on the grounds, among others, that the Extant U.S. HAVANA CLUB Registration was

fraudulently obtained, maintained, and renewed; that the registered mark was abandoned; and

that the registered mark misrepresents the source of goods;

        (b)     A declaration that BACO owns the common law rights in the HAVANA

CLUB mark for rum and that Defendants have no common law or other rights in any mark

incorporating or consisting of the words HAVANA CLUB;

        (c)     A declaration that Plaintiffs' use of the HAVANA CLUB mark does not

infringe on any mark owned by the Defendants or otherwise violate any enforceable rights of the

Defendants, because longstanding U.S. public policy and Section 211 of the Omnibus

Consolidated and Emergency Supplemental Appropriations Act, Public Law No. 105-277, 112

Stat. 2681 (Oct. 21, 1998) ("Section 211"), preclude recognition and enforcement of purported

rights in a trademark or registration that are founded on the Cuban government's expropriation of

assets; and

(d) An injunction prohibiting Defendants from using or registering in the PTO

or in any State of the United States any mark incorporating or consisting of the words HAVANA

CLUB and from interfering with Plaintiffs' use and registration of the HAVANA CLUB mark.

## PARTIES AND RELATED ENTITIES

### Plaintiffs and Related Entities

7.     Plaintiff Bacardi & Company Limited ("BACO") is a Liechtenstein company

having its principal place of business at 1000 Bacardi Road, New Providence, Commonwealth of

the Bahamas. BACO is the successor to Compañía Ron Bacardí S.A., a Cuban *sociedad*

*anónima* (joint-stock company) which was headquartered in Santiago de Cuba, Republic of

Cuba, until its assets in Cuba were confiscated by the Cuban government in October 1960.

8.     BACO, through its affiliates, licensees, and distributors, produces and markets

distilled spirits worldwide. BACO owns the internationally renowned name and mark

BACARDI, together with the registrations of that name and mark and the related business and

goodwill, on a worldwide basis. BACO was a party to the HC Cancellation Proceeding.

9.     José Arechabala S.A. ("JASA") is a *sociedad anónima* organized and existing

under the laws of the Republic of Cuba. JASA's headquarters and principal place of business

were in Cárdenas, Cuba, until its assets in Cuba were confiscated by the Cuban government in

1960. JASA's current principal place of business is in Vaduz, Principality of Liechtenstein.

JASA is the creator and the original owner of the HAVANA CLUB trademark in Cuba, the

United States, and other countries, and the trademark registrations associated therewith. JASA is

-5-

owned substantially by members of the Arechabala family. JASA is currently in the process of

voluntary corporate liquidation, by decision of its shareholders, who have formed a substantially

mirror-image company, Jose Arechabala International Ltd., to carry on the family's business.

      10.    José Arechabala International Ltd. ("JAI") is a joint-stock company organized and

existing under the laws of the Principality of Liechtenstein, having its principal place of business

in Vaduz, Liechtenstein. JAI is owned substantially by the same persons who are shareholders

of JASA.

      11.    In April 1997, JASA conveyed to JAI all right, title, and interest in and to the

HAVANA CLUB trademark worldwide and certain associated assets and goodwill, including the

secret family formula for the HAVANA CLUB rum (the "HAVANA CLUB Assets"). At the

same time persons comprising substantially all of the shareholders and holders of undivided

equity interests in JASA conveyed to JAI any and all right, title and interest that each of them

might hold in and to the HAVANA CLUB Assets. JAI in turn sold to BACO all right, title, and

interest in and to the HAVANA CLUB Assets worldwide. BACO is accordingly the successor

in interest to the original owners of the HAVANA CLUB trademark and the other HAVANA

CLUB Assets worldwide.

      12.    Galleon S.A. ("Galleon"), a wholly owned subsidiary of BACO, was a *sociedad*

*anónima* organized and existing under the laws of the Commonwealth of the Bahamas, with its

principal place of business in Nassau, Commonwealth of the Bahamas. Galleon was also a party

to the HC Cancellation Proceeding. In 1997, Galleon merged into BACO and BACO, as the sole

surviving entity, succeeded to all the assets of Galleon and assumed all of Galleon's liabilities.

BACO was substituted into the federal court action styled *Havana Club Holding, S.A. et al. v.*

*Galleon, S.A. et al.*, 96 Civ. 9644 (SAS), as the successor to Galleon in respect of the claims and counterclaims asserted therein.

13.     Plaintiff Bacardi U.S.A., Inc. ("Bacardi U.S.A.") (formerly named Bacardi-Martini U.S.A., Inc.) is a Delaware corporation having its principal place of business at 2100 Biscayne Boulevard, Miami, Florida 33137. Bacardi U.S.A. owns all the requisite federal and state permits to import rum and other distilled spirits into the United States and to sell such distilled spirit products to licensed wholesalers throughout the United States wherever the sale of distilled spirits is permitted by law. Bacardi U.S.A. is BACO's exclusive distributor in the continental United States of BACARDI, CASTILLO, and HAVANA CLUB rums. Bacardi U.S.A. was a party to the HC Cancellation Proceeding. Bacardi U.S.A., BACO, and Galleon will henceforth be collectively referred to as "Bacardi."

14.     Bacardi U.S.A., under the authority of BACO's predecessor, Galleon, began use of the HAVANA CLUB trademark for rum in interstate commerce in the United States in 1995, including advertising, distribution, and sales of HAVANA CLUB rum. Bacardi U.S.A. engaged in such use after reaching an interim understanding with JASA's representatives.

15.     BACO owns registrations of the mark HAVANA CLUB for rum in forty-four states, including New York, New Jersey, Texas, Pennsylvania, Michigan, Maryland, and Virginia. BACO is also the owner of Application Serial No. 74/572,667 pending in the PTO for registration of the word mark HAVANA CLUB for rum. This application was filed on September 12, 1994 as an intent-to-use application, and later was amended to allege use, with a first use date as early as 1934.

**Defendants and Related Entities**

16.     Defendant Cubaexport is a Cuban state-owned foreign trade enterprise which was established in 1965 by the Cuban Ministry of Foreign Commerce for the purpose of exporting

food and other products. Cubaexport is a "foreign state" within the meaning of 28 U.S.C. § 1603

and a "designated Cuban national" as defined in 31 C.F.R. § 515.305. Cubaexport's offices are

at Calle 24, n 55, edif. MINCEX, 8vo. piso, Havana, Cuba. Cubaexport was joined as a party to

the HC Cancellation Proceeding.

17.     Pernod Ricard S.A. ("Pernod") is a *société anonyme* (joint stock company)

organized and existing under the laws of France, with offices at 142 Boulevard Hausmann, Paris,

France. Pernod is one of the largest companies engaged in the business of manufacturing,

distribution and sale of spirits worldwide.

18.     Havana Rum & Liquors, S.A. ("HRL") is a *sociedad anónima* organized and

existing under the laws of the Republic of Cuba, with offices at 305A Miramar, Havana, Cuba.

HRL is wholly owned by Cuban nationals and is effectively controlled by the Cuban

government. HRL is a "foreign state" within the meaning of 28 U.S.C. § 1603 and a "designated

Cuban national" as defined in 31 C.F.R. § 515.305.

19.     Defendant Havana Club Holding, S.A. ("HCH") is a *société anonyme* organized

and existing under the laws of Luxembourg, with offices at 5, Rue Eugene Ruppert L2453,

Luxembourg. HCH is owned equally by Pernod and HRL and each has equal representation on

HCH's Board of Directors. HCH purports to hold title to trademark registrations for HAVANA

CLUB rum in countries other than Cuba. HCH was a party to the HC Cancellation Proceeding.

HCH is a "designated Cuban national" as defined in 31 C.F.R. § 515.305.

20.     Havana Club International, S.A. ("HCI") is a mixed company organized and

existing under the laws of the Republic of Cuba, controlled equally by HRL and Pernod, with its

headquarters and principal place of business in Havana, Cuba. HCI exports HAVANA CLUB

rum from Cuba under an exclusive license by HCH. HCI is a "designated Cuban national" as defined in 31 C.F.R. § 515.305.

JURISDICTION

21.     The Court has subject matter jurisdiction under 15 U.S.C. §§ 1071(b), 1119, and 1121; 28 U.S.C. §§ 1330, 1331, 1338(a), 1605(a)(1)-(4), 2201, 2202, and principles of supplemental and pendent jurisdiction. Venue is proper in this district under 15 U.S.C. § 1071(b) and 28 U.S.C. § 1391.

FACTS ENTITLING PLAINTIFFS TO RELIEF

**A.     JASA Creates and Uses the HAVANA CLUB Trademark**

22.     The Arechabala family business was founded by José Arechabala Aldama in 1878. The business included rum distilling and other enterprises. JASA, which was incorporated in or around 1924, carried out the family's rum business.

23.     JASA created, registered, and first used the trademark HAVANA CLUB for rum in Cuba, the United States and other countries. On or about March 19, 1934, JASA obtained Cuban Registration No. 53,614 of the mark HAVANA CLUB for "alcohol, rum, etc." In August 1935, JASA was issued Cuban Registrations Nos. 54,890 and 54,890-A for HAVANA CLUB Design marks.

24.     JASA produced HAVANA CLUB rum primarily for export, principally to the United States. JASA began to use the trademark HAVANA CLUB for rum sold in commerce in the United States at least as early as 1934. On May 14, 1935, JASA registered the words HAVANA CLUB on the Principal Register of the PTO as a trademark for "Ethyl alcohol, rum, etc." under U.S. Registration No. 324,385. On June 16, 1936, JASA registered a label design including the words HAVANA CLUB on the Principal Register of the PTO as a trademark for

-9-

"Rum, etc." under U.S. Registration No. 335,919. The design portion of that registered mark included the words *"Fundada en 1878"* (founded in 1878), a reference to the year in which the Arechabala family business was first established in Cuba. On August 11, 1953, JASA obtained U.S. Registration Nos. 578,679 and 578,680 on the Supplemental Register of the PTO for label design trademarks incorporating the words HAVANA CLUB.

25. From 1934 to the end of 1959, JASA continued to export HAVANA CLUB rum for distribution and sale in the United States. HAVANA CLUB rum sold by JASA in the United States was produced at various times both in Cuba and Puerto Rico. Before 1959, however, JASA had discontinued its production of rum in Puerto Rico and all HAVANA CLUB rum was produced in Cuba.

26. The words "Havana Club" were also used by JASA as a trading style or trade name to identify that part of JASA's business dealing with the production, export, distribution, and sale of HAVANA CLUB rum to the United States and elsewhere.

**B.    The Cuban Revolutionary Government Confiscates JASA's Assets in Cuba, Including the HAVANA CLUB Mark**

27. On January 1, 1960, troops of the Castro revolutionary government forcibly entered JASA's headquarters in Cárdenas, Cuba, taking control of the whole industrial complex, including the rum distillery, other industrial facilities, equipment, offices and business records. The members of the family who ran the rum distillery and other family businesses were expelled and not allowed to remove any papers or other property from their offices. The Deputy General Counsel and Secretary of the company was arrested and imprisoned for ten years. All other executives and shareholders were eventually forced to leave Cuba. The Cuban government designated an administrator to run the business to the exclusion of JASA and its owners.

28.     Under Law No. 890, dated October 13, 1960, the Cuban government purported formally to expropriate the physical assets, property, accounts, business records, and trademarks of a large number of Cuban businesses, including JASA and Compañía Ron Bacardí, S.A. This expropriation purported to affect all of JASA's tangible and intangible assets in Cuba, which comprised substantially all of the assets owned by the company, and also the trademark rights and related registrations owned by JASA in other countries, including the HAVANA CLUB trademark rights and related registrations in the United States.

29.     Law No. 890 specified that subsequent legislation would provide compensation for owners of property expropriated by Law No. 890. No such legislation has ever been enacted and neither JASA nor any of its shareholders has received any compensation for any assets of JASA that were seized by the Cuban government in 1960. The expropriation of those assets was, therefore, a confiscation. The value of the assets of JASA confiscated by the Cuban government exceeded 25 million dollars at the time of the confiscation.

30.     On November 1, 1966, the Cuban government purported to transfer to Cubaexport the trade names and registered trademarks that had been confiscated from JASA, including the HAVANA CLUB mark and related registrations. As a Cuban government enterprise, Cubaexport knew that all these names and marks transferred into its name had been expropriated from JASA under Law No. 890 without payment of any compensation. Soon thereafter, Cubaexport began selling HAVANA CLUB rum made in the distillery that had been confiscated from JASA.

31.     The Cuban government transferred the physical assets seized from JASA that had been associated with the production of HAVANA CLUB to another Cuban state enterprise, Empresa de Bebidas y Licores. In 1993, those assets were further transferred to Corporación

-11-

Cuba Ron, S.A. ("Cuba Ron"), still another enterprise owned or controlled by the Cuban government.

32.    The Cuban government deprived JASA of its assets, took away its rum and other businesses, seized its funds and corporate records (including records of JASA's trademark registrations abroad and its trademark agents), and imprisoned or intimidated JASA's senior executives and shareholders and eventually drove them into exile in various countries. As a result, JASA was unable to continue its business in or outside Cuba or to renew or maintain its trademark registrations in the United States. Despite this adversity, JASA and its shareholders maintained their determination to protect their rights and to resume production and sale of HAVANA CLUB rum when it became possible, either through political change in Cuba leading to restitution of their confiscated assets or, later, through an arrangement with a suitable partner contributing financial and managerial resources to that venture.

C.    **The Cuban Asset Control Regulations**

33.    In 1963, the United States imposed a total embargo of trade between the United States and Cuba under the Trading with the Enemy Act, 50 U.S.C. App. § 1 *et. seq.* The embargo has been implemented by the Cuban Asset Control Regulations ("CACR"), 31 C.F.R. Part 515, which are administered by the Office of Foreign Assets Control ("OFAC") of the Department of the Treasury. In 1996, Congress enacted the Cuban Liberty and Democracy Solidarity Act (the "Libertad Act"), which, among other things, codified the Cuban embargo. 28 U.S.C. § 6032(h).

34.    The CACR prohibit, *inter alia*, the importation, distribution or sale in the United States of rum produced in Cuba. 31 C.F.R. Part 515. This prohibition has been in effect since the inception of the CACR.

35.     Section 515.201(b)(1) of the CACR prohibits (except as specifically authorized

by OFAC) all transfers by any person subject to the jurisdiction of the United States of property

(or evidences of ownership of property) in which Cuba or any Cuban national (including a

designated Cuban national such as Cubaexport) has had, at any time since July 8, 1963, any

interest of any nature whatsoever, direct or indirect.  Section 505.201(b)(2) of the CACR

prohibits (except as specifically authorized by OFAC) all transfers outside the United States

involving any such property or property interests subject to the jurisdiction of the United States.

Accordingly, rights in U.S. trademarks or trademark registrations in which Cuban nationals have

an interest cannot be transferred under the CACR without an OFAC license.

36.     Section 515.201(c) of the CACR further prohibits "any transaction for the purpose

or which has the effect of evading or avoiding any of the prohibitions" of Section 505.201(b).

Section 515.203(a) of the CACR provides that any transfer that violates the CACR is null and

void and that such transfers "shall not be the basis for the assertion or recognition of any interest

in or right, remedy, power or privilege with respect to such property."

**D.     U.S. Public Policy Does Not Recognize Cuba's Confiscatory Acts in Respect of
        Property in the United States**

37.     As described below, Defendants have claimed certain rights based on actions by

the Cuban government purporting to confiscate JASA's property, including the HAVANA

CLUB trademark for rum.  Actions by a foreign government that expropriate assets without

adequate compensation are repugnant to United States public policy.  Accordingly, the United

States will not recognize or give effect to any such confiscatory act that purports to affect

property situated in the United States (the "Non-Recognition Doctrine").

38.     On October 21, 1998, Congress passed Section 211 of the Omnibus Consolidated

and Emergency Supplemental Appropriations Act, Public Law No. 105-277, 112 Stat. 2681 (Oct.

21, 1998) ("Section 211"), codifying, in part, the Non-Recognition Doctrine.  Section 211(b)

provides that:

> "No U.S. court shall recognize, enforce or otherwise validate any assertion of
> treaty rights by a designated national or its successor-in-interest under sections
> 44(b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126(b) or (e)) for a mark,
> trade name, or commercial name that is the same as or substantially similar to a
> mark, trade name, or commercial name that was used in connection with a
> business or assets that were confiscated unless the original owner of such mark,
> trade name, or commercial name, or the bona fide successor-in-interest has
> expressly consented."

39.     The term "designated national" is defined to mean "Cuba and any national thereof

including any person who is a specially designated national."  *See* Section 211(d)(1) and 31

C.F.R. § 515.305.  The term "specially designated national" is defined in the CACR to include,

among others, any entity that is owned or controlled by the Cuban government.  *See* 31 C.F.R. §

515.306(a)(3).  The term "confiscated" is defined in Section 211 to mean "expropriated by the

Cuban government on or after January 1, 1959, without payment of adequate and effective

compensation."  *See* Section 211(d)(2) and 31 C.F.R. § 515.336.

**E.      Cubaexport's Registration of the Confiscated HAVANA CLUB Mark**

40.     After Law No. 890 was issued, the Cuban government or its successors claimed

title to property owned by Cuban companies located outside Cuba, including rights to the

BACARDI trademark.  In a series of cases decided over several years and involving Cuban

companies in exile, courts in the United States and elsewhere refused to recognize such claims,

including claims to the BACARDI trademark, based on the principles underlying the Non-

Recognition Doctrine.

41.     Having failed to obtain worldwide title to the BACARDI trademark, BACARDI

being the most popular rum that had been produced in Cuba, the Cuban government then turned

to HAVANA CLUB, the mark designating the second most popular Cuban rum.  As a result of

the earlier court decisions, Cubaexport and the Cuban government knew that their claims to the
HAVANA CLUB mark in the United States or any other U.S. mark that Cuba had purportedly
confiscated under Law No. 890 would not be recognized in the United States.  Cubaexport then
engaged in a multifaceted effort (a) to conceal from the PTO that Cubaexport's claim to the
HAVANA CLUB name and trademark derived from the Cuban government's confiscation of
JASA's assets and (b) to mislead the U.S. public into believing that Cubaexport's HAVANA
CLUB rum, which Cubaexport intended eventually to sell in the United States, was the same as
JASA's HAVANA CLUB rum, which had been sold in the United States for more than two
decades.

     42.    On June 12, 1974, shortly after JASA's HAVANA CLUB Registrations expired,
Cubaexport applied to the PTO, under Section 44 of the Lanham Act, 15 U.S.C. § 1126, to
register a trademark consisting of a label design displaying the words HAVANA CLUB.  The
application was based on a newly issued Cuban Registration No. 110,353, dated February 12,
1974.  Although Cubaexport still held Cuban HAVANA CLUB registrations that had been
confiscated from JASA, Cubaexport obtained in its own name the new Cuban Registration No.
110,353 and used this new registration as the basis of its U.S. trademark application, in order to
conceal from the PTO that Cubaexport's claim of title to the HAVANA CLUB mark was based
on the confiscation of JASA's assets.

     43.    In filing this application to register the HAVANA CLUB & DESIGN mark,
Cubaexport consented to jurisdiction in the United States and appointed Rabinowitz, Boudin,
Standard, Krinsky, & Lieberman, PC as its domestic (U.S.) representative for service of process
in proceedings affecting the mark.

44.    The HAVANA CLUB & DESIGN mark that Cubaexport sought to register in the United States prominently displays the Spanish legend *"Fundada en 1878."* Cubaexport intentionally copied this legend from the label design that had been registered by JASA in U.S. Registration No. 335,919 in 1936. Cubaexport was founded in 1965, not in 1878. Cubaexport also knew that it would not be deemed to be JASA's successor under U.S. law. The statement *"Fundada en 1878"* was intentionally used by Cubaexport to mislead the American public into believing that Cubaexport's HAVANA CLUB rum had a family heritage dating back nearly a century and came from, or was associated with, or approved by, JASA, the original producer of the HAVANA CLUB rum that they had previously purchased and enjoyed in the United States. Cubaexport also knew that the HAVANA CLUB mark that it was applying to register still symbolized an invaluable reputation and goodwill as the result of the excellent quality and sales success of JASA's HAVANA CLUB rum in the United States.

45.    When Cubaexport applied to register the HAVANA CLUB & DESIGN mark in the United States, Cubaexport was well aware that JASA had discontinued making HAVANA CLUB rum only because the Cuban government had forcibly seized and confiscated JASA's rum distillery and other assets and because JASA's directors, officers, and shareholders had been driven into exile or imprisoned.

46.    Neither Cubaexport nor the Cuban government ever possessed the secret Arechabala family formula used by JASA to produce the HAVANA CLUB rum sold in the United States and elsewhere. The Cuban government surreptitiously concocted a new formula to produce its ersatz HAVANA CLUB rum, in a manner intended to deceive purchasers of HAVANA CLUB rum into believing that they were buying the same product that JASA had made. At all relevant times, Cubaexport knew that the formula used in the HAVANA CLUB

rum it sold was not the one that had been used by JASA. Therefore, Cubaexport's intended use
of the HAVANA CLUB mark was designed to deceive U.S. consumers regarding the true source
of the rum so marked.

47.    On January 27, 1976, the PTO issued U.S. Reg. No. 1,031,651 of the HAVANA
CLUB & DESIGN mark (the Extant U.S. HAVANA CLUB Registration) to Cubaexport.

48.    Neither JASA, JAI, their shareholders, nor BACO, as JASA's bona fide successor
in interest, has ever consented to the registration or use of the trademark and trade name
HAVANA CLUB by Cubaexport, HRL, or HCH.

49.    The rights to the HAVANA CLUB & DESIGN mark and the related federal
registration are intangible property rights with a situs in the United States. Rights in a trademark
in the United States may be acquired only by lawful use of that mark in interstate or foreign
commerce. Such usage confers common law trademark rights. The failure to register a mark
does not affect common law trademark rights. Nor does lapse of a registration, in the event that
one is obtained, affect common law trademark rights.

50.    Under Section 44 and Sections 1 and 45 of the Lanham Act, 15 U.S.C. § 1051 *et
seq.*, a foreign applicant must have a good faith intent to use the mark applied for in commerce in
the United States. When a foreign national such as Cubaexport registers a mark under Section
44 of the Lanham Act, that registrant must use the registered mark in commerce in the United
States within a reasonable period after filing an application under Section 44 of the Lanham Act.

51.    Cubaexport has never sold rum in the United States under the HAVANA CLUB
& DESIGN mark. Cubaexport has claimed that its failure to use the trademark is excused by the
Cuban embargo under the excusable-non-use doctrine codified in Section 8(b)(2) of the Lanham
Act, 15 U.S.C. § 1058(b)(2). Because of its familiarity with the excusable-non-use doctrine,

Cubaexport knew that JASA's non-use of the HAVANA CLUB mark after 1960 has been excused by the Cuban government's seizure of JASA's property and destruction of JASA's organization and management structure.

52.     To maintain its trademark registration, Cubaexport was required to file between the fifth and sixth years after its HAVANA CLUB & DESIGN mark was registered, an affidavit averring ownership and continued use of the mark. On or about January 12, 1982, such an affidavit was filed by Cubaexport in the PTO in respect of the Extant U.S. HAVANA CLUB Registration. This declaration, ostensibly signed by Fausto Alfonso Man, averred that Cubaexport was the owner of said mark and registration and invoked the embargo and the excusable-non-use doctrine to satisfy the use requirement of Section 8. For the same reasons set forth in paragraphs 44 to 46 above, Cubaexport knew in January 1982 that Cubaexport was not the lawful owner of the HAVANA CLUB & DESIGN mark in the United States, and continued to conceal and misrepresent the pertinent facts that would have undermined its claims.

**F.     The Joint Venture between the Cuban Government and Pernod**

53.     In the early 1990s, the Cuban government sought to obtain hard currency by enticing private foreign investments in Cuba. One prospective partner was Pernod. In November 1993, Pernod and the Cuban government entered into a joint-venture arrangement to exploit the HAVANA CLUB trademark worldwide. Pernod knew, prior to concluding this joint-venture with the Cuban government, that the HAVANA CLUB mark, along with the related rum-producing assets, had been confiscated from JASA by the Cuban government.

54.     In anticipation of the transaction with Pernod, the Cuban government caused Cubaexport to transfer all its rights to the HAVANA CLUB trademark outside Cuba and associated assets to HRL, a company controlled by the Cuban government. Luis Perdomo, a senior Cuban rum industry executive, was named President of HRL, and Vidal Manuel Prieto

Espina, who had previously served as managing director of Cubaexport, was made a managing director of HRL. Other officers were transferred from Cubaexport to HRL. Accordingly, on October 29, 1993, Cubaexport transferred to HRL its entire business connected with the HAVANA CLUB rum, including the goodwill associated with that business worldwide, and the right to export HAVANA CLUB rum to all the territories in the world. As part of this transfer of the HAVANA CLUB rum business, Cubaexport assigned to HRL its worldwide rights to the HAVANA CLUB trademark, including the rights to the Extant U.S. HAVANA CLUB Registration, together with the goodwill of the business symbolized by that mark. With this transfer of all its rum assets, Cubaexport left the rum business.

55.     The joint-venture arrangement was implemented in an agreement called *Convenio Asociativo* (Association Agreement) (the "Convenio") dated November 23, 1993, between Pernod and HRL. The object of the joint-venture was to advertise, distribute, and sell HAVANA CLUB rum worldwide. The parties agreed to create a Luxembourg entity, HCH, owned in equal parts by Pernod and HRL, which was to hold title to registrations of the HAVANA CLUB trademark. HCH was to be managed by a board of directors in which Pernod and HRL would be equally represented. Luis Perdomo was appointed Vice President of HCH and one of two Cuban directors on HCH's four-person board. HCI was established to handle the export of HAVANA CLUB rum from Cuba.

56.     At the closing of the transaction, Pernod paid to HRL a fixed sum (the amount of which has not been publicly disclosed, but which is believed to be many millions of dollars) and agreed to a continuing royalty arrangement. In exchange, HRL transferred to HCH all of HRL's rights in the HAVANA CLUB trademark for rum outside Cuba, together with the goodwill of the

business. HCI appointed Pernod as the exclusive distributor of HAVANA CLUB rums outside Cuba.

57.    In aid of the joint venture arrangements, Cuba Ron, a state-owned company, was organized in 1993 to distill rum in Cuba. Since 1993, Cuba Ron has supplied to HCI the rum sold under the HAVANA CLUB mark. Cuba Control, S.A., another Cuban entity, has been charged with overseeing and controlling the quality of that HAVANA CLUB rum.

58.    By written assignment dated January 10, 1994, Cubaexport purportedly confirmed the prior transfer to HRL of the rights to the U.S. HAVANA CLUB trademark and the Extant U.S. HAVANA CLUB Registration, along with the goodwill of that business. The assignment was executed by Milda Picos River, who was identified as Manager of Cubaexport. This purported assignment was recorded in the PTO at Reel 1104, Frame 047 on February 10, 1994. Cubaexport neither applied for nor obtained approval from OFAC for this transfer at that time. Accordingly, the transfer was in violation of the CACR and hence null and void.

59.    Cubaexport, HRL, HCH and Pernod understood and intended that the November 1993 transfer by HRL to HCH of the worldwide rights to the HAVANA CLUB trademark included such rights in respect of the U.S. HAVANA CLUB trademark and the related federal registration, together with the related goodwill of the business and the exclusive right to distribute HAVANA CLUB rum in the United States.

60.    Cubaexport, HRL and HCH knew that the CACR prohibited all transfers of U.S.-based intellectual property rights owned by Cuban nationals without the specific prior approval of OFAC. Such approval could be obtained only through an application to OFAC for a specific license in which the particulars of the transfer were fully and truthfully disclosed. Further, as OFAC had never granted a license for a transfer and sale which resulted in a substantial

monetary payment to the Cuban government, Cubaexport, HRL, and HCH knew in late 1993 or early 1994 that OFAC would not approve an assignment of the U.S. rights to the HAVANA CLUB trademark and the related federal registration from HRL to HCH if full information were disclosed.

61.    In 1993, Pernod caused its Spanish counsel to contact members of the Arechabala family in Spain in an effort to buy their worldwide rights to the HAVANA CLUB trademark. The Arechabalas broke off the talks when it became apparent that Pernod was not prepared to pay a fair price for the mark. In the course of the discussions, Pernod was advised by the Arechabala family representatives that JASA's prior rights to the HAVANA CLUB mark would be enforced.

62.    The Cuban government, Cubaexport, HRL and Pernod knew, at the time the Convenio was being concluded, that JASA had discontinued use of the HAVANA CLUB mark only under compulsion and that, rather than abandoning that mark, the Arechabalas were attempting to resume production and sale of HAVANA CLUB rum. Accordingly, the relationship between the Cuban government, Cubaexport, HRL and HCH was structured in an attempt to hide that the transfers violated U.S. statutes and regulations and that the chain of title for the HAVANA CLUB mark traced back to JASA.

63.    To this end, Cubaexport, HRL and HCH took actions that were intended to conceal from OFAC the November 1993 transfer to HCH of the U.S. HAVANA CLUB & DESIGN trademark and related federal registration pursuant to the Convenio, a transfer which was in violation of the CACR. Their plan called for placing record title to the HAVANA CLUB mark in the United States in HCH's name without revealing the transfer under the Convenio to the PTO or OFAC. HCH was to apply for a new registration of the HAVANA CLUB trademark

in the United States under Section 44 of the Lanham Act, on the basis of a Luxembourg

registration that HCH had acquired under the Convenio. Once HCH's new U.S. registration of

the HAVANA CLUB trademark was ready to issue, the Extant U.S. HAVANA CLUB

Registration would be renounced or allowed to expire. Under this scheme, the Defendants would

not reveal to OFAC or the PTO the prior November 23, 1993 assignment of that mark to HCH,

or the consideration paid to HRL by Pernod.

      64.    In furtherance of this scheme, Cubaexport, HRL, and HCH originally chose not to

memorialize in a separate U.S. assignment document the purported transfer of the Extant U.S.

HAVANA CLUB Registration from HRL to HCH. On May 15, 1995, HCH did apply for a new

U.S. registration of the HAVANA CLUB mark, under Section 44 of the Lanham Act, based on

its Luxembourg registration. But the plan to keep the Convenio transfers secret went awry, as

described below, when a cancellation proceeding brought by José María Arechabala Rodrigo

against Cubaexport in the PTO in May 1994 eventually forced Cubaexport to disclose the prior

transfers to HRL and HCH.

## G.    Protests by the Arechabala Family

      65.    After general information about the Pernod/Cuban joint venture to market

HAVANA CLUB rum appeared in the trade press, Ramón Arechabala, individually and on

behalf of the other shareholders of JASA, sent a letter to Pernod's Chairman, Patrick Ricard, in

December 1993. The letter stated, *inter alia*, that the HAVANA CLUB mark belonged to the

Arechabala family and had been unlawfully seized without payment of compensation, that

Pernod's attempt to acquire rights in the trademark HAVANA CLUB rum without the consent of

JASA and its shareholders would be ineffective, and that JASA and its shareholders were

prepared to bring legal claims to vindicate their rights. In addition, Juan Prado, a senior Bacardi

executive, wrote to Mr. Thierry Jacquillat, a senior Pernod executive, in December 1993, to warn Pernod that the rightful owner of the HAVANA CLUB trademark was the Arechabala family.

**H.    The Collapse of the Scheme to Conceal the Transfer from OFAC**

66.    On May 3, 1994, José María Arechabala Rodrigo filed a cancellation petition against Cubaexport in the PTO, seeking to cancel the Extant U.S. HAVANA CLUB Registration on the ground of abandonment (the "Arechabala Cancellation Proceeding").

67.    As HCH had not yet obtained a new U.S. registration of the HAVANA CLUB mark, the Arechabala Cancellation Proceeding forced HCH publicly to claim ownership of the Extant U.S. HAVANA CLUB Registration as a result of the November 23, 1993 assignment. HRL and HCH then executed a separate U.S. assignment deed on June 24, 1994, which purported to confirm the prior November 23rd transfer from HRL to HCH of the U.S. rights to the HAVANA CLUB & DESIGN mark and the related federal registration, along with the goodwill of that business. This purported assignment was then recorded in the PTO at Reel 1219, Frame 0428 on September 13, 1994. This transfer was in violation of the CACR and hence null and void.

68.    After having the assignment to HCH recorded in the PTO, HCH and HRL were substituted for Cubaexport as respondents in the Arechabala Cancellation Proceeding. HCH and HRL then challenged Mr. Arechabala's standing to contest HCH's Extant U.S. HAVANA CLUB Registration, arguing that HAVANA CLUB rum could not be made outside Cuba because of the alleged geographic significance of the mark. This contention was made notwithstanding that, at the very same time, HRL (with the knowledge of HCH and Cubaexport) was having HAVANA CLUB rum made in Panama with Panamanian rum. In fact, one out of every five bottles of the "seven-year" HAVANA CLUB rum produced for sale by HRL in 1994 and 1995 contained Panamanian rum. Declarations were filed in the PTO cancellation proceeding making

the knowingly false statements that HCH's HAVANA CLUB rum was exclusively made in Cuba of Cuban ingredients.

69.     The Arechabala Cancellation Proceeding was ultimately dismissed by the TTAB on the ground that the non-use of the HAVANA CLUB mark by HRL and HCH did not constitute abandonment because the Cuban embargo barred these entities from using the mark in the United States.

**I.     Bacardi's Acquisition of the HAVANA CLUB Mark**

70.     Bacardi had been interested in acquiring JASA's rights to the HAVANA CLUB mark since the 1970's and renewed that pursuit in 1993. Bacardi knew that the HAVANA CLUB mark had been purportedly confiscated from JASA under the same Law No. 890 that purported to confiscate the BACARDI name and mark, as well as the assets of Compañía Ron Bacardí S.A.

71.     After an agreement-in-principle between Bacardi and the Arechabala family had been reached in 1995, the Arechabalas undertook to reactivate JASA and to obtain the requisite corporate and shareholder approvals for the transaction. As a consequence of this process, the JASA shareholders decided to create JAI substantially as a mirror image of JASA, in order to operate in the future through a more flexible and modern corporate structure established outside Cuba. The JASA shareholders then initiated the process of liquidating the company.

72.     In April 1997, JASA, the JASA shareholders, JAI, and BACO reached final agreements regarding the HAVANA CLUB trademark. First, JASA transferred to JAI all of its right, title, and interest in and to the HAVANA CLUB trademark worldwide, the related goodwill of the business, and certain other related assets such as JASA's secret formula for the manufacture of HAVANA CLUB rum. Simultaneously, substantially all of JASA's shareholders transferred to JAI any and all right, title, and interest that they might hold in the HAVANA

CLUB trademark worldwide, and the related assets transferred from JASA to JAI. Second, JAI

transferred to BACO all right, title, and interest in and to the HAVANA CLUB trademark

worldwide and such other related assets, that JAI had acquired from JASA.

73.    Under the 1997 agreements, BACO is the owner of all title, right, and interest in

and to the mark HAVANA CLUB in the United States, Cuba, and elsewhere that previously

were owned by JASA and their shareholders.

**J.    Bacardi's Sale of HAVANA CLUB Rum in the United States**

74.    In 1995, under the interim understanding with the Arechabalas, Bacardi U.S.A.

imported into the United States rum produced in the Bahamas under the authority of Galleon,

and sold that rum under the HAVANA CLUB trademark in interstate commerce in the United

States.

75.    On July 14, 1995, Bacardi U.S.A. obtained BATF approval for the original labels

used on HAVANA CLUB rum.  The first sales by Bacardi of HAVANA CLUB rum in the

United States took place in 1995.  Bacardi shipped HAVANA CLUB "Light" and HAVANA

CLUB "Gold" rum to distributors in New York, Illinois, California, and Florida.  Those

distributors sold the HAVANA CLUB rum to retailers which, in turn, sold HAVANA CLUB

rum to consumers.  During 1996, Bacardi expanded the sale of HAVANA CLUB rum to licensed

wholesalers in other selected markets across the United States.

**K.    The HAVANA CLUB Litigation**

76.    On September 12, 1994, Galleon filed an "intent-to-use" application to register

the word mark HAVANA CLUB for rum on the Principal Register of the PTO.

77.    In July 1995, Galleon and Bacardi U.S.A. initiated the HC Cancellation

Proceeding before the TTAB, seeking cancellation of the Extant U.S. HAVANA CLUB

Registration, record title to which was at that time in the name of HCH.  Galleon contended,

*inter alia,* that the recorded assignments of the HAVANA CLUB & DESIGN mark and the related federal registration, first from Cubaexport to HRL, and then from HRL to HCH, violated the CACR and that such void transfers, under the language of the CACR, could not serve as "the basis for the assertion or the recognition of any interest in, or right, remedy, power or privilege with respect to such [Registration]." Cancellation was also sought on the ground that the Extant U.S. HAVANA CLUB Registration was fraudulently obtained, maintained, and renewed, that the registered mark was abandoned, and that the intended use of the registered mark misrepresented the source of the goods.

78.    On October 5, 1995, Cubaexport, HRL and HCH belatedly applied for a retroactive OFAC license that would authorize the two successive assignments of the HAVANA CLUB trademark.  The application filed with OFAC contained the knowing misstatements that (a) the "aforesaid assignments were part of the reorganization of the Cuban rum and liquors industry" and (b) "each of the assignors and assignees are nationals of Cuba."  The application thus concealed the fact that the HAVANA CLUB mark had been sold to a Luxembourg company, HCH, which was 50% owned by Pernod, a French and that neither of these companies was part of the Cuban rum "industry."

79.    On November 13, 1995, OFAC granted License No. C-18147 retroactively for the assignments of the HAVANA CLUB & DESIGN mark and the related federal registration, but that license was explicitly subject to the conditions that "this license is granted upon the statements and representations made in your application" and "if this license was issued as a result of a willful misrepresentation on the part of the applicant or his duly authorized agent, it may . . . be declared void from the date of its issuance."

80.    The Extant U.S. HAVANA CLUB Registration had to be renewed by early 1996 by its owner or that registration would automatically expire.  On January 18, 1996, HCH filed an application for renewal with a declaration signed by Luis Perdomo, Vice Chairman (the "Renewal Declaration").  The Renewal Declaration did not correct any of the misstatements and omissions that had been made in the previous submissions to the PTO, and the declaration asserted HCH's ownership of the Extant U.S. HAVANA CLUB Registration, explicitly referencing the PTO records showing the assignments to HCH.  On January 27, 1996, the PTO issued a Certificate of Renewal for the Extant U.S. HAVANA CLUB Registration in the name of HCH pursuant to Section 9 of the Lanham Act .

81.    ·In December 1996, HCH and HCI brought an action in the U.S. District Court for the Southern District of New York styled *Havana Club Holding, S.A. et al. v. Galleon S.A. et al.*, 96 Civ. 9655 (SAS), for infringement of the federally registered HAVANA CLUB & DESIGN trademark, false designations of origin under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and unfair competition.  Bacardi counterclaimed for cancellation of HCH's Extant U.S. HAVANA CLUB Registration on several grounds, including abandonment, fraud, and violation of the CACR.

82.    On March 17, 1997, the HC Cancellation Proceeding was stayed pending disposition of the federal court action, which involved some of the same issues.

83.    On April 17, 1997, OFAC issued a Notice of Revocation of Cubaexport's License No. C-18147 concerning the assignments of the HAVANA CLUB trademark and the related federal registration, based on "facts and circumstances that have come to the attention of this Office that were not included in the application of October 5, 1995."  OFAC, therefore, directed

that "License No. C-18147 issued to Cubaexport on November 13, 1995 is hereby revoked retroactive to the date of issuance," which was November 13, 1995.

84.    On August 8, 1997, the United States District Court for the Southern District of New York dismissed HCH's federal trademark infringement claim against Bacardi on the ground that HCH had never acquired any interest in the HAVANA CLUB & DESIGN registration that could be infringed, because the purported transfers from Cubaexport were null and void under the CACR. *Havana Club Holding, S.A. v. Galleon S.A.*, 974 F.Supp 302 (S.D.N.Y. 1997).

85.    On October 20, 1997, the court entered a Partial Judgment (the "Judgment") implementing the August 8th decision. That Judgment ruled that ". . . [HCH] and [HCI] have no rights to the registered trademark HAVANA CLUB for 'rum' in the United States." (Judgment ¶ 7). The Judgment also held:

> "Neither [HRL], [HCH], nor its licensee, [HCI] ever obtained any rights to the HAVANA CLUB mark in the United States by transfer." (Judgment ¶ 6)

> "Any rights that [HCH] may have had, may have, or claims to have had in the Registration of the HAVANA CLUB trademark (U.S. Reg. No. 1,031,651) from forever until today are hereby canceled." (Judgment ¶ 8)

86.    The District Court declined to decide whether Cubaexport had any rights in the U.S. HAVANA CLUB & DESIGN Registration, because Cubaexport was not a party to the action and had refused to join as a party. The Court held:

> "Those provisions of the original transfer agreement relating to transfers of the U.S. Rights to the HAVANA CLUB mark and the related U.S. Registration were rendered null and void by the CACR, § 515.201(b)(1), and the attempted assignment of said HAVANA CLUB mark and the related U.S. Registration were invalid and of no force and effect and *void ab initio*." (Judgment ¶ 4)

> "As a result, the status quo ante as of the October 29, 1993 date of said abortive original transfer agreement is restored, and Cubaexport retained whatever rights it had in said mark and the related U.S. Registration as of said date, notwithstanding the invalid transfers." (Judgment ¶ 5)

The court added:

"Nothing herein shall prevent Cubaexport, if it so chooses, from asserting or
seeking to enforce rights in the trademark HAVANA CLUB rum in the United
States and nothing herein shall prevent the defendants or others from contesting
those rights or contending that said rights were lost as a result of acts or omissions
by Cubaexport." (Judgment ¶ 10)

87.    After a bench trial, the District Court held, among other things, that Section 211

barred HCH from asserting rights in the "Havana Club" trade name, because that name was

substantially similar to the HAVANA CLUB mark that was previously used by JASA in

association with the business seized by Cuba without payment of compensation and because

HCH had not obtained Bacardi's consent to that use as the successor to JASA.

88.    On February 4, 2000, the United States Court of Appeals for the Second Circuit

unanimously upheld the trial court's decision. *See* 203 F.3d 116 (2d Cir. 2000). The Second

Circuit's Mandate became final on February 25, 2000, and HCH's petition for a writ of

*certiorari* was denied on October 2, 2000. Under Section 37 of the Lanham Act, 15 U.S.C. §

1119, certified copies of the decisions of the District Court, the Second Circuit, and the U.S.

Supreme Court were filed with the PTO.

89.    Instead of implementing the Judgment pursuant to 15 U.S.C. § 1119, the PTO

issued an Order to Show Cause on October 26, 2001, giving the parties 14 days to demonstrate

why the Director of the PTO should not rectify the PTO's records to reflect the District Court's

order invalidating the recorded assignments of the entire interest and goodwill in the U.S.

HAVANA CLUB & DESIGN mark and the related federal registration from Cubaexport to HRL

and from HRL to HRH. The Order to Show Cause omitted any reference to Paragraph 8 of the

Judgment, which cancelled any right or claim that HCH may ever have had, may have, or claims

to have had in the Extant U.S. HAVANA CLUB Registration, and also omitted reference to

Paragraph 4, which ruled that Cubaexport's transfers were void *ab initio*.

90.    A Notice of Recordal of an Assignment Document was put in the PTO record, together with a related Order signed by Lynne Beresford directing the PTO's Assignment Division to record an assignment of the Extant U.S. HAVANA CLUB Registration to Cubaexport. The conveying party was identified as the U.S. District Court for the Southern District of New York and the conveyance was by court order dated October 20, 1997. This assignment document did not restore the *status quo ante* as of the date of the abortive transfer, which was November 23, 1993.

91.    On January 15, 2002, the PTO issued a notice pursuant to 15 U.S.C. § 1119 stating that, having considered the initial submissions and replies from each party, the PTO's registration records would be rectified to conform with the assignment records.

**L.    The Interim Agreement**

92.    In a contract dated March 19, 2002, and purported to be made retroactive to October 4, 2000, Cubaexport, HRL, HCH, HCI, Cuba Ron, and Pernod agreed to amend the Convenio and all related agreements so that the HAVANA CLUB & DESIGN mark, the assets associated with the U.S. HAVANA CLUB rum business and certain other related rights conditionally reverted back to Cubaexport (the "Interim Agreement"). The parties further agreed that if (a) they were able to obtain an OFAC license authorizing the transfer of the mark to HCH or HRL, or (b) the PTO determined that Cubaexport did not own the HAVANA CLUB & DESIGN mark, or (c) "[a]ny other event [ ] makes possible the realization of the initial intent of the parties" to transfer the mark to HCH as expressed in the Convenio, then the mark and related rights would again return to HCH. Several provisions of the Interim Agreement purport to transfer property rights that are subject to the CACR without OFAC approval and are thus void *ab initio*.

**M.    The TTAB Cancellation Proceeding**

93.    On March 15, 2002, BACO, as successor to Galleon, and Bacardi U.S.A. filed a

motion in the HC Cancellation Proceeding to resume the proceeding (which had been stayed

during the court action), to substitute parties, and for summary judgment.  On January 21, 2003,

the TTAB resumed proceedings, set a briefing schedule, and joined Cubaexport as a defendant

along with HCH.

94.    The basis for Bacardi's summary judgment motion was that the Extant U.S.

HAVANA CLUB Registration had expired pursuant to 15 U.S.C. § 1059 and Rule 2.183 of the

Trademark Rules of Practice, 37 C.F.R. §§ 2.181-2.184 (1995), because Cubaexport had failed to

file the mandatory renewal application and declaration.  A Renewal Declaration had been filed

by HCH, but the October 20, 1997, Judgment held that any rights that HCH may have had, may

have or claims to have had in the Extant U.S. HAVANA CLUB Registration "from forever until

today are canceled" (Judgment ¶ 8) and further held that the attempted assignments of that mark

and the related federal registration "were invalid and of no force and effect and void *ab initio*."

(Judgment ¶ 4).  As the Renewal Declaration had not been filed by the owner of the registration,

the registration had not been validly renewed and had to be stricken from the Principal Register

of the PTO.

95.    In a decision mailed on January 29, 2004 (the TTAB Decision), the TTAB denied

Bacardi's motion for summary judgment.  The TTAB Decision was in error, as will be

demonstrated in this proceeding.  Among other errors, the TTAB mistakenly concluded that,

because HCH's Renewal Declaration had presented a complete application that met the formal

requirements for renewal, Cubaexport itself could have filed a renewal application and

declaration that would satisfy those same requirements.  By 1996, however, Cubaexport had left

the rum business and could not truthfully aver that, but for the Cuban embargo, it was ready and able to export HAVANA CLUB rum to the United States.

96.     The TTAB agreed with Bacardi that "[a] proper renewal application must be executed and filed by the owner of a registration" (TTAB Decision p. 36) and stated, citing 15 U.S.C. § 1127, that the term "registrant" includes "both the original registrant [Cubaexport] and a person who has acquired ownership through *proper transfer* of title." (TTAB Decision p. 36 n. 23) (emphasis added). Therefore, the TTAB concluded, "continuity of title from the registrant to the present owner must be shown." (TTAB Decision p. 36).

97.     The TTAB stated that "well before the nine-month renewal period commenced [on July 27, 1995] it appeared that Cubaexport was no longer the owner of the registration." (TTAB Decision P. 37)  This statement disregarded the Judgment, which had held that the transfers were void and that the *status quo ante* as of November 23, 1993, was restored. Cubaexport, not HCH, was then the putative owner of the Extant U.S. HAVANA CLUB Registration as of November 23, 1993, and through April 27, 1996, the statutory deadline for filing a valid renewal application and declaration.

98.     The TTAB also stated that "[a]ccording to HCH and Cubaexport, all of the parties concerned considered HCH as the owner of the registration." (TTAB Decision p. 37).  This statement ignored that the United States was also a concerned party and that HCH and Cubaexport had created their own predicament by violating the CACR. The Judgment held, among other things, that HCH never "obtained any rights in the HAVANA CLUB mark in the United States by transfer" (Judgment ¶ 6). Therefore, Cubaexport was the only party that the TTAB could deem to be the putative "owner" of that registration consistent with the Judgment.

99.     The TTAB then observed that:

> "[T]here is no opportunity now for Cubaexport to file a new, substitute or
> amended renewal application. The statutory renewal period has long passed, and
> neither we, nor the parties, may extend or reopen that period." (Judgment, p. 38)

But the TTAB went on to conclude, contrary to Section 211 and the Judgment, that HCH had

complied with the PTO Renewal Rules when it filed its renewal application in its own name, that

it had filed a proper renewal application, that the PTO had acted properly in accepting the

renewal application and renewing the application in HCH's name, and that the resulting renewal

application was valid.

100.    The TTAB never ruled on Section 211. The only rationale the TTAB offered for

ignoring the nullification of the transfers ordered by the Judgment is that, to avoid confusion and

administrative burden on the PTO, the TTAB "must focus on circumstances when the renewal

applicant filed its application, not on the circumstances which existed years later." (TTAB

Decision p. 38) This was legal error. The Judgment conclusively established that HCH never

had any claim whatsoever to legal or equitable title to the Extant U.S. HAVANA CLUB

Registration, so the TTAB was bound to treat HCH's renewal filing as a nullity.

101.    The TTAB Decision went on to consider whether any of the other claims in

Bacardi's 1996 Supplemental and Amended Petition were ones on which the TTAB could grant

relief. The TTAB dismissed Bacardi's claim of fraud in obtaining the registration on the ground

that Bacardi did not allege that JASA had used the HAVANA CLUB mark in the United States

in 1974 when Cubaexport filed its trademark application. Similarly, in dismissing Bacardi's

claim of fraud in maintaining the registration, the TTAB found that Cubaexport could not have

knowingly made a misrepresentation concerning ownership of the mark in its Section 8 affidavit,

since no allegation of JASA's use of the mark in the United States in 1974 was made. In 1974,

however, JASA was not able to use the mark in the United States because its assets had been

confiscated by the Cuban government and because, as a Cuban entity, it was barred by the Cuban embargo from selling rum in the United States.

102.    The TTAB further held that, since OFAC had not explained the reasons for revoking the transfer license, the allegation that Cubaexport and HCH had willfully violated the CACR and that HCH had knowingly filed a false Renewal Declaration failed to state a claim for fraudulent renewal. This confused the rules for pleading fraud with proof of a fraud allegation. The TTAB declined to determine whether there was a fraudulent transfer of the mark under the CACR on the ground that the TTAB "has little or no experience in determining violation of statutes or regulations that do not directly concern registrations of trademarks." (TTAB Decision p. 51).

103.    The TTAB rejected the abandonment claims on the ground that the assignment-in-gross rule does not apply to this case because Cubaexport, HRL and HCH never had business assets in the United States that could be separated from the trademark.

104.    Finally, the TTAB refused to consider whether the HAVANA CLUB & DESIGN mark was being used to misrepresent the source of the goods because this "claim is premised on the assumption that Cubaexport is not the true and legitimate owner of the HAVANA CLUB mark, which can only be regarded as a political question based on the premise that the Cuban government is not legitimate." (TTAB Decision p. 55). The TTAB added that it did not have the authority to answer this question. The TTAB did not rule on the applicability of the Non-Recognition Doctrine or the other bases, including Section 211, for concluding that Cubaexport was not the true owner of the Extant U.S. HAVANA CLUB Registration.

-34-

COUNT I

APPEAL FROM THE TTAB DECISION

**A.    The U.S. HAVANA CLUB & DESIGN Registration Must be Stricken Because Cubaexport Omitted Filing the Mandatory Renewal Application and Declaration**

105.    Paragraphs 1 through 104 are incorporated herein by reference.

106.    The Judgment voided the recorded transfers and left Cubaexport with whatever rights it had in the HAVANA CLUB & DESIGN mark in the United States and the related federal registration as of November 23, 1993, the date of the void transfers. The court did not reach the merits of Bacardi's claim for cancellation of the Extant U.S. HAVANA CLUB Registration because Cubaexport, which had a claim to title to that registration was not a party, and had refused to be joined voluntarily as a party, to the action before Judge Scheindlin. Therefore, the Judgment provided that "[n]othing herein shall prevent Cubaexport, if it so chooses, from asserting rights in the trademark HAVANA CLUB rum in the United States and nothing shall prevent [Bacardi] from contesting those rights or contending that said rights were lost as a result of acts or omissions by Cubaexport." (Judgment ¶¶4, 10). As Cubaexport was a party to HC Cancellation Proceeding, the TTAB was obliged to decide the effect of Cubaexport's omission, as the record owner, to renew the Extant U.S. HAVANA CLUB Registration.

107.    The Extant U.S. HAVANA CLUB Registration nominally owned by Cubaexport was set to expire automatically at the end of its 20-year term (plus the statutory grace period) on April 27, 1996 under Section 9(a) of the Lanham Act, 15 U.S.C. § 1059(a), unless the mandatory renewal application and declaration was filed by its owner prior to that deadline.

108.    Cubaexport did not file a renewal application and declaration on or before April 27, 1996, or thereafter.  As a result of this omission by Cubexport, the Extant U.S. HAVANA CLUB Registration expired automatically under the Lanham Act.

109.    On or about January 18, 1996, HCH filed a Renewal Declaration in its own name, claiming, under pain of perjury, that HCH owned the Extant U.S. HAVANA CLUB Registration based on the recorded assignments from Cubaexport to HRL and from HRL to HCH.  The Judgment held, however, that those recorded assignments were null and void *ab initio* under 31 C.F.R. § 515.203(a), and also canceled any rights HCH may have had, may have or claims to have had in the Extant U.S. HAVANA CLUB Registration from forever until the October 27, 1997 date of the Judgment (¶8).  Therefore, HCH could not satisfy the renewal requirement of continuity of title from Cubaexport and was not at that or any other time the owner of the Extant U.S. HAVANA CLUB Registration.

110.    Furthermore, the HAVANA CLUB trademark that is the subject of the aforesaid federal registration is, as the District Court held, similar to the HAVANA CLUB mark used with the assets of JASA seized by the Cuban government without compensation in 1960, so the TTAB was proscribed from recognizing or enforcing any interest of HCH in said registration.

111.    No renewal application and declaration was ever filed by the owner of the Extant U.S. HAVANA CLUB Registration prior to the statutory deadline for filing such renewal applications and declarations.

112.    Because the requirements of 15 U.S.C. § 1059 were not met, and the Extant U.S. HAVANA CLUB Registration expired, the records of the PTO must be rectified by striking and expunging said registration from the Principal Register of the PTO.

**B.     Fraud in Obtaining and Maintaining Registration by Cubaexport**

113.    Paragraphs 1 through 112 are incorporated herein by reference.

114.    The Cuban government, after having first failed to establish rights to sell its export rum under the BACARDI trademark, then turned in 1974 to the HAVANA CLUB mark, which had been used by JASA on the second most popular Cuban rum.  Cuba had lost a series of U.S. court decisions in similar cases under the Non-Recognition Doctrine.  Cubaexport, as an arm of the Cuban government, knew that its claims to the HAVANA CLUB mark in the United States or any other U.S. mark that Cuba had purportedly confiscated under Law No. 890 would be denied if the facts were fully disclosed to U.S. authorities and that it would not be deemed to be the successor to JASA under U.S. law.

115.    Nonetheless, on June 12, 1974, Cubaexport applied to the PTO, pursuant to Section 44 of the Lanham Act, 15 U.S.C. § 1126, to register a trademark consisting of a label design displaying the words HAVANA CLUB (the "HAVANA CLUB & DESIGN" mark). Although Cubaexport still held Cuban HAVANA CLUB registrations that had been confiscated from JASA, Cubaexport's June 12th application was based on a newly issued Cuban Registration No. 110,353, dated February 12, 1974.  This course of action was adopted to conceal that Cubaexport's claim of title to the HAVANA CLUB mark was based on the previous confiscation of JASA's assets.

116.    The HAVANA CLUB & DESIGN mark that was the subject of Cubaexport's U.S. trademark application prominently displays the Spanish legend *"Fundada en 1878,"* which Cubaexport intentionally copied from the label design that had been registered by JASA in the United States under Registration No. 335,919 in 1936.  Cubaexport's intention in prominently displaying *"Fundada en 1878"* as part of the HAVANA CLUB & DESIGN mark was to mislead the American public into believing that Cubaexport's HAVANA CLUB rum had a family

-37-

heritage dating back nearly a century and came from, or was associated with, or approved by, JASA, the original producer of the HAVANA CLUB rum that they had previously purchased and enjoyed in the United States. Cubaexport's decision to adopt the HAVANA CLUB mark for export rum was further based on the determination by senior Cuban rum executives that, in 1974, the HAVANA CLUB mark still had a valuable reputation and goodwill in the United States. That goodwill had been created by the success of JASA's HAVANA CLUB rum and it rightfully belonged to JASA in the United States.

117.    Moreover, when Cubaexport applied to register the HAVANA CLUB & DESIGN mark with the PTO in 1974, Cubaexport knew that JASA had only discontinued making HAVANA CLUB rum because JASA's rum distillery and other assets had been forcibly seized and confiscated by the Cuban government and its officers, executives, and shareholders had been driven into exile or imprisoned.

118.    Cubaexport never obtained the secret formula used by JASA to produce the HAVANA CLUB rum sold in the United States and elsewhere. So Cubaexport surreptitiously concocted a new formula for its ersatz HAVANA CLUB rum, which materially changed the character of the rum. Nonetheless, the HAVANA CLUB & DESIGN mark which Cubaexport had applied to register in the United States was designed by Cubaexport with the intent of misleading prospective purchasers into believing that they were buying the same product that JASA had made and sold in the United States.

119.    Accordingly, Cubaexport, made the following material false statements and omissions in connection with its application to register the HAVANA CLUB & DESIGN mark with knowledge of their falsity and with the intent of deceiving the PTO and keeping material information from coming to their attention:

-38-

a.  That Cubaexport was the owner in the United States of the HAVANA CLUB & DESIGN mark for rum.  This statement was knowingly false because Cubaexport knew:

  i. .  that JASA's HAVANA CLUB mark still enjoyed a strong reputation in the United States;

  ii.  that JASA continued to have common law trademark rights in the HAVANA CLUB mark for rum in the United States, and

  iii.  that the interruption of JASA's use of the HAVANA CLUB mark was caused by the confiscation of JASA's assets by the Cuban government and JASA had no intention of abandoning its United States trademark rights.

b.  That the label statement "Fundada en 1878" ("founded in 1878") referred to JASA's business, not to Cubaexport, which was founded in 1965, and that said label statement was intentionally designed to mislead consumers as to the provenance and the source of the rum sold under that mark; and

c.  That Cubaexport's use in the United States of the HAVANA CLUB & DESIGN mark in connection with the sale of rum would deceive U.S. consumers as to the source of the rum so marked.

120.  On January 27, 1976, U.S. Reg. No. 1,031,651 of the HAVANA CLUB & DESIGN mark was issued to Cubaexport.

121.  Neither JASA, JAI, their shareholders, nor Bacardi, as JASA's bona fide successor in interest, has ever consented to the registration or the use of the trademark and trade name HAVANA CLUB by Cubaexport, HRL, or HCH.

122.  To maintain the Extant U.S. HAVANA CLUB Registration, Cubaexport was required to file an affidavit between the fifth and sixth year after the registration, averring ownership and continued use of the mark.  On or about January 12, 1982, such an affidavit was filed by Cubaexport in the PTO in connection with the Extant U.S. HAVANA CLUB Registration.  This declaration, ostensibly signed by Fausto Alfonso Man, averred that

-39-

Cubaexport was the owner of said mark and registration and invoked the embargo and the excusable nonuse doctrine to satisfy the use requirement of Section 8.

123.    For the same reasons set forth in paragraphs 114 through 119 above, Cubaexport also knew in January 1982 that Cubaexport was not the owner of the HAVANA CLUB & DESIGN mark in the United States; that JASA was the owner in the United States of common law trademark rights in the HAVANA CLUB mark for rum; that JASA's HAVANA CLUB mark for rum still enjoyed a strong reputation; and that if Cubaexport were allowed to sell its rum labeled with the HAVANA CLUB & DESIGN mark in the United States, American consumers would be deceived as to its quality and source of origin.

124.    Wherefore, the U.S. HAVANA CLUB & DESIGN Registration has been fraudulently obtained and maintained in violation of 15 U.S.C. § 1064(3) and should be cancelled.

C.    **Fraud in Obtaining and Renewing Registration by HCH**

125.    Paragraphs 1 through 124 are incorporated herein by reference.

126.    Cubaexport, HRL, and HCH were, at all relevant times in 1993 and 1994, aware of the fact that their purported transfers of the HAVANA CLUB & DESIGN mark and the related federal registration in the United States were prohibited by the CACR absent a specific license from OFAC. Accordingly, in order to put and maintain the U.S. HAVANA CLUB & DESIGN Registration in HCH's name by false means, Cubaexport, HRL, and HCH deliberately caused their duly authorized representative to make statements on their behalf in an OFAC License Application that they all knew contained material misleading omissions and material affirmative false statements that were made with the intent of deceiving OFAC and putting the federal registration in the name of HCH by false means. These statements were as follows:

      a.     That the assignments were made as "part of the reorganization of the Cuban rums and liquors industry"; and

      b.     that "each of the assignors and assignees are nationals of Cuba."

127.   Furthermore, on or about January 18, 1996, defendant HCH knowingly filed a false Renewal Declaration averring that HCH owned the U.S. HAVANA CLUB & DESIGN mark and the related federal registration, when Cubaexport, HCH, and HRL all knew that the transfers had been the subject of false statements that had been made to OFAC and thus were void under the CACR because no valid OFAC license therefore had been obtained and that putative title to the Extant U.S. HAVANA CLUB Registration remained in Cubaexport.

128.   HCH also knew that Bacardi was using the HAVANA CLUB mark for rum in the United States on and before January 18, 1996 and HCH knew, for that reason as well, that HCH was not the true owner of the U.S. HAVANA CLUB & DESIGN mark and the related federal registration in the United States at that time.

129.   Wherefore, the U.S. HAVANA CLUB & DESIGN Registration was falsely and fraudulently put in HCH's name by Cubaexport and HCH and fraudulently renewed by HCH in violation of 15 U.S.C. § 1064(3) and should be cancelled.

**D.   Abandonment**

130.   Paragraphs 1 through 129 are incorporated herein by reference.

131.   On or about November 23, 1993, after assigning the rights to the U.S. HAVANA CLUB & DESIGN mark and the related registration to HRL and transferring its marketing employees to HCI, Cubaexport left the rum business. From 1993 to the present, a period of more than 3 years, Cubaexport has not advertised, licensed for sale, or sold HAVANA CLUB rum anywhere in the world.

132.    Cubaexport, since 1993, has held bare title to the Extant U.S. HAVANA CLUB Registration but at no time during that period has Cubaexport been ready or able to export HAVANA CLUB rum to the United States or anywhere else in the world.

133.    Cubaexport also abandoned the Extant U.S. HAVANA CLUB Registration and whatever claims it had to rights in the HAVANA CLUB & DESIGN mark in the United States by allowing the aforesaid federal registration to lapse.

134.    Wherefore, the HAVANA CLUB & DESIGN mark has been abandoned by Cubaexport within the meaning of Section 45 of the Lanham Act, 15 U.S.C. § 1127, and the Extant U.S. HAVANA CLUB Registration should be cancelled.

E.    **Misrepresentation of Goods**

135.    Paragraphs 1 through 134 are incorporated by reference.

136.    Defendant Cubaexport has allowed HCH and/or HCI (a) to prepare and cause advertisements for Defendants' ersatz HAVANA CLUB rum to appear in magazines and publications distributed through the channels of interstate commerce in the United States and (b) to pay promotional fees or to give other inducements to motion picture producers to cause their HAVANA CLUB rum and their purported HAVANA CLUB & DESIGN mark to be depicted in motion pictures distributed in interstate commerce in the United States, including the film "The Firm." These advertisements and the use and depiction of said mark in films are designed to induce American consumers into buying Defendants' ersatz HAVANA CLUB rum abroad and to build up a demand for said product in the United States.

137.    Cubaexport's use of the labeling statement incorporated in the HAVANA CLUB & DESIGN mark falsely indicating that the producer was "founded in 1878" is part of a deliberate scheme to pass off Defendants' ersatz HAVANA CLUB rum as being somehow

approved by JASA, or as being the same quality as the only HAVANA CLUB rum ever sold legally in the United States, which was produced by JASA.

138.    Furthermore, said advertising and promotional use of said HAVANA CLUB & DESIGN mark and Cubaexport's other aforesaid acts and omissions are intended to confuse the American public into wrongly believing that Cubaexport is somehow the legitimate successor to the original producer of the HAVANA CLUB rum sold in the United States, JASA. Indeed, the use of the statement "founded in 1878" as part of the HAVANA CLUB & DESIGN mark can have no other purpose.

139.    Through the aforesaid acts, Cubaexport has used the purported HAVANA CLUB & DESIGN mark as a vehicle for fraud and said mark is being used in violation of 15 U.S.C. § 1064(3) to misrepresent the source of Defendants' ersatz HAVANA CLUB rum.

140.    Wherefore, said mark was used by or with the permission of Cubaexport in violation of § 1064(3) and the registration thereof should be cancelled.

## COUNT II
## DECLARATION OF COMMON LAW RIGHTS IN THE HAVANA CLUB TRADEMARK

141.    Paragraphs 1 through 140 are incorporated herein by reference.

142.    BACO is the true owner of the common law rights in and to the HAVANA CLUB mark as the bona fide successor-in-interest to JASA, the original owner of those rights. JASA never abandoned its rights in and to the HAVANA CLUB mark; JASA was prevented from using the mark in the United States and elsewhere as a result of the Cuban government's confiscation of JASA's assets in 1960. At all times prior to BACO's acquisition of the mark, JASA intended to resume use of the mark when it had the means to do so.

143.    BACO also established common law rights in the HAVANA CLUB mark as a result of its own use of the mark in the United States. BACO used the mark in the United States in 1995 and 1996 and only discontinued use under an agreement with HCH and HRL. BACO is prepared, and intends, to resume use of the HAVANA CLUB mark in the United States. Similarly, BACO has not abandoned the common law rights to the HAVANA CLUB mark that it acquired from JASA.

144.    Defendants have no common law or other rights in any mark incorporating the words HAVANA CLUB. Defendants' alleged rights in any such a mark stem from Cuba's confiscation of JASA's assets. As a matter of public policy, the United States will not recognize a claim of right in a U.S. trademark that is based in whole or in part on such a confiscation.

145.    Further, Section 211 prohibits any United States court from recognizing, enforcing or otherwise validating Defendants' assertion of rights in a mark incorporating the words HAVANA CLUB because such a mark is the same as or substantially similar to the HAVANA CLUB mark that JASA used in connection with the assets that were confiscated by the Cuban government in 1960. Neither JASA nor Bacardi, as JASA's bona fide successor in interest, has consented to Defendants' use of a mark incorporating the words HAVANA CLUB. Accordingly, Defendants have no enforceable rights in any such mark.

146.    An actual controversy exists between the parties with respect to the foregoing claims of common law ownership and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below. Plaintiffs have no adequate remedy at law.

**COUNT III**

**DECLARATION OF NON-VIOLATION OF FEDERAL TRADEMARK LAWS**

147.    Paragraphs 1 through 146 are incorporated herein by reference.

148.    Plaintiffs' use of the HAVANA CLUB mark in connection with the sale, distribution, and advertising of HAVANA CLUB rum in the United States does not constitute trademark infringement or unfair competition in violation of Section 32 or Section 43(a) of the Lanham Act, 28 U.S.C. §§ 1114 or 1125(a).

149.    Plaintiffs' use of the HAVANA CLUB mark does not infringe under any federal law any mark purportedly owned by Defendants, or constitute unfair competition in violation of any right purportedly owned by Defendants under any federal law.

150.    Defendants have not been damaged, and will not in the future be damaged, by Plaintiffs' use of the HAVANA CLUB mark or by any alleged violation of federal law based on Plaintiffs' use of said marks.

151.    An actual controversy exists between the parties with respect to the foregoing claims of non-violation and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below.  Plaintiffs have no adequate remedy at law.

**COUNT IV**

**DECLARATION OF NON-VIOLATION OF STATE LAW**

152.    Paragraphs 1 through 151 are incorporated herein by reference.

153.    Plaintiffs' use of the HAVANA CLUB mark does not infringe under any state law any mark incorporating the words HAVANA CLUB purportedly owned by Defendants, or constitute unfair competition in violation of any right purportedly owned by Defendants under any state law based on a mark or trade name incorporating the words HAVANA CLUB.

-45-

154.    Defendants have not been damaged, and will not in the future be damaged, by Plaintiffs' use of the HAVANA CLUB mark or by any alleged violation of state law based on Plaintiffs' use of said marks.

155.    An actual controversy exists between the parties with respect to the foregoing claims of non-violation and the controversy is of sufficient immediacy to warrant the declaratory and injunctive relief requested below.  Plaintiffs have no adequate remedy at law.

## COUNT V
### TREATY VIOLATIONS AND CONSTITUTIONAL GROUNDS

156.    Paragraphs 1 through 155 are incorporated herein by reference.

157.    Contrary to Section 44 of the Lanham Act, 15 U.S.C. § 1126, and international conventions, the HAVANA CLUB mark was not used in commerce in the United States within a reasonable period after Cubaexport's original application was filed.

158.    Indeed, the HAVANA CLUB mark has never been used by the original registrant, Cubaexport, in interstate or foreign commerce of the United States.

159.    Wherefore, the purported HAVANA CLUB mark has never been used in commerce which may lawfully be controlled by Congress, so the PTO has no power to maintain the U.S. HAVANA CLUB & DESIGN Registration on the Principal Register of the PTO and said registration should be cancelled.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs pray for relief as follows:

160.    Plaintiffs request that this Court enter judgment:

(a)    Adjudging and declaring that Reg. No. 1,031,651 of the HAVANA CLUB & DESIGN mark be cancelled and stricken from the Principal Register of the PTO;

    (b)    Declaring that BACO owns the common law rights to the HAVANA

CLUB trademark in the United States, that BACO's use of the HAVANA CLUB trademark does

not infringe on any mark owned by Defendants or otherwise violate any enforceable rights of the

Defendants, and that Defendants have no rights in any mark incorporating the words HAVANA

CLUB;

    (c)    Enjoining Defendants, their agents, servants, employees, parents,

subsidiaries, affiliates and all persons in active concert with Defendants, from using or

registering in the PTO or in any State of the United States any mark incorporating or consisting

of the words HAVANA CLUB and from interfering with Plaintiffs' use and registration of the

HAVANA CLUB mark;

    (d)    Awarding Plaintiffs their costs and attorneys' fees pursuant to 15 U.S.C. §

1117 and applicable state law; and

    (e)    Awarding Plaintiffs such further relief as the Court may deem just and

proper.

                  Respectfully submitted,

|  |  |
|---|---|
| William R. Golden, Jr.<br>KELLEY DRYE & WARREN<br>101 Park Avenue<br>New York, New York 10178<br>(212) 808-7800 | Eugene D. Gulland (D.C. Bar No. 175422)<br>Oscar M. Garibaldi (D.C. Bar No. 251330)<br>Gregory M. Williams (D.C. Bar No. 467950)<br>COVINGTON & BURLING<br>1201 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004-2401<br>(202) 662-6000 |

Attorneys for the Plaintiffs Bacardi & Company Limited
and Bacardi-Martini U.S.A., Inc.

-47-

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BACARDI & COMPANY LIMITED,

and

BACARDI U.S.A., INC.,

      Plaintiffs,

    v.

EMPRESA CUBANA EXPORTADORA
DE ALIMENTOS Y PRODUCTOS
VARIOS d/b/a CUBAEXPORT

and

HAVANA CLUB HOLDING, S.A. d/b/a
HCH, S.A.,

      Defendants.

Case No. 1:04-CV-00519 (EGS)

**PARTIALLY-CONSENTED MOTION TO STAY
PENDING FINAL RESOLUTION OF PATENT AND TRADEMARK OFFICE
POST REGISTRATION OFFICE ACTION**

Plaintiffs Bacardi & Company Limited and Bacardi U.S.A., Inc. ("Bacardi")
request that the Court stay this action pending final resolution of any available appeals from the
Post Registration Office Action of the Patent and Trademark Office ("PTO") dated August 3,
2006 ("the PTO Action"). A copy of the PTO Action is attached as Exhibit A to the
accompanying Declaration of Emily Johnson Henn ("Henn Decl."). Defendants Havana Club
Holding, S.A. d/b/a HCH, S.A. ("HCH") and Empresa Cubana Exportadora de Alimentos y
Productos Varios d/b/a Cubaexport ("Cubaexport") have consented to a stay of Counts I and V

of the complaint, but they oppose a stay of Counts II-IV. The parties have agreed to suspend discovery pending the Court's ruling on this motion. For the reasons set forth below, the Court should grant Bacardi's request for a stay of this action in its entirety.

## STATEMENT OF FACTS

In this action Bacardi seeks (i) review of the decision of the Trademark Trial and Appeal Board ("TTAB") dismissing Bacardi's petition to cancel U.S. Registration No. 1,031,651 of the trademark HAVANA CLUB & DESIGN for rum (the "Extant Registration"); (ii) rectification of the PTO records by striking or canceling the Extant Registration; and (iii) declaratory and injunctive relief concerning related rights.

On August 3, 2006, the PTO Action ruled that the Extant Registration "will be cancelled/expired." (Henn Decl. Ex. A at 1.) The cancellation or expiration of the Extant Registration will afford equivalent relief to the primary relief that Bacardi has been seeking in this case and may in a practical sense make it unnecessary to litigate the disputes over related rights. Pernod Ricard (the owner of fifty percent of Defendant HCH's stock) has announced that it will seek review of the PTO Action.

The background leading to the PTO Action is as follows. Cubaexport's Extant Registration was due to expire on January 27, 2006, with a statutory six-month grace period for renewal running to July 27, 2006.[1] On December 14, 2005, Mr. Vincent N. Palladino of Ropes & Gray LLP submitted to the PTO an application for renewal of the Extant Registration. (Henn Decl. Ex. B.) In the ensuing months, there were communications between the PTO and Mr.

---

[1] Under Section 9(a) of the Lanham Act, 15 U.S.C. § 1059(a), a registration must be renewed every ten years through filing of a written application and payment of a prescribed fee. Under the Trademark Rules, "an application for renewal must be filed within one year before the expiration date of the registration, or within the six-month grace period after the expiration date of the registration. If no renewal application is filed within this period, the registration will expire." T.M.R.P. § 2.182.

2

Palladino concerning whether Cubaexport possessed sufficient authority to seek renewal of the registration under licenses issued by the Office of Foreign Assets Control ("OFAC").[2]  On April 6, 2006, OFAC determined that there was no such authority under existing OFAC licenses and on the following day Cubaexport applied for a specific license authorizing the renewal of the registration.

On July 20, 2006, the PTO issued a "Post Registration Office Action" stating that the application for renewal of the Extant Registration could not be accepted and directing "Registrant . . . to notify the USPTO" whether the necessary specific OFAC license "has been granted or denied." (Henn Decl. Ex. C. at 1.)  The PTO warned that "[i]f the owner . . . or if OFAC notifies the USPTO that the specific license has been denied, the registration will be deemed cancelled/expired." (Id. at 2.)

In a letter dated July 28, 2006, Mr. J. Robert McBrien, Acting Director of OFAC notified Mr. Palladino that the necessary specific license had not been and would not be granted:

> "Pursuant to the Cuban Assets Control Regulations, 31 C.F.R. Part 515, administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), renewal of the HAVANA CLUB trademark under these circumstances would be prohibited unless specifically licensed.
>
> OFAC has been engaged in consultation with relevant agencies in the U.S. Government, including the Department of State ('State'), on this issue. We have received guidance from State informing us that it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark. Accordingly, your request is hereby denied." (Henn Decl. Ex. D.)

---

[2] Transactions related to the renewal of a U.S. trademark registration in which Cuba or a Cuban national has an interest are forbidden by the general prohibitions of 31 C.F.R. §515.201(b) in the absence of a license from OFAC. While a general license is provided in 31 C.F.R. § 515.527(a)(1), certain transactions are excluded from that general license by 31 C.F.R. § 515.527(a)(2) and are prohibited in the absence of a specific license from OFAC. See 31 C.F.R. § 515.527(a).

Having received OFAC's notice of denial, Cubaexport notified the PTO on August 1, 2006, that OFAC had "declined to grant the specific license." (Henn Decl. Ex. E at 1.) Cubaexport requested that the Extant Registration be renewed "notwithstanding OFAC's decision not to grant Cubaexport a specific license." (Id.)

On August 3, 2006, the PTO issued another Post Registration Office Action ("the PTO Action") stating: "Because the specific license is necessary for authorizing payment of the required fee, and that license has been denied, the required fee . . . has not been submitted; accordingly, the registration will be cancelled/expired." (Henn Decl. Ex. A.) The PTO Action noted that Cubaexport "may file a petition to the Director requesting review of this decision." (Id.)

On August 8, 2006, Bacardi announced the relaunch of its HAVANA CLUB rum in Florida. After stating its intent to contest the PTO Action, Pernod Ricard acting through Pernod Ricard USA, LLC ("Pernod USA") filed suit in U.S. District Court for the District of Delaware on August 15, 2006. (Henn Decl. Ex. F.) Pernod USA — which is represented in Delaware by the same counsel representing Cubaexport in this case — asserts that Bacardi has made representations that are likely to mislead consumers into buying Bacardi's HAVANA CLUB rum, thereby diverting sales from Pernod USA's own spirits. (Id. ¶¶ 21-24, 30-33.) In particular, Pernod USA claims that it is harmed by Bacardi's allegedly false claims that it has rights to the HAVANA CLUB brand. (Id. ¶¶ 30-34.)

## ARGUMENT

This Court has broad discretion to stay all proceedings in this action pending the resolution of proceedings elsewhere. *Naegele v. Albers*, 355 F. Supp. 2d 129, 140 (D.D.C. 2005) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its

4

docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299

U.S. at 254. "Indeed, '[a] trial court may, with propriety, find it is efficient for its own docket

and the fairest course for the parties to enter a stay of an action before it, pending resolution of

independent proceedings which bear upon the case.'" *IBT/HERE Employee Representatives'*

*Council v. Gate Gourmet Div. Americas*, 402 F. Supp. 2d 289, 292 (D.D.C. 2005) (quoting *Leyva*

*v. Certified Grocers of Cal., Ltd*, 593 F.2d 857, 863-64 (9th Cir. 1979)).

      The PTO Action ruling that Cubaexport's HAVANA CLUB registration is

cancelled or expired affords relief equivalent to a key objective that Bacardi has been seeking in

this case. A stay of this case pending final resolution of any appeals of the PTO Action will

therefore economize judicial resources and save time and effort for the Court and the parties in

this case. The parties are currently engaged in discovery related to renewed dispositive motions

that Defendants have indicated they intend to file, but such motions will likely be moot in whole

or in part if the PTO Action stands. Further discovery and efforts to prepare and argue

dispositive motions may be unnecessary, and the resources of the Court and parties should not be

spent unless it becomes clear that the claims must be litigated. Because the resolution of any

available PTO appeals will likely affect any remaining questions in this case, a stay of all claims

is appropriate. *See Naegele*, 355 F. Supp. 2d at 141.

      Defendants will suffer no harm from a stay in this case. As they have filed no

counterclaims, the effect of the stay operates entirely on Bacardi's claims. The parties have

already agreed to suspend discovery pending the resolution of this motion. The parties also

agree that Counts I and V of Bacardi's complaint (Bacardi's appeal of the TTAB's decision and

Treaty/Constitutional claims) should be stayed. While Defendants maintain their position that

this Court should dismiss Counts II, III, and IV, the posture of the case after resolution of any

available PTO appeals may eliminate the need for this Court to entertain dispositive motions. As in *IBT/HERE Employee Representatives' Council*, the resolution of the related proceeding "may affect the parties' understanding of the scope of this case going forward, may reorient the parties' arguments, may catalyze a settlement of this matter, may moot the defendants' motion to dismiss, or may resolve the issues raised in this lawsuit in their entirety." 402 F. Supp. 2d at 293.

*Count II.* In Count II, Bacardi seeks a declaration that it has common law rights in the HAVANA CLUB mark and that Defendants have no rights in any mark incorporating the words HAVANA CLUB. (Compl. ¶¶ 142-45.) Bacardi alleges, *inter alia*, that Defendants' claimed trademark rights are contrary to the public policy of the United States (*id.* ¶¶ 144-45) — which was borne out by OFAC's letter of July 28 stating that "it would be inconsistent with U.S. policy to issue a specific license authorizing transactions related to the renewal of the HAVANA CLUB trademark." (Henn Decl. Ex. D.) The PTO's decision that the Extant Registration is cancelled or expired — assuming it withstands appeal — undermines Defendants' principal basis for claiming rights in the HAVANA CLUB mark. Defendants moved to dismiss Counts II-IV on the ground, *inter alia*, that "Cubaexport has a valid registration for trademark 'Havana Club.'" (Cubaexport Mot. to Dismiss at 34.) If the PTO Action stands, this argument will no longer be available to Defendants, and the parties' arguments will be reoriented if there is any further basis for the parties to litigate Count II. *See IBT/HERE Employee Representatives' Council*, 402 F. Supp. 2d at 293. Indeed, affirmance of the PTO Action may catalyze settlement or otherwise eliminate the need to continue litigation over Count II. *See id.*

*Counts III & IV.* Bacardi also seeks declarations that its use of the HAVANA CLUB mark does not violate any rights purportedly held by Defendants under federal trademark laws (Count III) or state laws (Count IV). (Compl. ¶¶ 149-50, 153-54.) The cancellation or

6

expiration of the Extant Registration pursuant to the stated policy of the United States necessarily affects the resolution of these counts. As in the case of Count II, Defendants moved to dismiss Counts III and IV on the ground, *inter alia*, that "Cubaexport has a valid registration for trademark 'Havana Club,'" (Cubaexport Mot. to Dismiss at 34) and these arguments must necessarily be abandoned or changed if Cubaexport's registration is cancelled or expired. Moreover, it is difficult to understand how Defendants could assert rights under federal or state law that are inconsistent with U.S. policy established by the State Department and recognized in the PTO Action.

Other developments between the parties and their affiliates also counsel in favor of a stay of all claims in this action. As previously noted, Bacardi relaunched its HAVANA CLUB rum in Florida on August 8, 2006, and one week later, Pernod USA (whose parent, Pernod-Ricard, owns a 50% interest in Defendant HCH (Compl. ¶¶ 17, 19)) filed suit against Bacardi. *See Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 06-505 (SLR) (D. Del. 2006). (*See* Henn Decl. Ex. F.) Pernod USA is represented in that case by the same counsel at Ropes & Gray who represent Cubaexport in this case. Pernod USA alleges in that suit that it is harmed by Bacardi's use of the HAVANA CLUB name — even though Pernod USA itself asserts no interest in the trademark and despite the PTO's determination that Pernod Ricard S.A.'s joint venture partner, Cubaexport, has lost any rights it may have had in the HAVANA CLUB registration. Bacardi's rights to the HAVANA CLUB mark are being litigated in that proceeding, brought by an affiliate of Defendants HCH and Cubaexport, which may affect or resolve the issues raised in Counts II-IV. *See IBT/HERE Employee Representatives' Council*, 402 F. Supp. 2d at 293.

In these circumstances, a stay of Bacardi's remaining claims will ensure that the Court and the parties need not expend resources dealing with allegations and arguments that will likely be moot. *Cf. In re Lorazepam & Clorazepate Antitrust Litigation*, 208 F.R.D. 1 (D.D.C. 2002) (concluding that a stay pending an appellate decision was warranted where "proceeding headlong with discovery and other matters before this Court has the very real potential of unnecessarily wasting significant resources of all parties . . . and the Court, because two significant issues are currently pending before the Court of Appeals, one of which could dispose of the litigation while the other could substantially reshape it").

Respectfully submitted,

/s/

Eugene D. Gulland (D.C. Bar No. 175422)
Oscar M. Garibaldi (D.C. Bar No. 251330)
Emily Johnson Henn (D.C. Bar No. 471077)
Jenny C. Ellickson (D.C. Bar No. 489905)
COVINGTON & BURLING
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

William R. Golden, Jr.
Michelle Graham
KELLEY DRYE & WARREN
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

September 15, 2006    *Attorneys for Plaintiffs*

8

### CERTIFICATE OF SERVICE

The undersigned member of the bar of this court hereby certifies that true

and correct copies of the Partially-Consented Motion To Stay Pending Final Resolution

of Patent and Trademark Office Post Registration Action, Declaration of Emily Johnson

Henn, and Proposed Order were served upon:

| | |
|---|---|
| Peter M. Brody (D.C. Bar No. 398717)<br>ROPES & GRAY LLP<br>One Metro Center<br>700 12th Street, NW, Suite 900<br>Washington, DC 20005-3948<br>Telephone: (202) 508-4600<br>Facsimile: (202) 508-4650 | Mark J. Biros (D.C. Bar No. 181719)<br>PROSKAUER ROSE LLP<br>1001 Pennsylvania Avenue, N.W.<br>Suite 400 South<br>Washington, DC  20004<br>Telephone: (202) 778-1104<br>Facsimile: (202) 416-6899 |
| Herbert F. Schwartz<br>Vincent N. Palladino<br>Pablo D. Hendler<br>Michele M. Winneker<br>ROPES & GRAY LLP<br>1251 Avenue of the Americas<br>New York, New York 10020-1104<br>Telephone: (212) 596-9000<br>Facsimile: (212) 596-9090<br><br>*Attorneys for Defendant Cubaexport* | Charles S. Sims<br>Jenifer deWolf Paine<br>PROSKAUER ROSE LLP<br>1585 Broadway<br>New York, NY  10036<br><br>*Attorneys for Defendant HCH* |

by electronic filing under the Rules of this Court.

September 15, 2006

_____
Emily Johnson Henn