IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PERNOD RICARD USA LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-505-SLR |
| | ) |
| BACARDI U.S.A., INC., | ) |
| | ) |
| | ) |
| Defendant. | ) |

Roger Dallery Smith, II, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Plaintiff.

Anne Shea Gaza, Esquire of Richards, Layton, & Finger, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: August 21, 2007
Wilmington, Delaware

Robinson, District Judge

## I. INTRODUCTION

Plaintiff Pernod Ricard USA, LLC ("plaintiff") filed this action against Bacardi U.S.A., Inc. ("defendant") for violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for allegedly false and misleading statements in the marketing and advertising of defendant's "Havana Club" brand rum. (D.I. 1 at ¶ 1) The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. (D.I. 1 at ¶ 2) The court previously denied defendant's motion for a change in venue to the Southern District of Florida because the asserted advantages of moving the case were insufficient to warrant a transfer. (D.I. 28 at 7) Currently before the court is defendant's motion to dismiss count two of the complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.I. 12) For the reasons that follow, the court grants defendant's motion.

## II. BACKGROUND

The instant litigation stems from a business dispute about the sale of "Havana Club" brand rum between, on the one hand, plaintiff and its joint venture partner, Empresa Cubana Exportadora De Alimentos y Productos Varios ("Cubaexport"), and, on the other hand, defendant. Both plaintiff and defendant are leading importers and distributors of spirits throughout the United States and are direct competitors in this regard. (D.I. 1 at ¶ 6) In order to understand the issues before the court, the history of the dispute needs to be related. The court relies for its background facts, in part, on the opinion issued by the United States Court of Appeals for the Second Circuit in Havana Club Holding, S.A. v. Galleon S.A., 203 F.3d 116 (2d Cir. 2000) ("HCH v. Galleon").

Plaintiff is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business located in Purchase, New York. (D.I. 1 at ¶ 4) Plaintiff is the third largest producer, importer, and marketer of spirits in the United States by sales value, and the fourth largest by sales volume. (Id.) Plaintiff owns 50% of Havana Club International ("HCI"), a joint stock society organized under the laws of Cuba, and 50% of Havana Club Holding ("HCH"), a Luxembourg holding company that owns the "Havana Club" mark in certain countries outside the United States. HCH v. Galleon, 203 F.3d at 119. Defendant is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices located in Miami, Florida. (D.I. 1 at ¶ 5) Defendant distributes, inter alia, "Havana Club" brand rum, which is made in Puerto Rico. (D.I. 1 at ¶ 5, ex. A)

Before the Cuban revolution, Jose Arechabala, S.A. ("JASA"), a Cuban corporation owned privately by members of the Arechabala family, produced "Havana Club" rum and owned the trademark "Havana Club" for use with its rum. JASA exported its rum to the United States until 1960, when the Cuban government seized and expropriated JASA's assets. HCH v. Galleon, 203 F.3d at 119. Neither JASA nor its owners ever received compensation for the seized assets from the Cuban government. Id. at 119-20. In 1963, the United States imposed an embargo on Cuba. Id. at 120.

From 1972 to 1993, Cubaexport, a Cuban state enterprise, exclusively exported "Havana Club" rum, primarily in Eastern Europe and the Soviet Union. Id. Cubaexport registered the "Havana Club" trademark with Cuban authorities in 1974, and with the United States Patent and Trademark Office ("PTO") in 1976 (Registration No.

2

1,031,651). Id. In 1993, Cubaexport sought to reorganize and find a foreign partner for its "Havana Club" rum business. Id. As a result, Havana Rum & Liquors, S.A. ("HR&L") was formed under Cuban law and entered into a joint venture agreement with Pernod Ricard, S.A. ("Pernod"), a French company distributing liquor internationally. Id. Under a November 1993 agreement between Pernod and HR&L, HCI and HCH were formed. Id. Through a series of agreements, Cubaexport assigned trademark Registration No. 1,031,651 to HR&L, which subsequently assigned such to HCH. Id. A "license" authorizing the assignments was issued in 1995 by the Office of Foreign Assets Control ("OFAC"), an agency of the Secretary of the Treasury charged with administering the Cuban embargo. Id. By 1994, HCI was exporting rum under the "Havana Club" trademark through the exclusive license to that mark from HCH. Id. at 121. From 1994 to 1998, HCI sold over 38 million bottles of "Havana Club" rum, with approximately 30% of the sales in Cuba (including sales to Americans traveling in Cuba), and the remainder exported to such countries as Spain, France, Germany, Italy, Canada, Mexico, Bolivia and Panama. Id. In 1996, HCH renewed the United States registration of the "Havana Club" mark for a term of ten years. Id. Despite these business arrangements, however, because of the Cuban embargo, HCI's "Havana Club" rum has never been sold in the United States. Id. HCI intends to export its rum to the United States as soon as legally possible.[1] Id.

---

[1]In 1997, OFAC revoked its license "as a result of facts and circumstances that have come to the attention of this Office which were not included in the [1995] application." HCH v. Galleon, 203 F.3d at 120.

3

In December 1996, HCH and HCI filed a lawsuit to enjoin Bacardi & Company[2] from using the "Havana Club" trademark, alleging violations of sections 32 and 43(a) of the Lanham Act. Id. Shortly thereafter, Bacardi purchased[3] the Arechabala family's rights (if any) to the "Havana Club" trademark, the related goodwill of the business, and any rum business assets still owned by the Arechabala family. Id. at 120. The Second Circuit concluded that the Cuban embargo barred assignment to HCH of the "Havana Club" trademark registered in the United States, that United States courts are precluded by statute from enforcing whatever rights HCI might have to trademark protection, and that HCI lacked standing to assert its false advertising and unfair competition claims under the Lanham Act. Id. at 119. In addition to the litigation in the Second Circuit, there apparently is pending before the PTO and the United States District Court for the District of Columbia challenges to Cubaexport's trademark. (D.I. 24 at 9)

Defendant officially launched its "Havana Club" brand rum in the United States in August 2006. (D.I. 1 at ¶ 7) Included within its marketing program are assertions that it owns the rights to the "Havana Club" brand "in the United States as the successor to a company that marketed a Cuban Havana Club rum prior to 1960." (Id. at ¶ 11) Defendant has characterized its "Havana Club" rum as a relaunch of the older, Cuban "Havana Club" rum. (Id. at ¶ 9)

Plaintiff contends that defendant violated § 43(a) of the Lanham Act, 15 U.S.C. §

---

[2]Bacardi & Company ("Bacardi") is a corporation organized in Liechtenstein and headquartered in the Bahamas. It is not clear from the record the corporate relationship between Bacardi and defendant, but it seems safe to assume there is such a relationship.

[3]In April 1997.

1125(a), because it willfully and falsely: (1) described its "Havana Club" rum's geographic origin ("count one"); and (2) stated that it owns the "Havana Club" mark ("count two"). (Id. at ¶¶ 21, 30)  Plaintiff argues that these misrepresentations mislead and deceive consumers to believe that defendant owns the "Havana Club" mark and sells Cuban-made rum. (Id. at ¶¶ 22, 31)  Plaintiff contends consumers purchase defendant's rum on the basis of these mistaken beliefs. (Id. at ¶¶ 23, 33)  Plaintiff further alleges that these misrepresentations will cause it to lose spirits sales and suffer damage to its reputation and goodwill. (Id. at ¶¶ 23-25, 34)

Plaintiff seeks to enjoin defendant from further violations of § 43(a) of the Lanham Act by disseminating the alleged misrepresentations. (Id. at 7)  Plaintiff also seeks an order compelling defendant to publish corrective advertising to dispel any false and deceptive impressions created by the alleged misrepresentations. (Id.)  Furthermore, plaintiff seeks defendant's profits and treble lost profit damages pursuant to 15 U.S.C. § 1117(a) for defendant's violations of § 43(a) of the Lanham Act. (Id.)

Defendant argues that plaintiff does not have standing to bring suit and fails to allege an injury that flows or reasonably could flow from defendant's alleged misrepresentations.[4] (D.I. 13 at 6)  Defendant challenges count two and argues that plaintiff failed to satisfy all of the elements of a false advertising claim because the misrepresentations were not made in connection with the rum and do not describe the rum's "nature," "characteristics," or "qualities." (Id. at 13, 14)  Plaintiff contends that its

_____

[4]Plaintiff seeks redress from defendant's alleged misstatements as a market competitor under a false advertising claim, rather than as one with superior trademark rights through a trademark infringement claim. (D.I. 1)

5

standing is proper because it is defendant's major competitor and that it has sufficiently pled a false advertising claim. (D.I. 24 at 7)

## III. STANDARD OF REVIEW

In reviewing a motion filed under Fed. R. Civ. P. 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. See Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007); Christopher v. Harbury, 536 U.S. 403, 406 (2002). A complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Id. at 1959.

## IV. DISCUSSION

### A. Standing

The doctrine of standing incorporates both a constitutional and a prudential element. See Pitt News v. Fisher, 215 F.3d 354, 359 (3d Cir. 2000). Constitutional standing is a threshold issue that must be addressed before examining issues of prudential standing and statutory interpretation. See Steel Co. v. Citizens for a Better

6

Environment, 523 U.S. 83, 94 (1998).

## 1. Constitutional Standing

Satisfying the Article III "case or controversy" requirement is the "irreducible constitutional minimum" of standing. See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 484 (3d Cir. 1998) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Constitutional standing contains the following three elements, each of which must be met: (1) plaintiff suffered an injury in fact; (2) a causal nexus exists between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable judicial decision. Id. (citations omitted). These requirements ensure that plaintiff has a "personal stake or interest in the outcome of the proceedings, sufficient to warrant . . . [plaintiff's] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on . . . [plaintiff's] behalf." Joint Stock Soc'y v UDV N. Am., Inc., 266 F.3d 164, 175 (3d Cir. 2001) (internal quotations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. (quoting Lujan, 504 U.S. at 561).

Section 43(a)(1)(B) of the Lanham Act provides that a defendant "shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged" by defendant's false statement. 15 U.S.C. § 1125(a)(1)(B). Defendant argues that plaintiff has failed to allege any factual basis for a causal connection between defendant's allegedly objectionable statement and plaintiff's injury. (D.I. 13 at 9) Defendant further contends that plaintiff has failed to identify the nature of this injury in anything other than conjectural terms. (Id.) Having reviewed the complaint, the court is persuaded that plaintiff has satisfied the requirements for constitutional standing in this

7

case. "All that the Article III's injury-in-fact element requires is 'an identifiable trifle' of harm[.]" Joint Stock Soc'y, 266 F.3d at 177 (citation omitted). Plaintiff directly competes with defendant in the spirits market and risks significant harm in this regard. See Id. (stating that if plaintiff had shipped even a small amount of vodka to the United States for sale to compete in the vodka market against defendant, the injury-in-fact element of constitutional standing would have been met). Because plaintiff and defendant are direct competitors, plaintiff has a "reasonable basis for the belief that [it] is likely to be damaged as a result of [defendant's] false advertising." Warner-Lambert Co. v. BreathAsure, Inc., 204 F.3d 93, 96 (3d Cir. 2000) (holding that plaintiff had constitutional standing where plaintiff's product competed "in general" with defendant's product). Further, plaintiff's requested relief of, inter alia, lost profits and attorney fees would sufficiently redress its alleged injuries. For these reasons, the court finds that plaintiff has satisfied the elements of constitutional standing.

## 2. Prudential Standing

Prudential standing "constitute[s] a supplemental aspect of the basic standing analysis and address[es] concerns regarding the need for judicial restraint." Oxford Assoc. v. Waste Sys. Auth., 271 F.3d 140, 145 (3d. Cir. 2001) (citation omitted). Thus, "[w]e . . . use the prudential limits of standing to ensure that only those parties who can best pursue a particular claim will gain access to the courts." Id. (citation omitted). Prudential standing embraces the following principles: "(1) the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties; (2) even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not

8

adjudicate abstract questions of wide public significance which amount to generalized grievances pervasively shared and most appropriately addressed in the representative branches; and (3) the plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Trump Hotels & Casino Resorts, 140 F.3d at 485 (internal quotation marks and citations omitted).

While "[n]o single formula is capable of answering every prudential standing question," the Third Circuit has identified a number of factors courts should consider when answering this question with regard to § 43(a); these factors are called the AGC test.[5] See Conte Bros. Automotive, 165 F.3d at 225, 233 (citations omitted). Under this test, a court must consider the following factors: (1) "the nature of the plaintiff's alleged injury" (i.e., "[i]s the injury of a type that Congress sought to redress in providing a private remedy for violations of the Lanham Act?"); (2) "[t]he directness or indirectness of the asserted injury"; (3) "[t]he proximity or remoteness of the party to the alleged injurious conduct" (i.e., is there "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest" by bringing an enforcement action?); (4) "[t]he speculativeness of the damages claim"; and (5) "[t]he

_____

[5] The Third Circuit first addressed prudential standing in Thorn v. Reliance Van Co., 736 F.2d 929, 933 (3d Cir. 1984). In that case, the Third Circuit held that one has prudential standing to sue under § 43(a) if "a reasonable interest to be protected against false advertising" exists. Thorn, 736 F.2d at 933 (citation omitted). In later cases, the Third Circuit "grappled with defining the term [reasonable interest] with greater precision," and subsequently adopted the Supreme Court's antitrust standing test articulated in Associated General Contractors of California, Inc v. California State Council of Carpenters, 459 U.S. 519 (1983) ("the AGC test") to determine prudential standing under § 43(a). See Conte Bros. Automotive, Inc., 165 F.3d at 231, 233-34.

9

risk of duplicative damages or the complexity in apportioning damages." Joint Stock Soc'y, 266 F.3d at 179-80, 182 (citations and internal brackets omitted). Courts have applied the AGC test on a case by case basis, weighing each factor without giving any one factor determinative weight. Id. at 180 (citations omitted).

The Lanham Act's focus is to redress commercial interests, including reputation, the ability to compete, and goodwill, that have been harmed by a competitor's false advertising. See Conte Bros. Automotive, Inc., 165 F.3d at 234. In the HCH v. Galleon litigation, the Second Circuit noted that "[a]ny rum producer selling its product in the United States can obtain standing to complain about Bacardi's allegedly false designation of origin as long as it can demonstrate the commercial injury required for an action under section 43(a)." 203 F.3d at 134. Therefore, the court will examine the commercial interest that has been alleged in this case under the AGC test prescribed by the Third Circuit. See Conte Bros. Automotive, Inc., 165 F.3d at 231 (determining that the dispositive question should be whether plaintiff has "a reasonable interest to be protected against false advertising[,]" which is illuminated by the AGC test).

In the case at bar, plaintiff alleges that it will suffer decreased rum sales because defendant's misleading advertisements will induce consumers to purchase defendant's rum instead of plaintiff's rum. Because plaintiff competes head-to-head with defendant, plaintiff is at a competitive disadvantage if defendant advances its market position through false advertisements. The court, therefore, finds that the nature of plaintiff's alleged injury is of the type that Congress sought to redress by providing a private remedy for Lanham Act violations. The first factor of the AGC test weighs in favor of prudential standing. Compare HCH v. Galleon, 203 F.3d at 132 (affirming the district

10

court's finding that HCI had no standing to bring suit where HCI did not sell its "Havana Club" rum in the United States market); Joint Stock Soc'y, 266 F.3d at 177 ("If the plaintiffs had shipped even a small amount of Russian vodka to this country for sale under a different name, they likely would have established a sufficient injury in fact.") (affirming district court's grant of summary judgment); Conte Bros. Automotive, Inc., 165 F.3d at 234 (explaining that because the "loss of sales [by retailers or wholesalers] at the retail level due to alleged false advertising [ ] does not impact [this plaintiff's] ability to compete; nor does it detract from [its] reputation or good will," appellant failed to allege the type of competitive harm the Lanham Act was enacted to redress).

The second factor addresses whether defendant's conduct directly affects either the plaintiff or the market in which it participates. Plaintiff is in the proper position to claim that defendant's activities directly lowered its sales and profits if purchasers are consciously selecting defendant's rum, rather than plaintiff's, as a result of defendant's advertisement. For this reason, the second factor weighs in favor of prudential standing.

The court finds that the additional AGC test factors do not present an obstacle to plaintiff's standing. Plaintiff, as defendant's direct market competitor, is of the class of persons whose self-interest would normally motivate them to vindicate the public interest in a false advertising claim.[6] Therefore, plaintiff is sufficiently proximate to the allegedly harmful conduct to satisfy the third factor. See Joint Stock Soc'y, 266 F.3d at 183 n.10 ("[A] direct competitor will usually have a stronger commercial interest than a

_____

[6] In this case, plaintiff is more proximate to defendant's allegedly harmful conduct than the appellants in both Conte Bros. Automotive, Inc. and Joint Stock Society.

11

non-competitor"). The damages examined under the fourth factor are those that are particular to the plaintiff. Because plaintiff has sold its product in the United States market, a lost sales and profits calculation would be concrete evidence of damages.[7] Id. at 183. The fourth factor weighs in favor of prudential standing. Finally, the fifth factor addresses the risk of duplicative damages and the complexity in apportioning damages. Expanding prudential standing to those in plaintiff's position would not result in a great increase in litigation in federal courts. Plaintiff's damages claims are assertable only by other United States rum marketers.[8] Expanding standing to parties like the plaintiff furthers the Lanham Act's underlying purpose by "ferret[ing] out unfair competitive methods and protect[ing] businesses from the unjust erosion of their good will and reputation." Conte Bros. Automotive, Inc. 165 F.3d at 236. The fifth factor, therefore, weighs in favor of prudential standing.

## B. Failure to Sufficiently Plead False Advertising

Section 43(a)(1)(B) of the Lanham Act provides in relevant part:

---

[7] The Joint Stock Society court held that, because appellant never sold its product in the United States market, any calculations of lost sales or profits would be speculative. Therefore, this factor weighed against prudential standing. 266 F.3d at 183.

[8] The high complexity of apportioning damages that exists with regard to expanding standing to a multitude of potential Russian vodka importers in Joint Stock Society does not exist here. 266 F.3d at 184-85. In contrast to Joint Stock Society, this court's holding extends standing only to rum distributors in the United States. While neither party has disclosed the precise number of such rum distributors, the type of impact on the federal courts the Third Circuit sought to avoid in Joint Stock Society has not been demonstrated in the case at bar. See also Conte Bros. Automotive Inc., 165 F.3d at 235 ("[R]ecognizing the right of every potentially injured party in the distribution chain to bring a private damages action would subject defendant firms to multiple liability for the same conduct and would result in administratively complex damages proceedings").

(a)(1) Any person who, **on or in connection with any goods or services**. . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any. . . false or misleading description of fact, or false or misleading representation of fact, which -

. . . (B) in commercial advertising or promotion, misrepresents the **nature, characteristics, qualities, or geographic origin** of his or her. . . goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (emphasis added). The Third Circuit has stated that, to establish a Lanham Act claim based on a false or misleading representation of a product, a plaintiff must show, inter alia, that the defendant has made false or misleading statements as to his own product.[9]

In count two, plaintiff asserts that defendant's statement that it owns the rights to the "Havana Club" trademark is likely to mislead and deceive customers. (D.I. 1 at ¶¶ 31-32) Defendant argues that count two should be dismissed because statements regarding defendant's ownership rights in a trademark do not concern the "nature, characteristics, qualities, or geographic origin" of defendant's rum as described by § 43(a). (D.I. 13 at 9-12)

### 1. "On or in connection with any goods or services"

Plaintiff asserts that it has properly pled this element because defendant's statements were made in connection with the commercial launch of its rum. (D.I. 24 at

---

[9]In addition, a plaintiff must show that: (1) there is actual deception, or at least a tendency to deceive a substantial portion of the intended audience; (2) the deception is material in that it is likely to influence purchasing decisions; (3) the advertised goods traveled in interstate commerce; and (4) there is a likelihood of injury to the plaintiff in terms of declining sales and loss of good will. See Warner-Lambert Co., 204 F.3d 87, 91-92 (3d Cir. 2000).

13

8) Defendant does not contest that its statement was made in the course of

commercial advertising or promotion, but contends that, even if its alleged

misstatements constituted commercial marketing of its rum, "it simply does not follow

that statements made about the trademark, which is not a good or service, state a claim

for false advertising under Section 43(a)." (D.I. 27 at 13) The court agrees. The

"good" for sale in commerce by defendant is rum, not the "Havana Club" trademark.

See Digigan, Inc. v. Invalidate, Inc., No. Civ. A. 02-420, 2004 WL 203010, *5 (S.D.N.Y.

Feb. 2, 2004) ("A patent is not a 'good or service' as those terms are used in the

Lanham Act.") (citations omitted); Hans-Jurgen Laube & Oxidwerk HJL AG v. KM

Europa Metal AG, No. Civ. A. 96-8147, 1998 WL 148427, *2 (S.D.N.Y. Mar. 27, 1998)

(rejecting "the proposition that intellectual property is a 'good' for the purposes of §

43(a)") (citation omitted).

## 2. "Nature, characteristics, qualities, or geographic origin"

Plaintiff's claim regarding defendant's statements as to its ownership of the

"Havana Club" trademark is required to relate to the rum's geographic origin, nature,

characteristics or qualities. Plaintiff asserts that this requirement is met because,

> to claim ownership of a trademark is to make a statement about a key product
> characteristic, which does not exist apart from the product. A term such as
> HAVANA CLUB identifies the product, distinguishes the product from rival
> brands, vouches for the product's consistent quality and fixes the product in the
> public mind. The commercial value of owning a coveted trademark, and of being
> entitled to claim such ownership, cannot be doubted.

(D.I. 24 at 10)

In Monsanto Co. v. Syngenta Seeds, Inc., 443 F. Supp. 2d 648, 652 (D. Del.

2006), this court held that defendant's purported misrepresentations regarding its status

14

as an authorized licensee under plaintiff's trademarks was not directed to the nature, characteristics, or qualities of the corn seed product (or the genetic event component of the corn seed product) at issue in that case, "which would adequately have pled a false advertising claim." Id. at 653 (citing Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 38 (2003)).[10] The court finds no occasion to depart from its precedent here. Although the court agrees with plaintiff that a trademark may signal to a consumer that a product is of a certain quality or consistency, this is distinguishable from conferring actual information about the characteristics or qualities of the product as contemplated by § 43(a). The court, therefore, finds that plaintiff has failed to sufficiently allege in its count two the first element of a § 43(a) false advertising claim.

## V. CONCLUSION

For the reasons stated above, defendant's motion to dismiss (D.I. 12) is granted. An appropriate order shall follow.

---

[10]That the court ultimately found that plaintiff's statements "boil[ed] down to [defendant's] alleged passing off [plaintiff's genetic corn seed] trait as its own," which was barred by Dastar, does not distinguish the court's holding on the Lanham Act counterclaim. Monsanto, 443 F. Supp. 2d at 653.

15