IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PERNOD RICARD USA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-505 (SLR) |
| | ) | |
| BACARDI U.S.A., INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## BACARDI U.S.A., INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO PRECLUDE EXPERT TESTIMONY OF WALTER MCCULLOUGH

Of Counsel:

Eugene D. Gulland
Oscar M. Garibaldi
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

William R. Golden, Jr.
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

Dated: September 17, 2008

William J. Wade (#704)
wade@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Laura D. Hatcher (#5098)
hatcher@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
*Attorneys for Defendant
Bacardi U.S.A., Inc.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

STANDARD ................................................................................................................... 1

SUMMARY OF ARGUMENT ....................................................................................... 2

ARGUMENT ................................................................................................................. 3

    A.    McCullough's Testimony Should Be Excluded As The Survey Was
            Biased In Favor of Pernod ................................................................................. 3

    B.    McCullough's Testimony Is Unreliable Because His Survey Was
            Improperly Designed and Conducted ................................................................. 5

          1.    McCullough's Universe Was Wrong ...................................................... 6

          2.    The Survey Methodology and Execution Violated Long-
              Established Survey Precepts ..................................................................... 9

          3.    The Order and Wording Of The Survey Questions Are Misleading .................. 10

          4.    The Control Used In The McCullough Survey Was Improper ............................ 14

          5.    Coding Errors Show the Data Analysis Was Inappropriate ................................ 17

CONCLUSION ............................................................................................................ 18

## TABLE OF AUTHORITIES

### CASES

*AstraZeneca LP v. Tap Pharm. Prods., Inc.,*
  444 F. Supp. 2d 278 (D. Del. 2006)...................................................................................2

*Bonesmo v. Nemours Found.,*
  253 F. Supp. 2d 801 (D. Del. 2003)....................................................................................2

*Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City,*
  383 F.3d 110 (3d Cir. 2004)..........................................................................................6, 9

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.,*
  No. SACV 04-725CJC (Ex), 2006 WL 5187497 (C.D. Cal. Mar. 2,2006)............14, 15

*Daubert v. Merrell Dow Pharm. Inc.,*
  509 U.S. 579 (1993) ......................................................................................................1

*Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.,*
  258 F. Supp. 2d 1197 (D. Kan. 2003)............................................................................4, 5

*Kumho Tire Co., Ltd. v. Carmichael,*
  526 U.S. 137 (1999)..........................................................................................................1

*Malletier v. Dooney & Bourke, Inc.,*
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)................................................................................2

*Pharmacia Corp. v. Alcon Labs., Inc.,*
  201 F. Supp. 2d 335 (D.N.J. 2002)...................................................................................4

*Smith v. Wal-Mart Stores, Inc.,*
  537 F. Supp. 2d 1302 (N.D. Ga. 2008)..............................................................................9

*U.S. v. Dentsply Int'l, Inc.,*
  277 F. Supp. 2d 387 (D. Del. 2003), *rev'd on other grounds,*
  399 F.3d 181 (3d Cir. 2005)..............................................................................................5

*Vista Food Exch., Inc. v. Vistar Corp.,*
  No. 03-CV-5203 DRHWDW, 2005 WL 2371958 (E.D.N.Y. Sept. 27, 2005) ..............6

### FEDERAL STATUTES

Fed. R. Evid. 104 ...............................................................................................................1

Fed. R. Evid. 401 ...............................................................................................................1

Fed. R. Evid. 402 ...............................................................................................................1

Fed. R. Evid. 702 ...............................................................................................................1

## MISCELLANEOUS

6 *McCarthy on Trademarks and Unfair Competition* § 32:159 (4th ed. 2003)....................6

Gary T. Ford, *The Impact of the* Daubert *Decision on Survey Research Used in Litigation*, 24 J. Pub.Pol. & Mktg. 234 (2005) ................................................................2, 3

iii

Defendant Bacardi U.S.A., Inc. ("Bacardi") submits this opening brief in support of its motion pursuant to Federal Rules of Evidence 104(a), 402, 403 and 702[1] to exclude the testimony of the survey expert of Plaintiff Pernod Ricard USA, LLC ("Pernod"), Walter McCullough ("McCullough"), on the grounds that the proposed expert opinion does not provide admissible, properly grounded, reliable testimony concerning the issues in this case.

## STANDARD

Under *Daubert v. Merrell Dow Pharm. Inc*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), before accepting the testimony of any expert, this Court must determine whether the testimony that the expert seeks to offer is relevant and reliable. If it is not, the expert must not be permitted to testify. Bacardi is not now challenging whether McCullough, Pernod's survey expert, is qualified to serve as an expert in a trademark case. The challenge is to biased and unreliable survey he designed. It is respectfully submitted that McCullough's survey should be excluded because the design and implementation of the survey discussed in his expert report entitled "Report On A Test To Determine The Country Of Origin Communicated By 'HAVANA CLUB' Rum" dated April 2008 (the "McCullough

---

[1]     These rules provide, in pertinent part:

Rule 104(a) states: "Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court." Fed. R. Evid. 104(a).

Rule 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Rule 402 states: "All relevant evidence is admissible . . . . Evidence which is not relevant is not admissible." Fed. R. Evid. 402.

Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702.

Survey") violates the established norms governing litigation surveys, making that survey and any opinions based on it unreliable.   A copy of the McCullough Survey is attached to the accompanying Declaration of Michelle M. Graham (the "Graham Dec.") as Exhibit A.

Pernod bears the burden of demonstrating admissibility of the survey.   *See, e.g., Bonesmo v. Nemours Found.*, 253 F. Supp. 2d 801, 806 (D. Del. 2003) ("the burden of showing competency rests on the party proffering the witness or evidence."); *AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 288 (D. Del. 2006) ("The party offering the expert testimony has the burden of proving admissibility.").

## SUMMARY OF ARGUMENT

1.   The principles of a well designed trademark survey are well-known.   In assessing the admissibility of Pernod's survey evidence, the court should consider whether:

a.   the proper universe was examined and a representative sample was drawn from that universe;

b.   the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys;

c.   the questions were not leading or suggestive;

d.   the data gathered were accurately reported; and

e.   the persons conducting the survey were recognized experts.

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 580 (S.D.N.Y. 2007).

2.   The generally accepted standards of objective procedures in surveys such as those at issue are discussed in a recent article by Bacardi's expert, Dr. Gary Ford, wherein Dr. Ford discusses an expanded list of basic principles of proper survey research that have been identified by Professor Shari S. Diamond's *Reference Guide on Survey Research*.   Gary T. Ford, *The Impact of the* Daubert *Decision on Survey Research Used in Litigation*, 24 J. Pub.Pol. &

Mktg. 234 (2005).  A true and correct copy of this article is attached to the Graham Dec. as

Exhibit B.  The questions posed by Dr. Ford that are relevant to this motion are as follows:

> Was the survey designed to be objective rather than biased?
>
> Was the appropriate universe identified?
>
> Did the sampling frame and sample approximate the population?
>
> Were the respondents properly screened?
>
> Did the survey ask relevant questions?
>
> Were the questions clear and unbiased?
>
> Was the likelihood of guessing minimized?
>
> Was order bias minimized?
>
> Were the interviewers properly trained?
>
> Was data entry accurate?
>
> Was the data analysis appropriate?
>
> Was the report comprehensive and objective?

*Id.* (citing Shari S. Diamond, *Reference Guide on Survey Research*, *in* Reference Manual on

Scientific Evidence 229 (2d ed. 2000)).  When these criteria are systematically applied to the

McCullough Survey, the conclusion that McCullough's opinions are unreliable is unmistakable,

so the McCullough Survey ought to be excluded from the evidence at trial.

## ARGUMENT

### A.    McCullough's Testimony Should Be Excluded As The Survey Was Biased In Favor of Pernod

The first question – was the survey designed to be objective – is obviously the

most telling one.  If the design of the survey was deliberately biased, then the results are

worthless.  Here, McCullough's reputation precedes him - several of McCullough's recent

surveys have been severely criticized by courts, and on at least two occasions, surveys conducted by McCullough have been excluded or given no weight by the court. In *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 362 (D.N.J. 2002), plaintiff offered a survey prepared by McCullough to support its claim that Alcon's use of the designation TRAVATAN for glaucoma medication was likely to dilute Pharmacia's XALATAN trademark. In that survey, McCullough surveyed an incorrect universe—only ophthalmologists, rather than all consumers of glaucoma medications. *Id.* at 363. McCullough made a similar sampling error here, as his survey was conducted nationwide rather than being restricted to Florida, the only market in which HAVANA CLUB rum is sold. *See* Part B.1, *infra.* The *Alcon* court also criticized the coding of the McCullough survey, especially since the errors in coding consistently favored McCullough's client. *Id.* Again, the same is true here. As discussed in Part B.5, *infra*, there are extensive errors in the coding of McCullough's HAVANA CLUB survey, which invariably favor his client, Pernod. Importantly, the *Alcon* court noted that McCullough failed to throw out results from an interviewer whose work was suspicious. *Id.* at 363-64. Indeed, the court recalculated McCullough's survey results to find a much lower dilution level than McCullough had originally claimed, and found that his survey could not support the proposition for which it was offered. *Id.* at 364.

Similarly, in *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197 (D. Kan. 2003), the court agreed with defendant's contention that the survey conducted by plaintiff "was obtained by 'questionable techniques' of a disreputable expert, *i.e.*, Mr. McCullough." *Id.* at 1210. As a result of criticisms leveled by defendant's expert, including McCullough's failure to use an adequate or appropriate control group and the poor phrasing of several questions, the court sustained a *Daubert* challenge to the survey and concluded that "Mr.

McCullough's conclusions lack scientific validity." *Id.* Therefore, the court refused to give the survey any weight. *Id.* Again, as discussed more fully below, these same problems undercut the reliability of the McCullough Survey offered here.

Like McCullough's surveys in *Pharmacia* and *Hill's Pet Nutrition*, there are a number of problems with the methodology of the survey offered here that are hard to dismiss as mere oversights given McCullough's experience in the field. These errors are compounded by McCullough's lack of candor in his sworn deposition testimony. In 1997, McCullough designed and supervised two surveys involving the same mark HAVANA CLUB, in an earlier case between affiliates of Pernod and Bacardi. A true and correct copy of McCullough's expert report in that case is attached to the Graham Dec. as Exhibit C. These previous surveys were conducted under the aegis of McCullough's research company, Monroe Mendelsohn Research, Inc. which also conducted the present survey. But, incredibly, McCullough testified at his deposition that he did not remember his involvement in the prior HAVANA CLUB surveys. (Deposition of Walter McCullough, taken July 30, 2008, Graham Dec. Ex. D, at 8:13-9:13.) Conveniently, McCullough's memory lapse allowed him to avoid having to explain his rationale for making crucial changes in the design of the present survey—all of which favored Pernod.

This Court has not hesitated to exclude survey evidence found to include significant errors. *See, e.g., U.S. v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 453-54 (D. Del. 2003), *rev'd on other grounds*, 399 F.3d 181 (3d Cir. 2005). The Court should do the same with McCullough's proposed testimony.

### B.   McCullough's Testimony Is Unreliable Because His Survey Was Improperly Designed and Conducted

As discussed above, when survey evidence is so deeply flawed that it cannot provide reliable and relevant evidence to a court, it is properly excluded. Several glaring defects

stand out in the McCullough Survey. These errors include McCullough's use of the wrong universe of survey respondents, improper execution of the survey design, misleading wording in the questions, an improper control and inaccurate coding. Any one of these defects, standing alone, would call into question the reliability and relevance of the McCullough Survey. When the errors are considered in their totality, the danger of prejudice, especially since this is a jury case, far outweighs any limited probative value the survey might possess.

           1.     <u>McCullough's Universe Was Wrong</u>

"One of the most important factors in assessing the validity of an opinion poll is the adequacy of the 'survey universe,' that is, the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Vista Food Exch., Inc. v. Vistar Corp.*, No. 03-CV-5203 DRHWDW, 2005 WL 2371958, at *6 (E.D.N.Y. Sept. 27, 2005) (internal citation and quotation marks omitted). The McCullough Survey went awry from the start because it failed to survey the correct "universe" or "segment of the population whose perceptions and state of mind are relevant to the issues in the case." *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 119 (3d Cir. 2004) (quoting 6 *McCarthy on Trademarks and Unfair Competition* § 32:159 (4th ed. 2003)). The relevant survey universe in this suit includes purchasers and likely purchasers of HAVANA CLUB rum in the state of Florida, the only market in which Bacardi's HAVANA CLUB product is sold. However, of the eight survey markets tested in the McCullough Survey, only one was located in Florida. Because 7/8 of the McCullough Survey polled respondents outside of Bacardi's market for its HAVANA CLUB rum, it should be excluded on this basis alone. *See Citizens Fin. Group*, 383 F.3d at 119-20 (consumer survey conducted outside of the market where a bank offered its services was excluded by the trial court as "too fundamentally flawed to be admissible"; affirmed on appeal).

Furthermore, a proper Florida sample would have had to be conducted in both English and Spanish because according to the U.S. Census Bureau, 20.2% of Florida residents are of Hispanic descent. Additionally, according to the U.S. Census Bureau, 23.1% of Floridians speak a language other than English at home. (Graham Dec., Ex. E.) Despite these significant demographic concerns, McCullough did not conduct his study in both English and Spanish. Rather, McCullough conducted his survey only in English and thus systematically excluded participants who spoke only Spanish.

Finally, the McCullough Survey failed to screen respondents to ensure that they had actually ever purchased rum. Instead, the only screener question regarding rum was question H, which read:

Which of the following types of products do you think you will buy in the next six months?

|       | Yes  | No/DK |
|-------|------|-------|
| Gin   | [ ]  | [ ]   |
| Vodka | [ ]  | [ ]   |
| Rum   | [ ]  | [ ]   |

(Graham Dec. Ex. A.)

Thus, McCullough cannot testify that any of the respondents had actually ever purchased rum. Bacardi's survey expert, Dr. Gary Ford, explained that while he was familiar with surveys where the screener requires all respondents to be purchasers of the product at issue, he was unaware of any survey that did not require any actual product purchasers in the ending sample. *See* Gary T. Ford's expert report in this action, titled "Rebuttal of Consumer Survey Conducted by Walter McCullough Titled 'Report On A Test To Determine The Country Of Origin Communicated By 'HAVANA CLUB' Rum,'" dated July 11, 2008 and attached to the

Graham Dec. as Exhibit F at ¶ 37. As the McCullough Survey did not even ask whether respondents had purchased rum in the past, it is entirely possible that it contained **no** individuals who had previously purchased rum. Such a sample is more prone to guessing than users who are intimately familiar with the product.

These errors in the McCullough sample design are particularly egregious since in McCullough's earlier mall intercept survey, he screened for past rum usage and provided an opportunity for Spanish speakers to participate. In the mall intercept survey, the screening question was, "Please tell me which if any, of the following types of beverages you have drunk in the past year at home or away from home." "Rum" was one of the products listed. The screener for the telephone interview survey also sought out rum usage, i.e., "Have you drunk rum in the past year either at home or away from home?" (Graham Dec. Ex. C.) Although these questions do not target purchasers, they at least limit the survey to rum drinkers. The present survey does not require respondents to be rum drinkers or purchasers. Similarly, both the telephone and mall intercept surveys in the earlier case were conducted in English and in Spanish, depending on respondent preference, and both were conducted among Florida residents, albeit the Miami area, rather than the entire state. (Graham Dec., Ex. C.) McCullough offers no cogent explanation for altering his survey design for this case when he had previously developed a survey with a more appropriate universe. But it is not hard to surmise why he did so. Florida residents are familiar with the total embargo on the sale of Cuban goods here. This would be especially true in the case of Cuban-Americans.

In short, the survey universe is simultaneously over-representative (by including approximately 7/8's of the respondents from areas outside Florida where HAVANA CLUB rum cannot be purchased and not ensuring that some respondents have ever purchased rum) and

under-representative (by systematically excluding individuals whose primary language was not English). A proper sample would have been restricted to Florida residents who have purchased rum in the recent past or who are likely to do so in the near future, and included both those who spoke English and Spanish. The universe flaws represent a fatal error in the McCullough Survey because the number of Florida residents is insufficient (i.e., approximately 25 each in the test and control groups) to draw any conclusions regarding consumer perceptions, because the survey included only prospective purchasers of rum rather than prior purchasers of rum, and because the Florida sample does not include non-English speaking Spanish speakers, excluding a substantial portion of the population. Accordingly, it is respectfully submitted that the Court should exclude the McCullough Survey. *See Citizens Fin. Group,* 383 F.3d at 119-21.

2.    The Survey Methodology and Execution Violated Long-Established Survey Precepts

The survey was not executed in such a way as to ensure that it was double-blinded so that neither the interviewers nor the interview subjects would know what the "correct" answer or the purpose of the survey would be. "[D]ouble-blind conditions are essential because if the respondents know what the interviewer wants, they may try to please the interviewer by giving the desired answer, and if the interviewer knows what his employer wants, he may consciously or unconsciously bias the survey through variations in the wording or the tone of his questions." *Smith v. Wal-Mart Stores, Inc.,* 537 F. Supp. 2d 1302, 1330-31 (N.D. Ga. 2008). This survey included an initial cell that was designed to make sure that the results would support a finding that "HAVANA CLUB" was geographically misdescriptive. The results of the first round of interviews comprising the test cell were telephoned to McCullough's company by the various mall interview centers. This procedure insured the centers knew this was a litigation study as there would be no need to cut off business surveys to prevent bad results. Moreover, once it was

apparent that McCullough's survey was being conducted for litigation and that the questions focused on geographic origin, it would have been obvious to the interviewing services that the actual test product was HAVANA CLUB rum and the control was "SILVER CLUB." Therefore, the blinding procedures broke down, another substantial flaw in the McCullough Survey.

3.    The Order And Wording Of The Survey Questions Are Misleading

The heart of any survey is the questions that are posed.  For the survey to work, the questions must be clear, precise, and solicit answers that are relevant to the issues in the case. The issue in the case at bar is whether consumers are misled into buying Bacardi's HAVANA CLUB rum because they are misled into believing that Bacardi's HAVANA CLUB rum is made in Cuba.  There are two unique problems that must be addressed in such a survey.  The first is that no rum made in Cuba may be sold in the United States, because for decades U.S. trade policy has prohibited importing and selling Cuban products here.  31 C.F.R. Part 515.  Second, rum produced in Cuba by an affiliate of Pernod is presently sold in Cuba under the HAVANA CLUB rum brand, which was unlawfully expropriated from its original owners by Fidel Castro. Since many Cuban Americans return to Cuba to see their families, they are familiar with the Cuban HAVANA CLUB brand.  The McCullough Survey does not take either of these problems into account.

The questions used in the McCullough Survey are both unclear and deliberately slanted.   The objective was to force respondents to keep answering questions until they responded "HAVANA CLUB," "Havana," or "Cuba."  Any one of those answers could then be categorized as evidence of confusion as to the origin of the product even though the question that is being answered asked for information other than the place of origin of the rum.  As a result, the answers are largely irrelevant to the issues in the case.

The questionnaire used in the McCullough Survey contains two filter questions (2A and 3A), and three open-ended questions (2B, 3B, and 3C). The first question (2A) on the survey is as follows:

> "Did the Rum you just looked at communicate to you anything about where the product was made?"
>
> If the answer is "Yes" the follow-up question (2B) is "What did the Rum you just looked at communicate to you about where it was made?"

(Graham Dec., Ex. A.) Question 2A is so worded as to upwardly bias the number of consumers who will say "yes." Dr. Ford pointed out, guessing is tacitly encouraged because the questionnaire does not provide the respondent with the full set of acceptable answers including "no" or "I do not know." (Graham Dec. Ex. F at ¶ 48.) A better question would have been, "Did *or didn't* the bottle you just looked at communicate anything about a place *or don't you know*?" (emphasis added). This would have limited guessing.

Moreover, a properly designed survey questionnaire would have assessed consumers' perception or "takeaway" by starting with a couple of open-ended main message questions, followed by properly worded questions targeting the place of origin. No such undirected questions are asked here. Instead, the survey immediately focuses on geographic origin, with question 2B, one of the key inquiries in the McCullough Survey, forcing consumers to confront a specific question right off the bat regarding country of origin.

Furthermore, the survey questions are misleading and inherently confusing. The first question, 2A, begins "Did the *Rum* you just looked at communicate to you . . ." (emphasis added); thus focusing the attention of the respondent not on the mark HAVANA CLUB – the subject of the misleading designation claim, or even the labeling on which the mark HAVANA CLUB appears – but rather on the rum itself. Rum, as rum drinkers know, is made from sugar

cane, so the great bulk of the rum sold in the United States comes from the Caribbean. Respondents, if asked to focus on the "Rum" as opposed to the "HAVANA CLUB" mark at issue are quite likely to answer "yes" to question 2A because they know the Caribbean is characterized by warm breezes and sandy beaches.  This is particularly true here since respondents are not cautioned against guessing.  The problem is compounded since the question closes by seeking the respondent's perception of "anything about [the place] where the product was made."  As the verbatim answers from the McCullough survey demonstrate, rum is associated with the sun, sea, and warm climates, so a respondent who had no knowledge of the country where the rum was produced might well answer "yes" based on the belief that nevertheless the place must be "sunny" or "sandy" because it is somewhere in the Caribbean.

However, a respondent who answered "yes" to question 2A because he or she had in mind some characteristic about the place other than its name is thrown a curve by the follow-up probe, which abruptly narrows focus exclusively on where the product was made.  A respondent confronted by the change in focus without time to collect his thoughts is likely to guess at the answer.  A number of respondents, accordingly answered "HAVANA CLUB" to Question 2B, although "HAVANA CLUB" is not a geographic designator.  These respondents (whom McCullough deems to be confused about the origin of the product) may well have been forced into guessing by the questions asked of them.

Respondents who answered "No" or I Don't Know" to question 2A are still asked question 3A.  This is improper because consumers who have not taken anything away as to a place of origin from their view of the "Rum" could not be confused about the geographic origin of the Bacardi HAVANA CLUB rum, as Pernod claims in the complaint.  Yet consumers who

answered "No" or "I Don't Know" to question 2A could still be classified by McCullough as "confused" based on their answers to later questions.

> Even more importantly, question 3A is both irrelevant and confusing. It states:
>
> Did the Rum you just looked at communicate to you
>
> (i) *anything* – i.e., climate? atmosphere?
>
> (ii) about *any other* place

(Graham Dec., Ex. A.) Read in context, "any other place" is a *place other* than the place "where the product was made," so the answer to that question is irrelevant to any issue in this case. It is undisputed, for instance, that the back label of Bacardi's HAVANA CLUB rum states the recipe for Bacardi's rum was created in Cuba. This would be truthful information about a place other than the place where the rum was made. But in the context of the survey, the purpose of Question 3A is to give the respondent another chance to respond "Cuba" and potentially be deemed "confused" by McCullough. The follow-up question asks only for the "*place*" that was communicated to you by the *product* (not the "rum"). McCullough admitted in his deposition that this follow-up question was designed to get an answer that mentioned a "place," not any other information. (Graham Dec. Ex. D at 111:10-16). Accordingly, someone who answered "yes" to question 3A because the back label "communicated" information about the rum originally being developed "in Cuba circa 1930" from a Cuban recipe would, McCullough hoped, answer just "Cuba" to this question.[2]

Then the "probe" switches back to the word "rum," and asks what is the *relationship* "between this place and the rum you just looked at?" Plainly, the questionnaire was deliberately biased to bring the "rum/place" relationship back into the picture. But these abrupt

---

[2]    The "Cuba" answer to this question is perfectly consistent with "Puerto Rico" being the origin.

changes in the focus of the questions instead simply confused a number of respondents who recited the type of the relationship between the first place they named (the place of manufacture) and the other place communicated.  This confusion is demonstrated by the following table of unresponsive verbatim answers given by respondents to this question (identified by the # of each respondent's Questionnaire.)

| Questionnaire # | Verbatim |
|---|---|
| 222 | "Kind of where the rums come from.  Rum comes from Puerto Rico & Cuba." |
| 223 | "I guess there is a city in Puerto Rico called Havana." |
| 225 | "the relationship between Havana, which is in Cuba & Puerto Rico is that they are both Caribbean islands." |
| 230 | "They are both Spanish countries" |
| 159 | "Geographically close" |
| 360 | "It is just two different Spanish places? |
| 438 | "I have family in St. Thomas" |

(Graham Dec., Ex. A at Ex. E.)  Other answers show that the respondents thought "Havana Club" referred to a "night club" or "bar."  These respondents, too, were frequently deemed as "confused," even though they had not necessarily stated that the rum was produced in Cuba.

      4.     The Control Used In The McCullough Survey Was Improper

        The control used in trademark surveys is a key element of the survey design.  The purpose of the control is to eliminate the background level of "noise" in any survey that comes from respondents' natural penchant for guessing.  In *Classic Foods Int'l Corp v Kettle Foods, Inc*, No. SACV 04-725CJC (Ex), 2006 WL 5187497 (C.D. Cal. Mar. 2, 2006), McCullough designed a survey that used an improper control.  The objective of the McCullough study was to show that there was no likelihood of confusion between the marks KETTLE CLASSICS and KETTLE for potato chips.  *Id.* at *5.  The survey offered by Kettle Foods showed significant levels of likely confusion.  *Id.* at *2.  McCullough's client's contention was that the word

"Kettle" was descriptive of a way of cooking potato chips and thus a weak mark. *Id.* at \*5. McCullough's survey was supposed to prove that the high level of likely confusion shown by the plaintiff's survey was attributable to "noise." *Id.* at \*6. McCullough's survey was offered in support of a motion to exclude Kettle Foods' survey. *Id.* at \*5.

Judge Carney observed that a proper control should share as many characteristics as possible with the allegedly confusing product except for the characteristic whose influence was being tested. *Id.* at \*4. In *Kettle Foods* the control used by McCullough was a bag of KETTLE COOKED CLASSICS potato chips that displayed trade dress that was quite similar to the trade dress on plaintiff's KETTLE potato chips. *Id.* at \*6. McCullough claimed this was a proper control "because it contains the attributes that [Kettle Foods] claims are non-infringing – *i.e.* a descriptive use of the word 'Kettle' in connection with another term such as 'Cooked.'" *Id.* at \*5. The control yielded a confusion level close to zero, when the "guesses" as to the control were subtracted from the "confused" responses. *Id.* But, as the court observed, McCullough's choice of a control biased the study:

> While Classic may be right that the word "Kettle" on the Cape Cod bag was too small to pick up significant amounts of "noise," Mr. McCullough's control is equally susceptible to criticism. For example, although Classic contends that a "control" is not supposed to exhibit the characteristic being tested for confusion, the "Kettle Cooked Classics" bag Mr. McCullough used shared the same font style, layout, colors, and absence of any additional brand name as the "Kettle Classics" bag being tested. The only difference was the addition of the word "cooked." Thus, the "yes" answers that Mr. McCullough characterizes as "noise" could in fact be actual consumer confusion between the "Kettle Cooked Classics" and Kettle Chips bags due to the similar appearance of the marks used on both bags and/or the absence of any other brand name on the bag.

*Id.* at \*6 (footnotes omitted). Consequently, McCullough's criticism was rejected and the court refused to exclude his adversary's survey. *Id.* at \*7.

Similar problems with control exist here. When testing to see whether a brand is geographically misdescriptive, the control should itself contain a geographic place indicator. Indeed, McCullough has used place indicators as controls in such surveys in the past. For instance, in the first trial involving HAVANA CLUB rum, McCullough used the brand "Kingston Select" for the control in his survey to determine whether the HAVANA CLUB name was misleading. In his deposition in that case, McCullough was asked: "What was your basis for using the term Kingston Select?" (Deposition of Mr. McCullough in *Havana Club Holding S.A. v. Galleon, S.A.*, 96 CV-9655 (SAS) (S.D.N.Y.), taken on March 24, 1997, Graham Dec. Ex. G at 111:3-4.) He replied: "I was looking for a city which was in the Caribbean . . . ." (Graham Dec. Ex. G at 111:5-6.) Indeed, in an earlier iteration of that same study, McCullough had used another control derived from the name of a Jamaican city, "Montego Bay Gold." But the "Montego Bay Gold"/HAVANA CLUB study ran into validation problems and had to be rerun. (Graham Dec. Ex. G at 113:4-18.) In short, in his previous survey involving the same brand, McCullough had twice used for his control a brand derived from the name of a Caribbean city. Respondents who answered that "Cuba" was where "Kingston Select" was made would be guessing and these guesses would be vetted out to find a confusion level. In contrast, here, McCullough used the mark SILVER CLUB as a control. "Silver" is not the name of a city in the Caribbean; instead, it is a color or type of rum. Not surprisingly, virtually no one thought "Silver" was the place where "Silver" Club rum was made. Again, McCullough provides no explanation for why he abandoned the criteria for a control used in the prior survey although it is obvious this would lead to a larger net confusion level. His failure to select an appropriate control further supports exclusion of his survey.

-16-

5.    Coding Errors Show the Data Analysis Was Inappropriate

Dr. Ford has opined that the abrupt way in which respondents were asked about "where the product was made" did not give them time to organize their thoughts.  (Graham Dec. Ex. F at ¶ 50.)  Consequently, a number or respondents initially said in response to Question 2B, "Havana", and then in response to Question 3B said "Puerto Rico."  Or respondents said the reverse, i.e., that it was made in Puerto Rico in question 2B and mentioned "Cuba" in question 3B.  Incredibly, McCullough counted all of these respondents as misled or confused.

For example, respondent 371 said:

| Question: | Response: |
|---|---|
| 2B. What did the rum you just looked at communicate about where it was made: | "Havana" |
| 3B. What other place was communicated to you by the product? | "Puerto Rico" |
| 3C. "What is the relationship between this place and the rum you just looked at? | "It's made there in Puerto Rico" |

Obviously, this respondent was aware that the rum was made in Puerto Rico and not in Cuba and yet he was counted as "confused."  (Graham Dec. Ex. F at ¶¶ 51-52.)

Respondent 410 said:

| Question: | Response: |
|---|---|
| 2B. What did the rum you just looked at communicate about where it was made? | "Puerto Rico" |
| 3B. What other place was communicated to you by the product? | "Cuba, Havana" |

This respondent, too, was deemed confused.  (Graham Dec. Ex. F at ¶¶ 53-54.)

## CONCLUSION

As Bacardi's expert, Dr. Gary Ford, pointed out, a failure in any one of the key survey design criteria is enough to make the survey results unreliable since the components do not compensate for one another; that is, a strong universe sample can not make up for biased questions or vice-versa. (Graham Dec., Ex. B.) Here there were multiple major breakdowns in key components of the survey's design, which prejudice the survey's result in favor of Pernod. Such a biased and improperly conducted survey is not admissible.

For the foregoing reasons, Bacardi's motion to exclude the expert testimony of McCullough should be granted and Pernod should be precluded from offering any testimony from McCullough herein.

Of Counsel:

Eugene D. Gulland
Oscar M. Garibaldi
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

William R. Golden, Jr.
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

Dated: September 17, 2008

William J. Wade (#704)
wade@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
Laura D. Hatcher (#5098)
hatcher@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
*Attorneys for Defendant*
*Bacardi U.S.A., Inc.*

-18-

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2008, I caused to be served by HAND DELIVERY and ELECTRONIC MAIL the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Jack B. Blumenfeld
Rodger D. Smith, II
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801

I hereby certify that on September 17, 2008, the foregoing document was sent via ELECTRONIC MAIL to the following non-registered participants:

Herbert F. Schwartz
Vincent N. Palladino
Pablo D. Hendler
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036

Laura D. Hatcher (#5098)
hatcher@rlf.com