IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PERNOD RICARD USA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-505 (SLR) |
| | ) | |
| v. | ) | **REDACTED – PUBLIC VERSION** |
| | ) | |
| BACARDI U.S.A., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PERNOD RICARD USA, LLC'S OPENING POST-TRIAL BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
  *Attorneys for Plaintiff*
  *Pernod Ricard USA, LLC*

OF COUNSEL:

Vincent N. Palladino
Eric R. Hubbard
Leslie M. Spencer
Brynn Metzger-Hare
Margaret C. Lu
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036
(212) 596-9000

June 3, 2009 – Original Filing Date
June 4, 2009 – Redacted Filing Date

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

NATURE AND STAGE OF PROCEEDINGS ....................................................................2

STATEMENT OF FACTS ...................................................................................................3

    A.    The Parties ................................................................................................3

        1.    Pernod Ricard USA, LLC ............................................................3

        2.    Bacardi U.S.A., Inc. ......................................................................4

    B.    Bacardi Associates Its HAVANA CLUB Puerto Rican Rum With Havana, Cuba ........................................................................................................5

    C.    Bacardi's Use Of HAVANA CLUB Misleads Consumers ......................8

        1.    Pernod USA's Survey Establishes That A Significant Number Of Consumers Believe HAVANA CLUB Rum Is Made In Cuba ........8

        2.    Bacardi Has No Survey Evidence To The Contrary ...................12

    D.    Bacardi's HAVANA CLUB Rum Does Not Use The Arechabala Formula ...........12

    E.    Pernod USA Is Likely To Be Injured ...................................................14

ARGUMENT .....................................................................................................................18

I.    PERNOD USA HAS PROVED COUNT I .................................................................18

    A.    Bacardi's Use Of HAVANA CLUB Is Misleading Because It Has A Tendency To Deceive A Substantial Portion Of Its Intended Audience ................19

        1.    Pernod USA's Survey Establishes That Bacardi's Use Of HAVANA CLUB Is Misleading ...................................................19

        2.    Bacardi Did Not Conduct A Survey Despite Evidence That Deception Was Likely To Occur ..................................................24

        3.    Bacardi Did Not Prove That Pernod USA's Survey Is Unreliable ...............26

        4.    Bacardi's Alleged Use Of The Arechabala Recipe Does Not Show That Deception Is Unlikely ..................................................32

    B.    The Deception Is Material ......................................................................34

    C.    Pernod USA Is Likely To Be Injured ...................................................35

II.    PERNOD USA HAD STANDING TO BRING COUNT I AFTER BACARDI LAUNCHED ITS HAVANA CLUB PUERTO RICAN RUM IN AUGUST 2006 ........36

CONCLUSION ..................................................................................................................38

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Anheuser-Busch, Inc. v. Caught-On-Bleu,*
    288 F. Supp. 2d 105 (D.N.H. 2003)................................................................20, 25

*Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.,*
    633 F.2d 746 (8th Cir. 1980) ........................................................................31, 33

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,*
    284 F.3d 302 (1st Cir. 2002)................................................................................24

*Coca-Cola Co. v. Tropicana Prods., Inc.,*
    690 F.2d 312 (2d Cir. 1982)................................................................................19

*Eco Mfg. LLC v. Honeywell Int'l, Inc.,*
    295 F. Supp. 2d 854 (S.D. Ind.), *aff'd,* 357 F.3d 649 (7th Cir. 2003) ...................20

*Gov't Employees Ins. Co. v. Google, Inc.,*
    77 U.S.P.Q.2d 1841 (E.D. Va. 2005)....................................................................22

*Goya Foods, Inc. v. Condal Distribs., Inc.,*
    732 F. Supp. 453 (S.D.N.Y. 1990)........................................................................19

*Havana Club Holding, S.A. v. Galleon, S.A.,*
    62 F. Supp. 2d 1085 (S.D.N.Y. 1999) ..................................................................35

*Home Box Office v. Showtime/The Movie Channel,*
    832 F.2d 1311 (2d Cir. 1987)..............................................................................28

*In re Bacardi & Co.,*
    48 U.S.P.Q.2d 1031 (T.T.A.B. 1997) ...................................................2, 5, 24, 33

*J&J Snack Foods Corp. v. Earthgrains Co.,*
    220 F. Supp. 2d 358 (D.N.J. 2002) ......................................................................20

*J&J Snack Foods Corp. v. Nestle, USA, Inc.,*
    149 F. Supp. 2d 136 (D.N.J. 2001) ......................................................................20

*Johnson & Johnson-Merck Consumer Pharms. v. Rhone-Poulenc Rorer,*
    19 F.3d 125 (3d Cir. 1994)..................................................................................19

*McNeilab, Inc. v. Am. Home Prods. Corp.,*
    501 F. Supp. 517 (S.D.N.Y. 1980)........................................................................24

*Merisant Co. v. McNeil Nutritionals LLC,*
    242 F.R.D. 315 (E.D. Pa. 2007)...........................................................................21

*Merisant Co. v. McNeil Nutritionals, LLC*,
    515 F. Supp. 2d 509 (E.D. Pa. 2007) ............................................................18, 20

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.*,
    129 F. Supp. 2d 351 (D.N.J. 2000) ............................................................20, 21

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
    290 F.3d 578 (3d Cir. 2002)...........................................................18, 19, 20

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
    86 F. Supp. 2d 305 (S.D.N.Y. 2000) .............................................................20

*Plasticolor Molded Prods. v. Ford Motor Co.*,
    698 F. Supp. 199 (C.D. Cal. 1988) ................................................................25

*Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*,
    93 F.3d 511 (8th Cir. 1996) ..........................................................................32

*Sanofi-Aventis v. Advancis Pharm. Corp.*,
    453 F. Supp. 2d 834 (D. Del. 2006)..............................................................36

*Sara Lee Corp. v. Kayser-Roth Corp.*,
    81 F.3d 455 (4th Cir. 1996) ..........................................................................19

*Scotch Whiskey Ass'n v. Barton Distilling Co.*,
    338 F. Supp. 595 (N.D. Ill. 1971) ............................................................31, 33

*Star Indus. Inc. v. Bacardi & Co.*,
    412 F.3d 373 (2d Cir. 2005)..........................................................................24

*Tyco Indus., Inc. v. Lego Sys., Inc.*,
    5 U.S.P.Q.2d 1023 (D.N.J. 1987) ........................................................20, 25, 28

*Volkswagen Astiengesellschaft v. Uptown Motors*,
    No. 91 Civ. 3447 (DLC), 1995 WL 605605 (S.D.N.Y. May 11, 1995) ............22, 25

*Warner-Lambert Co. v. BreathAsure, Inc.*,
    204 F.3d 87 (3d Cir. 2000)........................................................................18, 34

*Westchester Media Co. v. PRL USA Holdings, Inc.*,
    103 F. Supp. 2d 935 (S.D. Tex. 1999) ..........................................................20

**STATUTES**

10 Del. C. § 8106 ...............................................................................................36

15 U.S.C. § 1125(a) (1998)........................................................................... passim

15 U.S.C. § 1127 (Supp. 2008).......................................................................18

Fed. R. Civ. P. 12(b)(6)....................................................................................2

Fed. R. Evid. 103(A)(2) ........................................................................................................3

Public L. No. 105-277, 112 Stat. 2681 (Oct. 21, 1998) ("Section 211") ......................................35

**OTHER AUTHORITIES**

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:47
    (4th ed. 2008) ......................................................................................................18

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:178
    (4th ed. 2008) ..............................................................................................25, 28

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:163
    (4th ed. 2008) ......................................................................................................21

Gary T. Ford, *The Impact of the Daubert Decision on Survey Research Used in
    Litigation, Journal of Public Policy & Marketing* (2005) .........................................22

Shari Seidman Diamond, *Reference Guide on Survey Research, in Reference Manual
    on Scientific Evidence* (2d ed. 2000)..................................................21, 22, 23, 30

**INTRODUCTION**

Plaintiff Pernod Ricard USA, LLC ("Pernod USA") brought this action after defendant Bacardi U.S.A., Inc. ("Bacardi") began selling under the name HAVANA CLUB a rum made in Puerto Rico, not Cuba. As a marketer of MALIBU rum throughout the United States, Pernod USA alleged in Count I of the Complaint that its competitor's use of HAVANA CLUB was likely to injure Pernod USA by deceiving rum purchasers as to the geographic origin of Bacardi's Puerto Rican rum in violation of Section 43(a)(1)(B) of the Lanham Act. Based on its April 2008 survey of prospective rum purchasers, Pernod USA proved such deception at trial together with the other elements of its claim.

Pernod USA also proved at trial that Bacardi introduced its misleading brand of rum under circumstances that made clear such deception was likely to occur. Bacardi set out to take advantage of the popularity of Cuban products among American consumers. To that end, Bacardi branded its Puerto Rican rum HAVANA CLUB – not SAN JUAN CLUB or another name that would associate the product with Puerto Rico. Bacardi's website and other marketing materials make prominent and repeated reference to Havana in the HAVANA CLUB name and statements such as "Havana Nights" and "a premium rum that embraces the sultry seduction of Havana night life." Bacardi made no comparable effort to link its product to its actual place of origin: Puerto Rico.

Nor did Bacardi make any effort – before or after it introduced HAVANA CLUB rum in 2006 – to test whether its choice of that name would cause public deception. Bacardi ignored that prospect although it had reason to believe such deception would in fact occur. A prior survey had demonstrated that 48% of Cuban-Americans believed Bacardi's Bahamian HAVANA CLUB rum (marketed in the 1990s) originated in Cuba. That belies Bacardi's claim at trial that this small subsection of prospective rum buyers would not be deceived because they

supposedly are aware of the United States embargo on trade with Cuba. Moreover, the United States Patent and Trademark Office ("USPTO") had rejected Bacardi's applications to register as trademarks terms incorporating HAVANA, including HAVANA SELECT, HAVANA PRIMO and HAVANA CLIPPER, stating that "purchasers are likely to believe that the rum products to be sold under the proposed marks originate in HAVANA, Cuba." *In re Bacardi & Co.*, 48 U.S.P.Q.2d 1031, 1035 (T.T.A.B. 1997).

Although intent to cause deception is not an element of Pernod USA's claim, the earlier survey and other evidence confirms the results of the survey that Pernod USA did conduct and that Bacardi failed to refute: Bacardi's use of HAVANA CLUB causes the type of deception concerning the geographic origin of its rum that Lanham Act § 43(a)(1)(B) is intended to prevent. Bacardi should be enjoined from using the name HAVANA CLUB for rum that is made in Puerto Rico.

## NATURE AND STAGE OF PROCEEDINGS

On August 15, 2006, Pernod USA filed this action asserting that Bacardi has violated Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), by falsely and misleadingly describing the geographic origin of its HAVANA CLUB rum product, which is not produced in Cuba (Count I), and falsely stating that it owns the HAVANA CLUB trademark in the United States (Count II). (08/15/2006 D.I. 1). On September 13, 2006, Bacardi moved to transfer this case to the Southern District of Florida. (09/13/2006 D.I. 6). On September 22, 2006, Bacardi answered Count I (09/22/2006 D.I. 14), and moved to dismiss Count II under Fed. R. Civ. P. 12(b)(6) for failure to state a claim (09/22/2006 D.I. 12). The Court denied Bacardi's transfer motion on December 19, 2006 (12/20/2006 D.I. 28), and granted its motion to dismiss Count II on August 21, 2007 (08/22/2007 D.I. 42).

2

On April 10, 2008, Pernod USA served the Expert Report of Walter McCullough, which included a consumer survey establishing that Bacardi's use of HAVANA in the HAVANA CLUB name deceives a significant number of likely rum purchasers into believing that Bacardi's Puerto Rican rum is made in Cuba. On September 17, 2008, Bacardi moved to exclude Mr. McCullough's testimony about that survey, as well as the survey itself, from evidence. (09/17/2008 D.I. 81). The Court denied Bacardi's motion at the pre-trial conference held on February 18, 2009. (02/18/2009 Hr'g Tr. 5:20-25). At the pre-trial conference, the Court also ruled that Bacardi could not introduce evidence regarding the trademark ownership issues that were the subject of dismissed Count II. (02/18/2009 Hr'g Tr. 32:24-33:1, 34:24-35:21).

Count I was tried to the Court from March 3-5, 2009. At the close of trial, the Court provided Bacardi the opportunity to make an offer of proof with respect to the trademark issues orally or in writing (03/05/2009 Tr. 476:19-21). On March 30, 2009, Bacardi submitted a purported Offer of Proof by Defendant Under Fed. R. Evid. 103(A)(2) (03/30/2009 D.I. 102). Pernod USA filed objections to that submission on April 15, 2009 (04/15/2009 D.I. 103).

## STATEMENT OF FACTS

### A.    The Parties

#### 1.    Pernod Ricard USA, LLC

Plaintiff Pernod Ricard USA, LLC ("Pernod USA") is an Indiana limited liability company based in Purchase, New York. Pernod USA employs approximately 1000 people in the United States. Pernod USA is a leading supplier of spirits in the United States market. (03/03/2009 Tr. 27:21-28:9).

3

Since 2005, Pernod USA's leading brands have included MALIBU rum, which is a flavored white rum. (03/03/2009 Tr. 27:25-28:4, 29:11-30:20, 39:24-25, 40:25-41:4). MALIBU is the third largest brand of rum in the market, behind only BACARDI and CAPTAIN MORGAN. (PTX 18; 03/03/2009 Tr. 40:5-16). In 2005, approximately 1.3 million cases of MALIBU rum were sold in the United States. (PTX 18; 03/03/2009 Tr. 44:25 - 45:14).

In connection with the purchase of brands from the Seagrams Company in 2001, a number of brands of spirits were sold or transferred to Pernod USA, including WILD TURKEY bourbon, produced by Austin Nichols & Company ("Austin Nichols"). (03/03/2009 Tr. 38:23-39:9). "After transferring the distribution of WILD TURKEY bourbon to Pernod USA, Austin Nichols continued to operate as the producer of that product. (03/03/2009 Tr. 39:4-9). Austin Nichols did not market any brands of rum in the United States from 1995-1997. (03/03/2009 Tr. 38:16-18). Pernod USA is not a successor to Austin Nichols, which continues to exist. (03/03/2009 Tr. 38:23-39:9).

### 2.    Bacardi U.S.A., Inc.

Defendant Bacardi U.S.A., Inc. ("Bacardi") is a Delaware corporation with its executive offices located in Miami, Florida. (09/22/2006 D.I. 14, at 2). Bacardi markets and distributes BACARDI SUPERIOR rum, a white spirit. (03/03/2009 Tr. 40:25-41:6). BACARDI brand rum makes up approximately 40 percent of all rum sales in the United States. (PTX 18; 03/03/2009 Tr. 44:25-45:9). Bacardi began selling another white rum – HAVANA CLUB rum – in the United States in August 2006. (JTX 6; 03/04/2009 Tr. 241:22-242:19, 285:6-11). Bacardi selected Puerto Rico as the country to produce its HAVANA CLUB rum. (03/04/2009 Tr. 252:14-18). At the February 18, 2009 Pre-Trial Conference, Bacardi refused to state that it would not expand distribution of HAVANA CLUB throughout the 49 states other than Florida, where the product is currently sold, stating that it could not represent on the record "that Bacardi

4

is never going to sell its rum any place other than Florida." (02/18/2009 Hr'g Tr. 4:20-5:3, 5:15-19).

**B.      Bacardi Associates Its HAVANA CLUB
           Puerto Rican Rum With Havana, Cuba**

Cuba has a well-known reputation for rum production, and consumer trends indicate an interest in Cuban products. (JTX 2; 03/03/2009 Tr. 65:21-66:11). A Bacardi packaging brief for HAVANA CLUB rum states that "[g]iven the recent, strong interest in Cuban products by US consumers, this project has been made a priority." (JTX 2; 03/03/2009 Tr. 135:3-17; 03/04/2009 Tr. 276:5-279:1). At trial, Bacardi introduced into evidence a reported decision, which states that "purchasers would pay considerable attention to the word 'Havana' [in 'HAVANA CLUB'] as denoting origin of the rum in question." (DTX 120). In another case, Bacardi "alleged that ... U.S. consumers associate a certain popular style of rum as originating in Cuba." *In re Bacardi & Co.*, 48 U.S.P.Q.2d at 1035.

Bacardi did not conduct any consumer research before launching its HAVANA CLUB rum in August 2006, although it knew that purchasers would pay close attention to the word "Havana" and was aware of a consumer study concerning a Bahamian HAVANA CLUB rum that Bacardi had marketed in 1995-96. (03/03/2009 Tr. 151:17-152:25, 154:13-25). One part of that study was designed "to determine in what country Cuban-Americans would believe [Bacardi's] Bahamian HAVANA CLUB [rum] was produced, knowing that it was bought in a local liquor store." (PTX 67). It demonstrated that 48% of respondents believed the product was produced in Cuba. (*Id.*).

When Bacardi launched its HAVANA CLUB rum in 2006, it also was aware of *In re Bacardi & Co.*, 48 U.S.P.Q.2d 1031. In that case, the USPTO rejected Bacardi's applications to register as trademarks terms incorporating HAVANA, including HAVANA SELECT,

5

HAVANA PRIMO and HAVANA CLIPPER, because they are primarily geographically deceptively misdescriptive of non-Cuban rum. In doing so, the USPTO stated that "purchasers are likely to believe that the rum products to be sold under the proposed marks originate in HAVANA, Cuba." *Id.* at 1035.

Despite this evidence, Bacardi chose the name HAVANA CLUB for its Puerto Rican rum – rather than SAN JUAN CLUB or some other name reminiscent of Puerto Rico – and to emphasize Havana, Cuba in its marketing materials. (JTX 2; JTX 5; JTX 6; 03/04/2009 Tr. 276:5-279:1 279:3-13, 281:22-282:5, 282:14-22, 284:1-285:5). Bacardi's promotional strategy includes no comparable references to its product's Puerto Rican origin. (PTX 39; 03/03/2009 Tr. 139:1-5, 140:12-16; 03/04/2009 Tr. 284:17-285:5).

Bacardi's marketing of HAVANA CLUB rum invokes pre-revolutionary Havana nightlife. (PTX 41; PTX 43; PTX 61; 03/03/2009 Tr. 66:23-67:6, 146:7-14; 03/04/2009 Tr. 276:9-12, 276:24-277:6). The bottle and promotional materials for HAVANA CLUB rum were influenced by the strong interest of U.S. consumers in Cuban products. (JTX 2; 03/03/2009 Tr. 135:3-17; 03/05/2009 Tr. 369:6-22). Bacardi selected the sleek, frosted glass design of the HAVANA CLUB rum bottle to communicate a sultry night life feel reminiscent of 1950s Cuba. (PTX 43; 03/03/2009 Tr. 124:22-25).

Consistent with its marketing image of pre-revolutionary Havana nightlife, Bacardi also uses a Cuban theme on its HAVANA CLUB rum website, http://havanaclubus.com. (PTX 61). Cuban music plays in the background as the webpage heralds "the return of HAVANA CLUB rum" and describes the product as "a premium rum that embraces the sultry seduction of Havana nightlife." (PTX 41; PTX 61; 03/03/2009 Tr. 66:23-67:6, 146:3-14). The website suggests using HAVANA CLUB rum in three cocktails. The first is a "HAVANA

CLUB Cuba Libre," which is HAVANA CLUB rum mixed with cola. (PTX 61; 03/03/2009 Tr. 54:11-16, 132:19-133:4). The second is a "HAVANA CLUB Mojito." (PTX 61; 03/03/2009 Tr. 54:2-7, 132:19-133:4). The third is a "HAVANA CLUB Daiquiri." (PTX 61; 03/03/2009 Tr. 54:20-25, 132:19-133:4). A page from Bacardi's website is reproduced below:



(PTX 61).

Bacardi also has used marketing devices such as billboards, case cards, shelf-talkers, table-tent inserts, display racks, bottle display racks, shakers, and information cards to promote its HAVANA CLUB rum. (PTX 39; 03/03/2009 Tr. 132:2-18 139:15-18; 03/04/2009 Tr. 257:24-258:15). These marketing materials also promote the use of HAVANA CLUB rum in Cuba Libre, Daiquiri and Mojito cocktails. (PTX 39; PTX 43; 03/03/2009 Tr. 132:15-22, 139:15-22; 03/05/2009 Tr. 364:17-365:6).

Bacardi has held "Havana Night Events" to promote its HAVANA CLUB rum. (PTX 39). The "Havana Nights" promotional events took place at the club of a Cuban jazz musician. (JTX 5; 03/03/2009 Tr. 143:22-144:13, 145:1-19; 03/04/2009 Tr. 282:14-22). At the

7

"Havana Nights" events, Bacardi promoted a cocktail made with its HAVANA CLUB rum named "Groovin High in Havana" in addition to Cuba Libre, Daiquiri and Mojito cocktails. (JTX 5; 03/04/2009 Tr. 284:5-16).

Bacardi launched HAVANA CLUB rum in Florida and currently distributes it throughout the state, including Miami-Dade County, Jacksonville, Orlando, Tampa and Pensacola. (PTX 27; PTX 39; 03/05/2009 Tr. 359:8-24). To promote the launch of HAVANA CLUB rum, Bacardi issued press releases nationwide concerning the rum product. (03/05/2009 Tr. 415:8-16, 417:19-23, 417:24-418:17). Bacardi also distributed its HAVANA CLUB rum to various connoisseurs around the country to obtain their feedback. (03/05/2009 Tr. 415:17-19, 416:25-417:7). Bacardi's website also can be accessed nationwide.

Although Bacardi has confined sales of HAVANA CLUB rum to Florida since Pernod USA filed suit, its original marketing plans forecasted national sales in the future. (PTX 46; 03/03/2009 Tr. 148:25-149:15). Bacardi could execute a national release of HAVANA CLUB rum in a matter of 30-60 days because the packaging for HAVANA CLUB rum is prepared, the rum is available, and Bacardi's distribution network is already established. (03/03/2009 Tr. 65:8-16). In response to the Court's question at the February 18, 2009 pre-trial conference, Bacardi's counsel was unable to represent that Bacardi would not expand sales of its HAVANA CLUB rum outside of Florida. (02/18/2009 Hr'g Tr. 4:20-5:3, 5:15-19).

### C.   Bacardi's Use Of HAVANA CLUB Misleads Consumers

#### 1.   Pernod USA's Survey Establishes That A Significant Number Of Consumers Believe HAVANA CLUB Rum Is Made In Cuba

Pernod USA retained Walter McCullough to design and conduct a survey to determine the extent to which, if at all, Bacardi's HAVANA CLUB rum miscommunicates the geographic origin of its manufacture or ingredients. (PTX 47; 03/04/2009 Tr. 161:7-21).

8

Mr. McCullough is the chairman and CEO of IPSO Mendelsohn.  (03/04/2009 Tr. 160:1-8).
Prior to assuming that position in April 2008, he was president, CEO and owner of Monroe
Mendelsohn Research ("MMM").  (03/04/2009 Tr. 160:9-14).  During his forty year tenure at
IPSO Mendelsohn and MMM, he has designed and conducted 400-500 surveys for use in
litigation. (PTX 47, Ex. F; 03/04/2009 Tr. 160:15-161:6).

      Pernod USA's survey establishes that "due to Havana being part of the HAVANA
CLUB name," Bacardi's use of HAVANA CLUB for its Puerto Rican rum misled 18% of
potential rum purchasers into believing the product is made in Cuba and confused 4% of such
purchasers as to whether or not the product is made in Cuba. (PTX 47; 03/04/2009 Tr. 183:25-
185:17).  The level of misled/confused respondents was 20% (taking into account rounding of
percentages). (PTX 47; 03/04/2009 Tr. 185:18-186:6).  The percentage of misled (21%) and
confused (4%) respondents in Florida totaled 25%. (03/04/2009 Tr. 186:7-14).

      Mr. McCullough testified that the design and execution of his survey complied
with the Reference Manual On Scientific Evidence.  (03/04/2009 Tr. 186:22-187:11).  He used
the accepted test-control model to "isolate the effect that the Havana had, as part of the name,
HAVANA CLUB ... and determine the effect that Havana has on the miscommunication that
might develop." (03/04/2009 Tr. 172:1-17).  A test group of 205 respondents were shown
Bacardi's HAVANA CLUB rum bottle.  (JTX 6; PTX 47, Ex. C; 03/04/2009 Tr. 170:3-13,
170:17-171:6).  A second control group of 206 respondents were shown an otherwise identical
bottle in which SILVER CLUB was substituted for HAVANA CLUB and the initials "SC" for
"HC." (PTX 47, Ex. C; PTX 56; 03/04/2009 Tr. 170:3-9, 170:14-25, 171:7-25).

      Respondents were instructed:

> "I'd like you to look at this Rum.  Please look at it as you would if you saw it on
> display in a store and were deciding whether or not to buy it.  Please feel free to

examine the product as carefully as you wish, but please do not open the bottle, and let me know when you are done."

(PTX 47, Ex. A; 03/04/2009 Tr. 174:16-175:6; 175:15-176:1).

After respondents had examined the rum, they were instructed:

"Now, I'd like to ask you some questions. Please base your answers only on the product you just saw. For any of my questions, if you don't know or have no opinion, please just tell me so."

(PTX 47, Ex. A; 03/04/2009 Tr. 176:2-7). Respondents were then asked:

"2a. Did the Rum you just looked at communicate to you anything about where the product was made?

| | | | |
|---|---|---|---|
| Yes | ☐ 1 | → | ASK Q.2b |
| No | ☐ 2 | ] | SKIP TO Q.3a |
| I don't recall | ☐ 3 | | |

"2b. What did the Rum you just looked at communicate to you about where it was made?

"3a. Did the Rum you just looked at communicate to you anything about any other place?

| | | | |
|---|---|---|---|
| Yes | ☐ 1 | → | ASK Q.3b |
| No | ☐ 2 | ] | THANK RESPONDENT AND END INTERVIEW |
| I don't recall | ☐ 3 | | |

"3b. What other place was communicated to you by the product?

"3c. What is the relationship between this place and the RUM you just looked at? Anything else?"

(PTX 47, Ex. A; 03/04/2009 Tr. 176:8-178:18).

Interviewers were instructed to record the answers to Questions 2b, 3b and 3c verbatim. (PTX 47, Ex. B). Mr. McCullough personally reviewed all of the responses, which appear in his report. (PTX 47, Ex. E; 03/04/2009 Tr. 178:19-181:9, 181:16-23). He then placed them in one of three mutually exclusive categories: misled, confused or not misled or confused. (PTX 47, Ex. E; 03/04/2009 Tr. 181:12-15, 181:24-183:24). To arrive at the percentages of

10

misled and confused respondents, Mr. McCullough subtracted the control group responses from the test group responses. (PTX 47; 03/04/2009 Tr. 183:25-185:17).

| | HAVANA CLUB (Test) | | Silver Club (Control) | | % Diff. Test Minus Control |
|---|---|---|---|---|---|
| Total Respondents | 205 | 100 | 206 | 100 | |
| | # | % | # | % | |
| Misled | 40 | 20 | 5 | 2 | +18 |
| Confused | 8 | 4 | 1 | * | +4 |
| Total Misled/Confused | 48 | 23 | 6 | 3 | +20 |

* = Less than 0.5%. Note: individual %'s do not add to Total due to rounding.

All of the "misled" respondents (18%) said HAVANA CLUB was made in Havana or Cuba in answer to Question 2. (03/04/2009 Tr. 186:17-21).

A total of 411 respondents were questioned at established shopping mall interview facilities in eight cities in the nation's four census regions. (PTX 47; 03/04/2009 Tr. 165:22-166:20, 170:3-5). These cities included Jacksonville, Florida, where Bacardi's HAVANA CLUB rum is sold. (PTX 47; 03/04/2009 Tr. 166:2-12). In electing to conduct the survey in these cities, Mr. McCullough took account of both Bacardi's current marketing of HAVANA CLUB rum and planned expansion. (03/04/2009 Tr. 165:22-166:20).

Respondents were rigorously screened to assure that they were consumers likely to purchase rum and that they were otherwise qualified to respond to the survey questions. (PTX 47, Ex. A; 03/04/2009 Tr. 162:16-165:21). The survey was administered by experienced interviewers and field supervisors. (03/04/2009 Tr. 166:21-25). The interviewers and supervisors were provided with detailed written instructions, and the interviewers conducted practice interviews before they questioned respondents. (PTX 47, Ex. B; 03/04/2009 Tr. 167:1-168:9). Neither the interviewers nor the supervisors were told the purpose of the study or for whom it was being conducted. (03/04/2009 Tr. 168:10-21).

11

The interviewing process was validated by an independent agency, which confirmed that every one of the 74% of respondents they contacted had been interviewed. (PTX 47, Ex. D; 03/04/2009 Tr. 168:22-169:12).   At trial, Mr. McCullough characterized the survey as "among the cleanest I've ever experienced." (03/04/2009 Tr. 169:13-19).

### 2.   Bacardi Has No Survey Evidence To The Contrary

Bacardi did not conduct any market research before it launched its rum in 2006 to assess whether the use of HAVANA CLUB on a Puerto Rican rum would be deceptive. (03/03/2009 Tr. 151:17-152:25, 154:13-25).   Bacardi also did not conduct a survey after Pernod USA brought suit in August 2006 or after Pernod USA's April 2008 survey demonstrated deception.   Bacardi's expert Gary Ford testified at trial that he could have conducted a survey and submitted a report by July 11, 2008, if he had been asked to do so.   (03/05/2009 Tr. 451:17-452:7).   He further testified that in the absence of such a survey he could not express an opinion that Bacardi's HAVANA CLUB rum is not misleading.   (03/05/2009 Tr. 472:1-10).

### D.   Bacardi's HAVANA CLUB Rum
### Does Not Use The Arechabala Formula

The evidence presented at trial showed that Bacardi's HAVANA CLUB Puerto Rican rum does not use the formula that the Arechabalas used to produce a rum in Cuba. (DTX 140 [sealed]; DTX 148 [sealed]; 03/05/2009 Tr. 21:5-32:17 [lines 21:17-32:17 are sealed]).   Ramon Arechabala, who was a sales manager at Jose Arechabala SA ("JASA"), testified that he transcribed JASA's formula from memory in 1960 and ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (03/04/2009 Tr. 8:25-9:3, 13:16-22 [lines 13:16-22 are sealed]). That formula was used by JASA for making rum in Cuba from 1935-1960. (03/04/2009 Tr. 5:8-18).

12

The JASA █████████ formula specified ███████████████████████

███████████████████████████████████████████████████████████

(DTX 148 [sealed]; 03/04/2009 Tr. 10:10-22, 11:15-23 [sealed]).

███████████████████████████████████████████████████████████

███████████████████████████████████(DTX 148 [sealed];

03/04/2009 Tr. 10:18-11:2, 16:23-17:5 [sealed]). ██████████████████

██████████████████████(03/04/2009 Tr. 18:19-21 [sealed]). █████████

███████████████████████████████████████████████████

(DTX 148 [sealed]; 03/04/2009 Tr. 12:1-13 [sealed]).

Luis Planas, Bacardi's Process Director and Master Blender, testified that ███

███████████████████████████████████ (03/05/2009

Tr. 23:3-8 [sealed]).  Mr. Planas never spoke with Ramon Arechabala or anyone else from the

Arechabala family prior to developing Bacardi's HAVANA CLUB rum.  (03/05/2009 Tr. 21:11-

16).  In developing Bacardi's HAVANA CLUB rum, Mr. Planas ██████████████████

description ██████████████████████████, provided to him by a former Operational

Vice President at Bacardi, Tony Criado.  (03/03/2009 Tr. 125:13-126:10; 03/05/2009 Tr. 21:5-

10, 32:13-15 [lines 32:13-15 are sealed]).

Bacardi's HAVANA CLUB Puerto Rican rum is different from JASA's Cuban

rum.  (DTX 140 [sealed]; DTX 148 [sealed]; 03/05/2009 Tr. 21:5-32:17 [lines 21:17-32:17 are

sealed]).  Bacardi does not obtain its HAVANA CLUB rum ingredients ██████████(03/03/2009

Tr. 131:6-8; 03/05/2009 Tr. 24:15-16 [lines 24:15-16 are sealed]). ██████████████████

███████████████████████████████████████████████████

████(03/03/2009 Tr. 130:15-24; 03/05/2009 Tr. 8:6-12, 24:5-16 [lines 24:5-16 are sealed]).

13



███████████████████████████████ (03/05/2009 Tr. 25:5-23

[sealed]). ████████████████████████████

███████████████████████████████

(DTX 140 [sealed]; 03/05/2009 Tr.  25:12-26:8, 28:12-15, 29:6-8, 29:23-30:10, 31:5-9

[sealed]). ████████████████████████████

(DTX 140 [sealed]; 03/05/2009 Tr. 28:16-18 [sealed]).

████████████████████ (DTX 140 [sealed]; 03/05/2009 Tr. 29:4-5 [sealed]).

Of these many differences, perhaps the most important is ██████████████

████████████████████ (JTX 6; DTX 148 [sealed]; 03/04/2009 Tr. 10:18-22, 17:22-18:24,

20:15-25 [sealed]).

### E.    Pernod USA Is Likely To Be Injured

Pernod USA's MALIBU rum competes with other rum products in the United

States. (PTX 11; PTX 18; PTX 38; PTX 42; 03/03/2009 Tr. 41:7-10, 45:18-22, 141:18-142:9;

03/04/2009 Tr. 286:21-287:12). Those products include BACARDI SUPERIOR, CAPTAIN

MORGAN, CRUZAN, CASTILLO and RON RICO rum as well as other brands of rum that

have smaller market shares. (PTX 18; 03/03/2009 Tr. 40:5-13). One of the brands with which

MALIBU rum competes is Bacardi's HAVANA CLUB rum. (PTX 11; PTX 18; PTX 39;

PTX 61; PTX 65; 03/03/2009 Tr. 40:5-13, 40:25-41:24, 54:2-16, 54:20-55:7, 57:9-16, 57:17-

60:13, 61:22-63:24). Indeed, in tracking sales of its HAVANA CLUB rum, Bacardi includes

MALIBU rum among its competitor set segment. (PTX 38).

MALIBU's primary competition is other white rums that are consumed in similar

drink formats – frequently mixed with cola – and on similar occasions. (PTX 17; PTX 38;

14

03/03/2009 Tr. 48:19-49:15, 52:7-54:1; 03/05/2009 Tr. 365:16-366:3, 367:5-21). Because consumers typically drink white rums in similar formats, white rums compete closely for drink sales at on-premise locations and by the bottle in liquor stores and other off-premise locations. (PTX 39; PTX 65; 03/03/2009 Tr. 61:22-63:24).

Rums that are consumed in the same drink formats inherently compete because "it would be very likely that any other white rum that enters the marketplace is going to be promoted to consumers in those primary drink formats, rum cocktails and with cola." (03/03/2009 Tr. 53:21-54:1). In fact, Bacardi promotes the use of HAVANA CLUB rum mixed with cola, called a "Cuba Libre," and in classic cocktails Daiquiri and Mojito. (JTX 5; PTX 61; 03/03/2009 Tr. 54:2-7, 54:11-16, 54:20-25, 132:19-133:4; 03/04/2009 Tr. 284:1-13; 03/05/2009 Tr. 364:17-365:6).

Bacardi's own documents and the testimony of its Vice President and Managing Director for the Horizon Customer Business Unit, Douglas Landa, confirm that Bacardi's HAVANA CLUB rum competes for sales directly with BACARDI SUPERIOR in on-premise locations. (JTX 2; PTX 38; 03/05/2009 Tr. 366:1-10, 366:25-21). This is further evidence that Bacardi's HAVANA CLUB rum also competes with the MALIBU rum that Pernod USA markets in competition with BACARDI SUPERIOR rum.

MALIBU rum and HAVANA CLUB rum are distributed to the same type of off-premise locations. For example, MALIBU rum and HAVANA CLUB rum are both sold through Costco Cos. Inc., BJs Wholesale Club Inc. and Albertsons LLC. (PTX 11; PTX 27; PTX 38; PTX 39). Shelf layout of the rum category is consistent from retail store to retail store. (PTX 65; 03/03/2009 Tr. 59:19-60:1). MALIBU rum and Bacardi's HAVANA CLUB rum are shelved together in the rum section of Florida liquor stores and other off-premise locations.

15

(PTX 39; PTX 65).  Such close placement of the two products indicates they will compete directly for shoppers in the store. (03/03/2009 Tr. 61:22-62:12).

The photograph below depicts a typical rum display in a Florida retail store, showing three facings of HAVANA CLUB rum in the middle on the second shelf from the top, and five facings of MALIBU rum on the shelf directly below the HAVANA CLUB facings. (03/03/2009 Tr. 58:3-59:3).  Although the MALIBU label does not appear in the picture, its shelf position is apparent because MALIBU's white bottle is "one of the most recognizable packages in the spirits business."  (03/03/2009 Tr. 59:4-11).



(PTX 65).

The average retail price for BACARDI SUPERIOR rum is $13 per 750 mL bottle. (03/05/2009 Tr. 379:21-25).  The average retail price for MALIBU rum is $15 for a 750 mL bottle.  (03/05/2009 Tr. 380:1-3).  Bacardi's own documents show that HAVANA CLUB rum at $19 per 75 mL bottle competes directly with its $13 BACARDI SUPERIOR rum.  (PTX 38;

03/03/2009 Tr. 53:9-17; 03/05/2009 Tr. 366:1-10, 367:1-21).  It follows that HAVANA CLUB rum is priced so as to compete with MALIBU rum as well.

Pernod USA distributes MALIBU rum nationwide, including Miami, Orlando, Tampa and other locations in Florida.  (PTX 18).  MALIBU, as the third largest rum brand, has approximately 6 percent of the rum category market, which represents about 1.3 million cases of rum per year.  (PTX 18; 03/03/2009 Tr. 40:14-16, 44:25-45:14).  Florida is the second largest market for MALIBU rum in the United States, and one of the future growth markets for the MALIBU brand.  (03/03/2009 Tr. 57:14-16; 03/05/2009 Tr. 393:16-20).  In the 2006 fiscal year, the largest volume dining trade account for MALIBU rum was a restaurant in Orlando, Florida. (PTX 18). \\

Bacardi currently sells its HAVANA CLUB rum throughout the state of Florida. (03/03/2009 Tr. 41:25-42:3; 03/04/2009 Tr. 269:18-20).  Bacardi easily reached its distribution objectives for HAVANA CLUB rum in Florida.  (03/05/2009 Tr. 354:11-14).  As of August 2006, the target accounts sold list was already between 90-100% in all Florida markets. (PTX 37).

Pernod USA is losing sales of MALIBU rum to Bacardi's HAVANA CLUB rum. (03/03/2009 Tr. 61:22-63:24).  Jeffrey Agdern, Pernod USA's Vice President of Spirits Marketing, provided unrebutted testimony at trial that because MALIBU rum and HAVANA CLUB rum are direct competitors, it is likely that a consumer purchase of HAVANA CLUB will be a lost sale for MALIBU rum.  (03/03/2009 Tr. 61:22-62:2).  If Bacardi were to expand the market for HAVANA CLUB rum, Pernod USA's lost sales of MALIBU rum would increase. (03/03/2009 Tr. 64:1-65:16).

Bacardi could quickly and easily expand the market for HAVANA CLUB rum through a national launch, as set out in its initial marketing plan. Bacardi is one of the largest liquor suppliers in the United States, with one of the broadest distribution networks. (03/03/2009 Tr. 64:13-65:1). The BACARDI brand claims the largest share – approximately 40 percent – of the rum category market. (PTX 18; 03/03/2009 Tr. 44:25-45:9, 46:4-12). In this position, Bacardi is able to make recommendations on new products, how retailers should set up their shelves, and what products they should promote. (03/03/2009 Tr. 46:19-47:12). Bacardi's position in the market ensures that it could easily and quickly distribute a product nationally. (03/03/2009 Tr. 46:19-47:12, 64:13-65:1). Indeed, because the packaging for HAVANA CLUB rum is prepared, the rum is available, and Bacardi's distribution network is established, Bacardi could execute a national release of HAVANA CLUB rum in a matter of 30-60 days. (03/03/2009 Tr. 65:8-16).

## ARGUMENT

### I.    PERNOD USA HAS PROVED COUNT I

To establish a Lanham Act claim in the Third Circuit based on a false or misleading representation, a plaintiff must show: (1) that the defendant has made false or misleading statements as to its own product or another's product; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the representation at issue was used in commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of market share, or loss of good will. 15 U.S.C. § 1125(a)(1)(B); *Warner-Lambert Co. v. BreathAsure, Inc.*, 204 F.3d 87, 91-92 (3d Cir. 2000).

There is no dispute that Bacardi's HAVANA CLUB Puerto Rican rum sold in the United States travels in interstate commerce. *See* 15 U.S.C. § 1127 (Supp. 2008); 5 J. Thomas

18

McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:47 (4th ed. 2008).   And

Pernod USA proved each of the other elements of its claim.

    **A.**    **Bacardi's Use Of HAVANA CLUB Is Misleading Because It Has A**
                **Tendency To Deceive A Substantial Portion Of Its Intended Audience**

        Bacardi's use of the name HAVANA CLUB is misleading if it deceives or has a

tendency to deceive a substantial portion of potential rum consumers into believing that the

product's geographic origin is different from its actual place of origin, which is Puerto Rico.

15 U.S.C. § 1125(a)(1)(B) (2007); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck

Consumer Pharms. Co.*, 290 F.3d 578, 590 (3d Cir. 2002); *Warner-Lambert Co.*, 204 F.3d at 92.

The way to determine whether the HAVANA CLUB name deceives or has a tendency to deceive

consumers is to conduct a survey.   *Novartis Consumer Health, Inc.*, 290 F.3d at 594; *Merisant

Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509, 526 (E.D. Pa. 2007).   Pernod USA

conducted a survey.   Despite ample time and resources, Bacardi did not.

             **1.**    **Pernod USA's Survey Establishes That**
                   **Bacardi's Use Of HAVANA CLUB Is Misleading**

        Pernod USA's survey established that Bacardi's use of HAVANA CLUB for its

Puerto Rican rum misled 18% of potential rum purchasers into believing the product is made in

Cuba and confused 4% of such purchasers as to whether or not the product is made in Cuba.   The

level of misled/confused respondents was 20% (taking into account rounding of percentages).

(PTX 47;  03/04/2009 Tr. 185:18-186:6).   The percentages for Florida respondents were

consistent:   the misled (21%) and confused (4%) respondents in Florida totaled 25%.

(03/04/2009 Tr. 186:7-14).

        Those figures are more than enough to show a tendency to deceive a substantial

portion of consumers.   Indeed, standing alone, the 18% of "misled" respondents (who said in

answer to Question 2 that Bacardi's product is made in Havana or Cuba) proves actionable

deception. *See Novartis Consumer Health, Inc.*, 290 F.3d at 594:

> In *Coca-Cola* the consumer survey evidence demonstrated only 7.5% consumer deception. . . . [T]he Second Circuit [found] that "a significant number of consumers would be likely to be misled." *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982).
>
> In an analogous context involving trademark cases under the Lanham Act, courts have held that survey evidence of 15% confusion is sufficient to demonstrate actual confusion. *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 466-67 & n.15 (4th Cir. 1996) (15-20% confusion was sufficient to establish "actual confusion ... to a significant degree"); *Goya Foods, Inc. v. Condal Distribs., Inc.*, 732 F. Supp. 453, 457 n.7 (S.D.N.Y. 1990) (9-10% confusion was sufficient to demonstrate "meaningful evidence of actual confusion"). Likewise we believe that survey evidence demonstrating that 15% of the respondents were misled by the MNTS name is sufficient to establish the "actual deception or at least a tendency to deceive a substantial portion of the intended audience," *Johnson & Johnson-Merck Consumer Pharms. v. Rhone-Poulenc Rorer*, 19 F.3d 125, 129 (3d Cir. 1994), necessary to establish a Lanham Act claim for false or misleading advertising under section 43(a).

*Merisant Co.*, 515 F. Supp. 2d at 526 ("Courts have acknowledged that a 'confusion rate' of as

low as 7.5% to 10% may be adequate while a confusion rate of 15% is almost always deemed

sufficient.").

Pernod USA's survey was designed and conducted under the supervision of a

recognized and experienced expert in market research, Walter McCullough, whose surveys have

repeatedly been credited in litigation. *See, e.g., Westchester Media Co. v. PRL USA Holdings,

Inc.*, 103 F. Supp. 2d 935, 968 (S.D. Tex. 1999) ("this court credits ... the findings in

Mr. McCullough's survey"), *vacated in part on other grounds*, 214 F.3d 658 (5th Cir. 2000);

*Eco Mfg. LLC v. Honeywell Int'l, Inc.*, 295 F. Supp. 2d 854, 883 (S.D. Ind.) (crediting

Mr. McCullough's survey and stating "[h]e brought substantial experience and expertise to the

task, and he used reliable methodology and procedures"), *aff'd*, 357 F.3d 649 (7th Cir. 2003);

*Anheuser-Busch, Inc. v. Caught-On-Bleu*, 288 F. Supp. 2d 105, 122-23 (D.N.H. 2003), *aff'd*, 105

Fed. Appx. 285 (1st Cir. 2004); *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 321-24 (S.D.N.Y. 2000), *aff'd without op.*, 234 F.3d 1262 (2d Cir. 2000); *J&J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 381 (D.N.J. 2002); *J&J Snack Foods Corp. v. Nestle, USA, Inc.*, 149 F. Supp. 2d 136, 153 (D.N.J. 2001).

A total of 411 respondents were interviewed using the widely accepted mall intercept technique. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms.*, 129 F. Supp. 2d 351, 364 (D.N.J. 2000) (the "survey was administered in shopping malls around the country to 432 people who identified themselves as likely buyers of antacid products"), *aff'd*, 290 F.3d 578 (3d Cir. 2002); *Tyco Indus., Inc. v. Lego Sys., Inc.*, 5 U.S.P.Q.2d 1023, 1031 (D.N.J. 1987) ("[C]ourts have repeatedly accepted mall intercept surveys in litigation."), *aff'd without op.*, 853 F.2d 921 (3d Cir. 1988).

In electing to conduct the survey in eight cities including Jacksonville, Florida, located in the country's four census regions, Mr. McCullough took account of both Bacardi's marketing of HAVANA CLUB rum in Florida and its stated intention to expand distribution beyond that state. (03/04/2009 Tr. 165:22-166:20). That was a reasonable decision to make in March-April 2008 when the survey was conducted. Indeed, as recently as February 18, 2009, Bacardi could not assure the Court that it would not expand sales beyond Florida. (02/18/2009 Hr'g Tr. 4:20-5:3, 5:15-19). Moreover, the survey showed that consumers in Jacksonville were at least as likely to be deceived as consumers elsewhere. (03/04/2009 Tr. 186:7-14).

At the interview sites, prospective respondents were rigorously screened to assure among other things that they were likely purchasers of rum. (PTX 47, Ex. A; 03/04/2009 Tr. 162:16-165:21). *See Novartis Consumer Health, Inc.*, 129 F. Supp. 2d at 364 ("survey ... administered ... to ... likely buyers of antacid products"); *Merisant Co. v. McNeil Nutritionals*

*LLC*, 242 F.R.D. 315, 322 (E.D. Pa. 2007) ("In Lanham Act cases ... it is typical to survey prospective consumers."); 6 *McCarthy on Trademarks and Unfair Competition* § 32:163, at 32-321 ("[A] survey is designed to prove the state of mind of a prospective purchaser.").

The survey was administered by experienced interviewers and field supervisors, who were provided with detailed written instructions. (PTX 47, Ex. B; 03/04/2009 Tr. 166:21-168:9). The interviewers conducted practice interviews before they questioned respondents and were instructed, among other things, to record respondents' answers verbatim. (PTX 47, Ex. B; 03/04/2009 Tr. 167:1-21). *See* Shari Seidman Diamond, *Reference Guide on Survey Research, in Reference Manual on Scientific Evidence* 229, 264-65 (2d ed. 2000) ("Properly trained interviewers receive detailed instructions.... Interviewers also should be instructed to record verbatim the respondent's answers....").

Neither the interviewers nor the supervisors were told the purpose of the study or for whom it was being conducted and could not convey this information to respondents. (03/04/2009 Tr. 168:10-21). *See* Diamond, *Reference Manual on Scientific Evidence* at 266 ("To ensure objectivity in the administration of the survey, it is standard practice to conduct double-blind research whenever possible: both the interviewer and the respondent are blind to the sponsor of the survey and its purpose.").

To determine reaction to the HAVANA CLUB name, the survey utilized the generally accepted test-control model. (03/04/2009 Tr. 172:1-17). A test group of 205 respondents were shown HAVANA CLUB rum, and a separate control group of 206 respondents were shown SILVER CLUB rum. (JTX 6; PTX 47, Ex. C; PTX 56; 03/04/2009 Tr. 170:3-171:25). *See* Diamond, *Reference Manual on Scientific Evidence* at 257 ("The effect of the

22

allegedly deceptive message is evaluated by comparing the responses made by the experimental group members with those of the control group members.").[1]

Respondents in the test and control groups were told to examine the rum as if they were buying it in a store and to examine it as long as they wished. (PTX 47, Ex. A; 03/04/2009 Tr. 175:15-23). No questions were asked until the interviewer stated:

> "Now, I'd like to ask you some questions. Please base your answers only on the product you just saw. For any of my questions, if you don't know or have no opinion, please just tell me so."

(PTX 47, Ex. A; 03/04/2009 Tr. 174:16-175:6, 175:15-176:7). Respondents in both groups were asked the same open-ended filter and substantive questions. (PTX 47, Ex. A; 03/04/2009 Tr. 174:10-175:6). *See Volkswagen Astiengesellschaft v. Uptown Motors*, No. 91 Civ. 3447 (DLC), 1995 WL 605605, at *4 (S.D.N.Y. May 11, 1995) ("[S]ince the same question was used with the [test] group ... and the control group ..., any distorting effect from the question was cancelled out."). In particular, respondents were asked:

> "2a.   Did the Rum you just looked at communicate to you anything about where the product was made?"

(PTX 47, Ex. A; 03/04/2009 Tr. 176:8-24). Only if a respondent answered "yes" was s/he asked:

> "2b.   What did the Rum you just looked at communicate to you about where it was made?"[2]

(PTX 47, Ex. A; 03/04/2009 Tr. 176:25-177:4).

---

[1]   *Accord* Gary T. Ford, *The Impact of the Daubert Decision on Survey Research Used in Litigation, Journal of Public Policy & Marketing* 249 (2005) ("If it is necessary to expose respondents to a stimulus and then ask questions, a control group ... should be used."); *Gov't Employees Ins. Co. v. Google, Inc.*, 77 U.S.P.Q.2d 1841, 1846 (E.D. Va. 2005) ("After asking both [test and control] groups a series of questions designed to measure the likelihood of confusion, [Mr. Ford] compared the degree of confusion [in the two groups].").

[2]   Filter and substantive questions also were used in Question 3.

Respondents' answers were recorded verbatim.  (PTX 47, Ex. E; 03/04/2009 Tr. 177:5-179:16).  Mr. McCullough personally reviewed all of the responses.  (PTX 47, Ex. E; 03/04/2009 Tr. 179:14-16, 181:16-23).  He then placed them in one of three mutually exclusive categories:   misled, confused, or not misled or confused.   (PTX 47, Ex. E; 03/04/2009 Tr. 181:12-15, 181:24-183:24).  The verbatim answers appear in the report that Mr. McCullough prepared along with a statement of the survey purpose, the survey results and the other information and materials used to conduct the survey.  (PTX 47).  *See* Diamond, *Reference Manual on Scientific Evidence* at 270-71 (describing information and materials to be included in a survey report).

Finally, the interviewing process was validated by an independent agency, which confirmed that 74% of respondents had been interviewed – far in excess of the number typically contacted.  (PTX 47, Ex. D; 03/04/2009 Tr. 168:22-169:12).  *See* Diamond, *Reference Manual on Scientific Evidence* at 267 ("The standard procedure for validation of in-person interviews is to telephone a random sample of 10% to 15% of the respondents.").  The survey was among the cleanest Mr. McCullough had ever experienced during his long career.  (03/04/2009 Tr. 169:13-19).

### 2.   Bacardi Did Not Conduct A Survey Despite Evidence That Deception Was Likely To Occur

Bacardi's own evidence shows that "purchasers would pay considerable attention to the word 'Havana' [in 'HAVANA CLUB'] as denoting origin of the rum in question." (DTX 120).  Further, a 1997 survey of which Bacardi was well aware showed that 48% of Cuban-Americans believed Bacardi's HAVANA CLUB Bahamian rum was produced in Cuba. (PTX 67).  *See also In re Bacardi & Co.*, 48 U.S.P.Q.2d at 1035 (refusing Bacardi's applications to register HAVANA SELECT, HAVANA PRIMO and HAVANA CLIPPER for non-Cuban

rum and observing that "purchasers are likely to believe that the rum products to be sold under the proposed marks originate in HAVANA, Cuba").

Despite such warning signs, Bacardi launched its HAVANA CLUB Puerto Rican rum in 2006 without conducting any consumer research, which could have tested whether its use of the HAVANA CLUB name is deceptive. (03/03/2009 Tr. 151:17-152:25, 154:13-25). Even after Pernod USA filed suit and introduced its own survey in April 2008, Bacardi failed to conduct any consumer research to rebut the evidence of consumer deception. Instead, Bacardi moved ahead with a marketing program that highlights the connection between its non-Cuban rum and Havana, Cuba. *See Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 317 (1st Cir. 2002) ("[r]ather than investigating the matter, Bernard did nothing" while continuing to make a false representation); *McNeilab, Inc. v. Am. Home Prods. Corp.*, 501 F. Supp. 517, 530 (S.D.N.Y. 1980) (despite warnings "AHP did nothing to ensure that the misleading potential of its [advertising] strategy did not materialize").

Although Bacardi may attempt to excuse its lack of survey evidence by urging that it has no burden of proof on Pernod USA's Count I, that has not prevented Bacardi from conducting consumer surveys where it was a defendant in Lanham Act litigation and believed that a survey would support its position. *See Star Indus. Inc. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005) ("[Bacardi] ... submitted consumer surveys tending to rebut charges of actual consumer confusion."). Bacardi conducted no survey here because it recognized that a survey would reach the same result as the survey conducted by Pernod USA, by a prior adversary in litigation and by the USPTO: the name HAVANA CLUB connotes a rum of Cuban origin.

3.   **Bacardi Did Not Prove That
Pernod USA's Survey Is Unreliable**

Because Bacardi conducted no surveys, its expert Gary Ford testified at trial that

he did "not have a basis for expressing an opinion that [Bacardi's] product is not likely to

mislead." (03/05/2009 Tr. 472:1-10).  *See, e.g., Anheuser-Busch, Inc.*, 288 F. Supp. 2d at 122-23

(criticisms in absence of rebuttal survey failed to create triable issue of fact); *Volkswagen*, 1995

WL 605605, at *6-8 (same); *Plasticolor Molded Prods. v. Ford Motor Co.*, 698 F. Supp. 199,

202 (C.D. Cal. 1988) (judgment for plaintiff where defendant's expert did not conduct survey

and his testimony did "not counter the thrust, and ... result, of [plaintiff's] survey").

Instead, Bacardi resorted at trial to quibbling with Pernod USA's survey.  *See*

*Tyco Indus., Inc.*, 5 U.S.P.Q.2d at 1031 (rejecting a host of criticisms from an expert who did not

conduct his own survey because "'it is relatively easy for one expert to criticize a survey done by

another expert'") (citation omitted); 6 *McCarthy on Trademarks and Unfair Competition*

§ 32:178, at 32-366 ("It is notoriously easy for one expert to appear to tear apart the

methodology of a survey taken by another.").

Mr. McCullough's surveys have been repeatedly credited despite alleged

criticisms by opposing counsel and experts.  *See, e.g.,* cases *supra* at 20.  Here, as in those cases,

Bacardi failed to establish that the McCullough survey is unreliable.  Bacardi's expert did not

take issue with many aspects of the survey, including the use of the generally accepted test-

control survey methodology, the decision to interview 411 respondents in shopping mall settings,

the instructions provided to supervisors and interviewers, the interviewing process including the

maintenance of double blind conditions, or the interview validations.  Moreover, he did not

attempt to determine whether altering the survey in the ways he recommended would have

changed the results, although he conceded he would have had time to do a survey if he had been

asked after Pernod USA submitted its survey in April 2008.  (03/05/2009 Tr. 451:17-452:7, 472:1-10).[3]

Although not criticizing Mr. McCullough's use of the accepted test-control model (03/05/2009 Tr. 429:19-430:3, 431:15-432:9), Mr. Ford testified that "the name of a city, someplace in that region of the world" should have been used in place of the SILVER CLUB control cell name.  (03/05/2009 Tr. 430:13-18).  As alleged support for this position, he claimed that Mr. McCullough had used such a name in an earlier survey.  (03/05/2009 Tr. 430:19-23).  In fact, Mr. McCullough used the fictitious name KINGSTON SELECT in exploring a question not at issue in this case, namely, the extent to which Cuban-Americans were aware of a Cuban HAVANA CLUB rum.  (PTX 67; 03/05/2009 Tr. 453:14-454:16).  He did *not* use KINGSTON SELECT when he explored the place they believed Bacardi's HAVANA CLUB Bahamian rum was produced and determined that 48 percent attributed it to Cuba.  (PTX 67; 03/05/2009 Tr. 454:13-455:8).

Mr. Ford did not test how, if at all, using a city name such as KINGSTON CLUB in place of SILVER CLUB would have changed the survey results.  (03/05/2009 Tr. 453:3-7).  Mr. McCullough explained that such a non-neutral control would have been "completely inappropriate."  It would have *reduced* references to Havana in the control cell by increasing references to the other city name (Kingston).  That would have *inflated* the extent to which respondents were misled by HAVANA CLUB when the control cell "Havana" answers were subtracted from the test cell "Havana" answers.  (03/04/2009 Tr. 173:12-174:9).  In

---

[3]     Although Mr. Ford testified that he was retained by Bacardi to conduct an "independent review and critique" of the McCullough survey (03/05/2009 Tr. 451:6-16), that in fact did not occur.  Rather, Mr. Ford relied on a misreading of an earlier survey supplied to him by Bacardi's counsel.  (03/05/2009 Tr. 452:8-453:7).  *See infra* at 28.

Mr. McCullough's view, "that would be something that I would be criticized for quite properly." (*Id.*).

Mr. McCullough also did not err by interviewing prospective rum purchasers, rather than people who said they were both past and prospective purchasers as Mr. Ford recommended.  (03/04/2009 Tr. 163:8-25).  The legal issue is the state of mind of prospective purchasers of rum.  *See supra* at 21.  Moreover, based on his experience, Mr. McCullough opined that the overlap of people who said they would buy rum in the next six months and who had done so in the last six months "would be almost complete."  (03/04/2009 Tr. 163:14-25). Mr. Ford did not dispute this conclusion.  (03/05/2009 Tr. 457:17-19).

Mr. Ford claimed that the McCullough survey was overinclusive because it included respondents outside Florida who would "never be able to purchase HAVANA CLUB rum."  (03/05/2009 Tr. 425:11-16, 456:24-457:4).[4]  The McCullough survey demonstrated how consumers *did* react when they *were* exposed to Bacardi's product both within and outside Florida.  (PTX 47; 03/04/2009 Tr. 165:22-166:12, 186:11-14).  Because Mr. Ford did not test how Florida residents would react to the use of HAVANA CLUB on Bacardi's rum, he could not refute Mr. McCullough's evidence that respondents in Jacksonville were at least as likely to be misled or confused as respondents elsewhere.  (03/04/2009 Tr. 186:7-14; 03/05/2009 Tr. 472:1-10).  Nor could he refute the evidence that Cuban-Americans in Florida were misled by Bacardi's earlier use of HAVANA CLUB for a non-Cuban rum.  (PTX 67; 03/05/2009 Tr. 453:14-455:8).

---

[4] At trial, Mr. Ford improperly attempted to depart from this statement in his expert report by urging that he really meant respondents were unlikely to be able to purchase Bacardi's HAVANA CLUB outside of Florida within the next six months. (03/05/2009 Tr. 456:22-457:24).

In view of its stated expansion plans, Bacardi's charge of overinclusiveness rings hollow. Bacardi was unable to represent to the Court that it would not expand beyond Florida, and it did not demonstrate that deception would be unlikely to occur when it does so.  If Mr. McCullough had confined the survey to Florida, Bacardi could proceed with its expansion plans and argue that Pernod USA has no evidence concerning how consumers outside Florida react to its use of HAVANA CLUB.  Unless Bacardi was willing to foreswear those plans, it should have been prepared to show that sales outside Florida would not deceive consumers.  *Cf. Home Box Office v. Showtime/The Movie Channel*, 832 F.2d 1311, 1316-17 (2d Cir. 1987) (defendant bears "heavy burden" of showing that new promotional materials are not confusing after plaintiff's survey demonstrated original materials were confusing and this "allocation of the burden of proof ... best accords with our interpretation of the Lanham Act as a means of protecting ... the public from confusion").

Moreover, Bacardi has no evidence that respondents from Florida would react differently.  Indeed, Mr. McCullough's Jacksonville results, as well as evidence from a prior survey, show that prospective purchasers in Florida are deceived, just as they are in other locations. (PTX 47; PTX 67; 03/04/2009 Tr. 186:7-14).

While claiming the McCullough survey was overinclusive, Mr. Ford also said it was underinclusive because it was not administered in both English and Spanish although Bacardi's product currently is sold in Florida where 20% of the population is of Hispanic background.  (03/05/2009 Tr. 425:11-16, 427:24-428:22).  This ignores Bacardi's expansion plans and the fact that Bacardi's HAVANA CLUB rum is worded in English, not Spanish. (PTX 46; 03/03/2009 Tr. 148:25-149:15; 03/04/2009 Tr. 164:1-5).  The evidence did not establish that Bacardi targets Spanish speakers who do not understand any English or that such a

group would not be misled by Bacardi's use of HAVANA CLUB. Indeed, the 1997 survey showed that many Cuban-Americans, including Spanish speakers, mistakenly believed Bacardi's earlier HAVANA CLUB rum was made in Cuba. (PTX 67).

Bacardi's objections to the McCullough survey questions are a classic example of "focus[ing] strongly on the 'road not taken': Why did you not ask a different question?" 6 *McCarthy on Trademarks and Unfair Competition* § 32:178, at 32-366. *See, e.g., Tyco Indus., Inc.*, 5 U.S.P.Q.2d at 1033 (rejecting criticisms of questions where defendant's expert failed to conduct survey and prove that alleged question defects "in fact affected the results in any significant way"). Because Bacardi did not put its criticisms to the test, Mr. Ford could only speculate as to what respondents "might have said" if different questions had been asked. (03/05/2009 Tr. 434:13-17, 472:1-10).

He stated that beginning the substantive questioning with "Did the Rum you just looked at communicate to you anything about where the product was made?" (Question 2a):

> could have had, and was likely to have had, the effect of causing people to *play back* material that they read first on the label, second on the bottle, and so on, and would have had the impact of increasing the percentage of people who mentioned *the word "Havana."*

(03/05/2009 Tr. 434:4-435:1) (emphasis added). This confusing observation[5] ignores that eight times as many test group respondents (40 v. 5), who were exposed to HAVANA CLUB as opposed to SILVER CLUB on the bottle, said in answer to Question 2 that the rum is made in Cuba. Respondents in the control group had an equal chance of saying the product is made in Cuba when they "play[ed] back" what they saw on the bottle. Yet, they did so in far fewer numbers precisely because there was no reference to "Havana." If Bacardi did not want

---

[5]    Mr. Ford did not explain what he meant by "material" on the "label," "bottle" or "so on." There is no "label" on the "bottle." All text and designs, including "HAVANA CLUB [or SILVER CLUB] Brand Puerto Rican Rum," appear on the bottle.

consumers to notice the prominent display of HAVANA CLUB on the bottle, it could have chosen a different name.[6]

Turning to Question 3, Mr. Ford testified that he was "not sure exactly what the purpose is of that question or what it might show." (03/05/2009 Tr. 437:25-438:25). When his counsel reminded him of the reason Mr. McCullough asked the question, Mr. Ford said only that "I *think* if you wanted to know about ingredients, [Mr. McCullough] *might* have just asked about ingredients." (03/05/2009 Tr. 439:8-11) (emphasis added). He did not dispute that all of the respondents who were misled as to where the rum is made (18%) expressed that view in answer to Question 2.

Although the Court made clear that Mr. Ford's testimony could not go beyond his expert report (03/05/2009 Tr. 420:4-8), Mr. Ford improperly did so when he testified that Mr. McCullough omitted a standard of error that he said normally would appear in a survey of the kind Mr. McCullough conducted. (03/05/2009 Tr. 450:1-6). It is not surprising that Mr. Ford omitted this argument from his critique, given that such calculations are *not* appropriate in the nonprobability sample surveys that typically are used in Lanham Act litigation. *See* Diamond, *Reference Manual on Scientific Evidence* at 244, 271 (stating that most "consumer surveys conducted for Lanham Act litigation present results from nonprobability convenience samples" and that it is not "appropriate" to report estimates of sampling error in such surveys). As Mr. McCullough testified, "my training as a statistician was that you do not use the standard of error except when you have a probability sample. This is not a probability sample," which

---

[6]   Mr. Ford's quibbling extended to the use of "Rum" – as opposed to "Container" or "Bottle" – in Question 2. However, as Mr. Ford conceded at trial, it is perfectly obvious that respondents based their answers to that question on what appears on the bottle, not the liquid inside it. (PTX 47, Ex. E; 03/05/2009 Tr. 463:15-464:4).

31

"are extremely rare" in litigation surveys where mall intercept surveys are the norm. (03/04/2009 Tr. 231:10-19, 234:4-19).

Mr. Ford also improperly went beyond his expert report when he questioned for the first time at trial the coding of three answers to Question 2.  (03/05/2009 Tr. 443:3-445:10).[7] That testimony should be disregarded. But even if all three answers were discounted (which they should not be), the number of "misled" respondents simply goes from 40 to 37, resulting in 16.5% (18.5% minus 2%) deception rather than 18% (20% minus 2%).  A 16.5% rate is more than enough to support Pernod USA's claim.  In fact, the responses were not mischaracterized. For example, in answer to Question 2b ("What did the Rum you just looked at communicate to you about where it was made?"), one respondent stated "It said in Havana."  (PTX 47, Ex. E). That this respondent also noted the use of "Puerto Rican rum on the front" of the bottle does not change this answer.  (*Id.*)

### 4.    Bacardi's Alleged Use Of The Arechabala Recipe Does Not Show That Deception Is Unlikely

Pernod USA's unrebutted survey demonstrates actionable deception concerning where Bacardi's HAVANA CLUB Puerto Rican rum is made.  *See Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 748 n.2 (8th Cir. 1980) (enjoining "false designation of origin ... as to the [place of] manufacturing of the gold jewelry"); *Scotch Whiskey Ass'n v. Barton Distilling Co.*, 338 F. Supp. 595, 597-99 (N.D. Ill. 1971) (enjoining as a false designation of

---

[7]    By contrast, in his expert report Mr. Ford stated that three different respondents "initially said in response to Question 2b that the rum was made in 'Havana' and then in response to Question 3b said it the bottle [sic] also mentioned 'Puerto Rico.'  Or respondents said the reverse. ...  Incredibly, Mr. McCullough counted all of those respondents as misled or confused."  (DTX 86 ¶ 50).  That was simply wrong, as Pernod USA pointed out in successfully opposing Bacardi's *Daubert* motion.  "Misled" responses (18%) resulted exclusively from Question 2.  (03/04/2009 Tr. 186:17-21).  Despite this, Mr. Ford persisted in his mischaracterization of "confused" and "misled" responses at trial. (03/05/2009 Tr. 448:8-25).

geographic origin the use of "HOUSE OF STUART Blended Scotch Whiskey" for product "which included spirits not produced in Scotland, and which was made by mixing vatted Scotch malts ... with local spirits"), *aff'd in pertinent part*, 489 F.2d 809 (7th Cir. 1973).

It is no answer that the recipe for Bacardi's Puerto Rican rum allegedly is the same as the formula that the Arechabalas used to make their Cuban rum. Not only is it irrelevant as a matter of law, it is also wrong. Bacardi's own witnesses, Mr. Gomez and Mr. Planas, testified that the product is produced and bottled in Puerto Rico using ███████ from ███ ██████████████████████ but not ██████████ (03/03/2009 Tr. 130:15-131:8; 03/04/2009 Tr. 252:19-25, 260:12-20; 03/05/2009 Tr. 24:5-19 [lines 24:5-19 are sealed]). Thus, consumers who believe the product is made in Cuba are deceived, as Pernod USA's survey demonstrates.

This deception as to where the product is made exists whether or not Bacardi's recipe is the Arechabala formula. In fact, it is not. The evidence establishes that there are significant differences between them. (DTX 148 [sealed]; 03/04/2009 Tr. 10:18-11:2, 12:1-13, 16:23-17:5 [sealed]; DTX 140 [sealed]; 03/05/2009 Tr. 25:5-23, 25:12-26:8, 28:12-18, 29:4-5, 29:23-30:10, 31:5-9 [sealed]). ████████████████████████████████

██████████████████████████████████

██████████████████████████████ (DTX 148 [sealed]; 03/04/2009 Tr. 10:18-11:2, 12:1-13, 16:23-17:5 [sealed]). ████████████████████████████

████████████████████████████████████

████████████ (DTX 140 [sealed]; 03/05/2009 Tr. 25:5-23, 25:12-26:8, 28:12-18, 29:4-5, 29:23-30:10, 31:5-9 [sealed]). Indeed, Bacardi emphasizes its oak barrel aging on the back label of the HAVANA CLUB bottle. (JTX 6).

Bacardi did not present evidence that the use of HAVANA CLUB on its rum causes consumers to believe that the Bacardi and Arechabala rum recipes are the same. Even if it had, that would not disprove the deception shown by Pernod USA's survey concerning where Bacardi's rum is made. It simply would establish a second false representation about the nature of Bacardi's product, which uses a different recipe. *See Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 516 (8th Cir. 1996) (defendant's "ads falsely represented that the two drugs may be indiscriminately substituted").

Bacardi's focus on rum recipes is a distraction from the question at issue: whether or not Bacardi's use of HAVANA CLUB causes a substantial number of consumers mistakenly to believe that Bacardi's rum is made in Cuba. Pernod USA's survey proves that it does.

## B.   The Deception Is Material

The Lanham Act specifically refers to false or misleading designations of geographic origin. 15 U.S.C. § 1125(a)(1)(B). *See Black Hills Jewelry Mfg. Co.*, 633 F.2d at 748 (enjoining false designation of geographic origin); *Scotch Whiskey Ass'n*, 338 F. Supp. at 597-99 (same).

Further, the evidence shows that geographic origin is a material characteristic of HAVANA CLUB rum. Cuba has a well-known reputation for rum production, and consumer trends indicate an interest in Cuban products. (JTX 2; 03/03/2009 Tr. 65:21-66:11). A Bacardi packaging brief for HAVANA CLUB rum states "[g]iven the recent, strong interest in Cuban products by US consumers, this project has been made a priority." (JTX 2; 03/03/2009 Tr. 135:3-17; 03/04/2009 Tr. 276:5-279:1). In accordance with that packaging brief, Bacardi went to great lengths to highlight Havana and Cuba in its marketing materials while making no comparable effort to connect its rum to the place where it is actually produced – Puerto Rico.

34

Indeed, at trial, Bacardi introduced into evidence a reported decision, which states that "purchasers would pay considerable attention to the word 'Havana' [in 'HAVANA CLUB'] as denoting origin of the rum in question." (DTX 120).

At trial, Bacardi sought to prove the significance of Puerto Rico as the geographic source of its rum. (03/04/2009 Tr. 252:10-253:2, 259:24-261:6). However, Bacardi did not name its rum SAN JUAN CLUB or build its marketing campaign around sultry nights in San Juan. (03/04/2009 Tr. 284:17-21). Bacardi cannot have it both ways, claiming that its occasional references to Puerto Rico are important to consumers but its prominent and repeated references to Havana and Cuba are not. *See In re Bacardi & Co.*, 48 U.S.P.Q.2d at 1035, refusing Bacardi's applications to register terms incorporating HAVANA – including HAVANA SELECT, HAVANA PRIMO and HAVANA CLIPPER – for non-Cuban rum on the ground that such terms are primarily geographically deceptively misdescriptive and observing:

> HAVANA, Cuba, is a major city which produces a variety of goods, among which "rum" is listed as a significant product. [Bacardi] has alleged that ... U.S. consumers associate a certain popular style of rum as originating in Cuba.

C.    **Pernod USA Is Likely To Be Injured**

Because a mere likelihood of injury is sufficient, a party needs to show only that it has a reasonable basis for believing that sales or market share or reputation will be affected by the false or misleading representation. *See* 15 U.S.C. § 1125(a) (1998) (providing a cause of action for "any person who believes that he or she is or is likely to be damaged"); *Warner-Lambert*, 204 F.3d at 92-97. A reasonable basis exists if, for example, the parties market products in competition with each other. *Id.* at 96.

The evidence makes clear that Pernod USA markets MALIBU rum in direct competition with other white rums including Bacardi's HAVANA CLUB rum. *See supra* at 13-17. For example, white rums are consumed in the same drink formats and on the same types of

occasions, and are marketed to consumers according to those formats and occasions. (PTX 17;

PTX 38; 03/03/2009 Tr. 48:19-49:15, 52:7-54:1, 61:22-63:24; 03/05/2009 Tr. 365:16-366:3,

367:5-21). Because consumers drink white rums in similar formats, white rums compete closely

for drink sales at on-premise locations and by the bottle in liquor stores and other off-premise

locations. (PTX 39; PTX 65; 03/03/2009 Tr. 61:22-63:24). The evidence further shows that

Pernod USA is losing sales of MALIBU rum to Bacardi's rum, that Bacardi could quickly and

easily broaden the market for HAVANA CLUB rum through a national launch in accordance

with its initial marketing plans, and that this would increase lost sales of MALIBU rum which is

marketed nationwide. *See supra* at 16-17.

## II.    PERNOD USA HAD STANDING TO BRING COUNT I AFTER BACARDI LAUNCHED ITS HAVANA CLUB PUERTO RICAN RUM IN AUGUST 2006

As a marketer of MALIBU rum since 2006, Pernod USA plainly had standing to

file a claim for false designation of geographic origin challenging Bacardi's use of HAVANA

CLUB for Puerto Rican rum shortly after that use began in August 2006.

First, the Court already has determined that Pernod USA has standing to bring its

false designation of origin claim. (08/22/2007 D.I. 41, at 6-12 (finding constitutional and

prudential standing).) No trial evidence alters that conclusion. In fact, the evidence introduced

at trial highlights the competition between MALIBU rum and HAVANA CLUB rum, as well as

the fact that Pernod USA is likely to be injured from sales of Bacardi's HAVANA CLUB rum.

*See supra* at 13-17.

Second, Section 211 of Omnibus Consolidation and Emergency Supplemental

Appropriations Act (Public L. No. 105-277, 112 Stat. 2681 (Oct. 21, 1998)) ("Section 211") does

not bar a false designation of geographic origin claim under Section 43(a) of the Lanham Act.

*Havana Club Holding, S.A. v. Galleon, S.A.,* 62 F. Supp. 2d 1085, 1091, 1094 (S.D.N.Y. 1999)

(discussing Section 211 and distinguishing between trade name infringement and false designation of geographic origin claims), *aff'd*, 203 F.3d 116 (2d Cir. 2000).[8] Section 211 does not concern false designations of the geographic origin of a product. Section 211(a)(1) prohibits registration or renewal of a trademark or trade name that is the same as or substantially similar to a trademark or trade name used in connection with a business or assets confiscated by the Cuban government in the absence of consent by the original owner or a bona fide successor in interest. Sections 211(a)(2) and (b) prohibit a Cuban national from asserting rights in such a trademark or trade name. Count I does not involve the registration, renewal or assertion of rights in a trademark or trade name, and Pernod USA is not a Cuban national.

Third, Pernod USA brought this action within days of the August 2006 launch of Bacardi's HAVANA CLUB Puerto Rican rum product. There is no merit to Bacardi's claim that Count I is barred by the statute of limitations or undue delay. *See Sanofi-Aventis v. Advancis Pharm. Corp.*, 453 F. Supp. 2d 834, 855-56 (D. Del. 2006) (stating that appropriate time period for Lanham Act claims is three years, based on the Delaware fraud statute, 10 Del. C. § 8106, and that laches defense requires proof of undue delay and prejudice).

---

[8]     Bacardi-Martini U.S.A., Inc., one of the defendants in the prior *HAVANA CLUB* litigation, is a predecessor company to Bacardi U.S.A., Inc., the defendant in this case.

## CONCLUSION

For the foregoing reasons, Pernod USA requests that judgment be entered in its favor on Count I of the Complaint, and that Bacardi be permanently enjoined from using the name HAVANA CLUB in connection with its non-Cuban rum.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

_____
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
   *Attorneys for Plaintiff*
   *Pernod Ricard USA, LLC*

OF COUNSEL:

Vincent N. Palladino
Eric R. Hubbard
Leslie M. Spencer
Brynn Metzger-Hare
Margaret C. Lu
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036
(212) 596-9000

June 3, 2009 – Original Filing Date
June 4, 2009 – Redacted Filing Date

<u>**CERTIFICATE OF SERVICE**</u>

I, Rodger D. Smith II, hereby certify that on June 4, 2009, I caused the foregoing

to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification

of such filing to:

Anne Shea Gaza, Esquire
RICHARDS, LAYTON & FINGER, P.A.

I also certify that copies were caused to be served on June 4, 2009, upon the

following in the manner indicated:

<u>**BY E-MAIL**</u>

Anne Shea Gaza, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801

William R. Golden, Jr., Esquire
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY  10178

*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Wilmington, DE  19801
(302) 658-9200
rsmith@mnat.com