# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x

PERNOD RICARD USA, LLC               :

       Plaintiff,                  :   C.A. No. 06-505-SLR

       v.                          :

BACARDI U.S.A., INC.,                :   **REDACTED**
**PUBLIC VERSION**
       Defendant.                  :

---------------------------------------------------x

### ANSWERING POST-TRIAL BRIEF OF
### DEFENDANT BACARDI U.S.A., INC.

Of Counsel:                          William J. Wade (#704)
William R. Golden, Jr.               Anne Shea Gaza (#4093)
Mark S. Gregory                      Richards, Layton & Finger, P.A.
Matthew D. Marcotte                  One Rodney Square
KELLEY DRYE & WARREN LLP             920 North King Street
101 Park Avenue                      Wilmington, Delaware  19801
New York, New York  10178            (302) 651-7700
(212) 808-7800                          *Attorneys for Defendant*
                                        *Bacardi U.S.A., Inc.*

Dated:  August 3, 2009

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iv

PREFACE ............................................................................................................... 1

I.     NATURE AND STAGE OF PROCEEDING ................................................ 3

II.    THE RECORD ................................................................................................ 6

    A.    The Parties ............................................................................................ 6

        1.    Pernod USA ............................................................................... 6

        2.    Bacardi USA ............................................................................. 6

    B.    The Manufacture and Sale of HAVANA CLUB Rum ........................... 7

        1.    The 2006 Florida Relaunch of HAVANA CLUB Rum ............ 7

        2.    HAVANA CLUB's Cuban Heritage ...................................... 7

        3.    The Recipe For HAVANA CLUB Rum .................................. 8

        4.    The Production in Puerto Rico of HAVANA CLUB Rum ........ 9

            a.    The Art of Rum-Making ............................................... 9

            b.    The Development of HAVANA CLUB Rum ............... 11

        5.    The Marketing and Sale of HAVANA CLUB Rum ................ 13

    C.    The Cuban Heritage Statements Concerning HAVANA CLUB Rum Are Uncontroverted ............................................................................. 15

    D.    Pernod USA Markets MALIBU, a Cordial, as a Coconut-Flavored Caribbean Rum ............................................................................. 16

        1.    MALIBU is a Coconut Flavored Rum Cordial ..................... 16

        2.    MALIBU's Caribbean Advertising Theme ........................... 16

    E.    The Competitive Positioning of MALIBU ........................................ 18

III.    INTRODUCTION TO ARGUMENT ........................................................... 20

IV.    ARGUMENT ................................................................................................. 23

    A.    Pernod USA Has Failed To Meet Its Burden Of Proving Each Element of a § 43 Lanham Act Violation ............................................... 23

        1.    The Legal Standard For a § 43(a) Lanham Act Claim ........... 23

        2.    The Level of Deception Required In This Circuit ................. 23

        3.    The Criteria for Establishing Impliedly False Claims ........... 25

    B.    Pernod USA Did Not Establish That MALIBU Suffered Any Likely Competitive Injury ............................................................................. 26

**TABLE OF CONTENTS**
(continued)

Page

C.  Pernod USA Failed to Prove that the Alleged Misperception Regarding the Origin of HAVANA CLUB Rum Would Be Likely To Influence Purchasing Decisions ................................................................................ 30

    1.  There is No Presumption That a Misperception of Origin Satisfies the Materiality Requirement ................................................................ 30

    2.  No Proof Was Offered That the Purchasing Decisions of Consumers Are Likely To Be Influenced by a Rum's Origins ............... 30

    3.  Without Evidence That Cuba is Perceived as a Particularly Desirable Source for Rum, Any Misperception That HAVANA CLUB Rum Is From Cuba Must Be Deemed to be Immaterial .............. 32

D.  Pernod USA Did Not Establish That the Use of the Mark HAVANA CLUB on Bacardi USA's Rum Is Likely to Deceive a Substantial Portion of American Consumers as to the Origin of That Rum ...................................... 33

    1.  HAVANA CLUB is a Lifestyle Trademark, Not a Geographic Designation .................................................................................. 34

    2.  The Treasury Department's TTB Has Determined that HAVANA CLUB Is Not A Geographically Misleading Deceptive Brand for Rum ............................................................................................ 35

    3.  The Patent and Trademark Office Has Also Determined that "HAVANA" Formative Trademarks Are Not Materially Deceptive ...... 36

    4.  American Rum Buyers Are Not Apt To Be Deceived as to Where HAVANA CLUB Rum is Made Since the Sale of Cuban Rum in the United States Has Been Banned For Nearly 50 Years ...................... 38

E.  The Deception Survey Offered by Mr. McCullough Does Not Fit the Facts Or Address the Sole Issue in the Case so That Survey and McCullough's Expert Opinions Are Untrustworthy and Should be Disregarded ...................... 39

F.  The McCullough Survey Was Not Designed or Conducted in Accordance With Accepted Survey Practices And Principles ................................................ 45

    1.  McCullough's Use Of The Wrong Universe Is A Fatal Flaw ................ 46

    2.  McCullough's Control Was Faulty ........................................................ 50

    3.  McCullough's Survey Questions Were Ambiguous and Misleading ...... 52

    4.  McCullough Coded The Survey Incorrectly .......................................... 54

    5.  The Survey Flaws Are Major so the Results Are Meaningless ............... 55

G.  Bacardi USA Had No Obligation to Present Its Own Survey .......................... 55

**TABLE OF CONTENTS**
(continued)

Page

H.  Bacardi USA Has the Right to Truthfully Advertise the Cuban Heritage of
HAVANA CLUB Rum ..................................................................................... 56

CONCLUSION ............................................................................................................ 58

-iii-

# TABLE OF AUTHORITIES

## CASES

*44 Liquormart, Inc. v. Rhode Island,*
517 U.S. 484 (1996)..................................................................................................58

*ALPO Petfoods v. Ralston Purina Co.,*
913 F.2d 958 (D.C. Cir. 1990)................................................................................27

*Abbott Labs. v. Gerber Prods. Co.,*
979 F. Supp. 569 (W.D. Mich. 1997) ....................................................................24

*Am. Italian Pasta Co. v. New World Pasta Co.,*
371 F.3d 387 (8th Cir. 2004) .................................................................................26

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,*
42 F.3d 1421 (3d Cir. 1994), *cert. denied,* 514 U.S. 1103 (1995)................................31

*Amstar Corp. v. Domino's Pizza, Inc.,*
615 F.2d 252 (5th Cir. 1980) .................................................................................46

*AstraZeneca LP v. Tap Pharm. Prods., Inc.,*
444 F. Supp. 2d 278 (D. Del. 2006)........................................................................40

*In re Bacardi & Co. Ltd,*
48 U.S.P.Q. 2d 1031 (T.T.A.B. 1997) ....................................................................36

*Baglin v. Cusenier Co.,*
221 U.S. 580 (1911)................................................................................................58

*Bambu Sales, Inc. v. Sultana Crackers, Inc.,*
683 F. Supp. 899 (S.D.N.Y. 1988) .........................................................................57

*Beech-Nut Packing Co. v. P. Lorillard Co.,*
299 F. 834 (D.N.J. 1924) ........................................................................................57

*BellSouth Tellecommc'ns, Inc. v. Hawk Commc'ns, LLC,*
No. 1;04-CV-280-MHS, 2004 WL 1085324 (N.D. Ga. Apr. 12, 2004)....................24

*Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.,*
633 F.2d 746 (8th Cir. 1980) .................................................................................27

*Bonesmo v. Nemours Found.*,
253 F. Supp. 2d 801 (D. Del. 2003) ............................................................................39

*In re Cal. Innovations, Inc.*,
329 F.3d 1334 (Fed. Cir. 2003) ............................................................................34, 37

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
284 F.3d 302 (1st Cir. 2002) ....................................................................................30

*Citizens Fin. Group Inc. v. Citizens Nat'l Bank of Evans City*,
383 F.3d 110 (3d Cir. 2004) ......................................................................................46

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
No. SACV 04-725CJC (Ex), 2006 WL 5187497 (C.D. Cal. Mar. 2, 2006) ...................50

*Coca-Cola Co. v. Koke Company of Am.*,
254 U.S. 143 (1920) ..................................................................................................57

*Coca-Cola Co. v. Procter & Gamble Co.*,
642 F. Supp. 936 (S.D. Ohio 1986), *rev'd on other grounds*, 922 F.2d 28 (6th Cir. 1987)..........24

*Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*,
165 F.3d 221 (3d Cir. 1998) ......................................................................................28

*Cuban Cigar Brands N.V. v. Upmann Int'l Inc.*,
457 F. Supp. 1090 (S.D.N.Y. 1978) ..........................................................................38

*Daubert v. Merrell Dow Pharms. Inc.*,
509 U.S. 579 (1993)..............................................................................................39, 40

*Eaton Corp. v. Parker-Hannifin Corp.*,
292 F. Supp. 2d 555 (D. Del. 2003)............................................................................55

*Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*,
606 F. Supp. 2d 59 (D.D.C. 2009) ...............................................................................2

*First Health Group Corp. v. BCE Emergis Corp.*,
269 F.3d 800 (7th Cir. 2001) ......................................................................................26

*Forschner Group, Inc. v. Arrow Trading Co.,*
30 F.3d 348 (2d Cir. 1994)....................................................................................34

*Havana Club Holding, S.A. v. Galleon S.A.,*
203 F.3d 116 (2d Cir. 2000).....................................................................................3

*Havana Club Holding, S.A. v. Galleon, S.A.,*
974 F. Supp. 302 (S.D.N.Y. 1997) ...........................................................................3

*Havana Club Holding S.A. v. Galleon S.A.,*
No. 96 Civ. 9655 (SAS), 1998 WL 150983 (S.D.N.Y. Mar. 31, 1998) .........................3

*Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc., ,*
258 F. Supp. 2d 1197 (D. Kan. 2003)......................................................................50

*Johnson & Johnson-Merck Consumer Pharmas. Co. v. Rhone-Poulenc Rorer Pharms.,*
*Inc.,*
19 F.3d 125 (3d Cir. 1994).............................................................................. *passim*

*Joint Stock Soc. v. UDV North Am., Inc.,*
266 F.3d 164 (3d Cir. 2001)....................................................................................27

*Jose Arechabala, S.A. v. Ramirez,*
66 U.S.P.Q. 7 (Comm'r of Pats. 1945).....................................................................37

*Kumho Tire Co., Ltd. v. Carmichael,*
526 U.S. 137 (1999)................................................................................................39

*L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,*
214 F.2d 649 (3d Cir. 1954)..............................................................................26, 28

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,*
525 F. Supp. 2d 558 (S.D.N.Y. 2007).....................................................................46

*Mead Johnson v. Abbott Labs.,*
201 F.3d 883 (7th Cir. 2000)..................................................................................26

*Menendez v. Faber, Coe & Gregg, Inc.,*
345 F. Supp. 527 (S.D.N.Y. 1972) ..........................................................................38

*Merisant Co. v. McNeil Nutritionals, LLC,*
515 F. Supp. 2d 509 (E.D. Pa. 2007) ......................................................................25

*Nat'l Basketball Ass'n v. Motorola, Inc.,*
105 F.3d 841 (2d Cir. 1997)....................................................................................31

vi

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
290 F.3d 578 (3d Cir. 2002)........................................................................................24

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994).....................................................................................40, 55

*Pharmacia Corp. v. Alcon Labs, Inc.*,
201 F. Supp. 2d 335 (D.N.J. 2002) ...................................................................46, 53, 54

*Phoenix of Broward, Inc. v. McDonald's Corp.*,
489 F.3d 1156 (11thCir. 2007) ...................................................................................28

*Piazza's Seafood World, LLC v. Odom*,
448 F.3d 744 (5th Cir. 2006) ................................................................................35, 58

*Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*,
523 F. Supp. 2d 376 (S.D.N.Y. 2007)...........................................................................24

*Sandoz Pharmas. Corp. v. Richardson-Vicks Inc.*,
735 F. Supp. 597 (D. Del. 1989)..................................................................................31

*Sandoz Pharmas Corp. v. Richardson-Vicks, Inc.*,
902 F.2d 222 (3d Cir. 1990).......................................................................................23

*Scotch Whiskey Ass'n. v. Barton Distilling Co.*,
338 F. Supp. 595 (N.D. Ill. 1971), *aff'd in part and rev'd in part on other grounds*, 489
F.2d 809 (7th Cir. 1973) ............................................................................................27

*In re Spirits Int'l, N.V.*,
563 F.3d 1347 (Fed. Cir. 2009).....................................................................................30

*Stiffel Co. v. Westwood Lighting Group*,
658 F. Supp. 1103 (D.N.J. 1987) .................................................................................24

*Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.*,
559 F. Supp. 1189 (E.D.N.Y. 1983) .............................................................................45

*U.S. v. United Foods, Inc.*,
533 U.S. 405 (2001)....................................................................................................58

*Univ. Book Store v. Univ. of Wisconsin Bd. of Regents*,
33 U.S.P.Q. 2d 1385 (T.T.A.B. 1994) ...........................................................................34

*Universal City Studios v. Nintendo Co.*,
746 F.2d 112 (2d Cir. 1984).........................................................................................52

vii

*UpJohn Co. v. Riahom Corp.*,
641 F. Supp. 1209 (D. Del. 1986)........................................................................25

*Warner-Lambert Co. v. BreathAsure, Inc.*,
204 F.3d 87 (3d Cir. 2000)..................................................................................23

## STATUTES - OTHER AUTHORITIES

44 U.S.C. § 1507............................................................................................38

15 U.S.C. § 1125(a)(1)(B) .............................................................................23

27 C.F.R. § 5.22(k)(3)....................................................................................33

27 C.F.R. § 5.34(a).........................................................................................33

31 C.F.R. Pt. 515 ...........................................................................................38

Federal Alcohol Administration Act, 27 U.S.C. § 205(e) .............................35

Lanham Act, 15 U.S.C. § 1052(a) ...................................................................4

Lanham Act, 15 U.S.C. § 1125(a) ...................................................................3

Proclamation No. 3447, 27 Fed. Reg. 1085 (Feb. 6, 1962) ...........................38

Shari Diamond, *Reference Guide on Survey Research*, in Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 229, 258 (2d ed. 2000) ...................................51

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §27.53 (4th ed. 2009)...........................................................................................26, 27

Restatement (Third) of Unfair Competition §§ 1, 2 (1999)........................29, 33

4 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* §702 (2d ed. 2009)..........................40

## PREFACE

The sole claim of Pernod Ricard USA, LLC ("Pernod USA") that remains in this lawsuit is that the HAVANA CLUB trademark as displayed on the rum sold by Bacardi U.S.A., Inc. ("Bacardi USA") is likely to mislead a substantial portion of prospective and actual Floridian purchasers of Bacardi USA's product into believing that the rum was made in Cuba in violation of § 43(a) of the Lanham Act.  The statement of origin, "PUERTO RICAN RUM," is conspicuously displayed in bold black type right beneath the HAVANA CLUB brand on the front of the frosted bottle the rum is sold in.  The back label reinforces that Puerto Rican statement of origin by proclaiming that HAVANA CLUB rum is "a premium rum distilled and crafted in Puerto Rico."  Bacardi USA's HAVANA CLUB rum is depicted below as it would be seen by prospective purchasers on the shelf of a Florida liquor store:[1]



---

[1] The pictures below are representative of the bottle admitted as JTX 6.

1



A cursory examination of the labeling shows that consumers are highly unlikely to be deceived or misled.

Pernod USA was unable to produce at trial any probative evidence establishing the likelihood of a direct competitive injury to MALIBU, as required for success on a § 43(a) claim. Similarly, Pernod USA's evidence fell far short of establishing that the alleged misperception as to the origin of Bacardi USA's HAVANA CLUB rum was material; that is, it was likely to influence purchasing decisions. Thus, it failed to make out another crucial element of its § 43(a) claim. That Pernod USA could demonstrate no harm is hardly surprising, for Pernod USA has little or no apparent stake in the dispute that "has now traversed two federal Circuits, two federal agencies, and two decades." *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 606 F. Supp. 2d 59, 63 (D.D.C. 2009)

2

("*Cubaexport*").[2]  The present suit extends the "Havana Club" dispute to yet a third federal circuit.

The prior litigation involved rights to the HAVANA CLUB trademark in the United States.  Pernod USA's French parent, Pernod Ricard, S.A. ("Pernod SA"), and its Cuban partners, including Empresa Cubana Exportadora de Alimentos y Productos Varios ("Cubaexport"), an arm of the Cuban government, have, thus far, been unsuccessful in all those suits.[3]  A fair surmise, therefore, is that a major, if not the exclusive, motive behind this suit was to collaterally attack Bacardi USA's entitlement to use the HAVANA CLUB trademark.  What is plain here, whether or not an ulterior motive by Pernod USA is at play, is that when the elements of the single § 43(a) Lanham Act claim in this case are examined, there can be no doubt that Pernod USA has not met its burdens and that judgment should enter in favor of Bacardi USA.

## I.
## NATURE AND STAGE OF PROCEEDING

The Complaint filed by Pernod USA asserted two counts against Bacardi USA under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Count I, *inter alia*, alleged in Paragraph 21 that "Bacardi U.S.A.'s use of HAVANA CLUB for a rum not produced in Cuba and Bacardi U.S.A.'s statements that its HAVANA CLUB is the rum that was made in Cuba and sold in the United States before 1960 are false and misleading representations concerning the geographic

---

[2]     The federal registration of the HAVANA CLUB trademark whose cancellation was upheld in *Cubaexport* is the same Cubaexport registration referred to in Paragraph 15 of Pernod USA's Complaint.

[3]     *See Havana Club Holding, S.A. v. Galleon, S.A.*, 974 F.Supp. 302, 315 (S.D.N.Y. 1997) ("*Havana Club II*") (Havana Club Holding, S.A. and Havana Club International [Pernod USA's affiliates] "have no rights to the HAVANA CLUB trademark."); *Havana Club Holding S.A. v. Galleon S.A.*, No. 96 Civ. 9655 (SAS), 1998 WL 150983, at *1 (S.D.N.Y. Mar. 31, 1998) ("*Havana Club III*") ("Bacardi & Co. owns the 'Havana Club' mark for rum in the United States."); *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116 (2d Cir. 2000) ("*Havana Club IV*"). Although Pernod SA and its partners have no rights to sell HAVANA CLUB rum in the United States, they do so in a variety of countries outside the United States. (DTX 92; Tr. 104:2-19).

origin of Bacardi U.S.A.'s rum." The Complaint did not identify where Bacardi USA purportedly made the latter statement that its HAVANA CLUB is the rum that was made in Cuba and sold in the United States before 1960.[4] In its Answer, Bacardi USA denied making the latter statement as well as all the other salient allegations in Count I. (Ans. ¶¶ 20-28).

Count II alleged that Bacardi USA's statement that it owns the rights to the HAVANA CLUB trademark in the United States as the successor to a company that marketed a Cuban rum prior to 1960 was false. (Compl. ¶ 30). That statement was supposedly made in an interview on National Public Radio. (*Id.,* ¶ 11). The Complaint referred to the federal suits involving Havana Club Holding, S.A. and Cubaexport mentioned above (*id.,* ¶¶14-17, 19) and alleged, in effect, that Cubaexport was the real owner of the HAVANA CLUB trademark in the United States (*id.,* ¶ 15). No allegations explained Pernod USA's own interest in the trademark ownership dispute or hinted at why rum buyers would care about it. The Court dismissed Count II on August 21, 2007. (D.I. 41).

Bacardi USA's Answer, in addition to denying the allegations in Count I, asserted the affirmative defenses that: (a) the Complaint failed to state a claim; (b) Pernod USA lacked standing; (c) this action was being prosecuted by Pernod USA in violation of enumerated federal statutes and regulations; (d) the Complaint is barred by the statute of limitations; (e) the Complaint is barred by the doctrines of laches, waiver, and/or estoppel; (f) dismissal of the Complaint was required for failure to join necessary or indispensable parties; and (g) the Complaint fails under the Lanham Act, 15 U.S.C. § 1052(a), as amended, because Bacardi

---

[4]    The Complaint does allude to the fact that press release characterized HAVANA CLUB rum as a *relaunch* (Compl. ¶ 9), but this was a reference to the sales of HAVANA CLUB in the United States by Bacardi USA's predecessor beginning in 1995 that were subsequently voluntarily discontinued until court battles over ownership of the U.S. HAVANA CLUB trademark concluded. The resumption of sales of HAVANA CLUB rum by Bacardi USA was a "relaunch" of that product. In any event, Pernod USA never pursued its "relaunch" claim.

4

USA's first sales of its HAVANA CLUB rum in the United States took place in 1995 so it was entitled to maintain use of the HAVANA CLUB mark and register it in the United States Patent and Trademark Office ("PTO") regardless of whether that mark might be otherwise considered geographically misdescriptive.[5] (Ans. at 7-8).

With respect to certain of its affirmative defenses, Bacardi USA submitted an Offer of Proof (D.I. 102) to which Pernod USA filed a rebuttal (D.I. 103). The parties then submitted simultaneous opening post-trial briefs in accordance with the post-trial briefing schedule entered by the Court. (D.I. 106, 107). Bacardi USA filed an Opening Post-Trial Brief on the affirmative defenses on which it bears the burden of proof. Pernod USA filed an Opening Post-Trial Brief on its sole surviving claim and on those affirmative defenses for which it bears the burden of proof.

Notably, while Pernod USA survived an early standing challenge at the pleading stage, the evidence adduced at trial regarding its suspect motivation in bringing this false advertising suit makes a careful review of its standing, now that the record is complete, appropriate. Close scrutiny of Pernod USA's proof at trial reveals neither the evidence necessary to make out a direct competitive injury to MALIBU was adduced nor the facts necessary to satisfy the materiality requirement of a § 43(a) claim were proven. The proffered survey on deceptiveness falls short of the standards required by *Daubert* and should be given no weight.

This is Bacardi USA's Answering Post-Trial Brief regarding Pernod USA's § 43(a) Lanham Act claim and those affirmative defenses asserted by Bacardi USA on which Pernod USA bears the burden of proof.

---

[5]    Bacardi USA bears the burden of proof on certain of these affirmative defenses, and submitted its own opening post-trial brief in connection with those defenses.

## II.
## THE RECORD

**A.**    **The Parties**

1.    <u>Pernod USA</u>

Pernod USA, the plaintiff, is an Indiana limited liability company with its principal offices in Purchase, New York, and is a subsidiary of Pernod SA. (Compl. ¶ 4; Tr. 28:21-24, 29:5-6). Pernod USA advertises, distributes, and sells in the United States alcoholic beverage products under the authority of Pernod SA, its French parent, including MALIBU coconut flavored rum cordial. (Tr. 28:22-29:4).

2.    <u>Bacardi USA</u>

Bacardi USA, the defendant, is a Delaware corporation headquartered in Miami, Florida which is engaged, *inter alia*, in importing, distributing, and selling distilled spirits in Florida and elsewhere, including BACARDI and HAVANA CLUB rums. (Compl. ¶ 5). Bacardi USA first sold HAVANA CLUB rum that was produced in the Bahamas in 1995. (Tr. 248:22-249:5; DTX 91; DTX 104). Bacardi USA's affiliate, Bacardi & Company Limited ("BACO"), acquired the HAVANA CLUB mark, the related goodwill, and certain assets, including the recipe or formula for making that rum, from Jose Arechabala S.A. ("JASA"), a family-owned, Cuban rum producer.[6] (Tr. 272:17-23).

## REDACTED

---

[6]    JASA is referred to as "a company that marketed a Cuban HAVANA CLUB rum prior to 1960" in Paragraph 11 of Pernod USA's Complaint.

**B.**     **The Manufacture and Sale of HAVANA CLUB Rum**

     1.    The 2006 Florida Relaunch of HAVANA CLUB Rum

          Bacardi USA voluntarily discontinued sales of its HAVANA CLUB rum produced in the Bahamas that was sold beginning in 1995 while the question of the ownership of the U.S. HAVANA CLUB mark was being resolved in Manhattan federal court. *See Havana Club II, Havana Club III, Havana Club IV, supra.* The rival claimants to the U.S. HAVANA CLUB mark were, on the one hand, Havana Club Holding, S.A. and Havana Club International, S.A., entities formed as a joint venture between Pernod SA and Cuba and, on the other hand, Galleon, S.A., BACO's predecessor in interest. (*Id.*) In 2006, after Bacardi USA's affiliates prevailed in that litigation, Bacardi USA resumed sales solely in Florida of an updated version of HAVANA CLUB rum. (Tr. 242:20-24, 269:18-20). This HAVANA CLUB rum was made for Bacardi USA in Puerto Rico in accordance with the original Arechabala family recipe that BACO had acquired from JASA, together with its U.S. rights to the "HAVANA CLUB" mark and the related goodwill. (*Id.*, 252:14-18, 272:17-23). To date, all Bacardi USA's sales of its current HAVANA CLUB rum have taken place in Florida. (PTX 27; Tr. 269:18-20, 326:22-327:3).

     2.    HAVANA CLUB's Cuban Heritage.

**REDACTED**

7

**REDACTED**

**REDACTED**

4.      The Production in Puerto Rico of HAVANA CLUB Rum

      a.      The Art of Rum-Making

**REDACTED**

RLF1-3421022-1

**REDACTED**

10

**REDACTED**

b.      The Development of HAVANA CLUB Rum

**REDACTED**

11

**REDACTED**

RLF1-3421022-1

**REDACTED**

5.   <u>The Marketing and Sale of HAVANA CLUB Rum</u>

When Bacardi USA relaunched its HAVANA CLUB rum in Florida, it decided to follow a "grass roots" marketing approach.  (PTX 23; Tr. 253:11-20).  The keys to this approach consisted of engaging mixologists, bartenders, and wait staff to become ambassadors for the brand and drive word of mouth excitement relating to the product.  (Tr. 253:21-254:13).  The target consumers for Bacardi USA's HAVANA CLUB product were discerning, affluent, and well-educated adults age 24-49.  (*Id.*, 255:1-5).  Bacardi never sought, through any of its marketing, including its website or otherwise, to suggest to consumers that the product was produced in Cuba.  (*Id.*, 259:21-23, 273:23-274:2).  Indeed, essential to Bacardi's marketing strategy for HAVANA CLUB was to reinforce its Puerto Rican origins.  As John Gomez, the former Bacardi USA marketing executive who was integral to the creation of Bacardi USA's HAVANA CLUB rum, testified:

Q.    And if you keep the bottle handy there, what was the reason — you indicated that you worked on the packaging.   What was the reason why the front label includes the indication Puerto Rican rum?

A.    Well, there were really two primary reasons. Number one is that Puerto Rico has an excellent reputation for being a source for high-quality rum.  Bacardi rum, the world's greatest rum, is produced there.  And, you know —

Q    Any other reasons why Bacardi indicated Puerto Rican rum on there?

A.    Well, yes.  There's also a technical reason, which is the Commonwealth of Puerto Rico requires that any product that's produced there or any rum product that's produced there, you need to label on the front label the fact that it's Puerto Rican rum.  And they even have, like, some certain size, minimum size guidelines for the type face and things of that nature.

Q.    And do you know, with respect to the type face that Bacardi selected for the Havana Club product, whether Puerto Rican rum was at that minimum size font?

A.    It's larger.  It's significantly larger, I would say, than the minimum size requirement

Q.    All right.  And, again, the reason why you selected a significantly larger —

A.    Well, we wanted to make sure it was very clear it was coming from Puerto Rico in order to reinforce the quality and premium of this product since Puerto Rico has such a reputation for producing a high-quality rum.

(*Id.* 260:4-261:6).

Gomez went on to explain that, had the Florida population thought that Bacardi's

HAVANA CLUB product came from Cuba, the response would have been decidedly negative.

Q.    Based on your personal familiarity, what do you believe the reaction would be if a Cuban source product came into the Florida market?

> A.    It would just be an uproar.   There would be tremendous anger, disruption.  I wouldn't be surprised with a little bit of rioting thrown in.  It's a very volatile issue.
>
> Q.    I take it, it would be a negative reaction to any manufacturer who introduced such a product?
>
> A.    Absolutely.

(*Id.,* 274:16-24).

Bacardi USA wanted the packaging for HAVANA CLUB to achieve a super premium look and to evoke core values for the brand which included "sultry, stylish." (*Id.,* 245:22-25, 246:3-6).  The packaging also was to have a retro feel to it to get in tune with the trend towards a cocktail culture, bringing back the glamour of the prohibition era as well as some of the old cocktail drinks at that time.  (*Id.,* 246:7-15; JTX2).  Indeed, unrefuted testimony established that the older Cuban Americans who attended the "Havana Nights" promotions for HAVANA CLUB rum discussed in JTX 5 never thought the rum was made in Cuba.  (Tr. 289:22-290:14).

## C.    The Cuban Heritage Statements Concerning HAVANA CLUB Rum Are Uncontroverted

When Bacardi USA relaunched its HAVANA CLUB product, it issued a press release explaining and elaborating upon the statements made on the back label of the HAVANA CLUB bottle.  (JTX 4).  This press release was overseen by Pat Neal, who approved the press release and oversaw all aspects of it.  (Tr. 406:11-18).  Ms. Neal verified the Cuban heritage statements in the press release and on the back of the HAVANA CLUB bottle through a careful vetting process, involving the review of Bacardi USA's own extensive archive of historical Cuban materials and interviews with knowledgeable Bacardi USA employees.  (*Id.* 406:19-407:7).  To verify these statements, Ms. Neal examined various materials, including archival labels from JASA's HAVANA CLUB rum (DTX 87) and court decisions (DTX 120).  Ms. Neal

also spoke with individuals who had been personally involved with JASA, such as Ramon Arechabala. Mr. Arechabala confirmed the information Ms. Neal had previously obtained from her investigation of the documents and materials. (Tr. 414:17-21). These materials, together with Mr. Arechabala's testimony, substantiated the Cuban heritage statement made on the back labeling of HAVANA CLUB rum and in the press release admitted as JTX 4. Indeed, Pernod USA's Post Trial Brief seems to abandon any claim relating to any alleged false statement other than the fact of Bacardi USA's use of the name HAVANA CLUB for its rum product.

**D.      Pernod USA Markets MALIBU, a Cordial, as a Coconut-Flavored Caribbean Rum**

     1.      MALIBU is a Coconut Flavored Rum Cordial

       MALIBU is a coconut-flavored, pre-mixed rum cordial that was originally produced in South Africa in 1978 under the name COCO RICO. (Tr. 74:25-75:2, 89:3-13, 108:4-8). MALIBU has no ties whatsoever to the California beach town of the same name. (*Id.*, 86:4-13). MALIBU, despite its "Caribbean" labeling and advertising theme, is actually produced in Canada, apparently from a mixture of different Caribbean rums, coconut flavoring, sweeteners, and water. (*Id.*, 82:24-25, 87:20-88:6, 113:2-8). MALIBU is defined as a rum specialty or cordial by the U.S. Department of the Treasury's Alcohol and Tax and Trade Bureau ("TTB"). (DTX 112).[7] In most countries outside of the United States, MALIBU is promoted and sold as a cordial or liqueur, not a rum. (Tr. 79:8-11).

     2.      MALIBU's Caribbean Advertising Theme

       Despite its manufacture in Canada and its classification as a rum specialty drink or cordial under TTB's standard of identity regulations, Pernod USA touts the "Caribbean" heritage of MALIBU. (Tr. 82:24-24; DTX 112; JTX 7). Pernod USA's sole fact witness, Jeffrey

---

[7]      The TTB must issue a Certificate of Federal Label Approval ("COLA") before any distilled spirit product can be introduced for sale in U.S. commerce. (Tr. 106:6-20).

Agdern, Vice President of Spirits Marketing for Pernod USA, testified that American rum buyers consider the "Caribbean" (as opposed to a particular Caribbean island) to be the "most notable place where rum comes from." (Tr. 83:3-15). Agdern added, "[t]here's a set of Caribbean nations that are all assumed by consumers to be quality rum-producing countries." (*Id.*, 83:10-15). For this reason, the front of the white bottle in which MALIBU is sold prominently displays the words "CARIBBEAN RUM" beneath the MALIBU name and a sunburst and palm trees design mark. (JTX 7). A pseudo provenance stamp emblazoned with the word "CARIBBEAN" is also affixed to the front of the MALIBU package. (*Id.*).

MALIBU also has long been portrayed in promotional materials and advertising as a Caribbean rum. Because of the favorable perception of the Caribbean on the part of spirits consumers, Pernod USA markets MALIBU as a brand associated with the Caribbean islands. (*Id.*, 87:12-19). As Mr. Agdern explained, MALIBU's image, through its logo and packaging, seeks to evoke a carefree island lifestyle. (*Id.*, 86:14-24).

Pernod USA's own documents demonstrate that MALIBU is being marketed as a Caribbean-themed rum. In a marketing presentation entitled "Malibu Guiding Principle FY'07," a prime objective of Pernod USA for MALIBU was to forge a "tie to Caribbean." (DTX 51 at PR3715). On October 25, 2006, Pernod USA held a meeting at its Purchase, New York headquarters regarding the "Malibu 3 Year Long Range Plan, PR USA." (DTX 55). Pernod USA's objective in marketing MALIBU in the United States was summarized as: "[r]einforce Malibu's Caribbean heritage." (*Id.* at PR64468).

Puerto Rico, like Barbados, the Bahamas, and Cuba, is in the Caribbean. So, if Pernod USA's marketing research is correct, none of those islands enjoy a competitive advantage over the others with respect to consumers' perceptions as to a favorable locale for making rum.

17

The actual Canadian origin of MALIBU is never mentioned in Pernod USA's advertisements or promotional pieces. The Canadian statement of origin mandated by the TTB is only displayed on the back of the MALIBU bottle in a minimal font size. (JTX 7).

**E.     The Competitive Positioning of MALIBU[8]**

The only two types of competitive injury that are pertinent in a false advertising case are harm to reputation and lost sales. Pernod USA's sole fact witness expressly stated that "I don't believe there has been injury to [MALIBU]'s reputation" (Tr. 81:22-23), and Pernod USA makes no argument relating to such a reputational injury in its post-trial brief. Pernod USA also concedes it has not lost any measurable sales of MALIBU coconut flavored rum cordial to Bacardi's HAVANA CLUB rum. (*Id.*, 81:13-16). Its claims of injury are no more than rank speculation that, *should* sales of HAVANA CLUB rum be expanded beyond Florida, MALIBU sales *might* be lost. (*Id.*, 65:1-19).

The trial evidence shows that MALIBU, in the estimation of senior marketing executives at Pernod USA, competes with a whole laundry list of distilled spirit and cordial products, which include BACARDI, CAPTAIN MORGAN, PARROT BAY, CRUZAN, CASTILLO and RONRICO rums. (*Id.*, 41:5-13).[9] The primary competition for MALIBU is

---

[8]    The original Complaint alleged that both STOLICHNAYA vodka and MALIBU coconut-flavored rum cordial would somehow be hurt by Bacardi USA's sales of HAVANA CLUB rum in Florida. (Compl. ¶ 24, 33). The only types of injury that would be relevant would be reputational harm or lost sales. Pernod USA no longer has the right to distribute STOLICHNAYA vodka in the United States and the owner of the STOLICHNAYA brand apparently has no interest in pursuing the § 43(a) claim. (Tr. 90:6-13). In any event, Pernod USA formally dropped any claim of injury involving STOLICHNAYA vodka and offered no testimony concerning STOLICHNAYA vodka at trial. (*Id.*).

[9]    Notably, however, in Pernod USA's 2006 Malibu LRP review (PTX 11), the sole competing brands identified on the "Category and Competitive Set Trends" slide are Captain Morgan Parrot Bay and Cruzan, not Bacardi and certainly not Havana Club. (PTX 11 at PR64809).

described as white rum consumed in drink formats, *i.e.*, mixed drinks and cocktails like rum and coke and daiquiris. (Pl. Br. at 14-15).

As testimony at trial from Pernod USA's representative demonstrates, HAVANA CLUB rum has never been a matter of particular concern to the executives at Pernod USA responsible for marketing and selling MALIBU. Pernod USA has never bothered to track the sales in Florida of HAVANA CLUB rum, claiming that the sales are so small that tracking is not feasible. (Tr. 65:1-12). Pernod USA cannot point to any actual sales of MALIBU lost to HAVANA CLUB. (*Id.*, 81:13-16). Instead, these marketing executives use BACARDI rum as a surrogate to speculate that since MALIBU competes with BACARDI rum, the number one selling rum in the United States, MALIBU must, therefore, also compete with HAVANA CLUB rum.[10] This syllogism is false because of the obvious differences between BACARDI and HAVANA CLUB rum in terms of price point, taste, and packaging. HAVANA CLUB rum is positioned as a super premium rum that is not intended to cannibalize sales of BACARDI rum. (JTX 2; PTX 37; PTX 38; PTX 39; PTX 43). Indeed, Pernod USA's own document represents that rums priced above $15 for a 750 ml package, like HAVANA CLUB, fall into a different price section than MALIBU. (PTX 18 at PR196252). Pernod USA has previously acknowledged that it did not have an entry in this product category and needed to work toward developing one. (DTX 7).

Pernod USA's contention that MALIBU is somehow losing sales to HAVANA CLUB rum is nothing more than unsupported conjecture from Jeffrey Agdern. Agdern opined that because MALIBU and HAVANA CLUB rum are direct competitors, if a consumer "choose[s] to try something new, like Havana Club, then it's likely to be a lost sale for Malibu."

---

[10]    Ironically, at one point, Pernod USA attempted to validate that "Bacardi and Malibu are NOT really competing against eachother. [*sic*]" (DTX 49).

(Tr. 64:21-24).  This assertion by Agdern makes no sense in a competitive market with many

rums and vodkas for consumers to choose from.  No record evidence was offered to show that

any sales lost by MALIBU were attributable to alleged misperceptions about HAVANA CLUB

rum's origins.  If Floridians bought HAVANA CLUB rum simply to "try something new," this

would not be violative of § 43(a).

Bacardi USA's HAVANA CLUB marketing team does not view MALIBU as a

competitive product, and not just because MALIBU is not technically a rum.  John Gomez, a

former Bacardi USA marketing executive who was intimately involved in the development and

marketing of Bacardi's HAVANA CLUB rum, testified:

> Well they don't compete against each other because
> Havana Club is targeted to a completely different consumer
> group.  It's priced much higher. The usage is generally
> different, so it's really two different propositions.  We
> would not look at those -- at Malibu as being part of the
> competitive set for Havana Club.

(Tr. 285:17-22).

## III.
## INTRODUCTION TO ARGUMENT

Pernod USA's two-fold § 43(a) claim rests on the allegations that:  (i) Bacardi

USA's use of the trademark HAVANA CLUB "for a rum not produced in Cuba" is a false and

misleading representation as to the geographic origin of that rum and (ii) its statements that its

HAVANA CLUB rum is the HAVANA CLUB rum made in Cuba and sold in the United States

before 1960 also deceptively miscommunicate origin. (Compl. ¶ 21).  The latter alleged

misrepresentation, taken literally, is absurd — the HAVANA CLUB rum Bacardi USA sold in

2006 could not possibly be the rum JASA made in Cuba a half century ago.  More germanely,

Pernod USA offered no evidence at trial to show that Bacardi USA ever made the second

purported false advertising statement alleged in the Complaint, and its post-trial brief never mentions that claimed misrepresentation.

The back of the bottle in which HAVANA CLUB rum is sold does, however, make certain scrupulously accurate assertions of historical fact; namely, that Bacardi USA's "HAVANA CLUB rum is a premium rum distilled and crafted in Puerto Rico using the original Arechabala family recipe" that was "[d]eveloped in Cuba circa 1930." (JTX 6). Since the back label plainly and accurately states that Bacardi USA's HAVANA CLUB rum is distilled in Puerto Rico, this heritage statement cannot possibly be construed as misrepresenting where HAVANA CLUB rum is now being made. Indeed, the "distilled and crafted in Puerto Rico" wording reinforces the prominent "Puerto Rican Rum" statement of origin on the front label and is absolutely truthful.[11] If Pernod USA's position is that the remainder of the heritage statement is impliedly false because consumers take away the perception that Bacardi USA's HAVANA CLUB rum is the HAVANA CLUB rum made in Cuba and sold in the United States before 1960, then Pernod USA was obliged to offer a survey or other extrinsic evidence showing that the Cuban heritage statement was perceived in this fashion. For obvious reasons, no such evidence was offered.

Moreover, the literal truthfulness of the back label's "story" was not called into question at the trial. The fact that HAVANA CLUB rum was originally developed and sold in Cuba is the subject of judicial admissions and has never been disputed. The truthfulness of the rest of the Cuban heritage statement on the back label, that Bacardi USA's HAVANA CLUB was made in Puerto Rico *"using the original Arechabala family recipe,"* was proven at trial

---

[11]    The plain, unambiguous, and literal meaning of the words in this heritage statement cannot be construed to mean its rum "is the rum that was made in Cuba . . . before 1960" (Compl. ¶ 21), and Pernod USA has submitted no extrinsic evidence supporting the notion that this statement is impliedly false.

21

through the testimony of Bacardi USA's witnesses.

## REDACTED

(*See* pp 11-13, *supra*).  So, on
the trial record, it is uncontroverted that Bacardi USA's HAVANA CLUB rum was made using
the original Arechabala recipe for HAVANA CLUB rum.

   The McCullough Survey stands as Pernod USA's only evidence of alleged
deception.  Yet that survey, on close examination, does not fit the facts or the issue to be
resolved by the Court, and, as such, is inadmissible.  Moreover, as Bacardi USA's expert, Dr.
Ford, testified, the McCullough Survey was not designed or conducted in accordance with
accepted survey principles and practices.  The universe is wrong, the control is faulty, the
questions misleading, and the coding incorrect.  Since the survey does not meet *Daubert*
standards, it is entitled to little or no weight, and without the survey, Pernod USA's § 43(a) claim
fails.

   But the most glaring hole in Pernod USA's case is the dearth of evidence on two
crucial elements of its § 43(a) claim:  the materiality of the alleged deception and likely
competitive injury to MALIBU attributable to that alleged deception.  Materiality is barely
addressed by Pernod USA, and the evidence offered falls woefully short of carrying its burden.
Pernod USA provided the court with no probative evidence of a likely competitive injury to
MALIBU attributable to the sales in Florida of HAVANA CLUB rum.  Since Pernod USA's

failure to carry its burden on these two essential elements of its § 43(a) claim is readily apparent, these two substantive points are addressed first in Bacardi USA's arguments.

**IV.**
**ARGUMENT**

**A.    Pernod USA Has Failed To Meet Its Burden of Proving Each Element of a § 43(a) Lanham Act Violation**

     1.   The Legal Standard For a § 43(a) Lanham Act Claim

The Third Circuit has emphasized that "[a] competitor in a Lanham Act suit does not act as "a 'vicarious avenger' of the public's right to be protected from false advertising." *Sandoz Pharmas Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 230 (3d Cir. 1990) (quoting *Am. Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 145 (S.D.N.Y. 1987)). The parties concur that in order to prevail on a Lanham Act § 43(a) claim in this Circuit, Pernod USA must prove by a preponderance of the evidence:  (1) that Bacardi USA has made false or misleading statements as to its HAVANA CLUB rum; (2) that there is actual deception or at least a tendency to deceive a *substantial portion* of the intended audience; (3) that the deception is *material* in that it is likely to influence purchasing decisions; (4) that the representation at issue was used in commerce; and (5) that there is a likelihood of injury to Pernod USA in terms of declining sales, loss of market share, or loss of good will.  15 U.S.C. § 1125(a)(1)(B); *Warner-Lambert Co. v. BreathAsure, Inc.*, 204 F.3d 87, 91-92 (3d Cir. 2000).  As set forth in greater detail below, Pernod USA has failed to carry this burden.

     2.   The Level of Deception Required In This Circuit

Pernod USA flatly asserts that the level of deception necessary to meet the "*substantial portion* of the intended audience" standard required to support a false advertising claim is 15%. (Pl. Br. at 20).  This is incorrect.  Courts have accepted as low as a 15% level of deception where the health or safety of consumers was implicated, but the correct standard is a

RLF1-3421022-1

sliding one with the normal benchmark around 20%. In *Johnson & Johnson-Merck Consumer Pharmas. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 n.14 (3d Cir. 1994), the court indicated that a 20% deception rate would be sufficient. *See also Stiffel Co. v. Westwood Lighting Group*, 658 F. Supp. 1103, 1114 n.5 (D.N.J. 1987) (rejecting assertion that a 15% deception rate would constitute a sufficient showing).

Twenty percent (20%) is the rule of thumb used by the National Advertising Division of the Better Business Bureau (the "NAD") in its false advertising cases. *See, e.g., Wal-Mart Stores, Inc., "Unbeatable Prices" and "$700 Grocery Savings" Advertising*, Case #5032, 9-10 (Nat'l Adver. Div. June 8, 2009) (refusing to accept survey showing confusion levels in "10-13% range" and noting that "NAD has held that when assessing such surveys, approximately 20% or above has been consistently considered adequate (with 15% being **more the exception rather than the rule)** to show confusion") (emphasis added) (quotation marks omitted).[12]

The two cases cited by Pernod USA purporting to show that a 15% confusion rate is sufficient are distinguishable. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578 (3d Cir. 2002), discussed surveys only as part of an alternative basis for affirmance, after concluding the claims in question were literally false. The survey in question showed a confusion rate of approximately 25% rather than 15%. More

---

[12]   The NAD is a highly reputable industry tribunal for the resolution of advertising disputes. Indeed, several courts have found that deference to NAD expertise in these matters is appropriate. *See, e.g., Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 384-85 (S.D.N.Y. 2007) (staying proceedings to allow NAD to address issue before court proceedings); *BellSouth Tellecommc'ns, Inc. v. Hawk Commc'ns, LLC*, No. 1:04-CV-280-MHS, 2004 WL 1085324, at *3-4 (N.D. Ga. Apr. 12, 2004) (noting prior NAD finding as significant in granting preliminary injunction); *Abbott Labs. v. Gerber Prods. Co.*, 979 F. Supp. 569, 574-75 (W.D. Mich. 1997) (considering NAD decisions concerning survey design in false advertising case); *Coca-Cola Co. v. Procter & Gamble Co.*, 642 F. Supp. 936, 939 (S.D. Ohio 1986), *rev'd on other grounds*, 922 F.2d 28 (6th Cir. 1987) (NAD finding that ads not misleading weighs in favor of finding that ads not misleading).

importantly, the claims being made in *Novartis* related specifically to health and safety, and courts have regularly recognized that the public interest in protecting consumers requires a more stringent deception standard. *See, e.g., UpJohn Co. v. Riahom Corp.*, 641 F.Supp. 1209, 1224 (D. Del. 1986) (explaining that claims about clinical studies can create a deceptive impression about a product which would influence a consumer's decision to purchase it because "American consumers who see a product claiming that clinical tests have shown it safe for use expect that the product has gone through extensive and rigorous testing."). No such health or safety claim is made here.

Nor does *Merisant Co. v. McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509 (E.D. Pa. 2007), provide support for Pernod USA's contention that a survey purporting to show a 15% confusion rate mandates a finding that a "substantial portion" of consumers are confused. In *Merisant*, at issue was whether a survey where the confusion rate could be calculated in different ways would allow a plaintiff to survive summary judgment. The court, in denying summary judgment, concluded that issues of fact existed about the actual percentage of consumers confused. Here, we are in a wholly different posture — the case has been fully litigated, and the Court may make its own decision about, first, whether Pernod USA has shown that its survey is trustworthy, and second, whether the "substantial portion" requirement of § 43(a), applying a sliding scale with a 20% deception rate, has been met based on that survey.

3.      The Criteria for Establishing Impliedly False Claims

If a challenged advertising claim is not literally false, the plaintiff must prove that it is deceptive, which depends upon the message taken away by consumers. *See Johnson & Johnson-Merck,* 19 F.3d at 130 (Lanham Act plaintiff bears the burden of showing how consumers actually react to the allegedly false claim). The conventional way to carry this burden is an adequate and well-controlled survey showing how a substantial portion of consumers

25

perceive the challenged statement. A consumer survey is only of assistance to the trier of fact if the challenged claim is ambiguous: "[a]n advertising claim which is truthful and is clear on its face cannot be proven to be misleading by surveying consumers." 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:53, at 27-108.1 (4th ed. 2009) (hereinafter MCCARTHY). Professor McCarthy cautioned that "[t]he plaintiff in a false advertising case cannot re-define the usual meaning of terms in a competitor's advertising message in order to make it false and misleading." 5 *Id.* at 27-110. Attempts to use a survey to transform a clear and factual statement into a false and misleading one are not countenanced. *See, e.g., Am. Italian Pasta Co. v. New World Pasta Co.,* 371 F.3d 387, 393-94 (8th Cir. 2004) (refusing to allow survey concerning how "America's Favorite Pasta" statement is understood); *Mead Johnson v. Abbott Labs.,* 201 F.3d 883, 885-87 (7th Cir. 2000) (reversing district court's decision to rely on survey concerning purported misunderstanding of "1st Choice of Doctors" statement); *First Health Group Corp. v. BCE Emergis Corp.,* 269 F.3d 800, 804 (7th Cir. 2001) (refusing to allow plaintiff to avoid clear dictionary definition of "PPO" to create confusion).

**B.      Pernod USA Did Not Establish That MALIBU Suffered Any Likely Competitive Injury**

Under common law, a company doing business in a locality that was famous for producing a particular product had the right to stop the use of that geographic designation by a competitor who was from somewhere else. This was an exception to the common law requirement that only producers from the "single source" of a misrepresented product could bring a false advertising claim.[13] *See* 5 MCCARTHY § 27:26. Historically, § 43 (a) claims for

---

[13]      The Third Circuit, in the seminal case of *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.,* 214 F.2d 649, 651 (3d Cir. 1954), indicated in *dictum* that § 43(a) reflected the more modern view in § 761 of the Restatement of Torts, which provides a claim when a competitor fraudulently states the goods he markets have ingredients or qualities which they do not have, but which the plaintiff's goods do have.

false designations of geographic origin have similarly been restricted to producers located in a particular place, like the Black Hills, "who asserted their right to the use of a geographical designation in a suit against other producers who did not manufacture their goods in said area but nevertheless used the geographical designation in their name or label." *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 750 (8th Cir. 1980). *See also Scotch Whiskey Ass'n. v. Barton Distilling Co.*, 338 F. Supp. 595 (N.D. Ill. 1971)*, aff'd in part and rev'd in part on other grounds*, 489 F.2d 809 (7th Cir. 1973) (plaintiff was an association of Scottish whiskey producers that sued to prevent the counterfeiting of Scotch whiskey); *Joint Stock Soc. v. UDV North Am., Inc.*, 266 F.3d 164, 181-82 (3d Cir. 2001) (only producers and importers of Russian vodka would be likely to suffer a direct injury in terms of lost sales attributable to the alleged misrepresentation of SMIRNOFF as a Russian brand).

The original wording of § 43(a) explicitly retained the restriction that the plaintiff had to be "doing business in the locality falsely indicated as that of origin." This language in § 43(a) was changed in 1988, but the legislative history of the amendment shows there was no intent to lessen the standing or the proof of competitive injury requirements pertaining to false geographic designation claims that had developed in the case law. *See ALPO Petfoods v. Ralston Purina Co.*, 913 F.2d 958, 964 n.6 (D.C. Cir. 1990) (Congress intended that the § 43(a) amendments largely codify pre-1988 case law); 5 MCCARTHY § 27:10, at 27-22 (previous archaic language of § 43(a) replaced with wording reflecting the reality of case law interpretation).

Pernod USA is not from Cuba, and MALIBU is made in Canada. (Compl. ¶ 4; Tr. 28:21-29:6, 82:24-25). While Pernod USA alleges Bacardi USA has falsely identified Cuba as the origin of its HAVANA CLUB rum, MALIBU is not a Cuban rum either. (Tr. 87:20-24.)

27

So, if there were American consumers with a preference for Cuban rum, those consumers would not be diverted away from MALIBU to HAVANA CLUB rum. Since MALIBU does not come from Cuba, there can be no presumption of competitive injury. *See L'Aiglon Apparel, supra* n.13.

No claim of reputational injury has been made by Pernod USA. Jeff Agdern, Pernod USA's sole fact witness, testified "[n]o, I don't believe there has been injury to [MALIBU's] reputation, only potentially its sales." (*Id.,* 81:17-23). Any opinion as to the loss of potential future sales is pure speculation. Pernod USA was obliged to prove that MALIBU lost sales, or is likely to lose sales, directly on account of the alleged misperception that Bacardi USA's HAVANA CLUB rum is made in Cuba. The mere fact that MALIBU competes with BACARDI rum, another brand sold by Bacardi USA, or MALIBU may be losing sales to BACARDI rum, does not establish a direct competitive injury attributable to any false impression that HAVANA CLUB rum is produced in Cuba. Nor does the speculation that if HAVANA CLUB rum were sold nationwide MALIBU would at that point lose sales to HAVANA CLUB rum suffice to show direct competitive injury here.

In *Phoenix of Broward, Inc. v. McDonald's Corp.,* 489 F.3d 1156 (11thCir. 2007), the Eleventh Circuit recently applied the Third Circuit's prudential standing test as set out by then-Judge Alito in *Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.,* 165 F.3d 221, 225-27 (3d Cir. 1998), to a § 43(a) false advertising case. In *Phoenix of Broward,* as here, reputational injury was not claimed. The Eleventh Circuit rejected the argument Pernod USA makes here — that direct competitors invariably suffer a competitive injury within the meaning of § 43(a) when a false statement is made. Phoenix of Broward, a Burger King franchisee, claimed that a McDonald's advertisement falsely represented that customers had a fair and equal choice to win

high value prices offered by McDonald's, and, as a direct result of that misrepresentation, Burger King customers were lured to McDonald's. The Eleventh Circuit found the link between the misrepresentation and lost sales was too tenuous and held the lack of directness of the injury factor weighed against standing. In deciding whether the possibility of duplicate damages weighed in favor or against a finding of standing, the court reasoned that every other competitor of McDonald's could also sue if Phoenix of Broward were allowed to do so; weighing the *Conte Bros.* factors together, the court concluded that prudential standing did not exist.[14]

If MALIBU lost sales to HAVANA CLUB rum for any reason other than the purported miscommunication by Bacardi USA's HAVANA CLUB rum of its origin, those lost sales would not give rise to a § 43(a) claim. Bacardi USA has the right to engage in free and fair competition with Pernod USA, with the objective of getting prospective MALIBU customers to buy Bacardi USA's HAVANA CLUB rum. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 1 cmt. a (1999) ("The freedom to compete implies a right to induce prospective customers to do business with the actor rather than with the actor's competitors."). The record is devoid of any probative evidence indicating that any MALIBU sales were lost due to the supposed misperception of the origin of HAVANA CLUB rum. Indeed, Mr. Agdern expressly testified that Pernod never collected data on the sales of HAVANA CLUB rum in Florida, and off-hand had no idea what those total sales were. (Tr. 81:5-12). More importantly, Agdern was not aware of any actual sales that MALIBU had lost to HAVANA CLUB. (*Id.* 81:13-16). This lack of specific proof of direct competitive injury is a critical failing in Pernod USA's proof and mandates that judgment be entered for Bacardi.

---

[14] On the record, Pernod USA no longer can satisfy the Third Circuit's prudential standing test.

**C.    Pernod USA Failed to Prove that the Alleged Misperception Regarding the Origin of HAVANA CLUB Rum Would Be Likely To Influence Purchasing Decisions**

1.    There Is No Presumption That a Misperception of Origin Satisfies the Materiality Requirement

Pernod USA glosses over the critically important element of materiality by simply assuming that it is somehow entitled to a presumption of materiality.  (Pl. Br. at 34-35).  This contention is based on a misreading of the statute and the controlling caselaw.  Pernod USA asserts that origin is somehow an inherent characteristic or quality of rum and that a misrepresentation of origin presumptively satisfies the § 43(a) materiality requirement.  (*Id.*).  This argument makes no sense and is supported by no authority.  In those circuits recognizing this presumption, the inherent characteristic must be central to the marketability of the product; that is, "a characteristic that defines the product at issue."  *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312 (1st Cir. 2002).  The geographical origin of a rum is certainly not its defining characteristic or central to its marketability.  Again, using MALIBU as an example, it is manufactured in Canada using rums that come from a variety of locations.  (Tr. 401:7-20, 82:24-25, 87:20-88:6, 113:2-8).  No Third Circuit authority is cited in support of the claimed presumption and the evidence introduced by Bacardi USA in any event rebuts it.  Pernod USA's failure to offer evidence demonstrating materiality alone causes Pernod USA's § 43(a) claim to fail.

2.    No Proof Was Offered That the Purchasing Decisions of Consumers Are Likely To Be Influenced by a Rum's Origins

Before reaching § 43(a)'s "materiality" requirement, Pernod USA must first show that the HAVANA CLUB mark deceives a substantial proportion of the relevant segment of the public.  *Johnson & Johnson-Merck,* 19 F.3d at 129.  *See also In re Spirits Int'l, N.V.,* 563 F.3d 1347, 1356 (Fed. Cir. 2009) (there must be proof of likely deception of a substantial portion of

30

the intended audience and that the deception is material). Even assuming *arguendo* that there is a misperception among a substantial portion of Floridian rum drinkers that HAVANA CLUB rum is made in Cuba, Pernod USA still must prove that this misperception of Cuban origin would have a material effect on consumers' purchasing decisions. *See, e.g., Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1428 n.9 (3d Cir. 1994), *cert. denied*, 514 U.S. 1103 (1995) (plaintiff alleging false advertising must prove "that the deception is material in that it is likely to influence purchasing decisions"); *Sandoz Pharmas. Corp. v. Richardson-Vicks Inc.*, 735 F. Supp. 597, 601 (D. Del. 1989) ("[I]t is the [c]ourt's view that the advertising statement would probably not influence the purchasing decision."); 5 MCCARTHY § 27:35.

The Second Circuit decision in *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir. 1997), held that for an alleged misrepresentation to be deemed material, it must involve an attribute important enough that it is likely to make a difference to purchasers. Motorola advertised that its "SportsTrac" device, which regularly updated basketball scores, provided "updated game information direct from each arena." *Id.* at 855. The NBA asserted this claim was false as the scores came from television and radio broadcasts and were not "direct from each arena." *Id.* The district court found that the challenged advertising claims, even if false, were not "material," because their inaccuracy would not influence the purchasing decisions of consumers, whose interest in obtaining updated game scores was still served regardless of where the data originated. The Second Circuit upheld the trial court, noting that where the data came from was irrelevant to the prospective purchasers.

In other words, for the alleged deception to be material, Pernod USA would have to show that a significant portion of purchasers are moved by the alleged misdescription to buy the product expecting to get the misdescribed product. If, on the other hand, purchasers buy the

31

product because they like it for some other reason or are indifferent to the alleged misdescription, it is immaterial. An example of an immaterial geographical misdescription is provided by Pernod USA's own product. MALIBU, unlike HAVANA CLUB, is a geographical designation. MALIBU is not made in Malibu, California (Tr. 86:4-13), but this geographical misdescription does not make the MALIBU trademark a false geographical designation in violation of § 43(a) because there is no reason to believe that prospective purchasers believe Malibu, California is a preferred spot for making a coconut-flavored rum cordial.

3.     Without Evidence That Cuba is Perceived as a Particularly Desirable Source for Rum, Any Misperception That HAVANA CLUB Rum Is From Cuba Must Be Deemed to be Immaterial

A significant preference among prospective purchasers for Cuban rum is the *sine qua non* of satisfying the materiality requirement. Without that preference, even if prospective purchasers were misled about origin, this would still be irrelevant to their purchasing decisions. Pernod USA offered no competent documentary or testimonial evidence that American purchasers care whether HAVANA CLUB rum is made in Cuba or not. On the contrary, the testimony from Jeff Agdern and the results of Pernod USA's own marketing research establish that the Caribbean is thought by prospective buyers to be "the most notable place" for making rum. (Tr. 83:3-9). This evidence that Caribbean origin is preferred among rum drinkers completely undercuts any argument that the alleged misperception that HAVANA CLUB rum is made in Cuba would influence the purchasing decision of a significant portion of rum buyers.[15] Since, on Pernod USA's own testimony, Caribbean rum is the preferred choice of American rum purchasers, they would not buy HAVANA CLUB rum instead of MALIBU "Caribbean" rum regardless of whether HAVANA CLUB rum was perceived to come from Cuba. At most, the

---

[15]     Agdern testified that he had never seen any research among consumers finding Cuba was a particularly desirable place to make rum. (Tr. 85:5-21).

scales would be evenly balanced, as Cuba, Barbados, and Puerto Rico are all in the Caribbean region.

Moreover, it is indisputable that Cuban rum has not been sold in the United States for nearly 50 years. Accordingly, only an insignificant portion of American rum buyers would even be acquainted with that product. No probative evidence was proffered suggesting that a purchaser preference for Cuban rum survived the long hiatus during which no Cuban rum has been sold here. The TTB has also, by regulations subject to judicial notice, identified specific geographic regions to which prospective purchasers of rum and other spirits attach particular significance. The designations "Puerto Rico Rum," "Jamaica Rum" and "Demerara Rum" have been found by the TTB to be such geographically significant places to make rum. 27 C.F.R. § 5.22(k)(3). No such finding exists with respect to Cuba. These findings by the TTB should be given judicial deference. In the absence of any contrary evidence, these findings confirm the proposition that the buying decisions of American consumers would not likely be influenced by whether a rum was made in Cuba.

**D.     Pernod USA Did Not Establish That the Use of the Mark HAVANA CLUB on Bacardi USA's Rum Is Likely to Deceive a Substantial Portion of American Consumers as to the Origin of That Rum**

Pernod USA has the burden of proving that the use of the HAVANA CLUB mark on Bacardi USA's rum deceived or is likely to deceive a substantial portion of actual and prospective rum purchasers in Florida into believing that Bacardi USA's rum is presently made in Cuba. The Restatement (Third) Of Unfair Competition states that it is not possible to analyze the issue of whether a substantial part of the audience is likely to be deceived solely in terms of absolute percentages, as "the potential harm to such persons and to the interests of competitors must be weighed against the harm the imposition of liability and contemplated relief would cause to the actor and the remainder of the audience." RESTATEMENT (THIRD) OF UNFAIR

33

COMPETITION § 2, cmt. d (1999).  In this sliding scale, a minimum 20% rate of deception appears

to be the norm, with the courts occasionally going as low as 15% in exceptional cases involving

health or safety concerns. (*See* pp 23-25, *supra*).

  1.  <u>HAVANA CLUB Is a Lifestyle Trademark, Not a Geographic Designation</u>

    In a case where a trademark is alleged to be geographically deceptive, the plaintiff

must first show the public perceives the mark as connoting a place name as opposed to a

lifestyle.  A geographic designation is the name of a place.  The composite mark "HAVANA

CLUB" is not a geographic designation.  *See, e.g., Univ. Book Store v. Univ. of Wisconsin Bd. of

Regents,* 33 U.S.P.Q. 2d 1385, 1404 (T.T.A.B. 1994) ("the primary significance to the public of

the mark 'WISCONSIN BADGERS,' when considered in its entirety, cannot be said to be

geographical").  "HAVANA" modifies the word "CLUB," not rum, so the term "HAVANA

CLUB" itself is *not* a geographic designation.  As the Second Circuit has observed, "[t]he fact

that a composite phrase contains a geographic term does not necessarily mean that the phrase,

viewed as a whole, is a geographic designation." *Forschner Group, Inc. v. Arrow Trading Co.,*

30 F.3d 348, 355 (2d Cir. 1994).  There is substantial evidence that Bacardi USA and its

predecessor intended HAVANA CLUB to be viewed as a "lifestyle" mark.  (Tr. 125:22-126:4,

245:22-246:15, 247:19-248:6, 255:1-20, 259:15-20, 276:5-277:6; PTX 43).  If HAVANA CLUB

is perceived as a lifestyle trademark, then it is not a geographic designation and there is no

deception.

    "The question is whether *the phrase* can be construed to mean that the product is

made in a certain locale." *Forschner,* 30 F.3d at 355 (emphasis in original).  *See also In re Cal.

Innovations, Inc.,* 329 F.3d 1334, 1336-37 (Fed. Cir. 2003) (it must be established that the mark

misrepresents the goods).  The answer to that question depends on how prospective purchasers

perceive the entire mark.  "CLUB" is the predominant part of the mark in its entirety, so

HAVANA CLUB, when used as a trademark on a distilled spirit like rum is intended to portray a type of lifestyle, like NANTUCKET for clothes. The intended lifestyle message taken away from the HAVANA CLUB mark, which is reinforced by the retro packaging for the rum and Bacardi USA's promotional materials, is of the raffish, sultry nightlife experienced in a 1930's Havana night spot.

The origin statement "Puerto Rican Rum" is conspicuously displayed right beneath the HAVANA CLUB brand on the front of the bottle of Bacardi USA's rum. (JTX 6). The Puerto Rican origin of the rum is further emphasized by the wording on the back label that "HAVANA CLUB rum is a premium rum distilled and crafted in Puerto Rico." (JTX 6). In *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744 (5th Cir. 2006), the Fifth Circuit recently found the brands CAJUN BOY and CAJUN DELIGHT as used on catfish farm-grown in China were not deceptive since Piazza's Seafood had disclosed truthful information (country of origin) on the labeling of its products that eliminated any possible deception attributable to the brands. The court held that a state labeling law which plaintiffs were accused of violating with the reference to their products as "Cajun" was unconstitutional. The labeling of HAVANA CLUB rum similarly dispels any possibility of likely confusion as to where it was made.

2.     The Treasury Department's TTB Has Determined that HAVANA
       CLUB Is Not A Geographically Misleading Deceptive Brand for Rum

The label for Bacardi USA's HAVANA CLUB rum was approved by the TTB. (DTX 103). The TTB is charged under the Federal Alcohol Administration Act, 27 U.S.C. § 205(e), *inter alia,* with the duty of enacting regulations prohibiting the use of labels that deceive consumers, including the use of geographically misleading brand names. 27 C.F.R. § 5.34(a). The Certificate of Label Approval ("COLA") for Bacardi USA's HAVANA CLUB rum that was issued by the TTB is in evidence. (DTX 103; Tr. 261:7-25, 262:24-263:12, 262:17-

35

22). The Bureau of Alcohol, Tobacco, and Firearms, the predecessor of the TTB, also has issued COLAs for other versions of HAVANA CLUB rum that were not of Cuban origin. (DTX 104). The determination by the TTB, the agency with specialized expertise concerning distilled spirits, including rum, that the HAVANA CLUB brand is not misleading is entitled to deferential treatment from this Court.

3.   The Patent and Trademark Office Has Also Determined that "HAVANA"
     Formative Trademarks Are Not Materially Deceptive

The holding of *In re Bacardi & Co. Ltd*, 48 U.S.P.Q.2d 1031 (T.T.A.B. 1997), which Pernod USA cites in its brief repeatedly, does not stand for the proposition that "Havana" formative trademarks materially deceive the public as to the origin of rum. The opinion in *Bacardi & Co.* was based on an interpretation of the Lanham Act provision dealing with the registration of primarily geographically misdescriptive marks that was statutorily superceded by the NAFTA Implementation Act. [16] The 2003 Federal Circuit decision in *California Innovations* (p. 34, *supra*) overruled *sub silentio* earlier Trademark Trial and Appeal Board ("TTAB") decisions, like *Bacardi & Co.*, which did not take into account the import of the NAFTA amendments. In *Bacardi & Co.*, the TTAB upheld the refusal of the U.S. Patent & Trademark Office ("PTO") to register the "Havana" formative marks which BACO had applied for under § 2(e)(2) of the Lanham Act. The ground for the rejection was that the marks were primarily geographically misdescriptive; that is, that the marks had not yet become distinctive for rum through use. Had the PTO decided the marks were "materially deceptive" within the meaning § 43(a), the rejection would have been under § 1052(a).

---

[16]   The HAVANA-formative trademarks discussed in the *Bacardi & Co.* decision, including HAVANA SELECT, HAVANA PRIMO and HAVANA CLIPPER, all differed in sound, sight, and commercial impression from the HAVANA CLUB trademark. Moreover, those marks had not been (and were not afterwards) used by the applicant in the United States or anywhere else.

36

NAFTA explicitly added a materiality requirement to § 1052(a) of the Lanham Act that mirrored the longstanding materiality requirement of § 43(a). *Compare Cal. Innovations*, 392 F.3d at 1336-37 ("To deny a geographic mark protection under § 1052(a), the PTO must establish that (1) the mark misrepresents or misdescribes the goods, (2) the public would likely believe the misrepresentation, and (3) the misrepresentation would materially affect the public's decision to purchase the goods."), *with Johnson & Johnson-Merck*, 19 F.3d at 129 ("To prevail on its claim of unfair competition under Section 43(a), we have said a plaintiff must prove by a preponderance of the evidence: (1) that the defendant has made false or misleading statements as to his own product [or another's]; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; [and] (3) that the deception is material in that it is likely to influence purchasing decisions. . . .").

Judge Rader pointed out in *California Innovations*, 329 F.3d at 1336-37, that the PTO, pre-NAFTA, rejected geographic marks that "materially deceive the public" (the same materially deceptive standard found in § 43(a)) under § 1052(a) of the Lanham Act, not § 1052(e), which was the subsection cited by the TTAB in *Bacardi & Co.* Therefore, the TTAB did not find that the Havana formative marks at issue in *Bacardi & Co.* were deceptive within the meaning of § 43(a). The unmistakable implication of this holding, therefore, is that "HAVANA" formative marks are not deceptive. Indeed, in *Jose Arechabala, S.A. v. Ramirez*, 66 U.S.P.Q. 7 (Comm'r of Pats. 1945), the PTO explicitly rejected the Respondent's contention that "Havana is noted as an important source of rum" (internal quotation marks omitted) and held the HAVANA CLUB mark was not primarily geographically descriptive.

4.   American Rum Buyers Are Not Apt To Be Deceived as to Where HAVANA
     CLUB Rum Is Made Since the Sale of Cuban Rum in the United States Has Been
     Banned For Nearly 50 Years

The embargo imposed on trade with Cuba in 1962 remains in force to this day. [17]

The Cuban embargo, besides making Cuban rum unavailable, also prevents consumer deception.

Most Americans know of the embargo on trade with Cuba and this knowledge insulates them

from being deceived into believing that rum or other products sold in the United States come

from Cuba. In *Cuban Cigar Brands N.V. v. Upmann Int'l Inc.*, 457 F. Supp. 1090 (S.D.N.Y.

1978), a Cuban company contended that use of the UPMANN cigar brand by the former owner

of a Cuban cigar business should be enjoined as being geographically misdescriptive, since the

UPMANN mark was associated with cigars made in Cuba.   The court ruled deception was

unlikely, observing that "given the wide publicity attending the Cuban boycott . . . it is doubtful

whether 'the discriminating smokers who bought cigars bearing these trademarks, were not fully

aware that Cuban cigars and Cuban tobacco were no longer attainable in this country and that the

cigars they bought . . . were not made of Cuban tobacco.'" *Id.* at 1101 (second omission in

original).   *See also Menendez v. Faber, Coe & Gregg, Inc.*, 345 F. Supp. 527, 557 n.21

(S.D.N.Y. 1972).

The same reasoning holds true here.  If some rum drinkers did prefer Cuban rums

(an issue on which Pernod USA advanced no probative evidence), then over the last 50 years

they would surely have learned that Cuban rum cannot be obtained in the United States.

Consequently, these rum purchasers would not be misled by the HAVANA CLUB brand,

because it is obvious that rum sold in the United States cannot be from Cuba.  Consumers with

---

[17]     The embargo on trade with Cuba was announced in the Federal Register (Proclamation
No. 3447, 27 Fed. Reg. 1085 (Feb. 6, 1962)) and its terms are set forth in the Cuban Asset
Control Regulations, 31 C.F.R., Pt. 515.   Federal law provides the contents of the Federal
Register shall be judicially noticed. 44 U.S.C. § 1507.

no preference for Cuban rum would be indifferent as to whether the alleged misrepresentation was true or not, so any misperception on their part that the rum came from Cuba could not be material. Floridians, in particular, are exposed constantly to publicity about the embargo and know that Cuban rum (or any other Cuban product, for that matter) cannot be sold in Florida. (Tr. 274:7-24, 290:9-14). There is no reason to conclude that Floridians, the sole current audience for Bacardi USA's HAVANA CLUB rum, could be misled by the HAVANA CLUB brand into thinking Bacardi USA's rum came from Cuba.

E.    **The Deception Survey Offered by Mr. McCullough Does Not Fit the Facts Or Address the Sole Issue in the Case so That Survey and McCullough's Expert Opinions Are Untrustworthy and Should Be Disregarded**

As set forth above, Pernod USA did not offer any evidence to support many of the essential elements of its cause of action. These failings are more than sufficient to warrant entry of judgment in favor of Bacardi USA. The only issue on which Pernod USA makes a serious effort to attempt to meet its evidentiary burden was whether consumers were deceived into believing that HAVANA CLUB rum is produced in Cuba. The only evidence it offered was in the form of an expert survey. Under *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), this Court must determine whether the survey entitled a "Report On A Test To Determine the Country Of Origin Communicated by 'HAVANA CLUB' Rum" dated April 2008 (PTX 47, hereinafter the "McCullough Survey"), conducted by Mr. McCullough, and the expert opinions he proffered based on that survey, are relevant and reliable before according them any weight on the key issue of deceptiveness. The questionnaires that were filled out during the conduct of the McCullough survey were received in evidence. (PTX 49; Tr. 189:18-190:12).

The burden of proving the reliability and fit of the McCullough Survey rests squarely upon Pernod USA. *See, e.g., Bonesmo v. Nemours Found.*, 253 F. Supp. 2d 801, 806

39

(D. Del. 2003) ("the burden of showing competency rests on the party proffering the witness or evidence"); *AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 288 (D. Del. 2006) ("The party offering the expert testimony has the burden of proving admissibility."). As set forth more fully below, Pernod USA did not carry that burden.

In order to be of any assistance to the Court, the McCullough Survey and his expert opinions based on that survey must, under Federal Rule of Evidence 702, fit the facts and be relevant to the issues that are to be resolved in this case. *See Daubert,* 509 U.S. at 591-92 (even if the science is valid, the expert opinions must fit some disputed issue in the case); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 n.13 (3d Cir. 1994) ("the standard for fit is higher than bare relevance"). *See also* 4 J. WEINSTEIN & M. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 702 [02], at 702-17 (2d ed. 2009) (expert testimony, like all evidence, "must be relevant to an issue before the court; irrelevant evidence is inadmissible"). The only issue on which a survey could be helpful here is whether "HAVANA CLUB" as used as a trademark on Bacardi USA's rum is perceived by a significant portion of the actual and prospective purchasers of that rum as a designation of Cuban origin.

The stimulus used to test consumer perceptions in a survey is a critical component of "fit" in a false advertising case. The HAVANA CLUB trademark is the appropriate stimulus in this case, as the sole relevant issue turns on how consumers perceive that mark. Nevertheless, the McCullough Survey switched the primary emphasis away from the "HAVANA CLUB" stimulus to the rum itself because McCullough had been told by his client to enlarge the scope of the survey to include consumers' perceptions of where the ingredients in the rum were made. (Tr. 178:13-18). This issue is irrelevant to Pernod USA's § 43(a) claim. The primary emphasis had to be on the "Rum" as opposed to the brand HAVANA CLUB, because McCullough wanted

to probe the consumer nexus, if any, between the "Rum" and where its ingredients were perceived to come from.

McCullough testified about the second "ingredients" prong of the survey at trial:

> A.     Well, as you might have heard from my direct testimony, there were two objectives to the survey, not just to determine if there was a false communication in terms of the origin of where it was made, but also where the ingredients came from. And that was what I was probing for with question series three.
>
> Q.     I'm sorry. Again I didn't hear you.
>
> A.     That was what I was probing for with question series three, where the ingredients came from.

(Tr. 215:7-15). McCullough's ostensible rationale for conducting the second prong was that "[respondents] could think that the rum came from Puerto Rico but the ingredients came from Cuba," and respondents who did not know (or likely care) where HAVANA CLUB rum was made "still could have an opinion about where the ingredients came from." (*Id.*, 214:19-25, 214:5-13). McCullough acknowledged the "ingredients" test was added to the survey as a result of intermeddling by Pernod USA — "[t]here was an interest by Pernod about the possibility that some people may think that the product was made one place, possibly Puerto Rico, but that the ingredients might come from Cuba." (*Id.*, 178:13-18).

McCullough acceded to this client mandate and included the third series of questions in the survey. Question 3a asked: "Did the Rum you just looked at communicate to you *anything* about *any other place*?" (emphasis added). (PTX 47, Ex. A). Since this was a follow-up question posed to respondents who had just been asked "where the Rum was made," the "other place" Pernod USA hoped would be mentioned was the place where respondents thought the "ingredients" were made. The necessary "ingredients-rum" nexus was to be established by question Q.3c, which asked: "What is the relationship between this *other place*

41

and the Rum you just looked at?" (*Id.*) This inquiry was to be followed up by repeated probes of "anything else." (*Id.*).

The ingredient "test" was a complete failure from Pernod USA's perspective. The answers to questions 3a, 3b, and 3c demonstrate that many respondents misunderstood them. (*See* PTX 49). Only one of the 400 odd respondents (#410) even mentioned ingredients in responding to Q.3c. But McCullough did not forthrightly report to the Court that there was *no* evidence that HAVANA CLUB miscommunicates the origin of the ingredients of the rum. Instead, McCullough misused those responses to make a totally unwarranted extrapolation that certain individuals were "confused," not about the origin of the ingredients, but the origin of HAVANA CLUB rum. The "Conclusions" in the McCullough Survey asserted that "[a]nother 4% of respondents appeared to be confused about where HAVANA CLUB Rum is made." (PTX 47 at 3 (emphasis omitted)). The Survey Report then lumped that 4% of apparently confused respondents with the "misled" group and concluded that the results of the test show that "there is a 20% level of miscommunication." (*Id.* at 7). McCullough plainly meant the "miscommunication" to be understood by the Court as miscommunication by HAVANA CLUB rum of its origin as being Havana or Cuba. Indeed, McCullough, in his direct testimony, stated categorically that the 4% confused figure "represents the number, the net level of people who are confused based on my determination based upon the *Havana being part of the Havana Club name*." (Tr. 185:13-17 (emphasis added)).

On cross-examination, however, McCullough did not stand behind his Conclusions in the survey report and backed away from the categorical assertions made in his direct testimony. In response to a question about what the "confused" category meant, McCullough began hedging his testimony:

> The confused level is, are people who seem to give
> different answers, contradictory answers, when you look on
> the face of it, but I think that probably some of them, if not
> all of them, could be misled as well even though I can't
> state that from their answers.

(*Id.*, 229:17-21).   McCullough continued to equivocate as to what the "confused" category

meant, testifying that he "couldn't be absolutely sure that these people were misled" and "[t]he

confused answers seem to be misled, and there are some that are very close to being classified as

misled" and "I took those answers that weren't extremely clear and put them in a separate

category called confused." (*Id.*, 230:1-10).   Finally, McCullough was forced to concede that the

"confused" individuals were not properly deemed misled:

> Q.   And you called that miscommunication; is that right?
>
> A.   Well, it's potential miscommunication.   Again, I clearly
>      labeled it misled and separated it from the confused.   If the
>      Court wants to just use the misled, that's their prerogative.

(*Id.*, 231:11-15).   In short, McCullough, having been caught providing the Court with

conclusions that he knew were unsupportable—and quite likely wrong—as to a central issue in

the case, suggested that the Court ignore the results he reported that were knowingly wrong and

uncritically accept the rest of his survey report and his opinions as being trustworthy.   As

Professor Ford explained in his testimony, the people categorized as "confused" should not have

been counted toward a finding of deception, saying "[i]t's pretty clear to me that the people who

were categorized as confused are not misled.   And I don't think they should be counted as

misled." (*Id.*, 440:17-19).   Any reputable survey expert would concur with Ford, for

McCullough crossed the line from objectively reporting the data to impermissible speculation

based on faulty data.

The reasoning behind the maxim "*falsis in uno, falsis in omnibus*" applies equally

to experts as well as to fact witnesses.   There is no need to conclude that McCullough

deliberately lied to question the trustworthy of the rest of the survey and his related opinions. On

a careful parsing of his words, like "miscommunicated," McCullough clearly harbored mental

reservations about his treatment of the "confused" respondents in the survey report. McCullough

quite likely could come up with an explanation that would shield him against a claim of outright

falsehood. Still, there can be no doubt about his lack of candor to the Court. Once an expert has

demonstrated that he is less than forthright, there can be no assurance that the Court or opposing

counsel can ferret out the bias in that expert's opinion. McCullough, on cross examination,

perhaps aware of his own vulnerability, treated the subject of bias quite gingerly:

> Q. And in your experience as a survey expert, one of the
> problems that is most difficult to deal with is bias; isn't that
> right?
>
> A. That's a problem in some cases, yes.
>
> [ * * * ]
>
> Q. And once bias comes into the picture, then it is very easy
> for someone who is so minded to skew results or change
> the end results of the survey; isn't that right?
>
> A. Well, I hope nobody will be doing that.
>
> Q. And you in the past have been criticized by at least one
> court for biasing your questions; isn't that right?
>
> A. It's possible. I've been doing this for 25 years. I'm sure
> that some court has criticized me.

(Tr. 223:11-224:1). Then, after sparring as to whether fraudulent questionnaires were included

in the results of a survey he unsuccessfully proffered, McCullough retorted, "Well, when the

court disagrees with the expert, the Court always wins." (*Id.*, 224:15-16).

Here, McCullough distorted the survey by directing respondents to the wrong part

of the stimulus — the rum itself — and then proceeded with a survey design imposed by his

client that did not comport with the only issue before the Court. When the results of that

44

expanded survey did not come out the way Pernod USA hoped, McCullough made an unwarranted extrapolation to artificially inflate the deception level into a borderline area where, arguably, deception might be found.  The survey does not fit the facts of the case, the design was unduly influenced by McCullough's client, and the data was wrongly used to reach an unsupportable conclusion as to the "confused" respondents.   This robs the survey and McCullough's opinions of the indica of trustworthiness. *See, e.g., Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F. Supp. 1189, 1204-05 (E.D.N.Y. 1983).

**F.     The McCullough Survey Was Not Designed or Conducted in Accordance With Accepted Survey Practices And Principles**

Professor Ford in his report (DTX 86) and testimony, pointed out that the McCullough Survey was not designed and conducted in accordance with generally accepted survey practices.  Professor Ford taught marketing for 35 years at the University of Maryland and American University, has conducted approximately 50 surveys for litigation, and has published over 40 peer-reviewed articles in the area.  (Tr. 421:1-423:19).  Professor Ford concluded that the McCullough Survey was "fatally flawed" (DTX 86 ¶ 59) because of the major failures which warrant this Court giving that survey little or no weight.

The principal respects in which McCullough deviated from accepted survey principles are his selection of the wrong geographic universe for the survey, the systematic exclusion of Spanish speakers from the sampling, the use of an improper control, and the ambiguity of the survey questions. The coding in a number of instances was also wrong.  These are major problems, not technical flaws, and they render the McCullough Survey and his opinions based on that survey unreliable.

I.    McCullough's Use Of The Wrong Universe Is a Fatal Flaw

The only respondents who should have been included in the McCullough Survey are "that segment of the population whose perceptions and state of mind are relevant to the issues in the case." *Citizens Fin. Group Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 118 (3d Cir. 2004) (quotations omitted). The appropriate universe, accordingly, is limited to the geographical area where the products or advertisements being tested are available to potential purchasers, as Dr. Ford explained. (Tr. 425:17-426:11). In *Citizens*, the district court found that the relevant customer base to be tested was located in Buttler County and extreme northern Allegheny County, Pennsylvania. The defendant's expert in *Citizens*, Robert Reitter, did not include Butler County in his survey and instead conducted interviews at two malls in Allegheny County. The district court found that the proponent of the survey bears the burden of proving that the universe is proper, and concluded Reitter's universe was wrong and this mistake rendered the survey to be of so little probative value that it was excluded. The Third Circuit, noting that a skewed universe yields skewed results, held the Reitter survey suffered from fatal rather than technical flaws, and upheld its exclusion. *See also Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980) (excluding survey where defendant's products were not sold in 8 of the 10 cities used in survey); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) (excluding survey concerning expensive handbags in part because it was conducted in "midscale" malls, rather than "upscale" malls where purchasers of expensive handbags were more likely to shop).

In *Pharmacia Corp. v. Alcon Labs, Inc.*, 201 F. Supp. 2d 335, 362 (D.N.J. 2002), McCullough ran a survey, like the one at issue here, with the wrong universe. The survey was supposed to support the claim that Alcon's use of the mark TRAVATAN for a glaucoma medication was likely to dilute Pharmacia's XALATAN trademark. McCullough selected a

46

narrow universe favoring his client, consisting solely of ophthalmologists, rather than all users of glaucoma medications. The ophthalmologists, the court concluded, obviously knew more about glaucoma medications than their patients. The court recognized the seriousness of the flawed universe and held that McCullough's survey did not support the proposition for which it was offered.

Here, McCullough, despite his knowledge that HAVANA CLUB rum was only being sold in Florida (Tr. 166:13-20), selected a national universe for his mall intercept survey. The survey was conducted at malls located in Trumbull, Connecticut; Cleveland, Ohio; Atlanta, Georgia; Denver, Colorado; East Meadow, New York; Detroit, Michigan; Seattle, Washington; and Jacksonville, Florida. (*Id.,* 166:6-12). Since Florida residents are the only segment of the population that were actual or potential buyers of HAVANA CLUB rum, there is no question the geographical universe was wrong, as Dr. Ford explained. (*Id.,* 425:17-426:11).

Pernod USA tries to shift the blame for McCullough's decision to select the wrong geographical universe onto Bacardi USA, which refused to represent that it will never expand the sales of HAVANA CLUB rum outside of Florida. (Pl. Br. at 29). The fact is, however, that this case began in August 2006 and the survey was conducted during the period between March 21 and April 1, 2008. (PTX 47). This was over a year and half after the Complaint was filed,[18] and Pernod USA had no basis for believing that any expansion of the Florida market was in the offing. Indeed, the sales territory of HAVANA CLUB rum today remains limited to Florida. (PTX 27, Tr. 269:18-20, 326:22-327:3). Pernod USA had the burden of designing a survey with a proper geographic universe based on the facts of the case, and it

---

[18]    Pernod USA filed its Complaint on August 15, 2006.

47

failed to do so either for its own convenience or its trepidations about what a Florida survey might show.

There was a simple solution here. Pernod USA should have conducted a statistically significant survey cell in Florida at representative malls across the state, including malls in Miami and Southern Florida where many Cuban-Americans and other Hispanics reside, and screened to ensure that both Spanish speakers and respondents who had actually tried rum in the past six months would be part of the survey along with those who planned to try rum. Then Pernod USA would have had a survey (if it were designed without the additional flaws discussed here) yielding statistically significant results with respect to the alleged deception in Florida.[19]

The universe McCullough selected was not representative of the relevant consumers in at least two other significant respects. First, Spanish speakers were systematically excluded from the survey even though Pernod USA's own research shows that the incidence of rum drinkers skews to Hispanics. (Tr. 427:24-428:22). As Professor Ford pointed out, a substantial portion of Florida residents are Hispanics who speak a language other than English at home; these individuals were systematically excluded from the survey, which was provided only in English. (*Id.* 461:25-462:5; DTX 86 ¶ 34). Second, the survey also failed to screen respondents to ensure that those included in the survey were rum purchasers. Professor Ford explained that screening for past and current purchasers is necessary because "it's more likely that they would have been aware that they had never purchased rum from Cuba in the United States" and "it gives you more assurance that the people are likely to purchase the product in the

---

[19]      Then, if Pernod USA wished to expand its survey beyond Florida, it could also have conducted additional survey cells in the rest of the nation to determine whether the results nationwide were comparable to the results in Florida.

RLF1-3421022-1

future." (Tr. 427:1-23). It is unusual to fail to include both past and current purchasers. Indeed,

Professor Ford observed that:

> I've done maybe 50 or so of my own surveys for litigation.
> I probably rebutted an equal number, and I have never seen
> a litigation survey which did not screen for past or current
> purchasers of the product.

(Id., 427:3-6).[20]   These problems further compounded the geographical error.   As Dr. Ford

pointed out, the failure to use a proper universe is a "fatal flaw" in the McCullough Survey,

which renders "the results of the survey not useful." (Id., 429:8-18).

Pernod USA tries to explain away McCullough's use of the wrong universe by

erroneously arguing that "McCullough's evidence that respondents in Jacksonville were at least

as likely to be misled or confused as respondents elsewhere." (Pl. Br. at 28).  The McCullough

Survey provided no reliable evidence as to what percentage of respondents in Jacksonville, let

alone Florida, were misled.  McCullough acknowledged that he "would never offer a survey with

that small a sampling [as just those surveyed in the mall in Jacksonville] and expect it to be

accepted by a Court." (Tr. 194:23-195:3).  In any event, the Jacksonville sample still suffered

from the other flaws in the overall sample—the language barrier and the actual purchaser issue.

(See pp 48-49, supra).  Pernod USA's argument that Cuban Americans in Florida were misled by

Bacardi's earlier use of HAVANA CLUB on rum in an earlier survey (PTX 67; Pl. Br. at 5) is

egregiously wrong.  That earlier survey on which Pernod USA seeks to rely is double or triple

hearsay that was not proffered in this case and utterly lacks the requisite proof required by Rule

702 to prove the survey was properly designed and conducted.  Indeed, the survey was so badly

flawed that it was not offered or accepted in evidence in the case in which it was originally

---

[20]   An earlier mall intercept survey McCullough designed on rum brands screened both for
past rum usage and accommodated Spanish speakers. (PTX 67).

conducted. Accordingly, it is inadmissible as proof of the respondents' purported impressions under both Federal Rule of Evidence 702 and Rule 802.

2.   McCullough's Control Was Faulty

A danger in any consumer perception survey is that respondents may bring into the interviewing room preconceived notions that might lead to answers that have nothing to do with the stimulus that they are shown.[21] McCullough admitted that a proper survey must be designed to include controls that take into account possible extraneous factors. (Tr. 216:23-217:2). McCullough also agreed that "if somebody thought [Bacardi USA's HAVANA CLUB] product came from Cuba, and it had nothing to do with the HAVANA CLUB name, then that would be an extraneous factor that would be irrelevant to the Court." (*Id.*, 217:3-7). He also concurred with the statement that if you do not control for an extraneous factor then your survey can present misleading results. (*Id.*, 217:20-23.). McCullough further acknowledged that the heritage statement on the back label of the HAVANA CLUB rum bottle was an extraneous factor with respect to the issue of whether "HAVANA CLUB" could mislead people into thinking the rum came from Havana or Cuba. (*Id.*, 218:5-11). Other extraneous factors identified by McCullough that might affect consumers' responses in this survey included the Cuban embargo and the other HAVANA CLUB rum made in Cuba and sold outside the United States by Pernod USA's affiliate. (*Id.*, 218:12-14, 219:17-22). To ensure that such external factors are not responsible for respondents' answers, a control is typically used. (*Id.*, 429:19-430:3).

Courts have found that McCullough has, in the past, used improper controls that biased his studies. *See Classic Foods Int'l Corp. v. Kettle Foods, Inc.,* No. SACV 04-725CJC (Ex), 2006 WL 5187497 (C.D. Cal. Mar. 2, 2006); *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.,*

---

[21]   The testimony and research introduced by Pernod USA, for instance, showed that consumers associate rum with the Caribbean as well as sun, surf, and a laid-back Caribbean life style. (Tr. 83:3-9, 87:12-19, 86:14-24; DTX 52; DTX 55).

258 F. Supp. 2d 1197 (D. Kan. 2003). For example, McCullough's survey in the *Kettle Foods* case sought to show that there was no likelihood of confusion between the marks KETTLE CLASSICS and KETTLE for potato chips by showing that the high level of confusion indicated in plaintiff's survey was attributable to external factors. To do this, McCullough used as a control a bag of KETTLE COOKED CLASSICS potato chips that displayed a trade dress quite similar to the trade dress on plaintiff's packaging for its KETTLE potato chips. However, the court observed, McCullough's control biased the study because the "yes" answers that Mr. McCullough characterized as "noise" could in fact be the result of actual consumer confusion between the "Kettle Cooked Classics" and "Kettle Chips" bags due to the similar appearance of the marks used on both bags and/or the absence of any other brand name on the bag. McCullough's control here also biased the study by understating the number of guesses and not controlling for obvious extraneous factors such as the Cuban embargo, the truthful Cuban heritage statements, and an awareness of the other HAVANA CLUB brand.

Moreover, the McCullough Survey was supposed to test whether the composite word trademark "HAVANA CLUB" miscommunicated Havana or Cuba as the origins of Bacardi USA's rum. A leading reference manual points out "that the brand set as a stimulus for the control group should share as many characteristics as possible with the brand being tested, [*i.e.,* HAVANA CLUB], with the key exception of the characteristic whose influence is being assessed." Shari Diamond, *Reference Guide on Survey Research,* in Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 229, 258 (2d ed. 2000). The control selected by McCullough was not for the composite trademark HAVANA CLUB. Instead, he dissected the mark and substituted the word "silver" (typically known as a color or type of rum) for "Havana," and used "SILVER CLUB" for the control. (Tr. 222:4-5: PTX 56). This dissection of the mark was

51

improper. *Cf. Universal City Studios v. Nintendo Co.*, 746 F.2d 112 (2d Cir. 1984). This control was inadequate because the HAVANA CLUB mark was intended to suggest a certain lifestyle, and SILVER CLUB does not do that. A much better control, as Ford testified, would have been a composite trademark incorporating a different Caribbean city like KINGSTON SELECT or MONTEGO BAY. (*Id.*, 430:10-23). McCullough, in fact, had used KINGSTON SELECT as the control in an earlier botched survey on HAVANA CLUB rum in a prior case. (PTX 67). The inadequate nature of the "SILVER CLUB" control robs the survey of any validity.

    3.    <u>McCullough's Survey Questions Were Ambiguous and Misleading</u>

        Survey questions are supposed to be clear and precise. The questions in the McCullough Survey, however, are both ambiguous and deliberately slanted. McCullough's design called for each interviewer to ask two filter questions (2a. and 3a.) and three open-ended questions (2b., 3b., and 3c.). The filters first direct the respondents' attention to the "rum" itself. (PTX 47, Ex. A). Then the respondent is asked:

> Q.2a. "Did the Rum you just looked at communicate to you *anything* about where the product *was* made?" (emphasis added)

(*Id.*) If the answer is "yes" the following probe is asked:

> Q.2b. "What did the Rum you just looked at communicate to you about where it *was* made?" (emphasis added)

(*Id.*).

        A much clearer and precise probe question would have been: "Where do you think the Rum I just showed you *is* made or don't you know?" The difference between the use of the present tense in the suggested probe and the use of the past tense in McCullough's probe is

telling.[22]                            **REDACTED**

Respondent #381 answered Q.2b.

precisely as it was posed, stating "Cuba circa is what it said."  (PTX 49).  Then the same

respondent, again correctly, responded to Q.3c.: "It says Puerto Rican rum on the front I guess

*it's* made there" (emphasis added).  (*Id.*)  McCullough wrongly classified respondent #381 as

"confused" (*id.*) and admitted he classified anyone who said "Havana" or "Havana Club" in

response to Q.2b., asking where the rum *was* made, as "misled" or "confused."  (Tr. 198:17-

201:1).   The problem McCullough ignores is that there is no way to tell whether those

respondents were, in fact misled, or, instead interpreted his ambiguous question and truthfully

answered that HAVANA CLUB rum was formerly made in Cuba.  Regardless of whether the

ambiguity was inadvertent or done deliberately to bias the outcome, these questions do not meet

the clear and unambiguous standard required by accepted survey principles.

In *Pharmacia,* the court criticized and gave limited weight to a survey conducted

by McCullough where respondents were repeatedly asked why they gave a particular answer,

and any response given to any of those repeated questions that could be deemed evidence of

dilution was recorded as such.  *Pharmacia,* 201 F. Supp. 2d at 362.  The same error is present

here in McCullough's design of a survey that scored seemingly any reference to "Havana" or

"Cuba" in answers to a series of questions as evidence of confusion.  The Court should disregard

the McCullough Survey.

Similarly, McCullough failed to control for the embargo by phrasing his

instructions to ensure that respondents were aware that the HAVANA CLUB product was

---

[22]      In addition, the lack of a "don't you know" option in McCullough's question may have
had suggestive effects.  (Tr. 435:5-22; PTX 86 ¶ 48).

53

purchased in the United States. In an earlier McCullough survey (PTX 67), respondents were told that the rum that was the subject of the survey had been recently purchased at a nearby liquor store before questions were asked. This alerted respondents who knew of the embargo that the rum was not made in Cuba and allowed them to respond accordingly. (Tr. 445:11:446:7). Here, no such control for the embargo was built into the instruction when respondents were first shown the rum product, and respondents may have assumed that the HAVANA CLUB product was purchased overseas, rather than being available for sale in the United States.

      4.     <u>McCullough Coded The Survey Incorrectly</u>

As demonstrated above, all the respondents that McCullough coded as "confused" were coded incorrectly—there is no evidence they were confused—indeed, many actually correctly answered that HAVANA CLUB is produced in Puerto Rico. In addition, Dr. Ford pointed to several specific respondents who were miscoded. Respondent 371 clearly answered that the rum is "made there in Puerto Rico," but was nonetheless counted as "confused." (PTX 86 ¶¶ 51-52). Likewise, Respondent 410's answers are at least arguably correct, as they can be read as stating that HAVANA CLUB is made and its ingredients come from Puerto Rico, but that respondent was nonetheless coded as "confused." (Tr. 446:11-447:4; PTX 86 ¶¶ 53-54). Similarly, Respondent 210 arguably explained that Puerto Rico was where the HAVANA CLUB rum was manufactured, but was deemed "confused" anyway. (Tr. 447:25-448:13; PTX 86 ¶¶ 55-56). Coding errors favoring his client are a familiar theme with McCullough. *See, e.g., Pharmacia,* 201 F. Supp. 2d at 362-363 (noting that miscoding of one response resulted in substantial difference in results of survey conducted by McCullough). These coding errors further undermine any claim that the McCullough Survey was reliable or objective, and indicate that it must be excluded.

5.      The Survey Flaws Are Major so the Results Are Meaningless

The totality of the design flaws are more than enough to warrant giving the McCullough Survey no weight.  Whatever very limited merits the McCullough Survey may have cannot compensate for the serious flaws.  As Dr. Ford pointed out, even one fatal flaw can destroy a survey despite whatever other merits it may have:

> [A] bad sample cannot be fixed by a good questionnaire or compensated for.  When a flaw is fatal, one fatal flaw is sufficient to render the results of the survey not useful.

(Tr. 429:8-18).  Here, as illustrated above, there were multiple major breakdowns in several key components of the survey's design and administration which prejudiced it in favor of Pernod USA.  Such a biased and improperly conducted survey is appropriately given no weight.

**G.      Bacardi USA Had No Obligation to Present Its Own Survey**

Pernod USA has not carried its burden of showing that the HAVANA CLUB brand as used on Bacardi USA's rum is geographically materially deceptive.  Instead, it attempts to divert the Court's focus by arguing that Bacardi USA's decision not to present a consumer survey of its own should be held against Bacardi USA and cites various cases in which a plaintiff failed to offer a consumer survey as support for this proposition.  (Pl. Br. at 24-25).  In essence, Pernod USA seeks to turn the burden of proof on its head, and force Bacardi USA to prove that the McCullough Survey is inadmissible by proffering its own consumer confusion survey.  This is contrary to well-settled case law establishing that the party seeking to offer expert testimony must "prove by a preponderance of the evidence that the testimony is reliable." *Eaton Corp. v. Parker-Hannifin Corp.*, 292 F. Supp. 2d 555, 567 (D. Del. 2003) (citing *In re Paoli*, 35 F.3d at 744).  It is not Bacardi USA's burden to come forward with a survey of its own demonstrating the flaws in the McCullough Survey, but rather Pernod USA's responsibility to show that its own

55

survey is reliable.   On the testimony and evidence presented at trial, Pernod USA has utterly

failed to do so.   Accordingly, McCullough's testimony must be disregarded.

## II.   Bacardi USA Has the Right to Truthfully Advertise the Cuban Heritage of HAVANA CLUB Rum

This is a most unusual case, as the two decades of prior litigation whirling about

"HAVANA CLUB" confirms.   There is no question that the HAVANA CLUB mark has a

history that traces back to Cuba.   Its adoption and use by JASA on rum produced in Cuba in or

about 1935 was plainly in good faith.   Bacardi shares JASA's Cuban heritage and acquired the

HAVANA CLUB mark in an arms-length transaction after being approached by the Arechabala

family at a time when the Pernod SA/Cuban joint venture was trying to wrest their rights to that

mark and its invaluable reputation and goodwill from the Arechabalas without compensating

them.

**REDACTED**

56

**REDACTED**       Since Pernod USA offered no witnesses, expert or otherwise, who

professed to know anything about rum or how rum was made, there was no testimony

establishing that these supposed minor inconsistencies, even if they existed, affected the final

HAVANA CLUB rum product in any discernable way, and the evidence is that they did not.


**REDACTED**


Planas's testimony is uncontroverted, as Pernod USA presented

no witness who knew anything about making rum generally, or who, in particular, had ever

tasted JASA's HAVANA CLUB rum.

On the record here, there is no basis to conclude that there are any substantial

differences between Bacardi USA's HAVANA CLUB and JASA's HAVANA CLUB rum.

Consequently, Bacardi USA's right to use that mark has not been called into question by Pernod

USA. *See, e.g., Coca-Cola Co. v. Koke Company of Am.*, 254 U.S. 143 (1920) (Coca-Cola's

removal of cocaine from the original formula did not affect Coca-Cola's rights in that

trademark); *Beech-Nut Packing Co. v. P. Lorillard Co.*, 299 F. 834, 849 (D.N.J. 1924) ("Change

of formula has never indicated abandonment."); *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683

F.Supp. 899, 908 (S.D.N.Y. 1988) ("inherent and identifiable character" of product must be

changed in order to lose trademark).  The U.S. Supreme Court nearly a century ago held in

RLF1-3421022-1

*Baglin v. Cusenier Co.*, 221 U.S. 580 (1911), and U.S. courts have held ever since, that in these circumstances Bacardi USA ought to be free to continue to sell HAVANA CLUB rum here.

In short, the Cuban heritage statements Bacardi USA has made about its HAVANA CLUB rum stand uncontroverted. Bacardi USA's right to make them is constitutionally protected. *See, e.g., U.S. v. United Foods, Inc.*, 533 U.S. 405, 426 (2001) (First Amendment's objective is "protection of the consumer's interest in the free flow of truthful commercial information."); *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 496 (1996) (rejecting ban on alcoholic beverage advertising because First Amendment "provides constitutional protection for the dissemination of accurate and nonmisleading commercial messages."); *Piazza's Seafood World, supra* at p. 35.

## CONCLUSION

For all of the foregoing reasons, Bacardi respectfully submits that the Court should find that Pernod USA has not met its burden of proof with respect to Count One of the Complaint and Judgment should enter in favor of Bacardi USA.

Of Counsel:
William R. Golden, Jr.
Mark S. Gregory
Matthew D. Marcotte
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
(212) 808-7800

Dated: August 3, 2009

William J. Wade (#704)
Anne Shea Gaza (#4093)
Richards, Layton & Finger, P.A.
wade@rlf.com
gaza@rlf.com
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
*Attorneys for Defendant*
*Bacardi U.S.A., Inc.*

RLF1-3421022-1

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2009, I caused to be served by **hand delivery and e-mail** the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Jack B. Blumenfeld, Esquire
Rodger D. Smith, II, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801

I hereby certify that on August 3, 2009, I caused the foregoing document to be sent via **e-mail** to the following non-registered participants:

Herbert F. Schwartz, Esquire
Vincent N. Palladino, Esquire
Pablo D. Hendler, Esquire
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036

Anne Shea Gaza (#4093)
gaza@rlf.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2009, I caused to be served by **hand delivery and e-mail** the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Jack B. Blumenfeld, Esquire
Rodger D. Smith, II, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801


I hereby certify that on August 10, 2009, I caused the foregoing document to be sent via **e-mail** to the following non-registered participants:

Herbert F. Schwartz, Esquire
Vincent N. Palladino, Esquire
Pablo D. Hendler, Esquire
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036


*/s/ Anne Shea Gaza*
Anne Shea Gaza (#4093)
gaza@rlf.com